1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9

10 EASTERN DISTRICT OF CALIFORNIA

11 RAYMOND ANTHONY LEWIS,                    Case No. 1:03-cv-06775-LJO-SAB

12             Petitioner,                   DEATH PENALTY CASE

13        v.                                 MEMORANDUM AND ORDER:

14 RON DAVIS, Warden of San Quentin State    (1) DENYING THE FIRST AMENDED
   Prison,                                   PETITION FOR WRIT OF HABEAS
15                                           CORPUS, CLAIMS 1-19, 21-33 ARE DENIED
              Respondent.[1]                 ON THE MERITS, CLAIM 20 IS DENIED
16                                           WITHOUT PREJUDICE AS PREMATURE;
                                             (2) DENYING PETITIONER'S MOTIONS
17                                           FOR EVIDENTIARY HEARING, RECORD
                                             EXPANSION, AND DISCOVERY, and (3)
18                                           ISSUING CERTIFICATE OF
                                             APPEALABILITY ONLY FOR CLAIMS 14,
19                                           15, 16, 17, and 18

20                                           (Doc. Nos. 58-1, 109, 115, 121)

21                                           CLERK TO VACATE ANY AND ALL
                                             SCHEDULED DATES AND SUBSTITUTE
22                                           RON DAVIS AS RESPONDENT WARDEN
                                             AND ENTER JUDGMENT
23

24

25        Petitioner, Raymond Anthony Lewis, is a state prisoner, sentenced to death, proceeding

26 with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in

27 ───────────────
   [1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, warden of San Quentin State Prison, is substituted as Respondent
28 in place of his predecessor wardens.

                                             1

this action by Joan Fisher and Brian Abbington of the Office of the Federal Defender.

Respondent, Ron Davis, is named as Warden of San Quentin State Prison. He is represented in this action by Jeffrey Firestone and Stephanie Mitchell of the Office of the California Attorney General.

Before the Court for decision are (1) a February 12, 2013 motion for evidentiary hearing (Doc. No. 109), (2) a February 12, 2013 motion to expand the record (Doc. No. 115), (3) a February 12, 2013 motion for discovery (Doc. No. 121), and (4) the first amended petition (Doc. No. 58-1) record based claims 1-33.[2]

Having carefully reviewed the parties' filings and the relevant case law and for the reasons set out below, the undersigned finds that: (i) claims 1-19 and 21-33 shall be denied on the merits and claim 20 shall be denied without prejudice as premature, (ii) Petitioner's motions for evidentiary development, record expansion, and evidentiary hearing shall be denied, (iii) the first amended petition for writ of habeas corpus shall be denied, and (iv) Certificate of Appealability shall issue only for claims 14, 15, 16, 17, and 18.

## I. BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a March 29, 1991 first amended judgment of death of the Superior Court of California, County of Fresno, in case number 389385-6 following his November 26, 1990 conviction by jury trial of the June 7, 1988 first degree murder and robbery of Sandra Simms (hereinafter "Simms") with findings that he personally used a deadly and dangerous weapon (i.e., a wooden object) and that he committed the murder while engaged in the commission or attempted commission of a robbery. Penal Code §§ 187, 211, 12022(b), and 190.2(a)(17)(i), respectively; *see* CT 1, 3-6, 323-27, 681-82, 742-44, 961, 1035-40F.[3]

---

[2] All references to the first amended petition are to Doc. No. 58-1.

[3] Unless otherwise noted: (i) reference to state law is to California law, (ii) "CT" refers to the clerk's transcript on appeal, (iii) "RT" refers to the reporter's transcript on appeal; (iv) "1SHCP" refers to the initial state habeas corpus petition, "2SHCP" refers to the second state habeas corpus petition, "3SHCP" refers to the third state habeas corpus petition, and (v) other transcripts are referenced by date. References to page numbering are to the page numbering in the original documents except that Bates numbering is used where available and ECF system numbering is used for electronically filed documents.

On June 7, 1988, Petitioner was arrested for the murder of Simms. On June 9, 1988, he was charged with her murder. (CT 1.)

A preliminary hearing was held September 22-23, 1988 (CT 24-321), whereupon Petitioner was held to answer (CT 322).

On October 11, 1988, the Fresno County District Attorney filed an information that charged Petitioner with: Count I - malice aforethought murder (§ 187) with allegations that he personally used a deadly and dangerous weapon (i.e., a wooden object) (Penal Code § 12022(b)) and that he committed the murder while engaged in committing and attempting to commit robbery (Penal Code § 190.2(a)(17)(i)), Count II - robbery (Penal Code § 211). (CT 325-27.)

The information alleged that Petitioner had four prior felony convictions, viz.: (i) murder committed in 1975 (Penal Code § 187), (ii) robbery committed in 1982 (Penal Code § 211), (iii) sale of PCP committed in 1980 (Health and Safety Code § 11379), and (iv) receiving stolen property committed in 1986 (Penal Code § 496.1). It also alleged that he had served prison terms (Penal Code § 667.5(b)). [4] (CT 325-27.) The murder conviction was subsequently stricken as Petitioner was then a juvenile. (CT 336-40.)

On October 31, 1989, the People filed a statement of aggravating evidence (Penal Code § 190.3), that listed as factors in aggravation: (i) the nature of the offenses charged, (ii) Petitioner's prior felony convictions, and (iii) his prior criminal activity that involved use of force. (CT 362-64.) Regarding the latter, the prosecution presented evidence of the stricken juvenile murder conviction relating to the burning death of one A. Z. Rogers (hereinafter "Rogers"), that was the subject of an evidentiary hearing at trial.

Petitioner's initial counsel, John Ambry, withdrew due to conflict and was replace by Steven Noxon. (CT 328, 330.) Noxon was relieved following Petitioner's Marsden motion

---

[4] The state court record, lodged electronically (*see* Doc. Nos. 14, 50, 69-1, 69-2, 75-1, 82) is variously referred to by Doc. No. followed by Roman numeral hyphenated by alphabetical lodging designation, (e.g., Doc. No. 14 at II-K), and by Doc. No. followed by exhibit designation, provided that Doc. No. 14 at I-C, which consists of various individual Reporter's Transcripts on Appeal, is referred to by date (e.g., the February 20, 1991 Reporter's Transcript is referred to as 2/20/91 RT).

and replaced by appointed trial co-counsel Neal Pedowitz (hereinafter "Pedowitz") and Katherine Hart (hereinafter "Hart"). (CT 345-54, 382-84.)

Petitioner plead not guilty to all counts. (CT 328.) He admitted the three remaining prior convictions and waived his right to trial by jury thereon. (CT 598; RT 7471-73.)

The trial began on October 24, 1990. (CT 526-27.) During the guilt phase, the defense presented medical records of prosecution eyewitness Paul Pridgon and argued he was not competent to testify; that he was mentally deficient and a drug user; and that he had been placed in psychiatric care on numerous occasions.[5] (CT 429-46.) Pridgon, in the face of a defense motion that he be subjected to a psychiatric examination (CT 457; *see also* September 12, 1990 RT 44-45) voluntarily submitted to psychiatric examination (RT 4448-50).

On November 26, 1990, following 6 days of deliberation, the jury returned their guilty verdict and found the "robbery" special circumstance to be true. (CT 595-97; 681-82; RT 7444-52.) The jury also found Petitioner guilty of robbery. (CT 682.)

The penalty phase trial began on December 3, 1990 and lasted approximately 11 days. (CT 695-744.) As noted, the prosecution presented in aggravation the circumstances of the capital crime, Petitioner's prior convictions, and his prior criminal activity involving the use of force. (CT 362-64.) On December 18, 1990, following four days of deliberations, the jury returned a verdict of death. (CT 737-44, 961; RT 8962-65.)

On February 6, 1991, Petitioner filed a motion for new trial and for automatic modification of the death sentence (CT 968-86). The trial court denied the motions on February 20, 1991. (CT 1005-16; 2/20/91 RT 33-53.) On March 6, 1991, following further arguments concerning factors in mitigation (3/6/91 RT 79-87), that court denied a motion to reconsider its ruling on whether to modify the death sentence (CT 1020; 3/6/91 RT 87-88).

On February 14, 1991, Petitioner filed motions seeking modification of the verdict pursuant to Penal Code section 190.4(e), and seeking a hearing on alleged juror misconduct pursuant to *People v. Hedgecock*, 51 Cal. 3d 395 (1990). (CT 990-1004.) Regarding the latter,

---

[5] The record reflects an alternative spelling of the witness's name as Paul Pridgeon.

Petitioner alleged that jury foreman Paul W. convinced juror Sally B. to vote for death by stating that Petitioner had accepted Jesus Christ and would thus have everlasting life. (CT 990-1004; RT 7431.)

On February 20, 1991, following argument, the trial court denied modification of the verdict, and found the offer of proof in support of jury misconduct inadmissible under California Evidence Code section 1150 and irrelevant. (CT 1005; 2/20/91 RT 4, 8-33; *see* 2/20/91 RT 53-54.) That court also denied Petitioner's request to call witnesses and denied his request for a hearing. (CT 1005; 2/20/91 RT 4, 8-33; *see* 2/20/91 RT 53-54.)

On February 25, 1991, the state court of appeal summarily denied Petitioner's request for writ of mandate seeking to reverse the order denying the motion for hearing on jury misconduct. (CT 1017.) On March 5, 1991, the California Supreme Court denied Petitioner's application for stay and petition for review of same. (CT 1019.) Petitioner renewed the motion in the trial court on March 6, 1991 and it was again denied. (CT 1020; 3/6/91 RT 65-68.)

On March 29, 1991, an amended judgment of death was entered. (CT 1040A-1040F.)

On April 22, 1998 Petitioner, through appointed counsel Thomas Kallay, filed his direct appeal. *People v. Lewis*, Sup. Ct. No. S020032.

On November 24, 1999, Petitioner filed his first state petition for writ of habeas corpus in the California Supreme Court. *In re Raymond Anthony Lewis*, Cal. Sup. Ct. No. S083842.

On August 2, 2001, the California Supreme Court affirmed the judgment and sentence on direct appeal. *People v. Lewis*, 26 Cal. 4th 334 (2001). On September 19, 2001, that court denied petition for rehearing. *People v. Lewis*, S020032.

The petition for writ of certiorari to the United States Supreme Court filed December 18, 2001, *Lewis v. California*, Case No. 01-7693, was denied on April 22, 2002, 535 U.S. 1019 (2002).

On October 15, 2003, the California Supreme Court summarily denied on the merits all claims in Petitioner's first habeas petition, and found certain claims procedurally barred. *Lewis*

*on Habeas Corpus*, Case No. S083842.

Petitioner initiated this proceeding on December 9, 2003. (Doc. Nos. 1, 2.)

On March 30, 2004, the Office of the Federal Defender and CJA counsel Kevin Little were appointed to represent Petitioner in this proceeding. (Doc. No. 6.)

On February 4, 2005, Petitioner filed his first federal petition for writ of habeas corpus. (Doc. No. 42.) Petitioner, on that same day filed his second state petition for writ of habeas corpus. *In re Raymond Anthony Lewis*, Case No. S131322. (Doc. No. 50).

On October 12, 2006, the Court ordered this proceeding stayed pending state exhaustion. (Doc. No. 54.)

On June 29, 2007, Lewis filed his third petition for writ of habeas corpus in the California Supreme Court. *In re Raymond Anthony Lewis*, Case No. S154015. (Doc. No. 75-1.)

On February 20, 2008, Petitioner lodged in this proceeding a first amended petition for writ of habeas corpus (Doc. No. 58-1), that was ordered filed as of July 21, 2010. (Doc. No. 54 at 23; *see also* Doc. No. 70 at 1.)

On August 29, 2008, attorney Little withdrew. (Doc. No. 64.)

On July 21, 2010, the California Supreme Court summarily denied the second and third state habeas petitions, denying all claims on the merits as well as finding certain claims procedurally barred. *In re Lewis,* Case Nos. S131322 & S154015, (*see* Doc. Nos. 69-1 at 1, 69-2 at 1, respectively). On that same date, Petitioner's amended federal petition, lodged on February 20, 2008 (Doc. No. 58-1), was deemed filed nunc pro tunc pursuant to this Court's October 10, 2006, order (Doc. No. 54), and is the operative pleading.

On November 10, 2010, the Court found that all claims 1-33 in the amended petition were exhausted, (Doc. No. 74 at 1), and made effective the parties' stipulation, (Doc. No. 73 at 2), that the instant petition was timely under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

Respondent filed an answer to the amended petition on January 31, 2011, admitting

Petitioner's jurisdictional allegations, generally denying Petitioner's procedural allegations, asserting procedural defenses, and denying claims 1 through 33 including all subclaims. (Doc. No. 76.)

On October 25, 2011, Petitioner filed his opening merits brief. (Doc. No. 89.)

On June 4, 2012, Respondent filed his merits brief in opposition to the opening brief. (Doc. No. 98.)

On October 30, 2012, Petitioner filed his merits brief in reply to the opposition. (Doc. No. 105.)

On February 12, 2013, Petitioner requested an evidentiary hearing, (Doc. Nos. 109-114), with respect to claims 1 and 3 (Paul Pridgon's testimonial incompetency); claims 14, 15, 16 and 19 (ineffective assistance at penalty phase regarding mitigating evidence); claim 24 (prosecutorial misconduct regarding Paul Pridgon's testimony); claim 27 (ineffective assistance regarding plea negotiations); claims 17 and 18 (ineffective assistance at the penalty phase regarding death of Rogers); claim 29 (counsel conflict of interest); claim 12 (juror misconduct); and claim 26 (bad faith destruction of material evidence).

Contemporaneously, Petitioner requested expansion of the record to include exhibits 1 through 26 attached to the above motion for evidentiary hearing as well as exhibits 100 through 117 attached to the motion to expand the record.[6] (Doc. Nos. 115-120.)

Petitioner also requested discovery of information possessed by the state relating to competency of witness Paul Pridgon and alleged undisclosed promises in exchange for his testimony; the circumstances surrounding the death of Rogers and whether the evidence was sufficient for the jury to conclude Petitioner murdered Rogers; the circumstances surrounding Petitioner's relationship with Willis Randolph and charges levied in the Rogers's homicide; and the physical evidence collected in the investigation and prosecution of Petitioner in the Simms's homicide. (Doc. No. 121.)

On June 12, 2013, Respondent filed opposition to Petitioner's motion for evidentiary

---

[6] Petitioner acknowledges that Exhibits 100-117 were originally filed in other cases and were not before the state court. *See* Doc. No. 115 at 1 n.1.

hearing (Doc. No. 129), motion to expand the record (Doc. No. 130), and motion for discovery (Doc. No. 131).

On September 24, 2013, Petitioner filed his respective replies. (Doc. Nos. 137-139.)

No date has been set for Petitioner's execution.

## II. STATEMENT OF FACTS

This factual summary is taken from the California Supreme Court's summary of the facts in its August 2, 2001 opinion. Pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1), the California Supreme Court's summary of facts is presumed correct. Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the California Supreme Court. *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

### A. Guilt Phase

#### 1. Prosecution Evidence

The prosecution's main witness, Paul Pridgon, testified that he saw defendant repeatedly beat Sandra Simms with a two-by-four wooden board, strangle her, and take money from her person.

On June 6, 1988, the night of the murder, Simms, defendant, and his girlfriend, Michelle Boggs, smoked cocaine at defendant's boardinghouse. Defendant had met Simms approximately a month before, through Boggs. Later that night, Simms gave defendant money to buy more drugs. On his way to buy the drugs, defendant met Paul Pridgon for the first time. Pridgon took him to a drug dealer.

Afterwards, Pridgon took defendant to his apartment, which Pridgon shared with several individuals, where they smoked more drugs. Concerned that defendant may have run off with her money, Simms and Boggs went to look for him. When they found defendant and Pridgon, Simms repeatedly asked where her money was. Defendant said that he would get it, and left with Pridgon. When defendant and Pridgon later arrived at defendant's boardinghouse where Simms and Boggs were waiting, defendant pulled Simms aside and told her that he could buy $100 worth of crack cocaine for $30.

Defendant, Simms, and Pridgon went to buy the crack. Pridgon testified that earlier that evening, defendant had said he was going to knock down a prostitute who he knew had money. Defendant asked Pridgon if he was "down for taking the money." Pridgon answered "yeah," without understanding what defendant had said. When defendant repeated his plan, Pridgon stated, "No. I don't do that kind of stuff." Defendant replied, "Well, I['ll] do it my damn self."

The trio walked down an alley toward Pridgon's apartment. Defendant grabbed

a two-by-four wooden board that he said he would use to hit dogs. As they got close to Pridgon's apartment, defendant swung the two-by-four like a baseball bat at Simms's head. Simms, who was looking in another direction, fell down after the first blow. Defendant struck Simms with the two-by-four approximately six more times. Getting on top of Simms, defendant straddled her waist with his legs, grabbed her throat with his hands, and strangled her. He then ripped her blouse and took money out of her bra.

Defendant threatened Pridgon that he would kill him if he said anything. The two began walking. Defendant gave Pridgon a stainless-steel butter knife, which Pridgon threw into a trash can nearby. As they walked onto a main street, defendant threw the two-by-four into a backyard.

After the crime, defendant and Pridgon went back to Pridgon's apartment to smoke drugs that they had just purchased. Pridgon did not tell anyone at his apartment about the murder. Defendant, Pridgon, and Betty Thomas, who lived with Pridgon, left together to get more drugs. As they passed the alley where Simms's body lay, a man told them, "Don't go through the alley because this Black guy done killed a woman."

When Pridgon came back to his apartment, he told Lorene Allen, who was Thomas's mother and also lived with Pridgon, that defendant killed Simms. Allen did not believe him and said he was lying. Although Pridgon wanted to tell the police about the murder, Allen told him, "Don't do that, because you will get yourself in big trouble you can't get out of."

A man driving in the alley first discovered Simms's body. When a Fresno police officer arrived, he found Simms lying dead on her back. There was a pool of blood by her head, along with blood splatters spreading as far as 7 feet 10 inches away from her head. The left side of her face contained a large cut, and her neck had several razor-like cuts. A wood splinter was found in Simms's hair and a small clump of her hair was found by her right side. Simms's blouse was splattered with blood and partially open, with the two top buttons ripped off. Her lace bra contained a $20 bill. Simms's purse contained a check stub from Carl's Jr., a fast-food restaurant where Simms had worked. Employee and bank records showed Simms had cashed her $167.62 paycheck, which she had received the day she was killed.

The morning after the murder, Pridgon told police that defendant had killed Simms. Pridgon led a detective to the following items: the butter knife; the 18 to 24-inch-long two-by-four; and the woodpile from which defendant had picked up the two-by-four. The recovered two-by-four, which was chipped on one end, contained traces of human blood. The wood splinter found in Simms's hair fit the chipped end of the two-by-four. Criminologists, however, could not develop usable fingerprints from either the two-by-four or the butter knife, and could not assign a specific phosphoglucomutase (PGM) enzyme to the blood found on the two-by-four.

Defendant was arrested at his boardinghouse. Before being taken to police headquarters, defendant, who was barefoot, asked to put on some shoes. Detective Sanchez, who arrested defendant, stated defendant pointed to a pair of size 10 ladies' white Converse tennis shoes, which Detective Sanchez handed to defendant to put on. Defendant, who was wearing blue sweatpants, also asked for a green jacket hanging on his bed.

Tests on the right tennis shoe revealed the shoe contained human blood with a PGM type of two-plus, two-minus, which matched Simms's blood and that of approximately 2 percent of the population. However, the criminologist could not determine conclusively the source of the blood. Defendant's sweatpants and jacket also had traces of blood, but criminologists could not determine if the blood was human blood.

The pathologist confirmed that Simms's injuries were consistent with her being struck by a wooden object, like a two-by-four. He testified that Simms's head and face were struck approximately four to six times. He found multiple injuries only on Simms's face, head, and neck, which included injuries consistent with strangulation. He opined that Simms had been standing when she was first struck on the left side of her jawbone, fracturing her jawbone and rendering her unconscious. She sustained basal skull fractures when she fell to the ground and hit the right side of her head. Simms was alive but unconscious when she was strangled because there were no signs of resistance or struggle. The pathologist determined that strangulation was the main cause of death, with cerebral contusions from the basal skull fractures as a second or contributing cause.

2.     Defense Evidence

As his main defense, defendant attacked Pridgon's credibility, and presented evidence suggesting that Pridgon was to some extent involved in the crimes.

Defendant testified on his own behalf. He denied killing or hurting Simms, who was like a mother to him and even called him "son." He further denied being "hooked on" cocaine the night of the killing or needing any money. He last saw Simms when she, defendant, and Pridgon left defendant's boardinghouse for Pridgon's apartment because defendant wanted to pursue a woman who lived with Pridgon. As the three reached Pridgon's apartment, a Black man in a white Cadillac drove up and began talking to Simms. Simms got in the car and told defendant, "Mommy be right back," and said that she would return in 20 to 25 minutes. Simms and the man drove down the alley. When defendant and Pridgon went inside Pridgon's apartment, defendant noted the time was 11:50 p.m.

Defendant attacked the credibility of Pridgon, who was 23 years old at the time of trial. Through expert witnesses, defendant presented evidence that Pridgon suffered from mental disorders, mild mental retardation, and substance abuse. Experts testified that Pridgon's capacity to perceive and recollect Simms's killing was impaired, and that he made up information to fill in gaps in his memory. Defendant claimed that Pridgon imagined that defendant strangled Simms after listening to the pathologist's testimony. Defendant also argued Pridgon suffered from hallucinations, as evidenced from Pridgon's testimony that he heard blood flow from Simms's head, and heard defendant take money from Simms's bra. To further impeach Pridgon's credibility, defendant presented evidence of Pridgon's felony conviction for burglary and his conviction for being under the influence of cocaine. Two investigators who had dealt with Pridgon before believed him to be dishonest and untrustworthy. Based on numerous inconsistencies between Pridgon's testimony at trial and at the preliminary hearing, defendant moved to strike Pridgon's entire testimony. The trial court denied the motion.

Defendant also attacked the source and weight of the physical evidence. First, defendant testified that at the time of his arrest, Detective Sanchez-and not

defendant-picked out the tennis shoes, green jacket, and blue sweatpants for defendant to wear. Defendant claims he was wearing other clothes and shoes at the time. At trial, defendant maintained the tennis shoes and green jacket did not fit him, and did not belong to him. Instead, defendant testified he saw Pridgon wearing the jacket and remembered Pridgon wearing the tennis shoes on the night of the murder.

Defendant also presented testimony from a shoe store owner who opined the bloody tennis shoes fit Pridgon better than they fit defendant. Witnesses testified that Pridgon had a habit of carrying sticks, and was known as "Crazy Paul" in the neighborhood. Based on the foregoing, defendant argued that Pridgon was to some extent involved in the crimes, i.e., Pridgon either killed Simms himself, assisted in the particular crimes, or watched or was present as someone other than defendant killed Simms.

### B.     Penalty Phase

#### 1.     Prosecution Evidence

As factors in aggravation, the prosecution introduced evidence that defendant, when he was 13 years old, had participated in the 1975 murder of A. Z. Rogers. Defendant and his two friends poured gasoline into Rogers's car, where he was sleeping, and then threw a lit match. Rogers died from smoke inhalation and second and third degree burns covering 95 percent of his body.

The prosecution also introduced evidence that defendant had been involved in the 1982 residential burglary and robbery of 81-year-old Mariana Cardoza, the 1986 residential burglary and attack upon Norman Logan, and the 1986 residential burglary and attack upon Steven Ohler. While in jail in 1986, defendant punched, kicked, and threatened a fellow inmate with a shank, a jail-made weapon. In 1989, defendant created a jail disturbance by starting a fire, and attempted to stab an officer with a shank. The prosecution also showed that defendant was involved in a number of purse snatchings in April 1986. n.2

----------------------FOOTNOTE-----------------------

n.2 Ruling on defendant's automatic application for modification of the death verdict, the trial court gave little weight to the Norman Logan, Steven Ohler, and inmate assaults, and to the purse snatchings.

--------------------END FOOTNOTE--------------------

The prosecution introduced evidence of defendant's prior convictions for robbery (Pen. Code, § 211), receiving stolen property (*id.* § 496), and two counts of transporting, selling, and furnishing phencyclidine (PCP). (Health & Safety. Code, § 11379.)

#### 2.     Defense Evidence

As factors in mitigation, defendant presented expert testimony from Dr. Callahan, a psychiatrist, that, given defendant's prior convictions and violent past, he suffered from an antisocial personality disorder. Based on his review of

defendant's prior medical records, Dr. Callahan concluded that previous doctors examining defendant in 1975 had diagnosed him with paranoid schizophrenia with episodic violent behavior, impaired judgment, and borderline intelligence. Those doctors concluded that defendant should be placed in a psychiatric facility where he would receive antipsychotic medication and other drugs; however, this did not occur. Although defendant took the major tranquilizer Mellaril while he was in the California Youth Authority (CYA), he had not taken any medication from January 1, 1990, through the time of the penalty phase. Dr. Callahan concluded that defendant lived in a very unstructured and unsupervised environment, which in part may have accounted for defendant's criminal conduct. Dr. Callahan opined that a structured environment and medication would help prevent defendant from acting out violently. Dr. Callahan noted that antisocial personality disorder tends to diminish in adulthood. Defendant told Dr. Callahan that he wished to pursue an education in prison.

An expert witness, psychologist Dr. Adams, interviewed defendant a week before defendant testified. Dr. Adams concluded that defendant met the criteria for antisocial personality disorder given his criminal history, his incarceration for most of his life since he was 14 years old, and his inability to establish long-term relationships. Dr. Adams opined defendant's lack of a male role model adversely affected his character and personality development.

Odell Rogers, the brother of A. Z. Rogers and the boyfriend of defendant's mother, testified that he had warned Rogers about carrying gas in his car because he smoked and used matches. Odell Rogers was not afraid of defendant.

Defendant also introduced character evidence, which included the following testimonies: Minnie Lewis, defendant's mother, testified defendant wrote to her every week and told her if he was not executed he wanted to be a counselor to tell kids to stay off drugs and off the streets. She said she loved her son and would be extremely distraught if he were executed. Sandra McCullar, defendant's sister, testified that she spoke to defendant every week in jail, and believed that defendant had changed; that he talked about God and quoted from the Bible, and told McCullar to stay in school and not use drugs, and his younger half-brother to stay in school; and that she would miss defendant very much if he were executed. Cathy Jackson, defendant's cousin, testified defendant offered advice to young people to stay off drugs and out of trouble. She said she would miss him if he were executed.

Defendant also presented testimony regarding his behavior while incarcerated. Dana Crittenden, who worked for the Fresno County Sheriff's Department, testified that defendant always treated her with respect and even intervened when another inmate at court gave her problems. Richard Caldie, a correctional officer for Fresno County, testified defendant never treated him with disrespect or tried to attack him. Marvis Williams, who worked for the Fresno County jail, testified that she knew defendant for a year, he never gave her any problems, that he always treated her with respect, and that she liked him.

Finally, defendant presented the testimony of Richard Phillips, who then had been an inmate for over 20 years, and had spent more than the last nine and one-half years on death row. Phillips testified that there was much need for counselors for other inmates in prison, and that defendant could eventually become a counselor after a rigorous training and screening process.

12

1 *Lewis*, 26 Cal. 4th, at 346-52.

## III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2241(d), 2254(a).

This action was initiated on December 9, 2003. Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of AEDPA apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *see also Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016).

## IV. STANDARDS OF REVIEW

### A.  Habeas Corpus

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

"[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." *Brown v.*

1  *Walker*, Case No. C 09-04663 JSW, 2014 WL 4757804, at *5 (N.D. Cal. Sept. 24, 2014)

2  (citing *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004)).

3       As a threshold matter, this Court must "first decide what constitutes 'clearly established

4  Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at

5  71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law,"

6  this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

7  decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "In

8  other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal

9  principle or principles set forth by the Supreme Court at the time the state court renders its

10  decision." *Id.* In addition, the Supreme Court decision must "'squarely address [] the issue in

11  th[e] case'; otherwise, there is no clearly established Federal law for purposes of review under

12  AEDPA." *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (quoting *Wright v. Van Patten*,

13  552 U.S. 120, 125 (2008)); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Carey v.*

14  *Musladin*, 549 U.S. 70, 77 (2006).

15       If no clearly established Federal law exists, the inquiry is at an end and the Court must

16  defer to the state court's decision. *Musladin*, 549 U.S. at 77; *Wright*, 552 U.S. at 126; *Moses*,

17  555 F.3d, at 760. In addition, the Supreme Court has clarified that habeas relief is unavailable

18  in instances where a state court arguably refuses to extend a governing legal principle to a

19  context in which the principle should have controlled. *White v. Woodall*, 572 U.S. 415, 426

20  (2014). The Supreme Court stated: "'[I]f a habeas court must extend a rationale before it can

21  apply to the facts at hand,' then by definition the rationale was not 'clearly established at the

22  time of the state-court decision.'" *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666

23  (2004)).

24       If the Court determines there is governing, clearly established Federal law, the Court

25  must then consider whether the state court's decision was "contrary to, or involved an

26  unreasonable application of, [the] clearly established Federal law." *Lockyer*, 538 U.S. at 72

27  (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may

28

grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13; *see also Lockyer*, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (quoting *Webster's Third New International Dictionary* (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, (citing *Yarborough*, 541 U.S. at 664). The Supreme Court stated:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 786-87. In other words, so long as fair-minded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. *Id.* at 784. In applying this standard, "a habeas court must determine what arguments or theories supported . . . or could have supported the state court's decision; and then it must ask whether it is possible

15

fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 786. This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012). If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

 Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and "evidence introduced in federal court has no bearing on 2254(d)(1) review." *Id.* at 185. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), (citing 28 U.S.C. § 2254(e)(1)). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. *Townsend v. Sain*, 372 U.S. 293, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superseded by statute as stated in Williams*, 529 U.S. at 433-34.

If a Petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. *See Panetti*, 551 U.S. at 953 (when § 2254(d) is satisfied, "a federal court must then resolve the claim without the deference AEDPA otherwise requires."); *see also Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (same).

16

In this case, some of Petitioner's claims and allegations were raised and rejected by the California Supreme Court on direct appeal while others were raised in his state habeas petitions to that court and summarily denied on the merits.

In the latter case of summary denial, where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. The Supreme Court stated that "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 101-03. Petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98). "Crucially, this is not a de novo review of the constitutional question," *id.*, as "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id. (*quoting *Richter*, 562 U.S. at 102); *see also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir. 2014).

When reviewing the California Supreme Court's summary denial of a petition, this Court must consider that the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that:

> [T]he claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief. It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial ... to assess the merits of the petitioner's claims.

*Pinholster*, 563 U.S. 181 n.12 (quoting *In re Clark*, 5 Cal. 4th, 750, 770 (1993), *superseded by statute as stated in Briggs v. Brown*, 3 Cal. 5th 808, 841, 845, 848 (2017)); *see also Johnson v. Williams*, 568 U.S. 289, 300 (2013) (holding that even where the state court does not separately discuss a federal claim there is a presumption that that state court adjudicated the federal claim on the merits).

> [A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *accord Mann v. Ryan*, 828 F.3d 1143, 1153 (9th Cir. 2016) [Citation].

*Navarro v. Holland*, 698 F. App'x 541, 542 (9th Cir. 2017).

If this Court finds Petitioner has clearly made out a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. *Nunes v. Mueller*, 350 F.3d 1045, 1054 (9th Cir. 2003).

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim de novo without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 563 U.S. 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d, at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is de novo).

## V. PROCEDURAL BARS

As noted, certain of Petitioner's claims were alternatively denied by the California Supreme Court as procedurally barred. As to those claims, Respondent has invoked the independent state ground doctrine, pursuant to which a federal court will not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Vang v. Nevada*, 329 F.3d 1069, 1072 (9th Cir. 2003) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Since "cause and prejudice" can excuse a procedurally defaulted claim, *Smith v.*

18

*Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (quoting *Coleman*, 501 U.S. at 750), and "prejudice" essentially requires a merits analysis, the Court will proceed to the merits of claims found to be procedurally defaulted without determining whether the state procedural default is adequate and independent to bar relief in federal court. *Id.* (quoting *Coleman*, 501 U.S. 732-35).

A district court may exercise discretion to proceed to the merits in advance of litigation of procedural default. *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach the merits if on their face the allegations are clearly not meritorious despite asserted procedural bar); *see also Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (an application for habeas corpus may be denied on the merits even if unexhausted in state court); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) (relief may be denied on the merits where petition is clearly not meritorious despite asserted procedural bar).

## VI. PRELIMINARY MATTERS

The Court takes judicial notice of the certified record on appeal to the California Supreme Court, all documents on file in the California Supreme Court in the case of *People v. Lewis*, Fresno County Superior Court Case No. 389385-6), and all declarations, witness statements, and records filed on Petitioner's behalf in his state habeas corpus proceedings before the California Supreme Court, *In re Raymond Anthony Lewis,* S083842; S131322; S154015.

## VII. REVIEW OF CLAIMS

### A. Claims Relating to Juror Selection and Misconduct

1. Claim 11

Plaintiff alleges the trial court improperly excused prospective juror Lloyd G. for-cause due to bias against the death penalty, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 72-73; *see also* Doc. No. 89 at 228-38.)

#### a. Legal Standards

##### i. *Jury Selection*

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961); *see also Skilling v. U.S.*, 561 U.S. 358, 377-78 (2010).

The defendant must be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court."). A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced. *Fields v. Woodford*, 309 F.3d 1095, 1103 (9th Cir. 2002), (*amended*, 315 F.3d 1062 (9th Cir. 2002)); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (same).

In a capital case, "a prospective juror may be excluded for-cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *see also Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (general objections to death penalty or expressed conscientious or religious scruples against its infliction not sufficient basis to exclude potential juror for-cause); *Uttecht v. Brown*, 551 U.S. 1, 9, (2007) (a juror who is not substantially impaired in his or her ability to impose the death penalty under the state-law framework cannot be excused for-cause); Civ. Proc. Code section 229(h) (providing that "a challenge for implied bias may be taken . . . [i]f the offense charged is punishable with death, the entertaining of such conscientious opinions as would preclude the juror finding the defendant guilty; in which case the juror may neither be permitted nor compelled to serve.").

"[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for-cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for-cause. *Id.* at 733; *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

A finding of substantial impairment may be upheld even in the absence of statements from the juror that he suffered from such an impairment. *Uttecht*, 551 U.S. at 7. This Court must give deference to the trial court's determination on this issue, even if no specific analysis was conducted by the trial court and such an excusal constitutes an implicit finding of bias. *Id.* This deference exists because, as with other issues in the trial context, the trial judge is in the best position to make determinations as to demeanor and credibility. *Id.* The inquiry on review is whether the finding is fairly supported by the record. *Hendricks v. Vasquez,* 974 F.2d 1099, 1103 (9th Cir. 1992); *see also Rice* v. *Collins*, 546 U. S. 333, 341–342 (2006) (even if "reasonable minds reviewing the record might disagree about" the evidence, "on habeas review that does not suffice to supersede the [state] court's credibility determination.").

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan*, 504 U.S. at 729. "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion'." *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). "[T]he trial court retains great latitude in deciding what questions should be asked on voir dire." *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991). No hard-and-fast formula dictates the necessary depth or breadth of voir dire, *see United States v. Wood*, 299 U.S. 123, 145–146 (1936), and "the Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan*, 504 U.S. at 729. A trial court's failure to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 426.

An erroneous *Witherspoon-Witt* exclusion during jury selection is not subject to harmless error analysis. *Gray v. Mississippi*, 481 U.S. 648, 665 (1987) (the nature of the jury selection process defies any attempt to establish that an erroneous *Witherspoon-Witt* exclusion of a juror is harmless).

### b. State Court Direct and Collateral Review

Certain of these allegations were raised on direct appeal (Doc. No. 14 at I-E Vol. Four,

Arg. IX at 1-11), and denied on the merits, *Lewis*, 26 Cal. 4th, at 352-53.

Petitioner then fully presented that claim in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 43-45), which was summarily denied on the merits as to all claims (Doc. No. 69-2 at 1), and denied on procedural grounds as to certain claims (*id.*).

### c.     Analysis

Petitioner argues the for-cause dismissal of prospective juror Lloyd G. was contrary to *Witherspoon-Witt* because Lloyd G. voiced only non-disqualifying general reservations about the death penalty.  (RT 1387-90.)

Petitioner concedes that Lloyd G. stated his express and strong bias against the death penalty (RT 1368-87), but argues that he did so equivocally by stating that he was "not totally opposed" to it (RT 1368) and remained able to apply the law and potentially vote for the death penalty in this case (RT 1368-86).  He notes that Lloyd G. stated unequivocally that he could set aside his personal views and follow the law as explained to him.  (*Id.*)  Based thereon, Petitioner argues there was not a sufficient basis to find Lloyd G.'s express bias would have prevented or substantially impaired the performance of his duties.  *Brown*, 551 U.S. at 9; *see also United States v. Jackson*, 549 F.3d 963, 973 (2008) ("[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for-cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. . . .").

Petitioner also complains the trial court failed to make any findings pursuant to *Witherspoon-Witt* when it dismissed Lloyd G.; that the trial court stated only:

> The instruction on the death penalty leaves it up to the juror. He has already said, if it's up to me, I won't vote for a death penalty. I'll vote for life without parole. That's what he said.

(Doc. No. 89 at 231 citing RT 1388.)

The California Supreme Court rejected this claim on direct appeal, stating that:

> Defendant argues that the trial court improperly excused Prospective Juror

22

Lloyd G. based on his views against the death penalty. On his jury questionnaire and several times during voir dire, Lloyd G. specifically stated that he was biased against the death penalty, and that he saw no need for this type of punishment in society. However, defendant contends the prospective juror stated that he could apply the law according to the court's instructions. Thus, defendant claims the trial court violated his right to a fair and impartial jury under both the state and federal Constitutions by excusing Lloyd G. For reasons that follow, we disagree.

[I]n a capital case, a prospective juror may be excluded if the juror's views on capital punishment would 'prevent or substantially impair' the performance of the juror's duties. [Citations.] A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. [Citation.] [Citation.] (*People v. Jenkins* (2000) 22 Cal. 4th 900, 987 [95 Cal. Rptr. 2d 377, 997 P.2d 1044].) If the prospective juror's responses to voir dire questions are conflicting or equivocal, the trial court's determination of the juror's true state of mind is binding upon the reviewing court. [Citations.] (*People v. Bradford* (1997) 15 Cal. 4th 1229, 1319 [65 Cal. Rptr. 2d 145, 939 P.2d 259].)

We find no error. Lloyd G. stated that the prosecution would have to convince him of the need for capital punishment-not only under the particular facts of this case, but also as a general proposition-before he would vote to impose it. He thus possessed a bias against the death penalty which prevent[ed] or substantially impair[ed] his ability to perform his duty as a juror. (*People v. Jenkins*, *supra*, 22 Cal. 4th at p. 987.) Defendant points out, however, that Lloyd G. said he was not totally opposed to the death penalty, and that he could possibly change his mind about voting for life imprisonment rather than death. Despite his bias against capital punishment, the juror stated he could apply the law according to the court's instructions. At the very least, however, Lloyd G.'s responses were conflicting or equivocal. (*People v. Bradford*, *supra*, 15 Cal. 4th at p. 1319.) Accordingly, we are bound by the trial court's determination of Lloyd G.'s state of mind. (*Ibid.*)

*Lewis*, 26 Cal. 4th, at 352-53.

### i. Disqualifying Bias

The California Supreme Court was not unreasonable in rejecting the claim. The record reflects that prospective juror Lloyd G. was initially equivocal as to how his stated bias against the death penalty might impact his duties as a juror. He stated that his bias was not such that in every case and regardless of the evidence he would vote against a capital conviction, special circumstance and the death penalty. (RT 1367-70.) He stated that he could consider the prosecution evidence (RT 1372-75) even though in his mind, "the jury was still out on the death penalty[.]" (RT 1371.) He stated that he could set aside his personal feelings regarding what the law out to be and follow the law the court gave him. (RT 1386.)

However, he later qualified his statement that he could follow the law the court gave him, by stating that he would do so only where the law as applied to the facts left him no discretion regards the sentencing decision. (RT 1382-83, 1387.) He acknowledged his "strong[] bias[] against [the death penalty]" (RT 1383), and that to the extent of exercising his independent judgment he would "come in biased [against the death penalty]." (RT 1383-84.) He stated that notwithstanding the court's instructions, if the final decision is his, he probably would vote for life without parole (hereinafter "LWOP"). (RT 1382-85.)

Lloyd G. went on to explain during voir dire that this was because he was strongly biased against the death penalty as a general proposition. He doubted society needed to the death penalty to protect itself, such that the prosecutor would need to convince him of the need for the death penalty as a general proposition before he could ever vote to impose it in this case. (RT 1377-86.) He suggested he did not view the death penalty as a deterrent. (RT 1377.) He suggested that he favored abolition of the death penalty (RT 1378) because he viewed imprisonment as sufficient to protect society (RT 1380).

In the context of his bias against the death penalty and given a posited murder-robbery scenario, Lloyd G. stated that he did not think he could impose the death penalty for a killing during a robbery (RT 1381) because in his view "the taking of a life would be the crime, not the robbery." (RT 1382.) He stated that he did not understand why a murder during the course of a robbery should be a special circumstance enabling the death penalty. (*Id.*)

This view that the prosecutor would need to legitimize the death penalty and show the need for it as a general proposition reasonably suggests the noted standard for exclusion for-cause was met. The state supreme court reasonably could find prospective juror Lloyd G.'s noted voir dire responses, including that he was unconvinced the death is a punishment society needs to impose, would prevent or substantially impair discharge of his duties as a juror, *Witt*, 469 U.S. at 424, such that deference to the trial court's decision excluding him would be appropriate. *See Uttecht*, 551 U.S. at 9; *Hamilton v. Ayers,* 458 F. Supp. 2d 1075, 1094-95 (E.D. Cal. 2006) (no evidence to overcome presumption of correctness of trial court ruling on

prospective jurors' bias), *rev'd. on other grounds*, 583 F.3d 1100, 1135-36 (9th Cir. 2009).

Petitioner's rejoinder that in every capital case the prosecution is put to proving the need for the death penalty as a general proposition (*see* Doc. No. 89 at 235) is unsupported by the evidentiary record and disregards the totality of Lloyd G.'s noted voir dire responses. His argument that Lloyd G.'s dismissal arose from the trial court's misunderstanding of juror sentencing discretion (*see* Doc. No. 89 at 238) fails for the same reasons. *Witt*, 469 U.S. at 424 (exclusion for-cause is proper where a juror's views on capital punishment would impair the performance of his duties); *see id.* at 426 (deference to be afforded trial judge's definite impression that a prospective juror would be unable to faithfully and impartially apply the law); *accord Uttecht*, 551 U.S. at 7-10.

Similarly, Petitioner's argument the trial judge displayed a propensity to retain jurors who suggested a pro-death penalty stance is merely surmise. He cites to the trial court's refusal to excuse prospective juror Donna G. whose jury questionnaire and voir dire suggested a pro-death penalty position. However, as counsel conceded, the record reflects Donna G. stated that she would "listen to the evidence" (RT 1366) and the trial court based its decision on the totality of her responses during voir dire (RT 1367).

The responses of Lloyd G. appear in marked contrast to those of Donna G. The record shows the trial judge listened to Lloyd G.'s voir dire responses and observed his demeanor and thereupon concluded that Lloyd G.'s strong bias against the death penalty would substantially impair his ability to apply state law and the jury instructions impartially. *See Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) ("Actual bias is typically found when a prospective juror states that he cannot be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view."). Where a trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law despite a lack of clarity in the written record, "deference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 425-26.

In sum, the California Supreme Court reasonably found that Petitioner failed to demonstrate his jury was tilted in favor of capital punishment by virtue of the prosecution's for-cause challenge of prospective juror Lloyd G, for the reasons stated. *See Uttecht,* 551 U.S. at 9 (["[A] criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for-cause"). Given the entirety of the voir dire responses of prospective juror Lloyd G., the California Supreme Court reasonably found no error in the trial judge's dismissal due to express bias against the death penalty (RT 1367-90) which would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 11 shall be denied.

2.    Claim 12

Petitioner alleges prejudicial jury misconduct relating to extrinsic religious influence during penalty phase deliberations, violating his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 74-76; *see also* Doc. No. 89 at 239-59.)

a.    **Legal Standards - Juror Misconduct**

i.    *Juror Misconduct*

A jury's consideration of extraneous evidence violates a criminal defendant's right to trial by jury. *Turner v. Louisiana,* 379 U.S. 466, 471-73 (1965).

Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith*, 455 U.S. at 217; *see also United States v. Plache*, 913 F.2d 1375, 1377-78 (9th Cir. 1990) ("It is well-settled that a single partial juror deprives a defendant of his Sixth Amendment right to a trial by an impartial jury.").

The introduction of prejudicial extraneous influences into the jury room constitutes

misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966). A claim that jurors were exposed to extrajudicial evidence is considered based on an objective standard - whether the evidence would have affected a reasonable juror's consideration of the evidence. *Fields*, 503 F.3d, at 781 n.22.

On collateral review, juror misconduct claims "are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638, *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012); *Fields*, 503 F.3d, at 781 & n.19 (noting that *Brecht* provides the standard of review for harmless error in cases involving unconstitutional juror misconduct); *Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir. 1993) (a habeas petitioner must show that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict.").

**b.      State Court Direct and Collateral Review**

Certain of these allegations were presented to the California Supreme Court on direct appeal (Doc. No. 14 at I-E Vol. Five, Arg. XIV at 1-16), and denied on the merits, *Lewis*, 26 Cal. 4th, at 387-91.

Petitioner then fully presented that claim in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 71-5 at 46-51), which was summarily denied on the merits as to all claims (Doc. No. 69-2 at 1), and denied on procedural grounds as to certain claims (*id.*).

**c.      Analysis**

*i.      Juror Paul W.'s Conduct During and After Trial*

Petitioner argues that jury foreman Paul W. introduced into deliberations extraneous religious authority and beliefs mandating a certain course of conduct. He argues that Paul W., who started guilt and penalty deliberations with a prayer, told undecided fellow juror Sally B. during the course of penalty deliberations that [Petitioner] "had been exposed to Jesus Christ and if that was in fact true [Petitioner] would have 'everlasting life' regardless of what happened to him." (Doc. No. 58-1 at 74; *see also* CT 990-1004.)

Petitioner argues this conduct by the jury show it treated his jailhouse religious conversion as a reason to give him death, i.e. as an aggravating factor, when under state law a religious conversion can only be mitigating. (Doc. No. 58-1 at 75-76 citing Penal Code § 190.3(k).)

The record reflects that after the trial, on December 21, 1990 and again on February 6, 1991, Paul W. sent letters to counsel Pedowitz asking to meet with Petitioner and discussing the "good news" of God's plan and enclosing a book entitled "Born Again." (CT 997 and 999, respectively.) On the inside cover of the book was the inscription "To: Neal Pedowitz From: [Paul W.] Jury -- Ray Lewis Case 1990." (CT 1002.)

  *ii. Hedgecock Hearing Request*

On February 14, 1991, Petitioner moved the trial court for an evidentiary hearing pursuant to *People v. Hedgecock* regarding alleged juror misconduct and to subpoena jurors Paul W. and Sally B. regarding same. 51 Cal. 3d. 395 (1990); (CT 990-1004). Petitioner supported this request with the materials Paul W. sent to Pedowitz, and the February 13, 1991 declaration of fellow juror Jeffrey E. which stated that:

> [H]e was a juror present for deliberations at the guilt and penalty phases of [Petitioner's] trial; all 12 jurors held hands and prayed at the beginning of deliberations at both phases; and at the penalty phase,
>
> The second time we voted Paul W[.], our jury foreman, asked why people were having a difficult time making a decision. Sally B[.] said she needed some time to make the right decision, knew what was right but was having difficulty in voting. Paul said he did not know if it would help her, but what had helped him make his decision was that Raymond had been exposed to Jesus Christ and if that was in fact true Raymond would have "everlasting life" regardless of what happened to him. Sometime after that we reach[ed] a verdict.

(CT 993; *see also* 2/20/91 RT 4-7.)

On February 20, 1991, following argument, the trial court denied the motion for hearing as well as a motion for new trial based upon juror misconduct. (2/20/91 RT 3-33.) The trial court noted the absence of disputed fact given the prosecutor made no evidentiary objection to Petitioner's proffer (2/20/91 RT 9, 29-30; *see* 2/20/91 RT 33), and found

Petitioner's jury misconduct proffer inadmissible because it related to jury deliberations (2/20/91 RT 30-33, citing Evidence Code section 1150) and was irrelevant to juror conduct during their deliberations (*id.*; *see also* CT 1005; 2/20/91 RT 26-33,53-54); *Hedgecock*, 51 Cal. 3d, at 415. Specifically, the trial court found the juror misconduct proffer to be inadmissible because "all of this evidence . . . [concerned] statements made by jurors in the course of their deliberations . . . [including as to] the reasons for his or her vote." (2/20/91 RT 31-33, quoting *Hedgecock*, 51 Cal. 3d, at 418-19.)

On March 6, 1991, the trial court denied Petitioner's renewed motion for a *Hedgecock* hearing. (CT 1020; 3/6/91 RT 65-68.)

The California Supreme Court considered and rejected these allegations, stating that:

> Defendant moved to set aside the penalty verdict based on allegations that religious beliefs improperly influenced several jurors. Alternatively, he requested a hearing to investigate possible jury misconduct. (*People v. Hedgecock* (1990) 51 Cal. 3d 395 [272 Cal. Rptr. 803, 795 P.2d 1260].) The trial court denied both motions, along with defendant's subsequent oral motion for reconsideration. Defendant asserts error based on the trial court's denial.

> Defendant submitted a declaration from Juror Jeffrey E. stating that all 12 jurors held hands and prayed at the start of deliberations during both the guilt and penalty phases. During penalty deliberations, Jury Foreperson Paul W. questioned the jurors why they could not reach a verdict. According to Jeffrey E., Juror Sally B. "'said she needed some time to make the right decision, knew what was right, but was having difficulty in voting.'" Paul W. responded that "'he did not know if it would help her, but what had helped him make his decision was that [defendant] had been exposed to Jesus Christ and if that was in fact true [defendant] would have 'everlasting life' regardless of what happened to him.'" Jeffrey E. concluded, "Sometime after that we reach[ed] a verdict." Defendant did not submit a declaration from either Sally B. or Paul W., but intended to subpoena them to appear and testify at the *Hedgecock* hearing.

> In addition, a few days after the trial, Paul W. sent Defense Counsel Neal Pedowitz a letter requesting to meet and talk with defendant. Less than two months later, he sent a second letter and the book Born Again. Paul W. wrote that Pedowitz will have "real inner peace" and "purpose" by having a personal relationship with God and by accepting Jesus Christ, and urged that both Pedowitz and defendant read Born Again, which is "not about religion but relationship."

> The trial court denied defendant's motion. Relying on *Hedgecock*, the trial court found that Jeffrey E.'s declaration describing the conversation between Sally B. and Paul W. was inadmissible under Evidence Code section 1150, subdivision (a). This provision "may be violated not only by the admission of jurors'

testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations." (*People v. Hedgecock*, *supra*, 51 Cal. 3d at pp. 418-419.) The court also determined that Paul W.'s letters and book sent to defense counsel after the trial was over were irrelevant.

Defendant argues that Paul W.'s statement did not relate to his mental processes during deliberations, evidence of which is proscribed by Evidence Code section 1150, subdivision (a). Rather, his statement constituted evidence that Paul W. prejudicially influenced Sally B. with "an entirely illegitimate basis for imposing a death sentence." Defendant maintains that the jurors were improperly exposed to an extraneous source outside the record, i.e., an "extra-judicial code of conduct." (*Jones v. Kemp* (N.D. Ga. 1989) 706 F. Supp. 1534, 1559; *see also People v. Sandoval* (1992) 4 Cal. 4th 155, 193-194 [14 Cal. Rptr. 2d 342, 841 P.2d 862].) Also, Paul W.'s statement that if defendant had been exposed to Jesus Christ he would have everlasting life whatever happened to him, "sharp[ly] contrasted" with the jury instruction that life means life and death means death.[9] Thus, the trial court should have set aside the penalty verdict, or at a minimum, held a hearing to investigate the allegations of jury misconduct. For reasons that follow, we reject all points, which we discuss in turn.

-----------------------FOOTNOTE------------------------

N9 The jury was instructed as follows: "The term 'life without possibility of parole' means that the defendant will remain in prison the rest of his natural life, never to be paroled. The term 'death penalty' means that the defendant will be executed by the State of California."

--------------------END FOOTNOTE--------------------

In *Hedgecock*, we held that a trial court may conduct a hearing to determine the truth of jury misconduct allegations, when the court "in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*People v. Hedgecock*, *supra*, 51 Cal. 3d at p. 415.) We emphasized, however, the limitations of Evidence Code section 1150, subdivision (a). (*People v. Hedgecock*, *supra*, 51 Cal. 3d at pp. 418-419.) Although Evidence Code section 1150, subdivision (a) permits a court to receive otherwise admissible evidence about matters that may have influenced a verdict improperly, it limits the evidence as follows: "No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Thus, "when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*People v. Hedgecock*, *supra*, 51 Cal. 3d at p. 419.)

The trial court correctly determined that defendant's proffered evidence was inadmissible under Evidence Code section 1150, subdivision (a). The exchange between Sally B. and Paul W. clearly involved their decision-making processes.

30

(*People v. Hedgecock, supra*, 51 Cal. 3d at p. 419.) Sally B.'s statement evinced her struggle and difficulty when deciding whether to sentence defendant to death. Likewise, Paul W.'s statement described how he came to reconcile his decision to vote for the death penalty.

As an exception, Evidence Code section 1150, subdivision (a) does not prohibit admitting a statement that reflects a juror's reasoning processes if the statement itself amounts to juror misconduct, comparable to an objective fact such as reading a novel during trial, or consulting an outside attorney for advice on law relevant to the case. (*In re Stankewitz* (1985) 40 Cal. 3d 391, 398 [220 Cal. Rptr. 382, 708 P.2d 1260].) However, we disagree that Paul W.'s statement itself constituted misconduct.

Contrary to defendant's contention, by referring to Jesus Christ and defendant's possible everlasting life, Paul W. did not improperly refer to an extraneous source-his personal religious beliefs or a code that mandated a particular course of conduct-to influence Sally B.'s vote. (*Cf.* People v. Mincey, supra, 2 Cal. 4th at pp. 465-467 [jurors improperly read Bible passages during deliberations].) "The introduction of much of what might strictly be labeled extraneous law cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated." (*People v. Riel* (2000) 22 Cal. 4th 1153, 1219 [96 Cal. Rptr. 2d 1, 998 P.2d 969].)

That jurors may consider their religious beliefs during penalty deliberations is also to be expected. "The court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen." (*Jones v. Kemp, supra*, 706 F. Supp. at p. 1560; *cf. People v. Freeman* (1994) 8 Cal. 4th 450, 515 [34 Cal. Rptr. 2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) Given the collective nature of jury deliberations, we do not find it unusual, much less improper, that jurors here may have shared their beliefs with other jurors either through conversations or prayers.

We find nothing in the record, moreover, that suggests the jurors disregarded the law or the court's instructions, and instead imposed a higher or different law. (*People v. Sandoval, supra*, 4 Cal. 4th at p. 193.) The fact that some jurors expressed their religious beliefs or held hands and prayed during deliberations may have reflected their need to reconcile the difficult decision-possibly sentencing a person to death-with their religious beliefs and personal views. (*See Jones v. Kemp, supra*, 706 F. Supp. at p. 1560.) But it does not show that jurors supplanted the law or instructions with their own religious views and beliefs. (*See People v. Sandoval, supra*, 4 Cal. 4th at p. 194 ["We do not mean to rule out all reference to religion or religious figures so long as the reference does not purport to be a religious law or commandment."].) "We will not presume greater misconduct than the evidence shows." (*In re Carpenter* (1995) 9 Cal. 4th 634, 657 [38 Cal. Rptr. 2d 665, 889 P.2d 985].)

Contrary to defendant's contention, we disagree that Paul W.'s statement that defendant may have "everlasting life" contradicts the jury instruction that states,

31

in defendant's words, life means life and death means death. Everlasting life obviously does not exist in the physical world. In that regard, Paul W. did not dispute that death does not mean death, but instead was referring to *spiritual* everlasting life, a commonly understood expression of religious belief and faith. We assume that Sally B. perceived the difference between physical and spiritual everlasting life in light of the jury instruction. "Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case." (*Conservatorship of Early* (1983) 35 Cal. 3d 244, 253 [197 Cal.Rptr. 539, 673 P.2d 209].)

The cases upon which defendant relies are inapposite …. The prosecutor here did not make the religious references to Jesus Christ and everlasting life. "Reference by either party to religious doctrine, commandments or biblical passages tending to undermine that principle [that the jury should base their penalty determinations on evidence and legal instructions before it] is improper." (*People v. Sandoval*, *supra*, 4 Cal. 4th at p. 194.) A juror, Paul W., made the references in the course of deliberations …. The jurors did not consult material extraneous to the record, like the Bible. Rather, Paul W. merely shared with Sally B. his personal religious view and how he reconciled his vote for the death penalty…. Paul W. did not disregard a court's instruction, consult his own outside experience, and share his erroneous legal advice with other jurors. Again, he merely shared his personal view and did not purport to validate it as truth or impose his view on others. These distinctions underscore the privacy and sanctity of jury deliberations, i.e., "'the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved.'" (*In re Stankewitz*, *supra*, 40 Cal. 3d at p. 400; *In re Hamilton* (1999) 20 Cal. 4th 273, 294, fn. 17 [84 Cal. Rptr. 2d 403, 975 P.2d 600].)

Accordingly, we reject defendant's federal constitutional challenge based on his Sixth and Fourteenth Amendment rights to due process and trial by jury. We also reject defendant's argument that the jurors had a diminished sense of responsibility when they sentenced defendant to death, in violation of *Caldwell v. Mississippi* … and defendant's Eighth and Fourteenth Amendment rights to a reliable, individualized capital sentencing determination. (*See People v. Wash* (1993) 6 Cal. 4th 215, 258-261[24 Cal. Rptr. 2d 421, 861 P.2d 1107].)

*Lewis*, 26 Cal. 4th, at 387-91.

The California Supreme Court has gone on to state that:

The court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen.'" (*Lewis*, at pp. 389–390, 110 Cal. Rptr. 2d 272, 28 P.3d 34; *cf. People v. Sandoval* (1992) 4 Cal. 4th 155, 194, 14 Cal. Rptr. 2d 342, 841 P.2d 862 ["We do not mean to rule out all reference to religion or religious figures so long as the reference does not … purport to be a religious law or commandment"].)

*People v. Danks*, 32 Cal. 4th 269, 311 (2004), *as modified* (Apr. 14, 2004).

Here, the jury was instructed at the penalty phase that:

In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case [except as you may be hereafter instructed]. You shall consider, take into account and be guided by the [Penal Code section 190.3 factors] ….

(CT 875-77; RT 8945.)

You must decide all questions of fact in this case from the evidence received in this trial and not from any other source.

You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, that you must not … consult reference works or persons for additional information.

(CT 882; RT 8950.)

The term "life without possibility of parole" means that the defendant will remain in prison the rest of his natural life, never to be paroled. The term "death penalty" means that the defendant will be executed by the State of California. You are to assume that whatever penalty you impose will be carried out.

(CT 874, Defendant's Special Instruction E.)

After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the

33

> totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(CT 872-73.)

Petitioner fails to demonstrate on the evidentiary record that by virtue of Paul W.'s statements the jury impermissibly relied upon an extra-judicial material or a religious code of conduct contrary to their instruction "to decide all questions of fact in this case from the evidence received in this trial and not from any other source." (CALJIC 1.03, CT 605); *cf. Jones v. Kemp*, 706 F. Supp. 1534, 1559 (N.D. Ga. 1989) (trial court erred by allowing Bible in jury room during deliberations).

The record reflects that jurors had all evidence from both phases before them when then deliberated the penalty phase verdict (RT 8948). Jurors are presumed to follow the court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see also Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (quoting *Witt*, 469 U.S. at 423) ("[I]mpartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts."). Even if admissible, the California Supreme Court reasonably found that Petitioner's proffer in the trial court in support of a *Hedgecock* hearing did not rebut that presumption.

Especially so to the extent the religious theme of life after death is a commonly known one. *See, e.g.*, *Henry v. Ryan*, 720 F.3d 1073, 1086 (9th Cir. 2013) (extraneous information is less likely to be prejudicial when, as in this case, it "merely confirmed what any reasonable juror already knew."). Here, the jury was aware through the prior testimony of Petitioner's sister, Sandra McCullar, that Petitioner had become somewhat religious while in jail awaiting trial (RT 8577-80.) Counsel Pedowitz argued religious sensibilities at the penalty closing by reminding jurors that "thou shall not kill" and that they would have to reconcile a death penalty verdict with their own God. (RT 8894-95.)

Paul W.'s noted statements and comments reasonably could be seen to reflect his personal religious views and deliberative process rather than extrinsic information forbidden to

34

jurors.  As that California Supreme Court has noted, jurors at the sentencing phase have the duty to make a normative decision including individual moral and ethical considerations on the various sentencing factors.  *Danks*, 32 Cal. 4th, at 311.  Because Paul W.'s statements reasonably could be seen as deliberative rather than improper extrinsic evidence, Petitioner's argument that Sally B.'s sentence selection was swayed thereby is unavailing.

For the reasons stated, the California Supreme Court was reasonable in finding Paul W.'s statements did not impermissibly influence sentence selection.  *See,* e.g., *Fields*, 503 F.3d, at 780 (jury notes considered during sentencing deliberations that referred to well-known religious themes not constitutionally infirm).  Petitioner's argument otherwise (*see* Doc. No. 89 at 258; Doc. No. 105 at 191) reasonably could be rejected.

Petitioner's reliance upon *Zant v. Stephens* in his further argument that juror Paul W.'s statements served to deny him an individualized sentence determination based upon his character and the circumstances of his crime is similarly unavailing.  462 U.S. 862, 879 (1983) ("[W]hat is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.").  Even though the jury was not admonished regarding Paul W.'s alleged misconduct, Petitioner has not proffered facts suggesting the jury improperly was influenced by religion in determining his sentence, for the reasons stated.

Petitioner's reliance upon *Green v. Georgia* in arguing that denial of the *Hedgecock* hearing denied him due process because of allegedly unique circumstances presented also appears misplaced.  (*See* Doc. No. 105 at 186.)  The *Green* court found denial of due process in an extraordinary situation where witness testimony that a co-defendant had confessed to the crime was excluded on state evidentiary grounds.  442 U.S. 95, 96-97 (1979).  *Green* is simply inapposite, having nothing to do with juror misconduct, and relying upon extraordinary facts implicating fundamental fairness that are not present in this case. The statements of Paul W. do not reasonably suggest unique circumstances on par with those in *Green*.  Nor is an evidentiary hearing mandated every time there is an allegation of jury misconduct or bias.  *Tracey v.*

*Palmateer,* 341 F.3d 1037, 1045 (9th Cir. 2003).

Furthermore, the California Supreme Court's vindication of deliberative juror statements appears consistent with settled federal authority limiting juror testimony and making inadmissible evidence concerning juror mental processes. *See Tanner v. United States,* 483 U.S. 107, 117, 127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry."); Fed. R. Evid. 606 (protecting jury's deliberative process); *In re U.S. Financial Securities Litigation*, 609 F.2d 411, 430 n.68 (9th Cir. 1979) (federal courts have traditionally protected the jury's deliberative process by preventing challenges to a verdict based upon jury discussions, statements, and methods in reaching the verdict).

Accordingly, the California Supreme Court reasonably determined on the record before it that Paul W.'s statement during deliberations that Jesus Christ equals everlasting life, implying that Petitioner would has everlasting life if given the death sentence, was not a statement of non-evidentiary fact that caused his fellow jurors to ignore jury instructions that death meant death and life meant life, (RT 8939-40; CT 874), and did not undermine the jurors' sense of the importance of their sentencing verdict in violation of *Caldwell v. Mississippi.* 472 U.S. 320, 328-329 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.").

### iii. *Paul W. Voir Dire Responses*

Petitioner alleges that Paul W. failed to disclose in his voir dire questionnaire and responses that he spent one and one-half years as a missionary evangelizing Hindus in India (Doc. No. 89 at 250, citing 2/20/91 RT 13, 25), and the nature and extent of his prior employment as a teacher including whether such was in a religious capacity (2/20/91 RT 65). Pedowitz pointed in support to post-trial statements allegedly made by Paul W. to defense investigator Jimmy Hayes that Paul W. had engaged in such missionary work. (*Id.* at 25-26.) During the hearing on the *Hedgecock* motion, Pedowitz argued that:

> There is nothing in [Paul W.'s juror questionnaire] to indicate that his religious principles were such that he would be considering everlasting life and, in fact, espousing everlasting life in the jury room during death penalty deliberations. If he had made even a note of that or made any type of sounds like that, one of us would have disqualified him.

(February 20, 1991 RT 13.) Petitioner argues this allegation should have been the subject of a *Hedgecock* hearing.

However, even assuming arguendo that such alleged statements could have been presented as admissible evidence, Petitioner has not demonstrated that Paul W.'s voir dire responses were incomplete or incorrect in these regards to any material respect. (*See* CT 385-408; 456; RT 2852-64.) The juror questionnaire completed by the prospective jurors does not appear to directly solicit information regarding religious principles and missionary activities. (*See* CT 385-407.) To the extent of the voir dire questions posed, Paul W. stated that although he moderately favored the death penalty (RT 2856), he did not have such a conscientious opinion about the death penalty that he would vote for death in every case. (RT 2854.) Notably, Petitioner has not provided a declaration from Paul W. supporting counsel's argument. The allegation reasonably could be seen as speculative.

In the Ninth Circuit:

> For voir dire to function, jurors must answer questions truthfully. Nevertheless, we must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment. The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality. *See McDonough Power Equip. v. Greenwood,* 464 U.S. 548, 555-56, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)

*Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).

Even if Petitioner had shown that Paul W. was not forthcoming in his voir dire as alleged, the California Supreme Court reasonably could have found no lack of jury impartiality or basis upon which to challenge Paul W. for-cause, for the reasons stated. The trial court denied counsel's proffer in this regard, finding it inadmissible under Evidence Code section

1150 as a mere reflection of juror mental processes (2/20/91 RT 32) and irrelevant (2/20/91 RT 27). The California Supreme Court would not have been unreasonable in agreeing with the trial court. Additionally, to the extent Petitioner's claim that death qualification voir dire of juror Paul W. was improper as a matter of state law, such a violation it is non-cognizable in federal habeas. Alleged state law errors are not cognizable in federal habeas on that basis alone. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (federal habeas corpus does not lie for errors of state law).

### iv.    Prejudice

Petitioner argues the alleged juror misconduct prejudicially influenced sentence selection. He argues Sally B. was influenced to change her position from hold-out to a vote for death. He suggests Paul W. confirmed as much during his post-trial conversation with defense investigator Hayes. (*See* February 20, 1991 RT 25-26.) Petitioner again points to the habeas declaration of juror Jeffrey Engle, who states that:

> The second time we voted [Paul W.], our jury foreman, asked why people were having a difficult time making a decision. [Sally B.] said she needed some time to make the right decision, knew what was right, but was having difficulty in voting. Paul said he did not did know if it would help her, but what had helped him make his decision was that [Petitioner] had been exposed to Jesus Christ and if that was in fact true [Petitioner] would have "everlasting life" regardless of what happened to him. Sometime after that we reach[ed] a verdict.

(CT 993.)

However, for the reasons discussed above, the California Supreme Court was not unreasonable in finding such inferential evidence inadmissible and irrelevant under Evidence Code section 1150. Even if admissible, the inference raised by Petitioner's proffer appears weak and insufficient to overcome the presumption that jurors followed their instructions in considering the evidence before them. Particularly so, as the record reasonably could suggest that juror Sally B had made up her mind how she would vote even before Paul W. offered his personal religious observation. (2/20/91 RT 20-22; CT 990-94.) The voir dire responses of Sally B. suggest she could and would make the sentencing decision based upon the specific

38

evidence presented.  For example, she stated that although she did not like the death penalty, she felt that "it's one of the necessary things that we have to deal with in today's society."  (RT 711.)  She stated that she could impose the death penalty based upon the specific evidence presented.  (RT 712.)

While a reviewing court might properly consider the timing of changes in jury votes following introduction of extrinsic evidence, *see Fields*, 503 F.3d, at 798, Paul W.'s statements did not amount to extrinsic evidence, and Petitioner's proffer is unenlightening as to the chronology of subsequent jury voting.  Especially so, as the California Supreme Court presumably would have taken note that neither Paul W. nor Sally B. provided a declaration supporting the habeas proffer regarding alleged juror misconduct.

Petitioner's suggestion that the alleged jury misconduct allowed jurors to consider Petitioner's jailhouse interest in religion and the religious concept of life after death as an aggravating factor, a reason for imposing the death penalty, fails for the same reasons discussed above.  Even if such inferential evidence of jury misconduct was otherwise admissible, the inference appears weak and overborne by the presumption that jurors followed their instructions and considered only the evidence in the record.

Accordingly, the California Supreme Court was not unreasonable in concluding that Petitioner failed to show cognizable prejudice from the alleged juror misconduct.  *See Crittenden v. Ayers*, 620 F.3d 962, 990-92 (9th Cir. 2010), *amended on denial of reh, reh enbanc*, 624 F.3d 943, 970 (9th Cir. 2010) (juror's reference to and brief discussion of Biblical passage, after which deliberations continued, even if error, was not prejudicial).

*v.*    *Conclusions*

The California Supreme Court was not unreasonable in rejecting Petitioner's allegation that prejudicial jury misconduct relating to extrinsic religious influence during penalty phase deliberations violated his federal rights.

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme

Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 12 shall be denied.

**B. Claim Relating to Prosecution Witness Paul Pridgon**

1. Claim 1

Petitioner alleges the trial court erred by admitting testimony of prosecution eyewitness Paul Pridgon because Pridgon was then incompetent to testify and lacked personal knowledge, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 42-49; *see* Doc. No. 89 at 59-87.) He alleges the trial court should have instructed the jury to disregard Pridgon's testimony on these grounds. (*Id.*)

**a. Legal Standards – Testimonial Competence and Confrontation**

*i. Testimonial Competence and Confrontation*

The Sixth Amendment, as made applicable to the States by the Fourteenth Amendment, guarantees a criminal defendant the right to confront witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 315 (1974). "[A] primary interest secured by it is the right of cross-examination." *Id.* (quoting *Douglas v. Alabama,* 380 U.S. 415, 418 (1965)).

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Such reliability implicates witness competency. *Id.* at 851 (child witness must be competent to testify and must testify under oath).

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

Testimonial competence requires "a sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." *District of Columbia v. Arms*, 107 U.S.

519, 521-22 (1883).  The Court is obliged to examine the competency of a proposed witness upon challenge by the opposing party and where reasons to doubt a witness' competency are apparent.  *Arms*, 107 U.S. at 521.   The Court then passes upon the issue of competency "upon examination of the party himself, and any competent witnesses who can speak to the nature and extent [thereof]."  *Arms*, 107 U.S. at 522.

b. **State Court Direct and Collateral Review**

Petitioner raised this claim on direct appeal.  (Doc. No. 14 at I-E Vol. Two at 7-8, 54-59, 62-64, 69.)   The California Supreme Court denied the claim as procedurally barred and on the merits.  *Lewis*, 26 Cal. 4th, at 353-65.

c. **Analysis**

Petitioner argues that Pridgon lacked both the ability to testify competently and upon personal knowledge because of his inability to perceive, recall and testify as to matters seen and heard.  He also argues that Pridgon lacked the capacity to "communicate and understand the duty to tell the truth."  (Doc. No. 89 at 71 n.26, 73; *see also Arms*, 107 U.S. at 521-22 (a competent witness apprehends the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard).

Petitioner argues that Pridgon's lack of competency prevented effective confrontation and cross-examination.  (Doc. No. 58-1 at 42.)   As an example, he points to portions of Pridgon's testimony that he contends are incredible as a matter of law; that Pridgon could "hear" both the money taken from Simms during the assault and the blood flowing from her injuries following the assault.  (Doc. No. 89 at 82; *see* CT 236.)

Petitioner argues Pridgon's testimony should have been stricken and that its admission resulted in an unreliable verdict, *Beck v. Alabama,* 447 U.S. 625, 637-638 (1980), denying him due process and the right to confront Pridgon's testimony on cross-examination.

However, the California Supreme Court was not unreasonable in denying these allegations, for the reasons discussed below.

i.    *Personal Knowledge - Ability to Perceive and Recollect*

41

Petitioner alleges that state court erred in finding that Pridgon was able to testify to his perception and recollection of events he saw and heard on the night Simms was killed. He argues the state court gave too much weight to Pridgon's believability and too little weight to Pridgon's mental condition. He argues the latter precluded Pridgon from testifying to events within his personal knowledge.

In California, the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter; such personal knowledge may be shown by otherwise admissible evidence including the witness's own testimony. Evid. Code § 702.

Here, the defense repeatedly raised issues relating to Pridgon's ability to perceive and recollect prior to and during the trial. The defense, prior to trial, subpoenaed Pridgon's mental health records and had him examined for competency by a defense psychologist. The defense presented expert testimony, largely through psychologist Dr. John Pickering, that Pridgon had a low-normal functional IQ with indications of various mental conditions that could have impaired his ability to perceive and remember what happened on the night Simms was killed and left him prone to making up events to fill-in memory gaps, a process known to mental health professionals as "confabulation." (RT 4463.)

The defense cross-examined Pridgon on his drug use and psychological condition on the day Simms was killed. (RT 4458-59; *see also* RT 5507.)[7] The defense challenged Pridgon's allegedly unreliable testimony when it moved for judgment of acquittal under Penal Code section 1118.1. (RT 5800-05.) The defense, in closing argument, cited Pridgon's mental history and alleged incompetence (RT 7332-68) and argued his mental condition prevented him from truthfully and accurately testifying about Simms's murder (RT 7350).

The defense, however, did not challenge Pridgon's testimonial competency by in limine motion. (RT 4447.) The led the trial court to conclude that the jury would itself weigh the witness's ability to perceive, recollect and communicate. (RT 4425.)

The defense revisited these arguments in its motion for new trial, focusing on Pridgon's

---

[7] See Evidence Code section 780 regarding determination of witness credibility.

treatment for psychosis, his alleged paranoia and schizophrenia, and his noted seemingly irrational testimony about "hearing" the flow of blood and the "sound" of money being taken, all of which according to Petitioner rendered his testimony unreliable. (CT 971-972.) The trial court denied the new trial motion, noting that Pridgon had been impeached only as a "slow learner." (RT 5805-06.) That court refused to question "the credibility of [Pridgon] on the fact that [Petitioner] killed Sandra Simms and took money from her person at the time of the killing" (2/20/91 RT 38), and rejected "any argument [Pridgon] hallucinated the death and manner of killing of Sandra Simms" (2/20/91 RT 38-39).

The California Supreme Court considered and rejected these allegations that Pridgon lacked the capacity to perceive, recollect, testify from personal knowledge of Simms's killing, as follows:

> Before Pridgon testified, defendant requested that a psychiatrist be present in court during Pridgon's testimony to determine whether he had the capacity to perceive and recollect. Defendant later withdrew his request and agreed with the court that the issue whether Pridgon's capacity to perceive and recollect was impaired was "a matter of impeachment" pursuant to Evidence Code section 780. Neither party requested a hearing outside the jury to determine whether Pridgon was qualified to testify.

> On cross-examination, Pridgon testified that when Simms was lying on the ground after defendant had struck her, Pridgon saw and "heard" blood flow from her head, which sounded "[l]ike somebody pouring water in a cup." He also said that he knows how money "sounds." Defendant impeached Pridgon with his preliminary hearing testimony, including the fact that Pridgon failed to mention previously that defendant strangled Simms. When Pridgon testified at trial that he told the investigator about the strangling, he told defense counsel to confirm the strangling with the pathologist. Defendant contends that Pridgon simply overheard the pathologist's testimony and did not actually see defendant strangle Simms. Indeed, defendant points out that Pridgon failed to mention this fact to Lorene Allen, whom he told that defendant killed Simms. Defendant also maintains that Pridgon embellished his testimony with his statement that he purposely fell on his bad knee to allow Simms to run away, which Pridgon failed to mention at the preliminary hearing.

> Pridgon also purportedly described an "S," which he saw scrawled on the two-by-four used to kill Simms. Pridgon later clarified that the scrawled "S" was actually ants crawling over the two-by-four. In response to the defense question whether Pridgon's fingerprints were on the knife that defendant discarded, Pridgon testified: "No way my fingerprints. They took my clothes and my prints and my necklace. It was negative to me, is nothing. If it comes out positive me, yes, fingerprints on it. Because I could barely positive negative. Negative means no. There was no fingerprints." At one point, Pridgon refused to answer a

43

defense question regarding Simms's strangulation. Based on the foregoing testimony, defendant stated, "I think I'm going to ask the Court to consider striking all of Mr. Pridgon's testimony ... [¶] ... [b]ased on ... the wholesale impeachment that's been going on of him since he took the stand ...." The trial court impliedly denied the request.

After Pridgon testified, defendant called several expert witnesses who testified regarding Pridgon's mental disorders, including his psychosis, paranoia, and, "schizophreniform disorder." Psychiatrist Dr. Kinsey testified that in June 1987, he "triple-diagnosed" then 15-year-old Pridgon with schizophreniform disorder, low IQ, and substance abuse. For Pridgon's psychotic symptoms of anxiety and auditory hallucinations, Dr. Kinsey prescribed an antipsychotic major tranquilizer, which he recommended that Pridgon take for at least a year. His colleague, Dr. Moulder, a psychologist, made a similar diagnosis and added that Pridgon's substance and alcohol use would exacerbate his psychotic symptoms.

Psychologist Dr. Pickering testified that in September 1990, he diagnosed Pridgon with poly substance abuse and borderline personality, involving characteristics of confusion, uncertainty, inadequacy, fear, and paranoia. He disagreed, however, with other defense experts' diagnoses of schizophreniform disorder. Dr. Pickering believed that Pridgon suffered from confabulation,[3] which he explained is a process where a person goes "from a detail which may or may not be relevant to anything, to almost a giant imaginative leap ... [which] takes on credibility." In addition, Dr. Pickering opined that Pridgon's drug use impaired his ability to perceive and recollect. Dr. Deutsch, an addiction specialist, opined that smoking large quantities of cocaine over a long period could affect a person's mental processes, which could eventually progress to a psychosis where the person has hallucinations, paranoia, delusions, and increased feelings of hostility. He further testified that an individual suffering from borderline personality, atypical psychosis, or schizophreniform disorder, and who uses cocaine or PCP, is in a much worse position than one who does not.


-----------------------FOOTNOTE-----------------------

n.3 *See People v. Alcala* (1984) 36 Cal. 3d 604, 620, footnote 6 [205 Cal.Rptr. 775, 685 P.2d 1126] ("Confabulation is a process by which the witness fills gaps in memory with false and imaginary information, often implanted by others, and comes to believe in the truth of his reconstruction").

--------------------END FOOTNOTE--------------------

In rebuttal, the prosecution offered the expert testimony of Dr. Terrell, a psychiatrist, and Dr. Thackrey, a clinical psychologist. Dr. Terrell, who met with Pridgon on several occasions and reviewed prior medical reports and records on Pridgon, testified that Pridgon had the intellect of a seven-year-old, with a similar ability to recollect and comprehend. He also diagnosed Pridgon with substance abuse consisting of cocaine, marijuana, and PCP (which abuse was in remission), and atypical psychosis due to substance abuse. However, because Pridgon's account of the murder was "within the realms of human experience," Dr. Terrell testified that his account did not seem to consist of a psychotic fantasy. He further testified that notwithstanding Pridgon's diagnosed

44

mental disorders and low intellect, "[t]here is nothing that would lead me to believe that he would be incapable of reporting an account of an act of this nature," though Pridgon's degree of accuracy would be that of a seven-year-old.

Dr. Thackrey's findings were consistent with Dr. Terrell's. He concluded that Pridgon did not meet the criteria to be considered schizophrenic, nor did he suffer from delusional symptoms or auditory hallucinations, but noted that Pridgon did suffer from attention deficit hyperactivity disorder resulting in his lack of concentration and increased fidgetiness. Dr. Thackrey found nothing in his review of the record or his assessment of Pridgon that "would necessarily preclude [Pridgon's] ability to remember something that he saw happen or to tell us, at least in general terms, what had happened." Given Pridgon's limited intellectual abilities, Dr. Thackrey opined that "it could be ... relatively easy to inadvertently confuse Mr. Pridgon or elicit contradictory kinds of statements about details, and the like."

Based in part on defendant's assertion that Pridgon's testimony was "inherently unreliable," defendant moved for a judgment of acquittal, claiming insufficient evidence of guilt. The trial court denied the motion. The trial court also denied defendant's subsequent motion for a new trial or to modify the jury's verdict under section 1181, subdivisions 6 and 7, arguing that Pridgon's unreliable testimony made the verdict "contrary to ... evidence."

….

Defendant argues that Pridgon did not have the necessary capacity to perceive and recollect in order to testify under Evidence Code section 702, subdivision (a). To testify, a witness must have personal knowledge of the subject of the testimony, i.e., "a present recollection of an impression derived from the exercise of the witness' own senses." (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 702, p. 300; Evid. Code, § 702, subd. (a).) In order to have personal knowledge, a witness must have the capacity to perceive and recollect. (*See People v. Dennis* (1998) 17 Cal. 4th 468, 525 [71 Cal. Rptr. 2d 680, 950 P.2d 1035].) The capacity to perceive and recollect is a condition for the admissibility of a witness's testimony on a certain matter, rather than a prerequisite for the witness's competency. (*Ibid.*)[4] Upon a party's objection, a witness's personal knowledge must be shown before the witness may testify regarding the matter. (Evid. Code, § 702, subd. (a); *see also id.*, § 403, subd. (c)(1) [upon a party's request, a court must instruct the jury as to whether a preliminary fact exists before it may consider the proffered evidence].)

----------------------FOOTNOTE----------------------

n.4 One commentator has noted the confusion between a witness's competency under Evidence Code section 701, which relates to a witness's capacity to communicate and to understand the duty to tell the truth, and a witness's lack of personal knowledge under Evidence Code section 702, which relates to the witness's capacity to perceive and recollect. (1 Jefferson, Cal. Evidence Benchbook (Cont. Ed. Bar 3d ed. 2001) Competency and Qualification of Witnesses, § 26.7, pp. 414-415.) Although many, including defendant, have referred to a witness's capacity to perceive and to recollect (Evid. Code, § 702) as an issue of competency to testify, the term "competency" is more precisely referring to a witness's qualification to testify under Evidence Code section 701, subdivision (b). (*See People v. Dennis*, *supra*, 17 Cal. 4th at p. 525.)

"[I]f there is evidence that the witness has those capacities, the determination whether [he] in fact perceived and does recollect is left to the trier of fact. [Citations.]" (*People v. Dennis*, *supra*, 17 Cal. 4th at p. 526; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 46, p. 297 [the capacity to perceive and recollect is "only preliminarily determined by the trial judge, and ultimately redetermined by the jury"].) A trial court should allow a witness's testimony unless "no jury could reasonably find that he has such [personal] knowledge." (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 701, p. 284.) "The fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive [or] recollect ...." (*People v. Willard* (1983) 155 Cal. App. 3d 237, 240 [202 Cal.Rptr. 100].) Nor does a witness's mental defect or insane delusions necessarily reflect that the witness lacks the capacity to perceive or recollect. (*People v. McCaughan* (1957) 49 Cal. 2d 409, 420 [317 P.2d 974]; *People v. La Rue* (1923) 62 Cal. App. 276, 284 [216 P. 627] ["It is admissible ... in order to affect the credibility of the witness, to prove that he was or is subject to insane delusions; that his mind and memory are impaired by disease."].) A witness's uncertainty about his or her recollection of events does not preclude admitting his or her testimony. (*People v. Avery* (1950) 35 Cal. 2d 487, 492 [218 P.2d 527] [uncertainty of recollection goes to the weight and not admissibility of a witness's testimony].)

Defendant did not timely object to Pridgon's incapacity to perceive and recollect to limit the admissibility of Pridgon's testimony before he testified. Thus, without an objection, the trial court was not required to determine whether Pridgon had personal knowledge before he testified. (Evid. Code, § 702, subd. (a).) Although a party may move to strike a witness's testimony when lack of personal knowledge is shown on cross-examination (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 702, p. 300), defendant did not challenge Pridgon's testimony on this basis. Rather, defendant agreed that Pridgon's capacity to perceive and recollect was "a matter of impeachment," and proceeded to impeach his capacity through cross-examination and expert testimony. (Evid. Code, § 780, subd. (c); *see also People v. Cooks* (1983) 141 Cal. App. 3d 224, 302 [190 Cal.Rptr. 211] ["A witness may be cross-examined about his mental condition or emotional stability to the extent it may affect his powers of perception, memory (recollection), or communication"].) Thus, defendant's failure to object timely on the basis of Evidence Code section 702, subdivision (a), constitutes a waiver of this claim on appeal. (*See People v. Cudjo* (1993) 6 Cal. 4th 585, 622 [25 Cal.Rptr.2d 390, 863 P.2d 635] [party must object to witness's lack of testimonial competence to preserve this claim on appeal].) Even assuming, however, that defendant had timely and specifically objected on this ground (*see* Evid. Code, § 353), we find no substantial basis for the trial court to have excluded Pridgon's testimony.

Although Pridgon's testimony may have consisted of inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations, Pridgon "presented a plausible account of the circumstances of [Simms's] murder." (*People v. Anderson* (2001) 25 Cal. 4th 543, 574 [106 Cal.Rptr.2d 575, 22 P.3d 347] [witness who suffered from delusions was not incompetent to testify].) Pridgon testified to many details of the crime, which were unlikely to be known by anyone not present, and which were independently corroborated by the evidence. He also led police to the place where the two-by-four was discarded. Moreover, despite instances of Pridgon's incomprehensible

testimony (often on cross-examination), he also testified lucidly, albeit simply, throughout trial. For instance, after Pridgon testified he saw defendant get on top of Simms after striking her, the prosecution asked if defendant did anything to her. Pridgon replied, "Yeah, he had his hand right here. (Indicating.)

"Q[:] All right. Now you said he had his hand 'right here'?
"A[:] On her throat.
"Q[:] 'On the throat,' okay. And you showed me something with your hand. What-what was it that you saw him doing with his hand?
"A[:] He tore her blouse up, and stick his hand up there in her bosom."

In short, there was no substantial basis for the court to exclude Pridgon's testimony; rather, it was up to the jury to determine whether Pridgon's recollections were true. (*People v. Anderson*, *supra*, 25 Cal. 4th at p. 574; *see also People v. McCaughan*, *supra*, 49 Cal. 2d at p. 420; *People v. Avery*, *supra*, 35 Cal. 2d at p. 492; *People v. Willard*, *supra*, 155 Cal. App. 3d at p. 240.) Although defendant maintains that Pridgon's intimate knowledge of the crimes indicated that Pridgon and not defendant committed the crimes, this is a separate issue from whether Pridgon had the capacity to perceive and recollect.

Moreover, contrary to defendant's contention, we cannot conclude that Pridgon's testimony about hearing blood flow was improbable as a matter of law. (*See, e.g.*, *People v. Crowell* (1988) 198 Cal. App. 3d 1053, 1057 [244 Cal.Rptr. 296] [stabbing victim "'could hear the air and the blood bubbling out my back'"]; *People v. Fernandez* (1950) 301 N.Y. 302, 316 [93 N.E.2d 859, 866] [defendant "'could hear blood dripping'" from victim who was lying flat on the floor]; *State v. Oslund* (1985) 71 Or. App. 701, 704 [693 P.2d 1354, 1355] [defendant "heard [shooting victim's] blood dripping on the floor"].) Nor can we conclude as a matter of law that Pridgon could not hear the sound of money. The rustling of paper money is an audible sound. (*See, e.g.*, *Rushing v. State* (Ind. 1983) 449 N.E.2d 597, 598 [witness to robbery did not see defendant take money from the cash register but "heard the sound of money rustling and cash drawer clips flopping"].)

Indeed, in ruling on defendant's subsequent motion for a new trial, the trial court stated: "The Court sat approximately four to six feet from Pridgon during his entire trial testimony. The Court had an ample opportunity to observe the demeanor and manner in which Mr. Pridgon testified. In addition, the Court had an opportunity to observe the attitude of Mr. Pridgon toward this action and toward the giving of testimony in general. It is clear that Mr. Pridgon suffers from some type of mental problem. At the very least it can be said that he is a slow learner. [¶] However, the Court believed [Pridgon's testimony regarding the murder]." The trial court rejected defendant's contention that Pridgon hallucinated the death and the manner of killing. Although the court noted that Pridgon's testimony included inconsistencies (and did not attempt to reconcile them), it stated that, "The Court can only reiterate that at no time has the Court questioned the credibility of Mr. Pridgon on the fact that the Defendant killed Sandra Simms and took money from her person at the time of the killing."

As noted, because defendant failed to object that Pridgon lacked the capacity to perceive and recollect in order to testify, the trial court had no occasion to consider this issue. However, based on the record before us, we conclude that the trial court's statements regarding Pridgon's credibility strongly suggest that the court would have overruled defendant's objection and rejected his argument on this claim. To that end, we reject defendant's contention that the trial court

erroneously believed that Pridgon's capacity to perceive and recollect was an issue relating only to impeachment. The trial court's statements noted above reflect that it believed Pridgon had such capacity.

Plainly, Pridgon fell well short of being an ideal witness. As the prosecution's psychologist testified, it would be easy to inadvertently confuse Pridgon, given his limited intellectual abilities. Inevitably, his confusion mounted when someone motivated to make him look incredible-as defense counsel was-asked the questions. As a reviewing court, we confront a cold record without the trial court's benefit of observing firsthand the appearance and demeanor of the witness. Here, both the jury and trial court found that Pridgon was a credible witness, and we must give proper deference to such findings. (*People v. Jones* (1968) 268 Cal. App. 2d 161, 165 [73 Cal.Rptr. 727].)

Thus, we reject defendant's constitutional challenges based on his right of confrontation protected by the Sixth and Fourteenth Amendments to the United States Constitution, his rights to due process, to present a defense, to a trial by jury, and to a reliable conviction afforded under the Eighth and Fourteenth Amendments, and his right to a reliable, individualized capital sentencing determination guaranteed under the Eighth Amendment. For similar reasons, we reject defendant's claim of ineffective assistance of counsel for failing to timely object to Pridgon's capacity to perceive and recollect, or for otherwise conceding Pridgon's capacity was a "matter of impeachment." Where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People v. Cudjo*, *supra*, 6 Cal. 4th at p. 616.)

*Lewis*, 26 Cal. 4th, at 356–60. The California Supreme Court was not unreasonable in finding Pridgon testified competently in Petitioner's proceeding to events he perceived and remembered, for the reasons stated by that court and those discussed below.

(1)    Pridgon's Mental State

A.    **Pridgon's Mental Health History**

Pridgon's mental history and condition suggested limited cognitive abilities as well as behavioral, personality and substances abuse issues.

Pridgon attended special education classes while in school (RT 5340) and progressed as far as the eleventh grade. (CT 71; RT 5903.) He apparently was unable to read at the time of trial. (RT 5509.) He testified that he was born with a "disability problem [he was a] slow learner." (RT 5340.)

A year prior to Simms killing, at which time Pridgon was 20 years of age, he was evaluated by county mental health professionals relating to an alleged assault upon police

officers.  Pridgon reported he heard voices (RT 5593-95) and was prescribed Mellaril, an antipsychotic medication.  (RT 6110-11.)  He found the medication helped.  (RT 5596.)  He had stopped taking it by the time of the murder.  (*Id.*)

**B.      Defense Expert Opinion**

The defense presented testimony from mental health professionals, examining and non-examining, relating to Pridgon's mental condition during the period from 1987 up to 1990 when Petitioner's trial took place.  These defense experts generally agreed that Pridgon had a low-normal IQ, borderline personality with substance abuse overlay, and episodic psychosis related to substance abuse.  The defense expert retained for trial, Dr. John Pickering, went further and testified that these conditions could have impaired Pridgon's ability to perceive and recollect events surrounding Simms's killing and to confabulate in his recollection.

When Pridgon presented to the Fresno County mental health department in 1987 upon a state court referral following his fight with police officers (RT 6167-6203), he was interviewed by a psychiatric technician, Delia Mancebo. Her notes reflect that: (i) he attended special education classes for being a slow learner; (ii) he is paranoid, complaining people call him inappropriate names and stupid; (iii) in June of 1985, he was arrested and served seventeen days in jail for fighting with police officers who allegedly jumped on him; (iv) he had feelings of wanting to hurt others and himself; (v) he felt like killing the police officer who made a racial slur towards him; (vi) he would kill himself because he did not want to go to prison; (vii) he hears voices talking to him; (viii) he has no visual hallucinations; (ix) his mind races at times and that he cannot rest and walks the streets until 3:00 a.m.; (x) he would like to work but nobody will hire him; (xi) he is on social security; (xii) he has below normal intelligence; and (xiii) he has very poor impulse control.  (CT 69-70; RT 6852, 6862.)

Ms. Mancebo referred Pridgon to Dr. Paul Moulder, then a staff clinical psychologist employed by the Fresno County Department of Mental Health.  (RT 6167-74.)  Dr. Moulder evaluated Pridgon on three occasions during June-July 1987.  He testified that Pridgon was then psychotic and hallucinating, with a schizophreniform disorder, paranoid ideations, mixed

49

substance abuse, and borderline mental retardation. (RT 6177-82.) Even so, Dr. Moulder found Pridgon to be oriented and with a normal emotional presentation, albeit with some slight slurring of speech. (RT 6189-90.) Significantly, Dr. Moulder found Pridgon's memory and ability to concentrate to be fair. (RT 6207.)

Dr. Moulder recommended medication and avoidance of intoxicants. (RT 6167-96.) Pridgon admitted to auditory hallucinations occurring even when he was not using drugs. (RT 6303.) Dr. Moulder testified that Pridgon, who returned for at least one subsequent visit with treating psychiatrist Dr. Robert Kinsey (discussed below) (RT 6200), missed several follow-up appointments with him and that his case was closed in September 1987. (RT 6177.) Dr. Moulder felt there was a high likelihood that Pridgon would require ongoing treatment for his mental issues. (RT 6201-02.) But at the same time, he conceded that his findings regarding Pridgon were tentative; that he only saw Pridgon on three occasions which left him without the opportunity to confirm his diagnosis. (RT 6183, 6205.)

Dr. Moulder referred Pridgon to psychiatrist Dr. Kinsey, then employed by the Fresno County Department of Mental Health, who examined Pridgon in June 1987. (CT 434; RT 5898-5905.) Dr. Kinsey found Pridgon to be acutely psychotic and hearing voices, he diagnosed Pridgon with a low I.Q. i.e., "slow" and a schizophreniform disorder. (*Id.*) Dr. Kinsey also noted Petitioner's use of alcohol and drugs. (RT 5906, 5911.) Dr. Kinsey did not feel that Pridgon required hospitalization. (*Id.*) But he did prescribe Mellaril, a major tranquilizer (*id.*), with the view it should be taken for at least a year (RT 5907-08). Dr. Kinsey testified that Pridgon left his office with only one week's worth of the medication and did not return for further treatment or additional Mellaril. (RT 5906-09.)

Notably, Dr. Kinsey felt that Pridgon's psychotic symptoms could have been due to the substance abuse and that the symptoms would resolve with reduction of substance abuse. (RT 5913.) Dr. Kinsey testified that he was unaware if, when and how Pridgon's psychotic symptoms might have resolved after Pridgon left his office. (RT 5915.)

The defense retained clinical psychologist Dr. John Pickering, then employed by the

Fresno County Department of Mental Health (RT 4464-67, 5846-54), who examined Pridgon in September 1990 just prior to the start of trial. Pridgon voluntarily agreed to this jailhouse examination that was arranged by counsel Pedowitz. Dr. Pickering testified that he found indications of a thought disorder in partial remission; poly-substance abuse including multiple uses of cocaine on the night Simms was killed, prior to and after her killing; attention deficit disorder and hyperactivity; and feelings of paranoia. (RT 5927-35, 6021.)

Based thereon, Dr. Pickering testified that Pridgon's ability to perceive and remember what happened on the night of Simms's killing could have been impaired. (RT 5889, 5938-40.) He also testified that Pridgon could have been prone to "confabulate" in recollecting the events of that night and this case (RT 5940-44); he defined confabulation as being "a process whereby a person goes from a detail which may or may not be relevant to anything, to almost like a giant imaginative leap . . . and that imaginative leap takes on credibility." (RT 5940.)

Dr. Pickering also found Pridgon to demonstrate a "low normal functioning IQ, even though he does continue to have problems . . . with some kinds of specific cognitive tasks." (RT 5978.) He found Pridgon to have a "borderline personality" such that he had periods of confusion, fear, and paranoia (RT 5950); a "pervasive developmental disorder" (RT 5977); attention deficit disorder (RT 5979); and problems with substance abuse that prevented him from dealing with his other noted issues (RT 5950-51). Dr. Pickering suggested particularly that Pridgon's cocaine use could lead to or exacerbate hallucinations. (RT 5976.)

The defense also presented testimony from addiction expert Dr. Raymond Deutsch, a non-examining medical doctor. (RT 6104.) Dr. Deutsch testified that use of cocaine makes one less able to interpret reality and exacerbates psychotic symptoms. (RT 6113-14.) He testified that use of cocaine can lead to decreased recollection of events and confabulation, i.e., filling in the gaps in recollection with other often suggested information. (RT 6114-15.) He testified that an otherwise psychotic individual with a low I.Q. would be severely impaired by the use of cocaine. (RT 6107-14l.)

**C.     Prosecution Expert Opinion**

The prosecution presented testimony from mental health professionals who examined Pridgon at the time of trial. These experts generally agreed that Pridgon functioned at or slightly below the mildly retarded range; demonstrated psychotic illnesses exacerbated by substance abuse that were in remission at the time of trial; and subject to these issues found Pridgon generally able to perceive and recollect events.

Dr. Bruce Terrell, a psychiatrist and prosecution expert at trial, met with and examined Pridgon several times in October and November 1990. (RT 6755-60.) Dr. Terrell reviewed the reports of Drs. Moulder and Kinsey. He also reviewed reports by psychologists Dr. Stewart (*sic*, variously "Dr. Stuart") (*see* Doc. No. 82 V-GG Ex. 2 at 17-18) and Dr. Coleman, dated November 1988 and March 1989 respectively, who opined that Pridgon functioned in the very low normal to mildly retarded range. (*Id.* at 14-16; *see also* RT 6762-63.)

Dr. Terrell found that Pridgon functioned "at a much lower than average degree of intellect [than suggested by Drs. Stewart and Coleman], approximately at the level of a seven-year-old" (RT 6768); that his IQ was slightly below mildly retarded (*id.*). Dr. Terrell noted that Pridgon was born with microcephaly, a head that is smaller than normal, frequently indicative of a lower than average intellect. (RT 6769, 6820.) Dr. Terrell testified that Pridgon suffered psychotic illnesses due to substance abuse, illnesses that could manifest in hearing voices and that typically resolve over time and in Pridgon's case were then in remission. (RT 6770-71.)

Dr. Terrell opined that while Pridgon had difficulty expressing himself (RT 6770), he is reasonably able to understand questions that do not use large or complex words (*id.*). Dr. Terrell concluded that Pridgon was capable of observing and relating the events of Simms's killing (RT 6776) with the accuracy of a seven-year-old (RT 6781), provided that ingestion of drugs and stress (including stress related to Simms's killing, Petitioner's alleged threats against him, and the subsequent investigation and litigation) could impact that conclusion (RT 6782).

The prosecution also presented testimony by retained psychologist Dr. Michael Thackrey, who examined Pridgon during the trial and reviewed certain of his mental health

records including reports of Drs. Moulder, Kinsey and Terrell. Dr. Thackrey had expertise in the Minnesota Multiphasic Personality Inventory examination ("MMPI") that was administered to Pridgon by defense expert Dr. Pickering. Dr. Thackrey testified that although the MMPI examination was a widely-used diagnostic device (RT 7041-43), it required level of comprehension equating to the sixth to eighth grade level (RT 7044). He testified that based upon his meeting with Pridgon and review of his background information including as to difficulties reading and writing, the MMPI was inappropriate for Pridgon because it exceeded his ability to comprehend. (RT 7047-51.)

Dr. Thackrey administered alternative tests and found Pridgon to achieve an IQ of 69 (RT 7051), i.e. between mildly retarded and borderline intellectual functioning (RT 7052). Dr. Thackrey did not find Pridgon to be schizophrenic, delusional, or to demonstrate a thought disorder (RT 7053). Dr. Thackrey concluded that Pridgon could relate what he saw in relation to Simms's killing, at least in general terms (RT 7059), and that cocaine ingestion could make recalling details difficult (RT 7060). Dr. Thackrey suggested agreement with Dr. Terrell's findings, but would add a diagnosis of mild attention deficit-hyperactivity disorder. (RT 7069, 7079.)

**(2)    Evidence Corroborating Pridgon's Personal Knowledge**

Petitioner argues the California Supreme Court finding that Pridgon testified from personal knowledge was an unreasonable determination of the facts given the inconsistent and sometimes incredible testimony he provided. (*See* Doc. No. 89 at 74-80.) He argues the California Supreme Court considered only the threshold believability of Pridgon's testimony and disregarded "the collateral evidence of his incompetency." (*Id.* at 80.)

Petitioner again highlights Pridgon's noted testimony that he heard the sound of blood flowing and money being taken as suggesting unbelievability. He points to apparent inconsistencies between Pridgon's preliminary hearing testimony and that which he gave at trial including as relates to whether he saw Simms being strangled (*cf.* RT 5546, 5494 with RT 5712; CT 50-52); the extent to which the alley where Simms was killed was illuminated

53

sufficiently for him to see blood flowing and money taken from her (*cf.* RT 5397; CT 315 with RT 5398, 5405); where he was standing in relation to Simms and Petitioner at the time of the assault (*cf.* RT 5489, 90 with RT 5490); and the frequency of his cocaine smoking (*cf.* RT 5339 with RT 5422, 5490, 5549-55).

Petitioner also points to testimony from City of Fresno arson investigator Thomas Kuczynski that Pridgon had lied to him and was untrustworthy. (RT 5926.) He points to testimony of neighbors that: Pridgon "would ramble and carry sticks and boards off his fence . . . and throw them into the trash cans or throw them at the walls in his alley" (RT 5813; *see also* RT 7100), Pridgon carried such a stick "in his pocket" (RT 5815), and Pridgon was known in the neighborhood as "Crazy Paul" (RT 5820; *see also* RT 5821-22, 7100).

However, such matters appear subject to discount when considered in the context of the mental state evidence discussed above. While Pridgon might well have become confused during questioning over the years spanning crime to conviction, his interactions with others and demeanor and testimony on the witness stand suggested that he functioned at the borderline IQ level and could perceive and communicate truthfully and intelligibly in simple terms.

Pridgon had no apparent difficulty discussing Simms's killing with law enforcement, relating key events and accompanying Fresno police officer Olsen to the crime scene and pointing out evidence. (RT 4293-4305.) Olsen described Pridgon as "just a little slow", leaning toward possible mental retardation, but that "his intelligence did not seem to be hampered." (RT 4306.) Olsen testified Pridgon appeared to be normal, not under the influence of anything (RT 4305) and that Olsen did not have any problem understanding Pridgon (RT 4307).

At trial, Pridgon appeared oriented as to person, place, day, month and year. (RT 5289-5341.) Although he admittedly confused counsel Pedowitz with prior counsel Ambry (RT 5341-48, 5410-12), Pridgon nonetheless was able to relate his personal history, his first-time encounter with Petitioner on June 6, 1988, the evening Simms was killed, and his facilitating

1   Petitioner's purchase of $20 worth of rock cocaine and smoking it with him.  (RT 5288-5306.)

2          Pridgon was able to relate the details immediately leading to the killing and of the

3   killing itself; that Petitioner stated his intent to knock-out a prostitute and take her money and

4   that Pridgon refused to participate; that Petitioner led Simms and Pridgon down the alley near

5   Pridgon's apartment ostensibly to get the $20 Simms was demanding she be repaid; and that

6   Petitioner picked up a two-by-four and struck Simms seven times in the head, put his hands on

7   her throat and pressed, tore open her blouse and came out of her bosom area with a handful of

8   money.  (RT 5334-35; CT 41-53, 218; RT 5295-5326.)

9          Pridgon also was able to relate details of what happened after the attack; that he

10  disposed of a butter knife at Petitioner's direction; that Petitioner disposed of the two-by-four

11  used in the assault; that Petitioner bought $40 worth of rock cocaine; that they returned to

12  Pridgon's apartment and smoked the freshly purchased cocaine; that he, Petitioner and others

13  smoked more cocaine back at Petitioner's residence; that he returned home and told his

14  roommate Miss Loraine of the killing; that Miss Loraine called his mother who took him to the

15  police where he related these events and led officers to the crime scene evidence.  (RT 5327-

16  5338.)  Pridgon remained oriented as to person, place and time while relating these details.

17  (RT 5288-5338.)

18         The forensic and crime scene evidence and statements from other witnesses largely

19  corroborate Pridgon's testimony relating to Petitioner's apparent robbery motive and stated

20  intent to hit Simms and take her money and Petitioner's attack upon Simms.  The record shows

21  that Simms was gainfully employed at Carl's Jr., and that she had cashed a paycheck shortly

22  before her killing.  (*See, e.g.*, RT 4432-33, 4778.)

23         The testimony of Petitioner's girlfriend, Michelle Boggs, corroborates Pridgon's

24  account that on the night Simms was killed Petitioner, Simms and Pridgon went off together to

25  buy cocaine; Simms wanted Petitioner to make good on the $20 he owed her; Petitioner lacked

26  funds; and when Petitioner, Pridgon and Betty Thomas later returned without Simms,

27  Petitioner had newly purchased cocaine.  (*See, e.g.*, RT 4500-06, 4881-93, 4910-11, 5056,

28

1  5270-79, 6936.)

2     Detective Olsen's testimony corroborates Pridgon's narrative relating to certain events

3  of the evening Simms was killed, as well as the crime scene evidence collected with the

4  assistance of Pridgon.  (*See, e.g.*, RT 4293-4310.)

5     The testimony of Pridgon's roommates Allen, Thomas and Woods is essentially

6  consistent with Pridgon's version of certain of the evening's events and Pridgon's statement

7  that Petitioner had killed Simms and threatened to kill him.  (*See, e.g.*, RT 6240-71.)

8     Pathologist Dr. Nelson's autopsy findings are consistent with Pridgon's testimony in

9  many regards including that: Simms used cocaine shortly before she was killed, Simms, while

10 standing, was struck repeatedly and with great force on the face and head, Simms offered no

11 defense and collapsed to the ground, and Simms was then manually strangled.  (*See, e.g.*, RT

12 5616-72; CT 52-53, 218; claims 2, 10, 25, *post*; *Collins*, 546 U. S. at 341–342 (even if

13 "reasonable minds reviewing the record might disagree about" the evidence, "on habeas review

14 that does not suffice to supersede the [state] court's credibility determination.").

15    Also, Pridgon was able to provide a level of detail as to events in Petitioner's

16 proceeding, encounters with the defense, and even the movie Miss Loraine was watching on

17 television at the time he told he of the crime, that further suggests personal knowledge.  (RT

18 5341-58.)   Any suggestion that Pridgon was altered during his testimony is refuted by

19 Pridgon's denial that he was then seeing a doctor or taking medication (RT 5589), and his

20 demeanor and testimony at trial.

21    The trial court, in denying the motion to modify the verdict, noted that it was able to

22 observe Pridgon's demeanor and manner in testifying and found Pridgon to be a credible

23 witness to Simms's killing.  (February 20, 1991 RT 34; *see also Marshall v. Lonberger*, 459

24 U.S. 422, 434 (1983) (a federal court has no license to determine the credibility of witnesses

25 whose demeanor has been observed by the state court).  Specifically, that court stated the

26 following when denying the motion for new trial:

27

28    The Defendant argues that the testimony of Dr. Terrell and Dr. Pickering

56

confirm Pridgon had a substance abuse disorder, a personality disorder, and was mentally retarded. In addition, the Defendant argues that Pridgon contradicted himself numerous times and was consistently impeached with testimony from the Preliminary Hearing transcript. Therefore, it is argued, Pridgon's testimony was unreliable and lacking in credibility.

The Court sat approximately four to six feet from Pridgon during his entire trial testimony. The Court had an ample opportunity to observe the demeanor and manner in which Mr. Pridgon testified. In addition, the Court had an opportunity to observe the attitude of Mr. Pridgon toward this action and toward the giving of testimony in general. It is clear that Mr. Pridgon suffers from some type of mental problem. At the very least it can be said that he is a slow learner.

However, the Court believed the following testimony. Trial transcript page 5321:

"QUESTION: Now, when you saw" --
This is a question and answer section – session with Mr. Pridgon:
"QUESTION: Now, when you saw him hit her with the two-by-four, can you tell us if it was one time that he hit her or more than one time.
ANSWER: He hit her several times.
QUESTION: And on each time that he would hit her can you tell us anything about where he was hitting her?
ANSWER: He was hitting her over here and both sides, just kept beating her." References indicating.
"QUESTION: All right. Now, what you showed with your hands was both sides of your head.
ANSWER: Yeah. Just keep" -- strike that.
"ANSWER: Yeah, just kept beating her.
QUESTION: And you said, 'Just kept beating her'.
ANSWER: Yeah. Just kept beating her.
QUESTION: When -- when he -- when the Defendant hit the lady the first time, the first time he hit her was she -- was she standing up or down?
ANSWER: No, she fell down. She was -- she was stage.
QUESTION: I'm sorry?
ANSWER: She fell down and she started going - - going through stage, like, going into shock or something like going grumbling, making kind of a grumbling sound."

The Court also does not question the credibility of the following testimony of Paul Pridgon, trial transcript pages 5324 through 5326:

"QUESTION: All right. Now, you said he had his hand right here?
ANSWER: On her throat.
QUESTION: On the throat? Okay? And you showed me something with your hand. What -- what was it that you saw him doing with his hand?
ANSWER: He tore up her blouse and stick his hand up there in her bosom.
QUESTION: But a minute ago you had your hand with your fingers by the throat.
ANSWER: Right here, and doing something like this to her.
QUESTION: When you say 'something like this,' you are showing his fingers to go on either side of her throat.
ANSWER: Yeah. On her throat, pressing on her throat.
QUESTION: Pressing on her throat, is that right?

57

ANSWER: That's right.
QUESTION: And then going into the blouse, was that after pressing on the throat?
ANSWER: Yes.
QUESTION: And what did you see when you say he went in the blouse?
ANSWER: He came out with some money.
QUESTION: Were you able to tell exactly how much money?
ANSWER: No. I can't tell how much it was, but I knew it was a lot of money.
QUESTION: And can you -- were you able to tell if it was coins or paper?
ANSWER: It was paper.
QUESTION: From what you could see, did it appear to be more than one piece of paper money or just one piece?
ANSWER: He came out with a lot of money.
QUESTION: He came out --
ANSWER: With a handful of money.
QUESTION: A handful?
ANSWER: Hmm.
QUESTION: Now, you have been gesturing with your hand to the -- the breast area on your body. Is that where you saw him to reach in and come out with the money?
ANSWER: Yes.
QUESTION: What's the next thing that happened after you saw him come out with the money?
ANSWER: He got off of her.
QUESTION: And then what happened?
ANSWER: Then he grabbed me and said if I say something he's going to kill me.

The Court will not attempt to reconcile the inconsistencies in Mr. Pridgon's testimony including but not limited to the fact that the money -- money was found in Sandra Simms' brassiere at the time her body was discovered. The Court can only reiterate that at no time has the Court questioned the credibility of Mr. Pridgon on the fact that the Defendant killed Sandra Simms and took money from her person at the time of the killing.

The Defendant seems to argue that little weight should be placed on the corroborative evidence in the case. Pridgon led the investigators to the board believed to be the murder weapon, to a small knife which may have been involved in the crime, and buttons apparently torn from Sandra Simms' shirt were found in the vicinity of the body which would be circumstantial evidence of robbery.

The Defendant argues that there was no motive to rob Sandra Sims. The Court accepts the credibility of Paul Pridgon when he testified that the Defendant Raymond Lewis told him that he intended to hit the victim and take her money.

The Court emphatically rejects any argument Paul Pridgon hallucinated the death and manner of killing of Sandra Simms.

A significant piece of evidence has not been mentioned by the Defendant in his points and authorities. Detective Tom Sanchez testified that the time of the Defendant's arrest he pointed to a pair of white tennis shoes, i.e., circumstantially claiming ownership of them. At trial, the criminalist Rodn[e]y Andrus testified that the blood found on one of the tennis shoes was consistent with the blood of Sandra Simms. Michelle Boggs, the Defendant's one-time

58

girlfriend, testified the Defendant had worn white shoes. The Court found no substantial impeachment of either Detective Sanchez or Michelle Boggs.

The Court finds that the Defendant Raymond Anthony Lewis - - strike that. The Court finds that the Defendant Raymond Anthony Lewis to have been an unbelievable witness based on his prior convictions of robbery in violation of Penal Code Section 211 and receiving stolen property in violation of Penal Code Section 496.1.

For those reasons, the motion for a new trial is denied.

(2/20/91 RT 34-39.)

The California Supreme Court found no error in the trial court's denial of the motion for new trial, stating that:

After the jury returned its verdicts, defendant moved for a new trial claiming that Pridgon's testimony was unreliable, and therefore, the verdict was "contrary to ... evidence" under section 1181, subdivision 6. The trial court denied defendant's motion, finding substantial evidence that supported the fact that defendant committed the murder. The court found that irrespective of Pridgon's impeachment, the witnesses and evidence pointed to defendant as the killer; this included Pridgon as an eyewitness, defendant's motive to kill Simms, Pridgon's lack of a motive to kill Simms, and the tennis shoes containing blood consistent with Simms's, which were linked to defendant.

Defendant argues that the trial court should have granted his motion for a new trial because the evidence supporting the guilty verdict was insufficient given Pridgon's incompetent testimony, which was not independently corroborated. Defendant points out that the tennis shoes did not implicate defendant, but rather Pridgon. He emphasizes that the prosecution's criminologist could not determine the source of the bloodstains. Moreover, he claims he did not ask for the tennis shoes, but rather Detective Sanchez handed them to him when he was arrested. A shoe store owner testified that the tennis shoes, which were women's shoes, fit Pridgon better than they fit defendant. Defendant argues that the trial court should have evaluated Pridgon's testimony with "great caution," because his testimony was crucial to the prosecution's case, and in particular, because Pridgon suffered from mental defects. (*See People v. McCaughan*, *supra*, 42 Cal. 2d at p. 421; *People v. St. Andrew* (1980) 101 Cal. App. 3d 450, 459 [161 Cal.Rptr. 634].)

On a motion for a new trial, a trial court must review the evidence independently, considering the proper weight to be afforded to the evidence and then deciding whether there is sufficient credible evidence to support the verdict. (*People v. Davis* (1995) 10 Cal. 4th 463, 524 [41 Cal.Rptr.2d 826, 896 P.2d 119].) "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion. [Citation.]" (*People v. Hayes* (1999) 21 Cal. 4th 1211, 1260-1261 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

Based on our review of the record, we find no abuse of discretion. The record reflects that Pridgon had personal knowledge of the crime, which included his

capacity to perceive and recollect. (*See ante*, at pp. 358-359.) Moreover, contrary to defendant's contention, evidence corroborated Pridgon's testimony. The pathologist confirmed Pridgon's description of the murder and how it took place. Pridgon also led detectives to the murder weapon, which indicated that he witnessed the murder. Moreover, Detective Sanchez testified that when he asked defendant to get his shoes when he was arrested, defendant pointed to the tennis shoes in question. Boggs also recalled that defendant wore white tennis shoes, which were below the ankle, when he was arrested, and that he had no other shoes besides them. Also, blood tests on the shoes revealed that at least one spot was human blood, and consistent with Simms's blood PGM type: two-plus, two-minus. The Attorney General also points out that defendant, unlike Pridgon, had a motive to kill and rob Simms because he had no money. He also had the motive to kill to avoid returning the money Simms gave him to purchase drugs, and to silence her nagging about his returning her money. Moreover, assuming the trial court had a duty to exercise great caution in viewing Pridgon's testimony, there is nothing in the record to show that the court failed to do so.

We also reject defendant's contention that the evidence was insufficient to support the verdict. For challenges relating to the sufficiency of the evidence, "the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence-evidence that is reasonable, credible and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Kraft* (2000) 23 Cal. 4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Here, as explained, the evidence was sufficient. Thus, we conclude that the trial court's denial of defendant's motion for a new trial did not result in an abuse of discretion. (*See People v. Hayes*, *supra*, 21 Cal. 4th at pp. 1260-1261.)

*Lewis,* 26 Cal. 4th, at 364–65.

The California Supreme Court reasonably was unpersuaded that Pridgon lacked the ability to testify from personal knowledge, for the reasons stated. Apparently acknowledging as much, counsel treated Pridgon's mental state as a matter for impeachment rather than as going to threshold competency. (*See* RT 5288- 64; 5395-06, 5525-5602; 6295-96, 6302-04; *cf.* RT 5548, 5587, where Pridgon was unable to identify the number of days in a month and minutes in an hour); *Lewis*, 26 Cal. 4th, at 357. "The combined effect of the [] elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings." *Craig*, 497 U.S. at 846. For the reasons stated, the California Supreme Court reasonably could conclude Petitioner failed to show

1   Pridgon's testimonial incompetence when considering these elements in the context of the facts

2   and circumstances of this case.

3         Petitioner's passing arguments that Pridgon's alleged penchant for dishonesty (RT

4   5826, 5832), desire to deflect attention from his own participation in Simms's killing (Doc. No.

5   58-1 ¶ 94), and fear Petitioner would carry out threats against him (RT 6958-63), do not

6   suggest Pridgon lacked personal knowledge, but rather could be seen as going to evidentiary

7   weight.

8         *ii.      Testimonial Competence*

9         Petitioner alleges that Pridgon was unable to testify understandably and with

10  cognizance of the duty to tell the truth.  He faults the trial court for denying his motion to strike

11  as incompetent Pidgeon's testimony at the preliminary hearing.  (CT 66-67, 107, 114-116);

12  Evid. Code § 701(a).[8]

13        Petitioner revisits his arguments relating to Pridgon's mental state, discussed above.

14  (*See* Doc. No. 89 at 80); *Arms*, 107 U.S. at 521 ("a determination of testimonial competency

15  must give due consideration to evidence from any competent witnesses who can speak to the

16  nature and extent of his [incompetence].").  He focuses on the noted evidence in the record that

17  Pridgon was mentally slow with an IQ of 69 and diagnosed borderline intellectual functioning

18  (*see* RT 5507, 7051-52), and that Pridgon's drug use placed him in psychiatric care on more

19  than one occasion (*see* CT 429-46).

20        In California, testimonial capacity requires both the ability to communicate

21  understandably and to understand the duty to tell the truth.  (Evid. Code § 701.)  In this case,

22  the California Supreme Court noted that "[trial counsel] agreed with the court that the issue

23  whether Pridgon's capacity to perceive and recollect was impaired was a matter of

24

25

26  _____

27  [8] Evidence Code section 701(a) provides: "(a) A person is disqualified to be a witness if he or she is: (1) Incapable
    of expressing himself or herself concerning the matter so as to be understood, either directly or through
    interpretation by one who can understand him; or (2) Incapable of understanding the duty of a witness to

28  tell the truth."

impeachment" pursuant to Evidence Code section 780,[9] *Lewis*, 26 Cal. 4th, at 353, and that neither party requested a hearing outside the jury to determine whether Pridgon was qualified to testify, *id.*

Petitioner acknowledges the trial court found Pridgon to be testimonially competent when it denied his motion for new trial, *viz.*:

> [T]he trial court addressed the issue of Pridgon's competence to perceive, recall and testify to the facts of this crime once and only once. This was when it denied the motion for new trial, holding that even though it was "clear" that Pridgon suffered from "some type of mental problem," RT 2/20/91 at 34, the court's own observations of Pridgon as he testified led the court to "emphatically" reject any argument that Pridgon "hallucinated the death and manner of killing of Sandra Simms." [RT 2/20/91 at 38-39.]

(Doc. No. 58-1 at 47.)

The California Supreme Court considered and rejected allegations that Pridgon was testimonially incompetent, stating that:

> Defendant also contends that Pridgon was incompetent to testify under Evidence Code section 701, subdivision (a). A person is incompetent and disqualified to be a witness if he or she is "[i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him" (Evid. Code, § 701, subd. (a)(1)), or is "[i]ncapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a)(2).) "[T]he burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. [Citations.]" (*People v.*

---

[9] See Evidence Code section 780 which provides that "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following:
(a) His demeanor while testifying and the manner in which he testifies.
(b) The character of his testimony.
(c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies.
(d) The extent of his opportunity to perceive any matter about which he testifies.
(e) His character for honesty or veracity or their opposites.
(f) The existence or nonexistence of a bias, interest, or other motive.
(g) A statement previously made by him that is consistent with his testimony at the hearing.
(h) A statement made by him that is inconsistent with any part of his testimony at the hearing.
(i) The existence or nonexistence of any fact testified to by him.
(j) His attitude toward the action in which he testifies or toward
the giving of testimony.
(k) His admission of untruthfulness."

*Anderson, supra,* 25 Cal. 4th at p. 573; *see also People v. Mincey* (1992) 2 Cal. 4th 408, 444 [6 Cal.Rptr.2d 822, 827 P.2d 388].) The challenging party must establish a witness's incompetency by a preponderance of the evidence. (*People v. Farley* (1979) 90 Cal. App. 3d 851, 869 [153 Cal.Rptr. 695, 12 A.L.R.4th 301]; *see also* Evid. Code, § 405; 1 Jefferson, Cal. Evidence Benchbook, *supra,* § 25.6, p. 400.) Unlike a witness's personal knowledge, a witness's competency to testify is determined exclusively by the court. (3 Witkin, Cal. Evidence, *supra,* Presentation at Trial, § 61, p. 93; *see* Evid. Code, § 405, subd. (a).)

Defendant failed to object at trial to Pridgon's competency and in fact expressly stated that Pridgon was competent to testify. Accordingly, his claim is waived on appeal. (*People v. Cudjo, supra,* 6 Cal. 4th at p. 622 ["[d]efendant may not circumvent this objection requirement by claiming that the trial court should have inquired into the witness's qualifications on its own"].) Defendant argues, however, that he effectively retracted his waiver by later moving to strike Pridgon's entire testimony during trial. Assuming, however, that defendant timely and specifically objected to Pridgon's competence through his motion to strike (Evid. Code, § 353, subd. (a)), we find no substantial basis for the trial court to determine that Pridgon was incompetent to testify.

Although Pridgon may have suffered from mental disorders and his testimony was difficult to comprehend at times, the record does not support the claim that he was incapable of communicating so as to be understood, pursuant to Evidence Code section 701, subdivision (a)(1). (*See People v. Anderson, supra,* 25 Cal. 4th at p. 574 [no substantial evidence that witness, who delusionally believed imaginary son was present during murder, lacked capabilities under Evid. Code, § 701, subd. (a)(1) & (2)]; *People v. Jones, supra,* 268 Cal. App. 2d at pp. 165-166 [prosecution witness characterized as a "mental defective" by trial judge was not incompetent despite his conflicting and inconsistent testimony]; *People v. Scaggs* (1957) 153 Cal. App. 2d 339, 354 [314 P.2d 793] [record did not disclose that witness who was described as senile and of unsound mind was incompetent as a matter of law].) Consistent with Pridgon's diagnosis of having the intellect of a seven-year-old, he expressed difficulty with complex questions and often responded in incomplete, sometimes nonsensical, sentences. Mere difficulty in understanding a witness, however, does not disqualify that witness under Evidence Code section 701, subdivision (a). To the extent defendant contends Pridgon's responses were unbelievable-including his testimony that he "heard" blood and knew how money "sounds"-this was an issue of credibility for the jury and not relevant to the issue of Pridgon's competency. (*See Adamson v. Department of Social Services* (1988) 207 Cal. App. 3d 14, 20 [254 Cal.Rptr. 667].) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]" (*People v. Jones, supra,* 268 Cal. App. 2d at p. 165.)

Moreover, the fact that Pridgon initially refused to answer defendant's question regarding Simms's strangulation did not establish by a preponderance of the evidence that he did not understand the duty to tell the truth. (Evid. Code, § 701, subd. (a)(2).) After Pridgon's refusals to answer, defense counsel asserted that "I think [Pridgon's] lying right now." This, however, is a question of credibility for the jury as trier of fact. (*See* Evid. Code, § 780, subd. (a) [witness's "demeanor while testifying and the manner in which he testifies" may be relevant to credibility].)

> In sum, even assuming that defendant properly objected to Pridgon's competency to testify, there was no substantial basis for the trial court to exclude Pridgon's testimony on this ground. (Evid. Code, § 701, subd. (a).) Moreover, the record supports that the trial court would have rejected defendant's challenges to Pridgon's competency. Thus, we also reject defendant's claim of ineffective assistance of counsel based on counsel's failure to object to Pridgon's lack of competency. Where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People v. Cudjo, supra,* 6 Cal. 4th at p. 616.)

*Lewis*, 26 Cal. 4th, at 360–61.

Petitioner has not shown the California Supreme Court was unreasonable in these regards. That court reasonably found that notwithstanding Pridgon's alleged "mental disorders, mild mental retardation, and substance abuse," *id.* at 349, 354-55, 375, he was capable of communicating intelligibly, for the reasons stated by that court and those discussed above. *See id.* at 360.

Additionally, although Pridgon demonstrated a somewhat limited fund of knowledge (for example, he was unable to state the number of minutes in an hour [*see* RT 5587] and the length of a mile [*see* RT 5588]), he nonetheless showed an awareness of the nature and seriousness of proceedings against Petitioner and his role as witness in those proceedings. Pridgon testified that he raised his right hand and swore to tell the truth. (RT 5347.) He testified that he knew the difference between a lie and the truth. (RT 5423.) He testified that he would not answer a question he did not understand. (*Id.*) He testified that Simms's killing was "something real serious", that "[he was] tired of my people getting killing, tired of everybody getting killed … [l]ife ain't nothing to play with … once a soul gone, you cannot bring it back." (RT 5351.)

Petitioner's further argument that the trial court abdicated its responsibility to make competency findings, *see* Evid. Code sections 403, 701, appears refuted by the noted record. Notably, the defense waived challenge to Pridgon's competency, deciding instead to address the matter by impeaching his credibility under state law on the theory that Pridgon could not discern reality from fantasy. (RT 4444-64); Evid. Code § 780.

64

Petitioner alleges the trial court erred as a matter of state law by failing to instruct the jury on the issue of witness competency and personal knowledge.  (*See* Doc. No. 58-1 at 48.)

The California Supreme Court considered and rejected the argument, as follows:

Defendant did not request an instruction that Pridgon's capacity to perceive and recollect was a preliminary fact that the jury must find before it may consider Pridgon's testimony. (Evid. Code, § 403, subds. (a)(2), (c)(1).) However, defendant maintains that the trial court should have given this instruction sua sponte. In addition, defendant argues that the trial court should have "subsequently determine[d]" that Pridgon's personal knowledge was not proven as a preliminary fact, and therefore should have instructed the jury to disregard his testimony. (Evid. Code, § 403, subd. (c)(2).) We discuss each issue in turn.

Under Evidence Code section 403, subdivision (c)(1), if the court admits evidence subject to the existence of a preliminary fact, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." On its own terms, this provision makes it discretionary for the trial court to give an instruction regarding a preliminary fact unless the party makes a request. Because defendant failed to do so, the trial court was not required to instruct the jury that Pridgon's capacity to perceive and recollect was a preliminary fact that had to be found before the jury could consider his testimony. (Evid. Code § 403, subd. (c)(1).)

Nor was the trial court required to instruct the jury sua sponte. Contrary to defendant's contention, his challenge to Pridgon's capacity to perceive and recollect was not a defense per se or a theory of his case, but an evidentiary issue serving to limit Pridgon's testimony. Thus, the cases upon which defendant relies are inapposite. (*See, e.g.*, *People v. Sedeno* (1974) 10 Cal. 3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913] [sua sponte duty to instruct on involuntary manslaughter upon evidence of diminished capacity]; *People v. St. Martin* (1970) 1 Cal. 3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390] [sua sponte duty to instruct on issue of provocation]; *People v. Splawn* (1985) 165 Cal. App. 3d 553, 559 [211 Cal.Rptr. 638] [sua sponte duty to instruct on lesser included offense of attempted disposal of insured property with intent to defraud].) Indeed, the foregoing distinction is underscored by the purpose for this Evidence Code section 403, subdivision (c)(1), instruction in this case. Defendant's proposed sua sponte instruction would merely have told the jury the obvious: that if it found Pridgon could not perceive or recollect, i.e., that he hallucinated the murder and robbery, then the jury should disregard his testimony. Our faith in the common sense of jurors weighs against requiring a trial court to give such instruction sua sponte.

We also reject defendant's contention that the trial court should have subsequently instructed the jury to disregard Pridgon's testimony because the "jury could not reasonably find that the preliminary fact [of Pridgon's capacity to perceive and recollect] exists." (Evid. Code, § 403, subd. (c)(2).) Contrary to defendant's suggestion, we cannot conclude that "no reasonable person could find that [Pridgon] had personal knowledge of the circumstances," such that the trial court should have excluded his testimony as a matter of law. (*People v.*

*Blagg* (1970) 10 Cal. App. 3d 1035, 1039 [89 Cal. Rptr. 446]; Evid. Code, § 403, subd. (c)(2).)

Based on testimony of both prosecution and defense expert witnesses, the record reflects that Pridgon did not suffer from severe mental defects which substantially affected his testimony, or that Pridgon's cocaine use substantially interfered with his ability to perceive and recollect. Further, there was no evidence as to exactly when Pridgon stopped taking the major tranquilizer Mellaril, or that he would otherwise experience hallucinations without taking the medication, from which to infer that Pridgon experienced hallucinations on the day of the murder, as defendant contends. Regarding defendant's claim that Pridgon confabulated Simms's strangulation after he overheard the pathologist testify, Pridgon made gestures at the preliminary hearing indicating that he saw defendant strangle Simms before the pathologist testified. Moreover, Pridgon's failure to mention the strangling to Detective Sanchez or Lorene Allen may have been based on the detective's failure to include this in his report, and on Allen's statement that she did not want to know anything about the murder, which would cause Pridgon not to give her further details. Indeed, when the prosecution read the excerpt from the detective's report, which did not contain details of the strangling, Pridgon interjected that he recalled that defendant bent over Simms, put both hands on her neck, and attempted to strangle her before taking her money.

In addition, Pridgon's statement that he was "tired of my people getting killed" was not a delusional belief Pridgon had that he was a protector of an unidentifiable group. Rather, it was a statement reasonably interpreted that Pridgon, who was a Black man, was tired of fellow Black people, like Simms, getting killed. Moreover, Pridgon's statement that he was attempting to help Simms by falling on his bad knee was not inconsistent with his preliminary hearing testimony, and he eventually reaffirmed this statement during cross-examination. Finally, Pridgon's inability to tell time, including the exact time of the murder, would be consistent with his having the intellect of a seven-year-old.

In short, we conclude that the trial court did not err by failing to sua sponte instruct the jury regarding Pridgon's capacity to perceive and recollect as a preliminary fact (*see* Evid. Code, § 403, subd. (c)(1)), or by failing to instruct the jury to disregard Pridgon's testimony. (Evid. Code, § 403, subd. (c)(2).) Thus, we reject defendant's constitutional claims in this regard. For similar reasons, we reject defendant's claim of ineffective assistance of counsel for failure to request such instructions. Because there was no reasonable likelihood of prejudice in that the instructions would not have provided necessary guidance to the jurors, we need not determine whether counsel's performance was deficient. (*People v. Cox* (1991) 53 Cal. 3d 618, 656 [280 Cal.Rptr. 692, 809 P.2d 351] [two-pronged test for ineffective assistance of counsel claim].)

*Lewis*, 26 Cal. 4th, at 361-64.

In the first instance, the decision regarding whether a witness is competent to testify presents a question of state law and does not raise a cognizable federal question. *See, e.g.,* *Kentucky v. Stincer*, 482 U.S. 730, 742 n.12 (1987) (noting differing state laws regarding

testimonial competency); *Schlette v. California,* 284 F.2d 827, 834–35 (9th Cir. 1960) (question whether witness was disqualified to testify was adjudicated under state law and no federal question was presented). Although federal rights may be implicated in some circumstances, *see, e.g*., *Walters v. McCormick,* 122 F.3d 1172, 1176 (9th Cir. 1997) (due process may necessitate trial court hearing on witness competence), Petitioner has not demonstrated the failure to hold such a competency hearing was an abuse of discretion on the facts and circumstances presented in this case, for the reasons discussed, *ante.*

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief. *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

Furthermore, claims of instructional error will constitute a violation of due process under the Fourteenth Amendment only where the alleged error by itself infects the entire trial to such an extent that the resulting conviction violates due process. *Cupp v. Naughten,* 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Where the alleged error is the failure to give an instruction, the burden on the Petitioner is "especially heavy." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *see also Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).

Even assuming instructional error as alleged, Petitioner does not appear to demonstrate that he was denied a fundamentally fair trial. *See Chambers v. Mississippi*, 410 U.S. 284, 294, 303 (1973). The record reflects the jury was instructed upon consideration of evidence relating to witness credibility and personal knowledge, including in pertinent part as to witness credibility (CT 614, CALJIC 2.20); inconsistent statements by witnesses (CT 613, CALJIC 2.13); discrepancies in witness testimony (CT 616, CALJIC 2.21.1); conflicting testimony (CT 618, CALJIC 2.22); believability of a witness (CT 620, CALJIC 2.24); and eyewitness testimony identifying the perpetrator (CT 631, CALJIC 2.92).

The Sixth Amendment right of confrontation is satisfied "when the defense is given a

full and fair opportunity to probe and expose [the witness's] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *See Delaware v. Fensterer,* 474 U.S. 15, 22 (1985). Petitioner has not demonstrated that he was denied such an opportunity in this case, for the reasons stated.

### iv.    *Conclusions*

The California Supreme Court reasonably found that Pridgon was capable of intelligibly and truthfully relating what he saw and heard the night Simms was killed, as discussed above, summarized below.

The evidence from defense experts generally suggests Pridgon's low intelligence, borderline personality disorder, substance abuse, and some psychotic episodes relating to substance abuse. The suggestion posited by defense expert Dr. Pickering that these factors might have combined to impair Pridgon's ability to perceive and recollect events surrounding Simms's killing and to confabulate in his recollection is subject to discount. On cross-examination, Dr. Pickering appeared to walk back these opinions, suggesting that Pridgon presented only a borderline personality with a substance abuse overlay. (*See* RT 5988-6059.)

Dr. Pickering testified that Pridgon complained of being possessed by evil spirits; paranoia; feelings that he must injure himself or others; and hearing voices. (RT 6072-73.) However, Dr. Pickering's testing also revealed that Pridgon was possibly faking responses to his test questions in a way that would suggest mental disorder. (RT 5958-60.) Dr. Pickering suggested that Pridgon pretends to be slower than he really is. (RT 5986.)

The California Supreme Court reasonably could have discounted the defense theory that Pridgon's mental health complaints registered in the summer of 1987 with Ms. Mancebo and Dr. Moulder and treated by Dr. Kinsey continued to June 1988 when Simms was killed. (*See, e.g.*, RT 6089-90.) Defense expert Dr. Deutsch opined that not everyone who uses cocaine suffers memory loss. (RT 6136.) To the extent Pridgon may have suffered cocaine related psychotic episodes months prior to Petitioner's trial, Dr. Deutsch's testimony suggests

psychotic symptoms would have resolved shortly after the triggering substance abuse abated. (RT 6123-38.)

Although Pridgon admitted to smoking cocaine frequently around the time Simms was killed (RT 5339), Petitioner has not demonstrated Pridgon was impaired thereby to the point of testimonial incompetence. Dr. Terrell testified that he saw no evidence Pridgon was actively psychotic on the night Simms was killed. (RT 6839.) He suggested that Pridgon's psychological makeup was such that he does not fight with people unless provoked and that he has not used lethal force in any such confrontation. (RT 6865-66.) Dr. Terrell opined that Pridgon's account of the killing to detective Sanchez was not typical of hallucination because it lacked any bizarre and unrealistic quality. (RT 6788.)

Significantly, Pridgon was able to provide statements, interviews, and sworn testimony over the two years between the crime and judgment of conviction. (RT 5288-5602; 6295-6304; 6746-6748.) Petitioner has not demonstrated on the evidentiary record that during the course thereof Pridgon lacked an understanding of his duty to tell the truth and an ability to make himself understood. His concern for truth telling is exemplified by his concern for and correction of an errant litigation chronology. (*See* RT 5341.) The jury and trial court found Pridgon to be a believable witness, suggesting he was able to intelligibly and truthfully relate what he perceived of the event surrounding Simms's death.

The California Supreme Court reasonably could have credited Pridgon's testimony at trial that after Petitioner assaulted Simms and took her money, Petitioner grabbed him and stated he would kill him if he talked, which made Pridgon "nervous and afraid." (RT 5326.) Although Pridgon testified that he was afraid of Petitioner (RT 5581), Dr. Terrell opined that such stress would affect "mostly the smaller details and less so the bigger picture." (RT 6783.) That court reasonably found that although Pridgon's testimony included "inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations . . ." and was at times "incomprehensible . . ." *Lewis*, 26 Cal. 4th, at 357, "the record reflects that Pridgon had personal knowledge of the crime, which included his capacity to perceive and recollect." *Id.* at

364-65.

Petitioner's disagreement with the state court's competency determination is not alone a basis for federal habeas relief. *Waddington v. Sarausad*, 555 U.S. 179, 192 n.5 (2009); *see also Horton v. Mayle*, 408 F.3d 570, 576 (2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").

The California Supreme Court reasonably rejected Petitioner's allegations relating to Pridgon's testimonial competency and personal knowledge. Petitioner has not shown a due process deprivation, an error that infected the fairness and reliability of his proceeding. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (1988); *McGuire*, 502 U.S. at 72 (quoting *Naughten*, 414 U.S. at 147). The state court applying state law precepts found Pridgon competent to testify. The state court's interpretation of its own competency standard is binding upon this Court. *See United States v. Ramos,* 39 F.3d 219, 220 (9th Cir. 1994) ("a state court's interpretation of its statutes is binding on the federal courts unless a state law is inconsistent with the Federal Constitution").

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 1 shall be denied.

**C.      Claims Relating to Sufficiency of the Evidence**

1.      Legal Standards

**a.      Trial Court Error**

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. at 294, 303.

**b.      Sufficiency of the Evidence**

A federal habeas court reviews challenges to the sufficiency of the evidence by

determining whether in "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). "A reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010).

Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with reference to substantive requirements as defined by state law. *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979). In cases where the evidence is unclear or would support conflicting inferences, the federal court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Id.* at 326. To prevail here, Petitioner must show "that the prosecution's case against him "was so lacking that the trial court should have entered a judgment of acquittal." *McDaniel*, 558 U.S. at 131.

Evidence is sufficient under the due process clause where "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).

AEDPA adds another layer of deference over the already deferential *Jackson* standard. Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the *Jackson* standard when reviewing the Petitioner's claim. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1275 n.12 (9th Cir. 2005); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (recognizing that "unreasonable application" standard applies to insufficient evidence claim). "Expressed more fully, this means a reviewing court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel*, 558 U.S. at 133.

c. **Predicate State Offense**

In California "murder is the unlawful killing of a human being . . . with malice aforethought." Penal Code § 187(a). "[A]ll murder which is perpetrated . . . by any kind of willful, deliberate, and premeditated killing . . . is murder of the first degree. . . ." Penal Code § 189; *see also People v. Berryman*, 6 Cal. 4th 1048, 1085) (1993), *overruled on other grounds*, *People v. Hill*, 17 Cal. 4th 800, 822-23 (1998).

Premeditation and deliberation are generally established by proof of (1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing. *People v. Anderson*, 70 Cal. 2d 15, 26-27 (1968). The California Supreme Court "sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." *Id.* at 27.

However, the California Supreme Court has clarified that "the *Anderson* guidelines are descriptive, not normative." *People v. Koontz*, 27 Cal. 4th 1041, 1081 (2002). "[T]he *Anderson* factors, while helpful for purposes of review, are not a *sine qua non* to finding first degree premeditated murder, nor are they exclusive." *People v. Perez*, 2 Cal. 4th 1117, 1125 (1992); *see also Davis v. Woodford,* 384 F.3d 628, 640 n.3 (9th Cir. 2004).

2. Claim 2

Petitioner alleges Pridgon's testimony is not reliable and sufficient evidence supporting the guilty verdict because Pridgon was then incompetent and his testimony uncorroborated, violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. (Doc. No. 58-1 at 50-52; *see also* Doc. No. 89 at 59, 87.)

a. **State Court Direct and Collateral Review**

The California Supreme Court considered and rejected these allegations, couched as instructional error, on direct appeal. (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-H at 23-31, 34-35); *Lewis*, 26 Cal. 4th, at 361-645, 370-71.

b. **Analysis**

Petitioner argues that Pridgon's testimony is legally insufficient to support the verdict because it is incompetent, unsupported by personal knowledge, and uncorroborated by the evidence at trial. He argues that Pridgon, twice a felon and possibly a participant in the killing of Simms, lacked credibility.

Petitioner's allegations relating to Pridgon's competence and personal knowledge fail to the extent discussed in claim 1, *ante*. Petitioner's further arguments in these regards, discussed below, fare no better.

### i.     *Evidence Corroborating Pridgon's Testimony*

Petitioner revisits his argument that Pridgon's testimony was not supported by other evidence. The California Supreme Court considered and rejected allegations relating to corroboration, stating that:

> Pridgon's testimony was sufficiently corroborated. As discussed, Detective Sanchez testified that defendant pointed to the bloody tennis shoes as his, and tests later confirmed that a bloodstain on one shoe was consistent with Simms's PGM type. Based on her refreshed recollection, Boggs testified that the shoes the police took when they arrested defendant were defendant's, and that he had no other shoes besides those. Also, Pridgon's description of how Simms's murder took place was corroborated by the pathologist.

*Lewis*, 26 Cal. 4th, at 370-71.

That court's conclusions are supported by the record as discussed above and below.

### (1)     Petitioner was Motivated to Kill Simms

Petitioner denies that on the night of the killing he needed money (RT 6471-72). He denies being "hooked on" cocaine, though he admitted smoking cocaine that evening. (RT 6386; *see also* 2SHCP Ex. 11 at 243, 247.) He argues that he felt no pressure to repay the $20 Simms had given him that evening because he and Simms had a practice of lending money to one another. (RT 6468.) He argues that he would not have killed Simms because as he told the jury, she was "like a mother to [him]." (RT 6469.)

However, the record suggests that Petitioner needed money on the night Simms was killed. Petitioner had known Simms for more than a month; he had personal relationship with

73

her as well as financial and drug dealings - Simms apparently was funding the drugs they shared. (*See* RT 4872, 4875-76, 5057, 5274-75, 5308, 5310-11, 5717, 6054, 7326.) Petitioner's then girlfriend, Michelle Boggs, although denying Petitioner told her he was "broke" that night (RT 4823; *see also* 4827, 4891, 4895), told police that to her knowledge Petitioner had no funds of his own on the night Simms was killed (RT 5056, 6936; 2SHCP Ex. 11 at 267-68).

The record suggests that when Petitioner went to buy drugs for Simms on the evening of her death he had no funds other than the $20 Simms had given him. (CT 57-58; RT 6341, 6594, 6609, 6625.) Petitioner himself denied telling Pridgon or anyone else that he had a bank account and was going to the bank on the evening Simms was killed. (RT 6477-78; *cf.* RT 5194 where witness Betty Thomas states the contrary, and CT 40 where Pridgon states the contrary.)

According to Pridgon: (i) Petitioner had spent the $20 Simms loaned him on drugs that he did not share with Simms (RT 5307-11); and (ii) when Simms repeatedly demanded her $20 back (*id.*; *see also* RT 4872, 5307-08, 5310-11, 5717, 6054, 7326), Petitioner seemingly had no money to give her (s*ee* RT 4872, 4875-76, 5057, 5274-75), repeatedly telling Simms he would get it (*see* RT 5307-11).

When Petitioner went out later that evening with Simms and Pridgon, purportedly so that Simms could buy "$100 worth of crack for $30" (RT 4881-4883, 5015, 5058, 5276-5277, 5311. 6465), Petitioner presumably believed that Simms had at least $30 on her person and possibly more as she had been paid early that day for her work at Carl's Jr. (RT 4287, 4431-34, 4438, 4741-48, 4759-60, 5051.) Petitioner had known Simms for more than a month and was aware of her home and work routine. (RT 4797, 4818, 6326-28.)

Boggs confirmed Pridgon's testimony, that as Simms and Petitioner left to buy drugs, Pridgon was present. (RT 4881-83, 4886, 5015, 5058-59, 5276-77, 6465.) Petitioner confirmed that on the evening Simms was killed, he left with Simms and Pridgon and went to the gate of Pridgon's apartment, (RT 6381-82), proximal to the alley where Simms was killed.

(*See* RT 4336-37, 5288-89, 5336.)

When police found Simms's body, her blouse appeared to have been torn open, with buttons on the ground nearby (RT 4253-64, 4272-77, 4337-38, 4512-13); her bra was exposed and a folded $20 bill was visible in her bra (RT 4257, 4263-64, 4272-84, 4286, 4348). The facts reasonably could suggest that at least $10 was taken from Simms's person at the time of the attack.

Petitioner admittedly had seen Simms keep money in her bra. (RT 6351.) The record reasonably suggests that as Pridgon testified, Petitioner took cash from Simms's bra area and left a $20 bill left behind, possibly missing it in the low light at the crime scene. (RT 4272, 4341, 5397, 6384, 6387.) Significantly, although Petitioner was apparently without funds at the time (RT 4893-94, 5060-61, 5279), he inexplicably came up with money sufficient to buy at least $30-$40 worth of crack cocaine after Simms went missing (RT 4889, 4974, 5059-60, 5206, 5277, 6480, 6491).

Although Petitioner speculates the buttons from Simms's blouse were removed by paramedics during attempts at resuscitation (*see* Doc. No. 89 at 85 citing RT 4264), he does not point to facts in the record in support. The paramedic's monitoring leads that may have been attached to Simms's chest area do not necessarily suggest an inference that emergency medical personnel tore off the buttons. (*See* RT 4258-65, 5675.)

**(2)**   **Witness Testimony and Forensic Evidence Corroborating Pridgon**

Betty Thomas, who shared Pridgon's apartment, confirmed Pridgon's account that on the night Simms was killed, Petitioner and Pridgon returned to the latter's apartment, having earlier smoked cocaine there, with still more cocaine. She noticed that both were sweating. (RT 5197.) They told her that they had been jogging. (RT 5196-99.) Thomas testified that as she, Petitioner and Pridgon later left the apartment, a person told them "Don't go through the alley because this [B]lack guy done killed a woman."[10]  (RT 5202, 5223-24.)

Lorene Allen, who was staying with Pridgon in his apartment along with her daughters

_____

[10] The record reflects that Petitioner is Black. (CT 1041.)

Betty Thomas and Rhonda Allen and son Jimmy Allen, testified that when Pridgon returned to the apartment as the police were investigating the crime scene, he was by himself and upset. (RT 6236-40.) Pridgon told her "I know who did it." (RT 6240.) Jimmy confirmed this in his testimony (RT 6265) and that Pridgon spoke of Petitioner's threat to kill him if he told anyone what had happened. (RT 6270-71.) Lorene did not believe Pridgon and asked Pridgon's mother, Irma Anderson to come over. (*Id.*) Irma believed her son and took him down to talk with the police later that morning. (RT 6244.)

The apparent murder weapon located by Pridgon, a wooden two-by-four admitted into evidence at trial, matched splinters in Simms hair (RT 4275, 4280, 4301, 4342-43, 4514, 4521, 4376-80) and had stains (RT 4354, 4377) that tested positive for human blood (RT 4375, 4383).

The pathologist who autopsied Simms, Dr. Jerry Nelson, testified that the injuries he found, lacerations, bruises and abrasions about decedent's right and left head and face, were consistent with her having been struck multiple times with an object such as the two-by-four (RT 5616-33, 5658-62, 5674), and that death resulted from strangulation (RT 5624-28, 5672). Dr. Nelson further opined that Simms was standing when she was struck on the left jawbone, fracturing and exposing the jawbone, knocking her unconscious and causing her to fall to the ground striking the right side of her head, sustaining coup contrecoup brain injuries (*id.*; RT 5631, 5655-66).

Dr. Nelson testified that Simms was manually strangled after she fell to the ground (RT 5624-31, 5659, 5669, 5671), with strangulation being the primary cause of death and cerebral contusions, brain hemorrhage and fractures being secondary causes of death. (RT 5621-28.) He testified the beating occurred first, followed by strangulation. (RT 5628.)

Dr. Nelson's testimony appears in harmony with Pridgon's account at trial that: Petitioner swung the two-by-four in a two-handed fashion like a baseball bat striking Simms on the side of the head (RT 5319-21, 5491-94, 5539-40, 5571, 5717-18), Simms immediately fell and went into shock (RT 5320-22, 5492, 5718), Petitioner continued to hit Simms after she fell

76

to the ground (RT 5321-23, 5571, 5717; *see also* RT 5718), and Petitioner then got on top of her, straddled her waist, grabbed her throat with his fingers on both sides and pressed on her throat strangling her (RT 5323-25, 5494, 5526, 5543-44, 5546, 5555, 5570-71).

Additionally, the record contains biologic evidence connecting Petitioner to the crime. Although Petitioner claims the blood-splattered white tennis shoes he wore to the police station at the time of his arrest belonged to Pridgon (RT 4290, 4301, 4516-17, 4523, 5838-40) and were selected by detective Sanchez at the time of his arrest (RT 6456), the California Supreme Court presumably resolved conflicting inferences in favor of the prosecution, *see Jackson*, 443 U.S. at 319, 326 and its finding that Petitioner identified those shoes as his own (RT 4498-99, 5063, 5806, 6450, 6461) is reasonable and entitled to deference under *Jackson* and AEDPA. *See McDaniel*, 558 U.S. at 133. Petitioner testified at the guilt phase that he did not see any of Pridgon's clothing or tennis shoes in Petitioner's room the night Simms was killed. (RT 6489, 6504.) Although Pridgon testified equivocally that he was wearing tennis shoes and/or brown leather shoes on the night Simms was killed (CT 134; RT 5730, 5743), he expressly denied the tennis shoes admitted at trial were his shoes (RT 5433-36).

The prosecution presented forensic testimony that the blood mark [on the right tennis shoe] was human blood (RT 4369-71, 4380-81, 4383) that matched Simms's phosphoglucomutase or "PGM" enzyme type (RT 4535, 4575-76, 4678-79, 4681-89, 4690, 4708-09), if not her blood type (RT 4700).

*ii.    Evidence Relating to Pridgon's Credibility*

Petitioner argues Pridgon's testimony was not reliable and sufficient evidence supporting the guilty verdict because Pridgon lacked credibility. His specific arguments in this regard fall short, for the reasons discussed *ante* and *post*.

**(1)    Criminal Background and Reputation**

Petitioner argues that Pridgon lacked credibility given his serious criminal record at the time of trial that included prior felony convictions for burglary and being under the influence of cocaine. (RT 2/20/91 39:13-18; RT 5437, 5462.) He points to Pridgon's alleged frequent

use of crack cocaine around the time of Simms's killing (RT 5339) including on the day Simms was killed (RT 5441-47), as well as during the months leading up to Petitioner's trial (RT 5548). He notes that at the time of Petitioner's trial, Pridgon was on probation for being under the influence of cocaine (RT 5437), and he was then in custody on a charge of commercial burglary (RT 5462). Also, Petitioner points to testimony of two law enforcement officers that Pridgon was a liar and cheater. (RT 5831-32, 5919, 5926, 6807-08.)

But the jury was aware of Pridgon's criminal background and had been properly instructed as to consideration thereof. (*See* claims 1, *ante* and 7, 15, *post*.) In particular, the jury was given instructions covering consideration of "witness credibility" and "witness statements that were inconsistent, discrepant and false." (RT 8908-15.) Both the jury and trial court were able to observe Pridgon and gauge his demeanor while testifying. The jury presumably followed its instructions. Petitioner's argument as to the relative weight of the evidence does not alone suggest constitutional error.

### (2) Inconsistent Testimony

Petitioner argues that Pridgon's credibility was impeached by his inconsistent testimony. He points to the following:

> Pridgon testified at the preliminary hearing that he heard blood flowing from Simms (CT 236); whereas at trial Pridgon testified to hearing and seeing the blood, "pouring out of her head like a cup of water." (RT 5350, 5399.)

> Pridgon testified at the preliminary hearing that he never saw any money taken from the victim (CT 220-21); whereas he testified at trial that to seeing Petitioner remove a handful of money from Simms's bra. (RT 5325-26, 5349-50.)

> Pridgon testified at the preliminary hearing that lighting at the crime scene was low, the only light being in a parking lot "a minute" away (CT 156, 220-21); whereas at trial he testified that there was plenty of light. (CT 217, RT 5348-49.)

> Pridgon testified at the preliminary hearing that he purchased cocaine once a week (CT 85); whereas at trial he testified that he did so "once in a great while." (RT 5421-22.)

> Pridgon testified at the preliminary hearing that after Simms's murder he came home, changed his clothes, and put on tennis shoes (CT 133-34); whereas in his

trial testimony he equivocally denied doing so (RT 5425) and denied owning tennis shoes. (RT 5425-26, 5532-37.)

Pridgon's testimony at preliminary hearing did not mention Simms was strangled (CT 49-54, 213-21); whereas at trial he seemingly demonstrated Simms's strangling. (RT 5539-68, 5718-19.)

Pridgon testified at the preliminary hearing that he was in front of Simms and Petitioner when the attack occurred (CT 210); whereas at trial he testified he was behind them. (RT 5490-91.)

Also, Petitioner points to certain of Pridgon's testimony that appears to be inconsistent with that of other witnesses. For example, he notes Pridgon testified that just prior to the murder, he met Petitioner and Simms on San Pablo Street; whereas Boggs testified that the three met at Petitioner's apartment. (RT 5310-11.)

Even so, any alleged inconsistencies were before the jury. As discuss above, the jury was instructed upon consideration of evidence relating to witness credibility and personal knowledge. (CT 613, 614, 616, 618, 620, 631; *see also* RT 8902-16.) The jury presumably considered whether and the extent to which any failures of perception and recollection reflected upon credibility. The trial court apparently considered as much in denying counsel's motion to strike Pridgon's entire testimony on impeachment grounds. (RT 5507.)

The jury was also aware through the expert testimony, including that of Dr. Terrell, that stress, including as related to Simms's killing and Petitioner's subsequent threats again him, could have impacted Pridgon's testimony. (RT 6782.) Pridgon's inconsistent testimony, to the extent arising at the preliminary hearing and closer in time to the capital crime, reasonably could show Pridgon's susceptibility to such stress. According to Pridgon, after Petitioner killed Simms, he grabbed Pridgon and threatened to kill him if he told anyone. (*See* RT 5317-50.) Pridgon testified that he did not immediately try to get away from Petitioner and report the crime because he was afraid Petitioner would come after him. (RT 5577-79.)

Also, the defense presented through the testimony of psychologist Dr. Pickering the theory that Pridgon's inconsistent testimony suggested the possibility of confabulation. (RT 5853, 5928, 5942-44, 5980-85, 6035-43; *see* RT 6044.)

When considered in the context of the evidentiary record as a whole, the noted inconsistencies do not fatally undermine Pridgon's eyewitness account of Petitioner's planned attack to rob Simms, disposal of the murder weapon, and Petitioner's threat against Pridgon should he tell anyone what happened. Pridgon credibly testified that just prior to the attack upon Simms, Petitioner led Simms and Pridgon to an empty apartment, not the known dope connection's apartment, ostensibly to get back from the dope connection the $20 Simms had given Petitioner for the purchase of drugs. Petitioner's orchestrating such a charade reasonably suggests he was unable to come up with the money to repay Simms even though he had promised to do so. (*See, e.g.,* RT 5485-88.) Pridgon credibly testified that Simms was first beaten and then strangled, which is consistent with the pathologist's findings. (RT 5628.) In this regard and further corroborating Pridgon's testimony, it does not seem that Pridgon was aware of the pathologist's chronology of Simms's injuries when Pridgon testified at trial regarding same.

### (3)    Third-Party Culpability Theory

Petitioner presented a defense that Pridgon lacked credibility because he was an accomplice to or otherwise participated in Simms's killing, perhaps in league with the driver of a white Cadillac that Petitioner contends Simms entered shortly before her death.

Petitioner testified that he did not kill Simms. (RT 6470.) He suggests the evidence implies that Pridgon did, including as follows.

### A.    Pridgon's Motive and Knowledge of the Crime

Petitioner points out that: (i) Pridgon was present when Simms was killed (RT 7024-25), (ii) Pridgon knew details of the crime and crime scene and was able to locate for authorities the murder weapon (the two-by-four) thrown in a nearby backyard, and a knife disposed of in a dumpster after Simms was killed (RT 4295-96, 4309-10, 4329, 4353, 4365, 4375, 5338, 5555, 6562-66), (iii) he had just met Pridgon on the night of Simms's killing (RT 5289-91, 6360) making it unlikely he would have confided in Pridgon about a plan to hit a prostitute and take her money (CT 56; RT 5334-35; RT 2/20/91, 34, 38), (iv) he was making a

1   living selling drugs and so did not need money for any purpose including to repay the $20

2   Simms loaned him to buy drug the evening she was killed (RT 4914-15, 6625), and (v) he and

3   Simms were friends and on good terms (RT 3818, 4797, 4818, 6384) and had a practice of

4   loaning each other money and that Simms owed him $10 when she was killed (RT 4915,

5   5056).

6        However, the witness, physical and forensic evidence corroborating Pridgon's

7   eyewitness testimony appears to substantially outweigh Petitioner's noted inferential evidence.

8   Petitioner's suggestion that he had any source of income is entirely unsubstantiated in the

9   factual record.  His suggestion that he was not financially motivated to kill Simms does not jibe

10  with evidence that Simms was buying drugs for him.  Particularly, the apparent charade of

11  trying to recover the $20 Simms had loaned him from the apartment of a non-existent drug

12  dealer clearly suggests Petitioner did not have any money.

13       **B.     Pridgon's Propensity for Violence**

14       Petitioner argues that a violent outburst by Pridgon was more likely the cause of

15  Simms's death than the prosecution theory that she was robbed.  He points to evidence

16  discussed above which he contends suggests that Pridgon was mentally unstable, prone to

17  violence against people he did not like, and that Pridgon had a practice of carrying sticks like

18  the one that killed Simms.  (*See, e.g.*, CT 69-70; RT 6852, 6862.)

19       However, assuming arguendo the admissibility of such propensity evidence, the jury

20  heard expert testimony to the contrary.  Dr. Terrell testified that he saw no evidence Pridgon

21  was actively psychotic on the night Simms was killed (RT 6839).  He suggested that Pridgon's

22  psychological makeup was such that he would not fight with people unless provoked and that

23  he has not used lethal force in any such confrontation.  (RT 6865-66.)  Consistent with Dr.

24  Terrell's opinion, the couple occasions noted in the record where Pridgon allegedly became

25  physical, once on a school bus and once with police officers, apparently followed upon some

26  provocation.

27       Additionally, the jury heard testimony from a neighbor of Pridgon, Joe Razo, that he

28

had lived in Pridgon's neighborhood since 1971 and seen Pridgon frequently and never saw Pridgon carrying around sticks (RT 6914), had never heard Pridgon referred to as "Crazy Paul" (RT 6916), and did not consider Pridgon to be mentally slow or retarded (RT 6917). Pridgon for his part denied carrying sticks for when walking around the neighborhood. (*See* RT 5562-90.)

### C. Crime Scene and Forensic Evidence

Petitioner argues the physical evidence links Pridgon to the crime. Petitioner testified that when he was arrested in his bedroom, Fresno Police detective Sanchez came out of the bedroom with blue sweat pants, white tennis shoes and a green jacket and told Petitioner to put them on (RT 6450-56); Petitioner contends he did not request these items, which were forensically linked to the crime and admitted into evidence (RT 6451-60). He denies the white tennis shoes and green jacket belonged to him (RT 6340, 644658; 6505-08), stating these items were too small for him (RT 5837-41, 6463, 6646-48). Petitioner claims these items belonged to Pridgon (RT 6457-59), and were worn by Pridgon on the night of Simms's killing (RT 6459).

Petitioner testified that on the night of Simms's murder, he was wearing different clothes, a blue striped sweat suit. (RT 6339.) Also, he testified he was wearing three-quarter high Nike tennis shoes. (RT 6340.)

However, it appears that Petitioner was substantially impeached in these regards during his guilt phase testimony. (RT 6570-6644.) At trial, detective Sanchez's uncontroverted testimony was that Petitioner pointed to the shoes and clothes. (RT 4495-4504.) Apart from Petitioner testimony, which is subject to discount given his prior felonies and the contrary testimony by Boggs, (RT 6933), the record does not appear to support Petitioner's contention that he was then cuffed behind his back and unable to point to the clothing and shoes.

At trial, Pridgon denied the white tennis shoes (People's Exhibit #2) were his shoes (RT 5537-38). Both Petitioner and Pridgon tried on the tennis shoes for the jury. The record suggests that although a defense witness shoe salesman felt the shoes fit Pridgon better than

Petitioner (RT 5839), neither of the two enjoyed a proper fit (RT 5538; 5839-43). Pridgon also denied the green jacket was his; he tried it on in front of the jury and stated that "it fit tight." (RT 5560.)

The testimony of Petitioner's mother, Minnie Lewis, that about a month before Simms's killing she went shopping with Petitioner and bought him a different (bigger) pair of white tennis shoes (RT 6750-54), reasonably could be discounted given the testimony of Petitioner's girlfriend Boggs, who initially testified that she did not know whom the white tennis shoes belonged to (RT 4498-99, 4988-91), but later testified that the white tennis shoes admitted into evidence and worn by Petitioner at the time of his arrest were Petitioner's shoes, his only shoes (RT 6926-33).

Additionally, the nature and extend of Simms's injuries do not support an inference that Pridgon was the perpetrator. Dr. Nelson testified that a "great force" was required to inflict Simms's basal skull fractures (RT 5624) and that she was stuck "very firmly" across the jawbone (RT 5631). The record reflects that Petitioner was then a weight-lifter and had a muscular build. (RT 5063-64, 6647-48.) Pridgon had a slight build. (RT 4310, 5685-87.)

### D.     Man in a White Cadillac

Petitioner testified that while he, Simms and Pridgon were walking from Petitioner's home to Pridgon's apartment, a white Cadillac pulled up and a man in the car called Simms's name. (RT 6382-83.) Simms went to the car and left with the man telling Petitioner "mommy be right back." (RT 6384.) Petitioner testified that after Simms left, he and Pridgon met up with Boggs and went back to Petitioner's boarding house. (RT 6489.)

However, the record does not appear to support Petitioner's white Cadillac defense. For the reasons more fully discussed in claim 26, *post*, a trier of fact reasonably could find the paint residue taken from a fence board in the alley where Simms was killed, allegedly from the white Cadillac, to be minimally probative. The crime scene evidence does not suggest that a car recently had passed anywhere near the fence. Moreover, Petitioner's uncorroborated testimony regarding the white Cadillac is subject to discount given his prior two felonies and

83

the noted contrary corroborated testimony by Pridgon.

*iii.* *Sufficiency of the Evidence*

Petitioner argues that Pridgon's testimony was legally insufficient to support the verdict. He suggests that Pridgon did not know the difference between "reality and fantasy"[11] and that his testimony reflected that latter. (RT 4464.) He argues that the state court made an unreasonable determination of fact when it found Pridgon's testimony to be competent, credible and sufficient. (*See* 2/20/91 RT 34-39); *see also Lewis*, 26 Cal. 4th, at 358-59.

However, the California Supreme Court reasonably rejected these allegations. The personal knowledge, competency, and confabulation allegations fail for the reasons discussed above.

Additionally, the California Supreme Court reasonably denied insufficiency of the evidence allegations. When considering the motions for new trial and modification of the verdict, the trial referred to the aggravating evidence including "the circumstances of the present crime and special circumstance, murder committed during the course of a robbery." (2/20/91 RT 46; CT 1011, 1028-29.) The trial court noted Petitioner's "somewhat illogical" apparent motive of avoiding having to pay back the $20 he borrowed from Simms. (2/20/91 RT 46.) But that court nonetheless accepted Pridgon's testimony that: (i) Petitioner told him he intended to hit the victim and take her money, (ii) Petitioner hit Simms with the two-by-four, (iii) after the first hit, Simms fell and started going into shock and making grumbling sounds, (iv) Petitioner hit her several times and just kept beating her, and (v) Petitioner tore open Simms's blouse, stuck his right hand into her bosom area and brought out a handful of paper money. (2/20/91 RT 34-38; *see also* RT 5317-50.)

The trial court also noted that:

> At the time of the killing the Defendant had been lifting weights for a number of
> years and was very muscular. By comparison the victim was of slight build. The
> manner of killing was abominable. The Defendant wielded a two-by-four piece
> of wood and hit the victim several times. The Court finds that these facts and

---

[11] See Evidence Code section 702 regarding requisite personal knowledge of a testifying witness.

84

circumstances have been established beyond a reasonable doubt and substantially outweigh any circumstances in mitigation, whether previously listed or not, heard by the Court during the entire trial.

(2/20/91 RT 46-47; *see also* CT 1011, 1029.)

The trial court summarized by stating that:

[T]he Court finds that the factors in aggravation have been established beyond all reasonable doubt and substantially outweigh those in mitigation. It is therefore the Court's further finding that the jury's verdicts and findings are not only supported by the overwhelming weight of the evidence but upon an independent review are not contrary to law or the evidence.

(2/20/91 RT 52; CT 1015-16, 1033.)

Even if one were to discount Pridgon's testimony, the remaining record is substantially inculpating of Petitioner. The noted record reflects that: (i) on the day Simms was killed, Petitioner repeatedly bought crack without any apparent source of funds, (ii) Petitioner spent the $20 Simms gave him to buy drugs he did not share with Simms, and when she confronted him about this he repeatedly promised to repay her even though he lacked any apparent ability to do so, (iii) Petitioner knew Simms had money on her person and where she kept it (i.e. in her bra), (iv) witnesses placed Petitioner with Simms near the crime scene, (v) after Simms was killed, Petitioner went to Pridgon's apartment and explained to Betty Thomas that he was sweating because he had been jogging, (vi) he was linked to crime scene biologic evidence on clothing attributed to him, and (vii) his guilt phase testimony denying the killing and suggesting Pridgon did it was substantially impeached. (*See* claim(s) 10, 24-25, *post*.)

### iv. Conclusions

For the reasons stated, the California Supreme Court was not unreasonable in denying the allegations that Pridgon testimony was unreliable and legally insufficient because he lacked the capacity to competently testify from personal knowledge and lacked credibility.

Even if such allegations were credited, the record viewed most favorably to the prosecution, *see Jackson*, 443 U.S. at 319, 326, reasonably contains sufficient evidence of Petitioner's guilt. The California Supreme Court's denial of the claim is entitled to deference

under *Jackson* and AEDPA. *See McDaniel*, 558 U.S. at 133.

In sum, Petitioner has not demonstrated that given the evidentiary record in this case including Pridgon's testimony, viewed in the light most favorable to the underlying judgment, no rational trier of fact could find beyond a reasonable doubt that the Petitioner was guilty and the special circumstance was true. The state court identified the elements required and demonstrated familiarity with the trial evidence including Pridgon's testimony.

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 2 shall be denied.

### 3. Claim 10

Petitioner alleges the trial court erred by refusing to strike the robbery conviction and special circumstance as unsupported by the evidence (i.e., supported only by the unreliable and uncorroborated testimony of Pridgon, *see* CT 973-75), violating his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a reliable determination of guilt and to be convicted only upon sufficient evidence. (Doc. No. 58-1 at 70-71; *see also* Doc. No. 89 at 60; CT 973-75.)

#### a. State Court Direct and Collateral Review

Petitioner raised on direct appeal the part of this claim relating to Sixth and Eighth Amendment violations attributable to the special circumstance allegations. (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. VIII at 86-93.) The California Supreme Court denied these allegations on the merits. *Lewis*, 26 Cal. 4th, 365-68.

The full claim was presented to the California Supreme Court in Petitioner's third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 40-42). That court denied portions of the claim as procedurally barred, (Doc. No. 69-2 at 1), and summarily denied the full claim on the merits (*id.*).

#### b. Analysis

Petitioner alleges that the trial court erred by denying his motions for new trial and to strike the robbery special circumstance on grounds of insufficient evidence.

### i.    *Sufficiency of Robbery Conviction*

Petitioner argues his conviction and sentence were supported by insufficient evidence denying him due process, *Jackson*, 443 U.S. at 319; *In Re Winship,* 397 U.S. 358, 366 (1970), and rendering arbitrary his resultant conviction and sentence, *Gregg v. Georgia*, 428 U.S. 153 (1976).  He argues the evidence does not show that he was motivated to and intended to rob Simms.

### (1)    **Pridgon's Credibility**

Petitioner re-argues his position that the trial court should not have accepted the credibility of Pridgon and should not have credited Pridgon's testimony that Petitioner "intended to hit the victim and take her money."  (Doc. No. 58-1 at 70 citing RT 2/20/91 38:21-24.)  This argument fails for the reasons stated, *ante*.  *See, e.g., Collins*, 546 U. S. at 341–342 (even if "reasonable minds reviewing the record might disagree about the evidence, on habeas review that does not suffice to supersede the [state] court's credibility determination.").

### (2)    **Taking Property by Force or Fear**

Petitioner argues his testimony shows that he had no need to take and did not take money from Simms on the night she was killed.  He argues that any action he allegedly took to avoid repaying the $20 Simms gave him earlier that evening was insufficient to constitute robbery and robbery-murder because there was no taking of personal property by force or fear. Penal Code § 211.

Petitioner supports these arguments by pointing to his testimony that he did not need money on the night Simms was killed (RT 6471-72) because he had income from selling drugs (RT 4915, 6466) and by virtue thereof received beneficial terms whenever he purchased cocaine (RT 6662).  He points to his testimony that he had been friends with Simms for about a month (RT 6328), sometimes purchased drugs for her using her money or money he loaned to

her (RT 6334, 6341-43, 6468). He testified that he purchased cocaine with the $20 Simms gave him that evening and then encountered Pridgon, whom he had not previously met. Viewing Pridgon as a potential customer, Petitioner testified he went with Pridgon's to the latter's apartment and smoked some of the cocaine and gave some of it to Simms when he and Pridgon encountered her and Boggs on the street later than night. (RT 6359-77.)

Petitioner denied being present when Simms was killed. He testified that later than evening, as he, Simms and Pridgon were walking back to Pridgon's house, he saw Simms get into a white Cadillac occupied by a Black male, Simms telling Petitioner "mommy be right back." (RT 6383-84.) He testified the car then drove down the same alley where Simms was killed. (RT 6385.) According to Petitioner, he then went back into Pridgon's apartment and smoked cocaine with Pridgon and his roommates Betty Thomas and Jimmy Woods, whereupon Pridgon and Woods left the apartment (RT 6388-94) and came back later sweating and nervous (RT 6483).

Petitioner also points to the $20 that remained on Simms's body when discovered by the police as evidence she was not robbed. (*See* 2/20/91 RT 34, 38.)

The California Supreme Court considered and rejected these allegations, as follows:

> In his motion for a new trial, defendant alternatively requested that the trial court strike the robbery special circumstance (§ 190.2, subd. (a)(17)(A)), which the jury had found true. Defendant argued that based on the crucial but unreliable testimony of Pridgon, the special circumstance was unsupported by evidence. Denying his motion, the trial court declined to reconcile inconsistencies in Pridgon's testimony, including the fact that money was found on Simms's person. The court rejected defendant's contention that Pridgon had hallucinated the death and manner of killing Simms. The court was "satisfied beyond a reasonable doubt" under section 211 that defendant killed Simms while engaged in the commission of robbery. On appeal, defendant asserts that substantial evidence does not support the robbery special circumstance, and argues that the trial court otherwise implicitly concluded that defendant had not committed a robbery. We discuss each point in turn.

> Substantial evidence must support a special circumstance finding. (*People v. Jenkins*, *supra*, 22 Cal. 4th at p. 1022.) "In reviewing the sufficiency of evidence for a special circumstance, the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." (*People v. Mickey* (1991) 54 Cal. 3d 612, 678 [286 Cal.Rptr. 801, 818 P.2d 84].) We find the record contains substantial evidence that

88

defendant murdered Simms while engaged in the commission of a robbery.

After Pridgon testified that defendant had pressed on Simms's throat and reached into her blouse after striking her, the following colloquy took place:

"Q[uestion by the prosecution:] And what did you see when you say he went in the blouse?
"A[nswer by Pridgon:] He came out with some money.
"Q[:] Were you able to tell exactly how much money?
"A[:] No, I can't tell how much it was, but I knew it was a lot of money.
"Q[:] And can you-were you able to tell if it was coins or paper?
"A[:] It was paper.
"Q[:] From what you could see, did it appear to be more than one piece of paper money or just one piece?
"A[:] He came out with a lot of money.
"Q[:] 'He came out'-
"A[:] With a handful of money.
"Q[:] 'A handful'?
"A[:] Hum.
"Q[:] Now, you've been gesturing with your hand to the-the breast area on your body. Is that where you saw him reach in and come out with the money?
"A[:] Yes.
"Q[:] What's the next thing that happened after you saw him come out with the money?
"A[:] He got off of her.
"Q[:] And then what happened?
"A[:] Then he grabbed me and said if I say something, he's going to kill me."

In addition, when the prosecution asked whether defendant had ever mentioned wanting to hit Simms and take money from her, Pridgon answered, "Yes. [¶] He say he know where a prostitute at that got money .... He asked me if I'm down for taking the money. [¶] I don't quite understand what he was saying. And I told him, 'Yeah.' I didn't understand what he said. But when he repeat over again, I told him, 'No. I don't do that kind of stuff.' [¶] ... He said, 'Well, I do it my damn self.'"

There was also circumstantial evidence that defendant robbed Simms. Defendant admitted he had seen Simms keep money in her bra. Physical evidence also showed that the top of Simms's blouse was ripped open, revealing her brassiere containing a folded $20 bill, and that buttons that had come from Simms's blouse lay near her body. There was evidence that Simms had recently cashed a paycheck and that she normally set aside money for rent from the paycheck and used the rest to purchase crack. Based on these facts, a reasonable trier of fact could conclude that defendant robbed Simms. As discussed previously, we reject defendant's contention that the trial court should have disregarded Pridgon's testimony as inherently unreliable. (*See ante*, at p. 362.)

We also reject defendant's claim that the trial court implicitly foreclosed the finding of robbery based on the court's observation that "[a]lthough somewhat illogical, the apparent motive of the murder was to obviate the necessity of the defendant returning money to the victim which had been given to the defendant for the purpose of purchasing drugs." In other words, defendant did not kill Simms intending to rob her, but killed her to avoid paying a debt. As further evidence that he did not rob Simms, defendant states he did not take money from her person, which is supported by the fact that $20 was found on Simms's

body.

Contrary to defendant's suggestion, the trial court's observation that defendant may have had the motive to kill Simms to cancel a debt he owed her does not preclude the finding of the robbery special circumstance. (*See People v. Kraft*, *supra*, 23 Cal. 4th at p. 1053 ["appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence"].) Although the record may have supported both theories, it was up to the trier of fact to determine whether or not defendant committed the robbery beyond a reasonable doubt. (*People v. Mayfield* (1997) 14 Cal. 4th 668, 791 [60 Cal.Rptr.2d 1, 982 P.2d 485].) Indeed, the trial court, upon denying defendant's motion for a new trial or alternatively to strike the robbery special circumstance, independently reviewed the sufficiency of the evidence and credited Pridgon's testimony "on the fact that the Defendant killed Sandra Simms and took money from her person at the time of the killing," and "that the Defendant Raymond Lewis told him that he intended to hit the victim and take her money."

"'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]'" (*People v. Kraft*, *supra*, 23 Cal. 4th at p. 1054.) As noted, the record reveals substantial evidence from which a reasonable trier of fact could conclude that defendant robbed and murdered Simms. Thus, a reversal of the robbery special-circumstance finding was not warranted. (*People v. Kraft*, *supra*, 23 Cal. 4th at p. 1054.) Accordingly, we reject defendant's claim that his sentence violates the federal constitutional prohibition against arbitrary and capricious action.

*Lewis*, 26 Cal. 4th, at 365-68.

Here, for the reasons discussed above, the record reasonably suggests that Petitioner needed money; had stated his intention to hit Simms and take her money; was aware Simms had money on the night of her killing and where she kept it on her person; tried unsuccessfully to enlist Pridgon in this endeavor; bludgeoned and strangled Simms and removed cash from her person; and finished up by threatening to kill Pridgon should he tell anyone what Petitioner had done. Petitioner has not demonstrated that this evidence of robbery supported in the record is subject to discount because he may have owed Simms $20 and that sum remained on Simms body after the crime.

Petitioner's noted contrary testimony appears less than credible and readily subject to discount. Petitioner's testimony that he was a drug dealer is subject to discount given Pridgon's testimony, apparently credited by the jury, that Petitioner asked Pridgon where drugs could be purchased. Petitioner conceded during his guilt phase testimony that he was "broke"

the day Simms was killed (RT 6594). His insistence that Simms's was not after him for the money she loaned him to buy cocaine is contrary to the testimony of Pridgon and Boggs. (*See, e.g.*, claim 8, *post*.) Moreover, Petitioner's character for truthfulness was impeached with his prior felony convictions and the inconsistencies between his testimony and that of every other witness who encountered him the evening Simms was killed.

The sufficiency of the evidence claims raised in habeas proceedings must be measured with reference to substantive requirements as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (federal court is bound by "a state court's interpretation of state law"). For the reasons stated, Petitioner has not demonstrated that under this standard the California Supreme Court was unreasonable in rejecting these allegations.

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 10 shall be denied.

4.     Claim 30.

Petitioner alleges the trial court erred by admitting over defense objection legally insufficient penalty phase evidence of prior unadjudicated violent acts consisting of: (i) multiple drive-by purse snatchings committed in 1986, (ii) residential burglaries and assaults upon Norman Logan and Stan Ohler committed in 1986, and (iii) a jailhouse assault on inmate Leonard Ellis committed in 1986. (Doc. No. 58-1 at 196-98; *see also* Doc. No. 89 at 222-28.) He argues these errors violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Id.*)

a.     **State Court Direct and Collateral Review**

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 77-81), which was summarily denied on the merits, and denied on

procedural grounds (Doc. No. 69-1 at 1).

**b.    Analysis**

Petitioner argues the trial court erred by admitting over defense objection unreliable evidence of the above noted unadjudicated incidents, and that these incidents were not sufficiently proven at trial.  (Doc. No. 58-1 at 196-97; *see also* RT 3213, 6231, 8068, 8092, 8103, 8236, 8330-38, 8345.)  He notes the trial court allowed the evidence to be admitted even though it later acknowledged the insufficiency of the evidence when denying Petitioner's motion for modification of the sentence.  (*See* Doc. No. 58-1 at 197 citing CT 1006-15.)

Petitioner argues the error was prejudicial because the insufficient evidence combined with counsel's alleged failure investigate, develop and present mitigating life history resulted in an unreliable death sentence.  (*See* Doc. No. 58-1 at 198 citing *Johnson v. Mississippi,* 486 U.S. 578 (1988).)

*i.    Admissibility of the Unadjudicated Incidents*

Petitioner argues the unadjudicated incidents are not sufficiently supported by the evidence and lack aggravating weight.  As to the 1986 drive-by purse snatchings of victims Kristi Nehring, Pauline Quitoriano, Ina Macom, and Irene Pedro in which Petitioner allegedly participated, he notes that none of these victims identified him as the perpetrator.  (*See* CT 8068; *see also* RT 3213. 8067-8214; 8272-81, 8284.)

He argues that in the 1986 residential burglaries and attacks against Norman Logan (RT 8238-71) and Steven Ohler (RT 8231), neither victim identified him as the perpetrator (RT 6231).  He notes that although his erstwhile compatriot, Willis "Junior" Randolph told Ohler (RT 8236) and law enforcement authorities (RT 8236) that Petitioner was the perpetrator, Randolph later denied he did so (RT 8187-8201).

As to the 1986 jailhouse assault upon inmate Leonard Ellis, Petitioner notes that although Ellis first implicated him as the assailant that punched, kicked and threatened with a shank, Ellis later denied Petitioner was the assailant.  (RT 8330-45.)

Petitioner argues that given these alleged insufficiencies:

> [He] was denied due process by the violation of his substantial and legitimate expectation that he would be able to benefit from the state-created statutory right under section 190.3(b) to have only evidence of prior activity that was *actually criminal* admitted against him as an aggravating factor rather than have that right be arbitrarily taken away from him. *See Hicks v. Oklahoma*, 447 U.S. 343 (1980).

(Doc. No. 58-1 at 197; *see also* Doc. No. 89 at 225-27.)

However, Petitioner has not demonstrated the state court was unreasonable in admitting the evidence of unadjudicated acts. California's death penalty statute allows the jury to consider "criminal activity by the defendant which involved the use or attempted use of force or violence. . . ." Penal Code § 190.3(b). The Supreme Court has upheld the constitutionality of California's death penalty law, including section 190.3(b), which permits evidence of prior criminal activity involving violence or threats of violence. *California v. Ramos*, 463 U.S. 992 (1983); *California v. Brown*, 479 U.S. 538, 543 (1987); *Boyde v. California*, 494 U.S. 370 (1990); *Tuilaepa v. California*, 512 U.S. 967, 975-80 (1994).

California's death penalty statute expressly provides that a capital defendant's prior violent conduct is relevant to the penalty determination. Also, California law calls for a single jury to determine both guilt and penalty. *People v. Balderas,* 41 Cal. 3d 144, 205 (1985). Petitioner fails to identify any Supreme Court authority supporting his contention that presentation of evidence of prior unadjudicated criminal activity to the same jury that convicted him of first degree murder with a special circumstance denies him an impartial fact finder. *See, e.g.*, *Sharp v. Texas*, 488 U.S. 872 (1988) (Marshall J, dissenting) ("I would grant the petition to resolve the question whether the Eighth and Fourteenth Amendments preclude the introduction of evidence of unadjudicated criminal conduct at the sentencing phase of a capital case."). Since the Supreme Court has not decided the issue, the state court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Musladin*, 549 U.S. at 77; *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005).

Furthermore, the alleged staleness of the unadjudicated evidence is not alone a basis to

bar its admission.  A long delay between a defendant's prior violent crime and the penalty trial does not make use of the prior violent crime unfair or unreliable.  *See People v. Bolin*, 18 Cal. 4th, at 335 ("[T]he use of [section 190.3] factor (b) evidence does not run afoul of the statute of limitations.").

Petitioner's reliance upon *Hicks v. Oklahoma* as authority otherwise is misplaced.  447 U.S. 343 (1980).  To the extent *Hicks* holds that arbitrary deprivation of state law entitlements denies due process, the Supreme Court had held that California's statute does not enable such a deprivation.  *Tuilaepa,* 512 U.S. at 975-80.  California juries are "free to consider a myriad of factors to determine whether death is the appropriate punishment."  *Ramos*, 463 U.S. at 1008.  Unlike Petitioner's cited *Johnson v. Mississippi* where the sentencing jury considered a conviction that had previously been reversed (*see* 486 U.S. at 580-82, 585-86, 590), the unadjudicated acts evidence presented in this case was otherwise admissible for the jury's determination whether it had been proven beyond a reasonable doubt, and then in reaching an individualized sentence pursuant to the trial court's instructions.  *Stephens,* 462 U.S. at 879 ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.").  For the same reasons, the California Supreme Court reasonably found unpersuasive Petitioner's argument that his sentencing determination was constitutionally unreliable..

Here, the jury was aware victims Logan and Ellis were impeached in certain aspects of their testimony denying Petitioner's involvement in their respective crimes.  (*See* RT 8309-11, 8344-46.)  The jury was instructed on the elements of the predicate aggravating acts of assault, battery, arson, and robbery (RT 8920-34), as well as aider and abettor and accomplice liability (RT 8917-19, 8927-34; CT 789-95), consideration of prior consistent or inconsistent statements (CT 767), witness credibility (CT 768, 784), and weighing conflicting testimony (CT 772). The jury also was instructed to apply the proof beyond a reasonable doubt standard when assessing the unadjudicated acts, that:

Before a juror may consider any of such criminal acts as an aggravating

circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the Defendant, Raymond Anthony Lewis, did, in fact, commit such criminal acts. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance.

(RT 8941; CT 960; *see also* CT 783-84, 838-39.)

The jury is presumed to follow the court's instructions. *Weeks*, 528 U.S. at 234. Given the foregoing, the California Supreme Court reasonably could find the noted evidence of unadjudicated criminal conduct in this case was admissible with the jury to determine the weight accorded it. That the trial court ultimately discounted the aggravating value of certain of the unadjudicated acts evidence in its order denying the automatic motion to modify the sentence, does not suggest otherwise. (*See* 2/20/91 RT 49-52; CT 1014-1015.)

   *ii.    Prejudice*

Even if the trial court erred as alleged, the California Supreme Court reasonably could have found the error was not prejudicial because it did not have a substantial and injurious effect or influence in determining the jury's verdict. *Brecht,* 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d, at 916.

After essentially discounting the noted unadjudicated acts evidence, the trial court found that:

> [T]he factors in aggravation have been established beyond all reasonable doubt and substantially outweigh those in mitigation. It is therefore the Court's further finding that the jury's verdicts and findings are not only supported by the overwhelming weight of the evidence but upon an independent review are not contrary to law or the evidence.

(2/20/91 RT 52; *see also id.* at 34-50; CT 1011-16, 1028-29, 1033; RT 5321-26; Doc. No. 98 at 408.)

The aggravating evidence presented by the prosecution even without the challenged unadjudicated incidents reasonably outweighs the totality of mitigating evidence. The prosecution presented substantial aggravating evidence of the circumstances of Simms's killing

1   and special circumstance found true; Petitioner's knowing involvement in the burning death of

2   Rogers; the 1989 jailhouse assault on correctional officers and disturbance by starting a fire;

3   Petitioner's participation in the Cardoza robbery; and Petitioner's prior felony convictions for

4   sale of a controlled substance, receiving stolen property, and robbery. *See Lewis*, 26 Cal. 4th,

5   at 350-51.

6   Notably, as to the jail house fire, the California Supreme Court considered the

7   allegation and found it to constitute "violence or a threat of violence" for purposes of Penal

8   Code section 190.3(b). *Lewis*, 26 Cal. 4th, at 391-92. Petitioner has not demonstrated on the

9   evidentiary record that the state court was unreasonable in this regard. His argument otherwise

10  speculating as to the nature and extent of risks raised by this activity reasonably could be

11  discounted as lacking support.

12  Accordingly, the California Supreme Court would not have erred in finding no

13  reasonable probability of an LWOP sentence had the jury not been presented with the

14  challenged evidence of unadjudicated criminal acts.[12]

15          *iii.    Conclusions*

16  The California Supreme Court did not err by summarily rejecting the claim that

17  admission of the noted unadjudicated acts evidence and the jury's consideration of that

18  evidence violated Petitioner's federal rights.

19  Accordingly, the state court rejection of these allegations was not contrary to, or an

20  unreasonable application of, clearly established federal law, as determined by the Supreme

21  Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable

22  determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

23  Claim 30 insufficiency of the evidence allegations shall be denied.

24  **D.      Claims Relating to Ineffective Assistance of Counsel**

25          1.      Legal Standard

26

27  [12] Petitioner's additional argument of prejudice based upon the cumulative effect of counsel's ineffective investigation, development, and presentation of mitigating life history information fails for reasons discussed in

28  claims 14-16 & 19, *post*.

96

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial. *See Murray*, 745 F.3d, at 1010-11: U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon v. Wainwright*, 372 U.S. 335, 34345 (1963); *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002).

The Supreme Court explained the legal standard for assessing a claim of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). *Strickland* propounded a two-prong test for analysis of claims of ineffective assistance of counsel. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. *Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 688); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).

Petitioner must show that counsel's errors were so egregious as to deprive him of a fair trial, one whose result is reliable. *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see also Richter*, 562 U.S. at 107. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have

had for proceeding as they did." *Pinholster*, 563 U.S. at 196.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. *Strickland* permits counsel to "make a reasonable decision that makes particular investigations unnecessary." *Richter*, 562 U.S. at 106 (citing *Strickland*, 466 U.S. at 691).

However, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690–91); *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible

98

mental defenses).

The petitioner also must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." *Richter*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).

That is, only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met *Strickland's* demand that defense errors were "so serious as to deprive [him] of a fair trial." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner because of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since the petitioner must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Under AEDPA, the Court does not apply *Strickland* de novo. Rather, the Court must determine whether the state court's application of *Strickland* was unreasonable. *Richter,* 562 U.S. at 99-100. Establishing that a state court's application of *Strickland* was unreasonable under 28 U.S.C. § 2254(d) is very difficult. *Richter*, 562 U.S. at 100. Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)). Further, because the *Strickland* rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." *Richter*, 562 U.S. at 101; *see also Premo v. Moore*, 562 U.S. 115, 127 (2011) (noting the leeway afforded state

courts under AEDPA in applying general standards).

If the petitioner makes an insufficient showing as to either one of the two *Strickland* components, the reviewing court need not address the other component. *Strickland*, 466 U.S. at 697.

Counsel may formulate a strategy, reasonable at the time, and balance limited resources consistent with effective trial tactics and strategies. *See Richter*, 562 U.S. at 107. Counsel is not required to pursue an investigation that would be fruitless, or harmful to the defense. *Id.* at 108.

A reviewing court "need not determine the actual explanation for counsel's [strategic choices], so long as his [choices fall] within the range of reasonable representation." *Morris v. State of California*, 966 F.2d 448, 456 (9th Cir. 1991).

Conclusory allegations are insufficient to raise a cognizable claim of ineffective assistance. *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory suggestions that counsel provided ineffective assistance "fall far short of stating a valid claim of constitutional violation"); *see also James v. Borg*, 24 F.3d 20, 26 (1994) (conclusory allegations that are not supported by a statement of specific facts "do not warrant habeas relief"); *United States v. Taylor*, 802 F.2d 1108, 1119 (9th Cir. 1986) (a petitioner's "vague and speculative assertions" fail to satisfy his burden under *Strickland*).

2. Guilt Phase Claims

a. **Claim 3**

Petitioner alleges that counsel ineffectively presented issues of Paul Pridgon's testimonial incompetence to the trial court, violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (Doc. No. 58-1 at 53-54; *see also* Doc. No. 89 at 59.)

i. *State Court Direct and Collateral Review*

This claim was presented on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. III at 23-30, Arg. IV at 31-39) and denied on the merits, *Lewis*, 26 Cal.

100

4th, at 356-65.

The same claim was presented in Petitioner's first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 4 at 69-72, Claim 5 at 72-77, and Claim 6 at 77-79), and summarily denied on the merits, (Doc. No. 14 at II-P at 1).

### ii. Analysis

Petitioner argues counsel failed to adequately object on competency grounds and request appropriate instruction that Pridgon's testimony be disregarded if incompetent, which led to waiver of competency claims on direct appeal.

The record reflects that in August of 1990, prior to trial, the defense filed a motion seeking Pridgon's medical records as they related to his testimonial competency and ability to recollect. (CT 429-446.) The following month, the defense moved that Pridgon undergo a psychiatric examination. (CT 457.) Although the prosecution objected, Pridgon agreed to the examination, which according to counsel mooted the pending motion for mental examination. (RT 4448.)

Petitioner faults counsel for then conceding Pridgon's substantive competence and arguing lack of competence solely as a basis for impeachment. He argues any such waiver could not have been strategic because Pridgon's intellectual disability impairments and his history of drug abuse, all of which were in the record, demonstrated testimonial incompetence. Particularly so given that the defense called four experts at trial, Drs. Pickering, Kinsey, Deutsch and Moulder, each of whom, according to Petitioner, opined that Pridgon lacked testimonial capacity (*see* claim 1, *ante*); and counsel went on to argue Pridgon's testimonial incompetency at closing. (RT 7337-52.)

The California Supreme Court considered and rejected the allegation that counsel was ineffective in these regards, stating that:

> Moreover, the record supports that the trial court would have rejected defendant's challenges to Pridgon's competency. Thus, we also reject defendant's claim of ineffective assistance of counsel based on counsel's failure to object to Pridgon's lack of competency. Where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence

cannot establish ineffective assistance." (*People v. Cudjo, supra*, 6 Cal. 4th at p. 616, 25 Cal. Rptr. 2d 390, 863 P.2d 635.)

*Lewis*, 26 Cal. 4th, at 361.

That court also denied alleged ineffectiveness relating to instructional error regarding personal knowledge, as follows:

Defendant did not request an instruction that Pridgon's capacity to perceive and recollect was a preliminary fact that the jury must find before it may consider Pridgon's testimony. (Evid. Code, § 403, subds. (a)(2), (c)(1).) However, defendant maintains that the trial court should have given this instruction sua sponte. In addition, defendant argues that the trial court should have "subsequently determine[d]" that Pridgon's personal knowledge was not proven as a preliminary fact, and therefore should have instructed the jury to disregard his testimony. (Evid. Code, § 403, subd. (c)(2).) We discuss each issue in turn.

Under Evidence Code section 403, subdivision (c)(1), if the court admits evidence subject to the existence of a preliminary fact, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." On its own terms, this provision makes it discretionary for the trial court to give an instruction regarding a preliminary fact unless the party makes a request. Because defendant failed to do so, the trial court was not required to instruct the jury that Pridgon's capacity to perceive and recollect was a preliminary fact that had to be found before the jury could consider his testimony. (Evid. Code § 403, subd. (c)(1).)

Nor was the trial court required to instruct the jury sua sponte. Contrary to defendant's contention, his challenge to Pridgon's capacity to perceive and recollect was not a defense per se or a theory of his case, but an evidentiary issue serving to limit Pridgon's testimony. Thus, the cases upon which defendant relies are inapposite. (*See, e.g., People v. Sedeno* (1974) 10 Cal. 3d 703, 720 [112 Cal. Rptr. 1, 518 P.2d 913] [sua sponte duty to instruct on involuntary manslaughter upon evidence of diminished capacity]; *People v. St. Martin* (1970) 1 Cal. 3d 524, 531 [83 Cal. Rptr. 166, 463 P.2d 390] [sua sponte duty to instruct on issue of provocation]; *People v. Splawn* (1985) 165 Cal. App. 3d 553, 559 [211 Cal. Rptr. 638] [sua sponte duty to instruct on lesser included offense of attempted disposal of insured property with intent to defraud].) Indeed, the foregoing distinction is underscored by the purpose for this Evidence Code section 403, subdivision (c)(1), instruction in this case. Defendant's proposed sua sponte instruction would merely have told the jury the obvious: that if it found Pridgon could not perceive or recollect, i.e., that he hallucinated the murder and robbery, then the jury should disregard his testimony. Our faith in the common sense of jurors weighs against requiring a trial court to give such instruction sua sponte. [¶] … [¶]

In short, we conclude that the trial court did not err by failing to sua sponte instruct the jury regarding Pridgon's capacity to perceive and recollect as a preliminary fact (see Evid. Code, § 403, subd. (c)(1)), or by failing to instruct the jury to disregard Pridgon's testimony. (Evid. Code, § 403, subd. (c)(2).) Thus, we reject defendant's constitutional claims in this regard. For similar reasons, we reject defendant's claim of ineffective assistance of counsel for failure to request such instructions. Because there was no reasonable likelihood

102

of prejudice in that the instructions would not have provided necessary guidance to the jurors, we need not determine whether counsel's performance was deficient. (*People v. Cox* (1991) 53 Cal. 3d 618, 656 [280 Cal. Rptr. 692, 809 P.2d 351] [two-pronged test for ineffective assistance of counsel claim].)

*Lewis*, 26 Cal. 4th, at 361-64.

The California Supreme Court was not unreasonable in denying these alleged errors, for the reasons stated by that court and those that follow.

### (1) Deficient Performance

The California Supreme Court reasonably could find an objectively reasonable attorney as a matter of tactics, on the facts and circumstances of this case, would choose not to pursue a seemingly unmeritorious witness competency claim in favor of marshalling an impeachment defense, as counsel did here.

That court was not unreasonable in upholding the trial court's admission of Pridgon's testimony and denying defense motion to strike that testimony on incompetency grounds, for the reasons discussed in claims 1 and 2, *ante*, summarized here.

The record reasonably suggests that notwithstanding Pridgon was mentally slow, with borderline intellectual functioning and a history of poly-substance abuse with occasional psychotic symptoms, he was capable of communicating intelligibly and testifying truthfully and from personal knowledge. Notably, Petitioner's contention that trial defense experts Drs. Pickering, Kinsey, Deutsch and Moulder each opined that Pridgon lacked testimonial capacity reasonably could be seen as inferential and subject to discount. For the reasons stated, Petitioner has not demonstrated the failure to hold such a competency hearing was an abuse of discretion.

Counsel was able to confront and cross-examine Pridgon and test his personal knowledge of events relating to Simms's killing. Counsel had the opportunity to and did impeach Pridgon in certain regards. *See Fensterer,* 474 U.S. at 22. To the extent of counsel's avowed impeachment defense, the record shows the jury was instructed upon consideration of evidence relating to witness credibility and personal knowledge, including in pertinent part as to witness credibility (CT 614, CALJIC 2.20); inconsistent statements by witnesses (CT 613,

CALJIC 2.13); discrepancies in witness testimony (CT 616, CALJIC 2.21.1); conflicting testimony (CT 618, CALJIC 2.22); believability of a witness (CT 620, CALJIC 2.24); and eyewitness testimony identifying the perpetrator (CT 631, CALJIC 2.92).

Generally, impeachment tactics are a matter of trial strategy, and the mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice. *United States v. Ferreira-Alameda*, 815 F.2d at 1254; *see also Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (counsel's tactical decisions are given great deference and need only be objectively reasonable); *Delap v. Dugger*, 890 F.2d 285, 298 (11th Cir. 1989) (no ineffectiveness where the prior testimony was substantially consistent). Where the witness is thoroughly examined, failure to impeach with minor inconsistencies between preliminary hearing and trial testimony does not establish ineffectiveness because "the decision to not use everything is preeminently a tactical decision best made by counsel." *Jaiceris v. Fairman*, 290 F. Supp. 2d 1069, 1082 (N.D. Cal. 2003).

Relatedly, the California Supreme Court reasonably rejected Petitioner's allegation the jury should have been instructed on testimonial competency. Petitioner has not demonstrated his trial was fundamentally unfair in the absence of such an instruction, for the same reasons discussed above. *See Chambers,* 410 U.S. at 294, 303. Moreover, counsel's failure to request such an instruction, even if state law error, is not in any event a basis for federal habeas relief. *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

Accordingly, an objection and request for instruction relating to Pridgon's competency and implicating his personal knowledge reasonably appeared futile. Failure to object is not ineffectiveness where an objection would have lacked merit. *Lockhart v. Fretwell,* 506 U.S. 364, 372, 374 (1993); *United States v. Bosch,* 914 F.2d 1239, 1247 (9th Cir. 1990) (no ineffectiveness of counsel upon non-prejudicial failure to request instruction). Counsel's argument at closing asserting Pridgon's incompetency (*see* RT 7337-52), is not evidence otherwise.

### (2) Prejudice

The California Supreme Court reasonably found that absent counsel's alleged deficiencies, there does not remain a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694. "The mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice." *Ferreira-Alameda*, 815 F.2d at 1254; *see also Jaiceris*, 290 F. Supp. 2d at 1080-82.

Petitioner has not demonstrated on the record that during the course of his testimony Pridgon lacked an understanding of his duty to tell the truth and an ability to make himself understood. The jury and trial court found Pridgon to be a believable witness, suggesting he was able to intelligibly and truthfully relate what he perceived of the event surrounding Simms's death. Notably, counsel was able to pursue their strategy of impeaching Pridgon, with some success.

The omitted instructions likely would not have been helpful to the jury. The California Supreme Court reasonably found that such instructions would not have provided any necessary guidance because the jurors were presumptively aware that incompetence testimony could not be relied upon.

Additionally, the trial record apart from Pridgon's testimony is inculpating of Petitioner, for example: (i) on the day Simms was killed, Petitioner repeatedly bought crack without any apparent source of funds, (ii) Petitioner spent the $20 Simms gave him to buy drugs he did not share with Simms, and when she confronted him about this he repeatedly promised to repay her even though he lacked any apparent ability to do so, (iii) Petitioner knew Simms had money on her person and where she kept it (i.e. in her bra), (iv) witnesses placed Petitioner with Simms near the crime scene, (v) after Simms was killed, Petitioner went to Pridgon's apartment and explained to Betty Thomas that he was sweating because he had been jogging, (vi) he was linked to crime scene biologic evidence on clothing attributed to him, and (vii) his guilt phase testimony denying the killing and suggesting Pridgon might have participated in Simms's killing was substantially impeached.

Petitioner's disagreement with the state court's competency determination is not alone a basis for federal habeas relief. *Sarausad*, 555 U.S. at 192 n.5; *see also Horton*, 408 F.3d, at 576 ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").

(3)     **Conclusions**

The California Supreme Court was not unreasonable in finding counsel was not prejudicially deficient by failing to object to Pridgon as an incompetent witness and seeking instruction that his testimony be disregarded if incompetent.

A fair-minded jurist could find that Petitioner fails to establish counsel's performance fell below an objective standard of reasonableness and that absent counsel's alleged deficiencies, there remains a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694.

The California Supreme Court's rejection his claim on the merits was neither contrary to, nor an unreasonable application of *Strickland*, nor based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 3 shall be denied.

**b.     Claim 4**

Petitioner alleges ineffective assistance by counsel's withdrawal of their request to have a psychiatrist in the courtroom while Pridgon was testifying, violating the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (Doc. No. 58-1 at 55-56; *see also* Doc. No. 89 at 59-60.)

*i.     State Court Direct and Collateral Review*

This claim was also presented to the California Supreme Court in Petitioner's first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 7 at 79-82.) That court summarily denied the claim. (Doc. No. 14 at II-P at 1.)

*ii.     Analysis*

Petitioner in his reply brief states his intention not to pursue claim 4. (Doc. No. 105 at 106; *see also* Doc. No. 109 at n.7.) However, he has not notified the Court that the claim has been withdrawn. Upon review, the Court finds that Petitioner fails to demonstrate that California Supreme Court's rejection of the claim was unreasonable.

The record reflects that counsel withdrew the request for clinical psychologist Dr. Pickering to observe Pridgon during testimony in court, stating that "I'm going to withdraw [the request], Judge, okay? I don't want Dr. Pickering in here when Mr. Pridgon is on the stand." (RT 4484.)

The California Supreme Court, in denying direct appeal claims relating to the testimony of Pridgon, noted that:

> Before Pridgon testified, defendant requested that a psychiatrist be present in court during Pridgon's testimony to determine whether he had the capacity to perceive and recollect. Defendant later withdrew his request and agreed with the court that the issue whether Pridgon's capacity to perceive and recollect was impaired was "a matter of impeachment" pursuant to Evidence Code section 780. Neither party requested a hearing outside the jury to determine whether Pridgon was qualified to testify.

*Lewis*, 26 Cal. 4th, at 353;

> Defendant also requested to have a psychiatrist or psychologist in the courtroom while Pridgon testified to determine whether Pridgon had the capacity to perceive and recollect. However, before the court could rule, counsel withdrew his request stating, "I just mooted [the issue]."

*Lewis*, 26 Cal. 4th, at 374;

> [D]efense counsel withdrew his request for a psychiatrist or psychologist to be present during Pridgon's testimony, thus precluding any cognizable appellate claim that the trial court abused its discretion on this evidentiary issue. "[T]he absence of an adverse ruling precludes any appellate challenge." (*People v. McPeters* (1992) 2 Cal. 4th 1148, 1179 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

*Lewis*, 26 Cal. 4th, at 375.

(1)     **Deficient Performance**

That court reasonably denied the claim 4 allegations given Petitioner's complete failure to support it.  (*See* Doc. No. 89 at 59-60); *Richter*, 562 U.S. at 98 (petitioner bears of burden of showing "there was no reasonable basis for the state court to deny relief.").  Especially so here, as Dr. Pickering examined Pridgon outside of court and reviewed his mental health history and testimony in this proceeding, reasonably suggesting withdrawal of the request for in-court observation was tactically motivated.

### (2)    Prejudice

The California Supreme Court reasonably could have found that absent counsel's alleged deficiencies, there does not remain a reasonable probability of a different outcome, given Dr. Pickering's noted testimony as to his findings and opinions.  *Strickland*, 466 U.S. at 694.  As above, "[T]he mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice."  *Ferreira-Alameda*, 815 F.2d at 1254.

### (3)    Conclusions

The California Supreme Court was not unreasonable in finding counsel was not prejudicially deficient by withdrawing the request to have a psychiatrist in the courtroom while Pridgon was testifying.

A fair-minded jurist could find that Petitioner fails to establish counsel's performance fell below an objective standard of reasonableness and fails to demonstrate that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-94.

The California Supreme Court's rejection his claim on the merits was neither contrary to, nor an unreasonable application of *Strickland*, nor based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 4 shall be denied.

### c.    Claim 9

Petitioner alleges ineffective assistance by counsel's failure to present expert testimony

that Simms was struck by a left-handed person, violating his rights under Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (*See* Doc. No. 58-1 at 68-69.)

### i. *State Court Direct and Collateral Review*

This claim was presented to the California Supreme Court in Petitioner's first state habeas petition. (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 15 at 122-24.) That court summarily denied that claim on the merits. (Doc. No. 14 at II-P at 1.)

### ii. *Analysis*

Petitioner faults counsel for failing to retain an expert in biomechanics to testify that Simms must have been struck by a left-handed person such as Pridgon (RT 6207, 6310), rather than a right-handed person such as Petitioner (RT 5542-43, 5770, 6636). (*See* Doc. No. 89 at 130.) He points to evidence that Simms was struck on the left side of her head and face (*id.* citing RT 5616, 5655-59), and asserts the inference that her assailant was left-handed and positioned to her left at the time of the attack (RT 7317-19).

### (1) **Deficient Performance**

Petitioner argues that given the nature and extent of Simms's injuries the attack had to have been by a left-handed assailant positioned to the left of Simms, who was then looking away.

The pathologist who performed the autopsy, Dr. Nelson, concluded that Simms was struck forcefully to her left head and face. Dr. Nelson opined that Simms was standing when struck forcefully across the left jawbone breaking jaw and knocking her unconscious. (RT 5631, 5655, 5664-66.) He noted that Simms had no injuries to her hands or forearms (RT 5630, 5658-59), suggesting Simms did not have an opportunity to defend the attack. He testified that Simms had numerous injuries to the left side of her face (*see* RT 5619, 5661-74) and had been struck four to six times on her head and face (RT 5617, 5658).

The prosecution presented expert testimony that the physical evidence was consistent with Simms being struck by a right-handed assailant who must have used the amount of force a weight-lifter like Petitioner would use. (RT 6636, 7264, 7284, 7377- 7378.) Petitioner then

had a muscular build and weighed 185 pounds.  (RT 5063-64, 6457, 6580-84, 6636, 6647-48.)
By contrast, at that time Pridgon had a distinctly non-muscular build and weighed 129 pounds.
(RT 4310, 5685-87, 6207, 6310.)

Pridgon testified at both the preliminary hearing and trial that he was facing Simms and
Petitioner (CT 198, 210-214) when the latter, who was standing next to Simms, struck her (CT
208-211).  Pridgon testified that Simms was on the left and Petitioner was on the right at the
time of the attack.  (CT 208.)  But his testimony was equivocal as to where he (Pridgon) was
relative to the other two when the attack occurred.  Pridgon testified at preliminary hearing (CT
49, 198, 208-11) that he was ahead of Simms and Petitioner, with Simms on the left and
Petitioner on the right (CT 208-11).  At trial, he testified that he was behind them.  (RT 5490-
91.)  He quickly corrected himself, stating that he was in front of them.  (*Id.*)  In any event,
Pridgon appeared consistent that Petitioner was on Simms's right side, regardless of whether
Pridgon was behind them or turned around "waiting for them."  (*See* CT 211; RT 5319-21,
5489-94, 5571, 5717-18.)

Pridgon apparently gestured during his trial testimony in a way to suggest Simms was
initially struck on the right side of the head behind the ear (RT 5491-92), by a double-fisted
baseball bat- type swing from the right to the left (RT 5493), as he had done at the preliminary
hearing (CT 215).  This reasonably could be viewed as consistent with certain of the injuries
Dr. Nelson found to the right side of Simms's head, possibly preceding the blows to the left
side of her head described by Dr. Nelson.  Dr. Nelson also noted blows to Simms's right scalp
that could be seen as consistent with a right-handed assailant to Simms's right side.  (RT 5618,
5674-75.)  Notably, Pridgon did not describe the specifics of the sequence of blows by
Petitioner or Petitioner's specific position relative to Simms as he continued to hit her.  Nor has
Petitioner demonstrated that Dr. Nelson's findings and facts otherwise in the record somehow
preclude the possibility of a right-handed assailant.

Petitioner's argued inference that Simms's injuries were not caused by Petitioner but
rather a left-handed assailant positioned to her left could be seen as inconsistent with Dr.

110

Nelson's analysis of the wounds. He notes injuries proximal to Simms's left ear could have been marginal abrasions from the end of the two-by-four that in turn could suggest a right-handed assailant standing to Simms's left, i.e. a left-handed assailant wielding the board from Simms's left seemingly would have struck Simms's chin area with the board's end. (RT 5618.)

Moreover, Petitioner defense theory that Pridgon was the assailant reasonably could be rejected for the reasons discussed in claims 2 *ante* and 5-6 *post*.

### (2) Prejudice

Even if counsel was deficient by not presenting expert testimony supporting the left-handed assailant theory, Petitioner has failed to show prejudice. The jury was aware of the defense theory that Pridgon might have been the assailant or participated in her killing. Counsel Pedowitz argued during the guilt and penalty phases that given Dr. Nelson's testimony, Simms must have been struck from behind by a left-handed person like Pridgon. (RT 7317-19, 8891.) Yet the jury also heard the prosecution argument that according to Dr. Nelson the killer was strong and right-handed given the damage caused and angle of the blows. (RT 7264, 7284, 7377-78.)

Significantly, counsel, in cross-examining Dr. Nelson did not develop the left-handed versus right-handed killer theory relative to the mechanics involved in the blow to Simms. This even though Dr. Nelson testified to the significant force generated by the board that struck Simms. (RT 5667-69.) Given the noted facts and circumstances in the record, a reasonable inference could be drawn that such cross-examination would not have been favorable to Petitioner and that counsel was tactically motivated in not pursuing this theory. *See Strickland*, 466 U.S. at 689. Especially so, as the noted evidence readily could suggest an inference that the right-handed Petitioner suddenly struck Simms with the significant force a muscular individual like Petitioner could generate. (*See, e.g.*, RT 5491, 5493, 6636, 7317-197264, 7284, 7377-78.) In this regard, the record suggests Pridgon was not impeached on his gesticulated right-handed swing as the type of motion Petitioner made when striking Simms. (RT 5493,

111

6207, 6310.)

Additionally, the California Supreme Court reasonably found Petitioner's re-argument of his noted third-party liability defense theories unpersuasive for the reasons discussed in claims 2, 5 and 6.  It follows that court reasonably rejected Petitioner's contention that counsel was prejudicially deficient in investigating, developing and presenting a third-party liability defense at trial.  *Strickland*, 466 U.S. at 689.

Finally, for all the reasons discussed, the California Supreme Court reasonably could have found unremarkable and non-prejudicial the fact that state habeas counsel was denied funding for a biomechanical expert.  (*See* Doc. No. 105 at 139 citing 1 Inf. Rep. at 106.)

### (3)    Conclusions

The California Supreme Court reasonably found that counsel was not prejudicially deficient but rather tactically motived in not presenting a biomechanics expert to support a left-handed killer defense.  *See Gentry*, 540 U.S. at 8 (when counsel focuses on some issues to exclusion of others, there is strong presumption it was tactical, rather than negligent). Counsel's planting the seed of the left-handed killer argument without eliciting potentially damaging rebuttal on the topic was not necessarily unreasonable.  *See Pinholster*, 563 U.S. at 201 (if defense had called witness, that would have opened door to rebuttal by state expert).

Petitioner has not demonstrated on the evidentiary record that the prosecution experts could have been impeached regards the nature and extent of force applied to Simms so as to inculpate someone with the slight physical stature of Pridgon.  Moreover, "counsel for the defense is not required to present expert testimony on all possible defenses in a case."  *Hall v. Sumner,* 512 F. Supp. 1014, 1021 (N.D. Cal. 1981).

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

The state court rejection of the claim was not contrary to, or an unreasonable

application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 9 shall be denied.

**d.      Claim 25**

Petitioner alleges that counsel was ineffective by failing to investigate and present a guilt phase defense based on the physical evidence, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and International Law.[13]  (Doc. No. 58-1 at 176.)

*i.        State Court Direct and Collateral Review*

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 47-55), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

*ii.       Analysis*

Petitioner faults counsel for failing to investigate and retain an expert to review and test the physical evidence and challenge the prosecution's contention the evidence corroborated Pridgon's testimony.  (*See* RT 7261-67, 7274-75, 7280- 89, 7313, 7370, 7384; 2SHCP Ex. 11 at 244-45.)

Specifically, Petitioner points to the prosecution analysis of alleged bloodstains on: (i) the green jacket (RT 4518) and blue sweat pants (RT 4516-17) allegedly worn by and belonging to Petitioner, (ii) the two-by-four alleged to be the murder weapon, and (iii) the tennis shoes allegedly worn by Petitioner during the commission of the offense (RT 4516-17). He also points to the apparent failure to analyze fingernail scrapings taken from Simms, and the brown slippers Petitioner contends were taken from his apartment.  (*See* 2SHCP at Ex. 11.)

Petitioner argues the defense should have retained an expert to review and analyze this evidence (2SHCP Ex. 11), and the prosecution's test results (RT 4317-19, 4388).  In particular,

---

[13] Petitioner fails to identify the international law upon which he relies; presumably he is relying on the same provisions set forth in Claim 32.  (Doc. No. 58-1 at 212-30.)  In any event, Petitioner is no longer pursuing the international law portion of his claims (*see* Doc. No. 105 at 74, 107, 144 at n.52, 146, 148, 219-20) and the Court considers as much in its analysis of each claim alleging a violation of international law.

he faults counsel for not retaining a serologist to examine the blood evidence (2SHCP at Ex. 11), that he contends was crucial given the overall weakness of the prosecution case and the fact that Simms and Petitioner had the same blood type, i.e. type "B" (RT 4438-39, 4534-39, 4548-50, 4667-68; Doc. No. 82 at V-EE Ex. C at 15).

### (1)    Deficient Performance

Petitioner offers the habeas declaration of forensic scientist Keith Inman, suggesting that given the facts and circumstances of this case, the physical evidence in this case should have been examined by a defense expert.  (2SHCP Ex. 15.)

The record suggests the defense team examined certain of the physical evidence in the possession of the prosecution.  A police log shows that on three occasions defense investigator Rocky Pipkin reviewed at least some of the physical evidence.  (*Id.*; *see also* 2SHCP Ex. 11 at 305-06, 318-20; Doc. No. 82 at V-EE Ex. E at 35-37, 44, 53-54.)  Petitioner's former counsel, Steven Noxon (CT 330, 350), also reviewed some items in evidence.  (2SHCP Ex. 11 at 320; *see also* Doc. No. 82 at V-EE Ex. E at 44.)  The California Supreme Court reasonably could presume that Noxon discussed what he knew of this evidence with Pedowitz.  Petitioner has not demonstrated otherwise.

Petitioner's argument faulting counsel for being unaware of the physical evidence and test results in the hands of the prosecution is refuted by the record.  Any arguable uncertainty among counsel in these regards related only to testing that the prosecution had in progress (RT 4318-19) and testing the defense might contemplate (RT 4388).

Petitioner's arguments relating to the specific evidence in issue are discussed separately below.

### A.    Clothing

Petitioner faults counsel for failing to develop evidence that the bloodstained clothing he wore when arrested was not his clothing.  He argues that counsel was unreasonable in failing to rebut the prosecution contention that Petitioner at the time of his arrest pointed to and requested the green jacket and blue sweat pants admitted into evidence.  (RT 4498-99, 4505-

07); *see also Lewis*, 26 Cal. 4th, at 348, 350. Petitioner testified he was not wearing these clothes on the night Simms was killed. (RT 6339-40.)

Petitioner argues a police procedures expert could have testified that murder suspects are hand cuffed behind their back upon arrest (RT 4498-99; 2SHCP Ex. 19), thereby impeaching testimony of the arresting officer that Petitioner was cuffed with his arms in front of him (RT 4505) and pointed to the clothing selected by police. Petitioner's testimony is that his hands were cuffed behind his back. (RT 6454-55.)

Still, the factual record does not suggest that Petitioner was cuffed behind his back at the time of his arrest and so unable to point out items of clothing. Counsel reasonably could have determined that further investigation and development of this argument by indirect evidence would have raised only the weakest inference.

Furthermore, the defense stipulated the blue sweat pants belonged to Petitioner. (RT 5808; *see also* RT 5693.) "[C]ounsel for the defense is not required to present expert testimony on all possible defenses in a case." *Hall,* 512 F. Supp. at 1021.

Petitioner points to Boggs's testimony that she had never seen Petitioner wear the green nylon jacket removed by the police from the boarding house room Petitioner shared with a smaller in stature roommate. (RT 4977-79, 4990, 4499.) However, the record shows that the prosecution successfully objected on relevance grounds to counsel's attempt to introduce just such evidence. (RT 4733-39.) The California Supreme Court reasonably could find counsel was not deficient in not further pursuing the matter. *See Quintero-Barraza*, 78 F.3d, at 1349 (counsel need not make a futile motion).

Petitioner goes on to argue the prosecution failed to definitively show the stains on the green jacket and blue sweat pants admitted into evidence were human blood. (RT 4372-73, 4383-84, 4544-45, 4681-90.) He argues that the PGM blood typing used was not supported at trial with the raw test data (CT 458-467; 2SHCP at Ex. 11), and is "subject to interpretation and the presence of contaminants in blood" (RT 4693).

However, the record reflects the jury was aware the prosecution testing of these items

115

for human blood was inconclusive. State criminalist Andrus examined blood samples from Petitioner and Simms and determined that their "PGM [blood] types" were different. (RT 4559-60, 4577, 4668-69, 4671, 4674, 4677-78.) Criminalist Hamman testified that he tested the blue sweat pants for human blood and the results were inconclusive –such that he had no opinion in this regard. (RT 4372-84.) Hamman tested the green jacket for human blood and here also the results were inconclusive – such that he again expressed no opinion in such regard. (*Id.*) Criminalist Heredia performed "PGM" testing on the jacket approximately two years later and her results were similarly inconclusive. (RT 4374, 4524, 4540-42, 4544-47.) Counsel argued the inclusive test results to the jury. (RT 7327-29.)

Petitioner argues that had the clothes he claims he was wearing on the night of Simms's killing, i.e. blue pants and a blue top, been tested for biological material, it would have shown he was not the perpetrator. (2SHCP at Ex. 11.) But the record shows these items were collected by police from Pridgon's apartment a few days after Simms's killing. (RT 5062, 5176, 5183, 5720; Doc. No. 50 Ex. 11 at 239-40.) Moreover, it appears the defense team visually examined these items (Doc. No. 50 Ex. 11 at 306, 316; Doc. No. 82 at V-EE Ex. E at 35-37), and to that extent counsel presumptively would have been aware of any potentially exculpatory evidence. Also, testing of these items would likely not have aided the defense. A positive test result would simply have placed Pridgon at the crime scene, something already in the record. A negative result would have been exculpating of Pridgon.

Accordingly, although Petitioner's habeas expert, Dr. Inman, suggests the clothing and prosecution test data should have been examined by a defense expert (2SHCP Ex. 15), the California Supreme Court reasonably could have found counsel not deficient for failing to retain experts to examine evidence that was not otherwise inculpatory of Petitioner.

### B.      Low-Top White Tennis Shoes

Petitioner faults counsel for failing to rebut the prosecution contention that the low-top white women's tennis shoes admitted into evidence belonged to him.

Petitioner testified to his practice of not wearing low-top tennis shoes because of

116

injuries to his right ankle suffered as a youth while jumping into a ditch. (RT 6448-50, 6508, 6576.)  He showed the jury a scar on the inside of his right calf allegedly from this injury. (RT 6508-09, 6577.)  Petitioner's mother Minnie testified that he regularly wore high-top shoes due to an ankle injury. (RT 6752.)  Minnie testified that she had bought him a pair of high-top white tennis shoes size ten and a half in the weeks prior to the killing. (RT 6754.)

Petitioner's girlfriend Boggs, who was with Petitioner in his room at the time of his arrest, testified that the police found the tennis shoes by the door of Petitioner's room and that she had never seen them before and did not know who owned them. (RT 4498-99, 4988-91.) Boggs also testified that she had never seen Petitioner wear shoes folded down at the heal which was the way he wore the white tennis shoes at the time he was arrested. (RT 4989-90, 6463.)  However, Boggs later testified that the low-top white tennis shoes in evidence belonged to Petitioner. (RT 6928-29, 6931-33, 6944.)

The defense called an experienced athletic shoe salesman, Alan Guthrie, who testified the tennis shoes fit Pridgon better than Petitioner. (RT 5835-44.)  However, he furthered testified that he would not recommend the fit for either Petitioner or Pridgon. (RT 5843.)  The jurors were allowed to touch the shoes when on Petitioner's feet and when on Pridgon's feet, and consider their own impression. (RT 6744-47.)

Petitioner also faults counsel for failing to controvert the prosecution showing that Simms's blood was on the tennis shoes. (2SHCP at Ex. 11; *see also* RT 4370, 4576 4679-82, 4700.)  Although he concedes the shoes had only a small amount of bloodstain, still he suggests the defense should have tested the bloodstain because the PGM blood typing used by the prosecution was not supported at trial with raw test data (CT 458-467; 2SHCP at Ex. 11), and is "subject to interpretation and the presence of contaminants in blood" (RT 4693).

The prosecution's forensic analysis showed human blood on the shoes that matched the PGM blood type of Simms. (RT 4575-76, 4678-79, 4681-90, 4708-09.)  That blood could not have come from Petitioner. (RT 4368-83; 2SHCP Ex. 11 at 248-49.)

Senior criminalist Rodney Andrus testified about the enzyme PGM and how it is used

to discriminate among donors. (RT 4560-65.) He testified that he analyzed separate bloodstains from the right shoe using the normal accepted practice and found after running the PGM test four times the result consistently was the PGM type to match Simms (i.e. PGM of 2 plus, two minus), but not Petitioner (i.e. PGM of one plus, one plus). (RT 4569-77, 4677-86.) Andrus testified that he did not test the stain to determine if it was human blood because the small stain available was not conducive to several rounds of repeated testing (RT 4682); he felt the blood was likely human given the circumstances; and he was unaware of non-human blood that would give the PGM test result he achieved, two plus, two minus (RT 4680).

Although Andrus conceded that sample contamination can affect the PGM test result (RT 4694-95), he did not believe the stains from the right tennis shoe were contaminated to any significant extent (RT 4696). Petitioner's proffer does not appear to suggest that further testing would have shown otherwise.

Additionally, given the defense theory that the tennis shoes belonged to Pridgon and that Pridgon killed Simms (*see, e.g.*, RT 7322), counsel reasonably could have determined not to challenge the prosecution experts in this regard.

Accordingly, for the reasons stated, the California Supreme Court reasonably could have found counsel was not deficient as alleged.

## C.     Brown Slippers

Petitioner faults counsel for failing to investigate and retain an expert to examine the brown slippers he contends were seized by police from his apartment. (RT 4592-94.) He suggests there was the potential for "shoe impression evidence" that could have been used to distinguish the impression of the slippers from that of the bloodstained tennis shoes. (Doc. No. 58-1 at 178; *see also* 2SHCP Ex. 11.)

However, the California Supreme Court reasonably could have determined counsel was not deficient in these regards. The slippers belonged to Pridgon and were collected by police from Pridgon's apartment several days after Simms was killed. (*See* RT 4498-99, 4507-08, 6928-29, 6931-33, 6944.) Nothing in Petitioner's version of events has him owning or wearing

1    slippers at the time of the killing. Petitioner has not demonstrated on the record that shoe

2    impression evidence was in issue in this case, or how evidence of external or internal

3    impression from the slippers could have been exculpating of him.

4          Furthermore, any evidence of Pridgon's foot-size that might have been gleaned from

5    the slippers is cumulative of the testimony of defense witness Alan Guthrie, the footwear

6    salesperson, regarding the relative fit of the tennis shoes, that they fit Pridgon better than

7    Petitioner. (RT 5835-40, 5843-44, 6446-47.) Notably, the jurors were allowed to touch the

8    tennis shoes while Petitioner and Pridgon each wore them. (RT 6744-47.)

9          **D.      The Two-By-Four Murder Weapon**

10         Petitioner faults counsel for failing to develop evidence exploiting the prosecution's

11   failure to definitively show the stains on the two-by-four were human blood. (RT 4690.)

12         Yet the record reflects the state's initial forensic analysis concluded the two-by-four

13   had human bloodstains on it. (RT 4375, 4383; 2SHCP Ex. 11 at 248-49.) To the extent

14   Petitioner notes the further "PGM" testing by state criminalist Andrus was inconclusive (RT

15   4557, 4559-60, 4566-89, 4674, 4690, 4708), that information was before the jury (*id.*).

16         Also, the prosecution introduced evidence that a splinter of wood in Simms's hair

17   matched the two by four admitted into evidence. (RT 4354, 4376-80, 5403, 5555, 6748;

18   2SHCP Ex. 11 at 248.) The pathologist Dr. Nelson testified at some length matching Simms's

19   wounds to the edges of the two-by-four.

20         Accordingly, for the reasons stated, the California Supreme Court reasonably could

21   have found counsel was not deficient as alleged.

22         **E.      Fingernail Scrapings**

23         Petitioner faults counsel for not testing victim fingernail scrapings. Especially so, he

24   argues as the same were unsuccessfully tested by the prosecution. (*See* 2SHCP at Ex. 11.)

25         However, the California Supreme Court reasonably could have found counsel was not

26   deficient as alleged. The record suggests the prosecution did not test the fingernail scrapings.

27   (Doc. No. 82 at V-EE Ex. C at 9.) Here again, counsel reasonably could have determined not

28

                                          119

to pursue this evidence given the absence of inculpatory testing by the prosecution.

Additionally, counsel reasonably could have determined it unlikely that relevant evidence would be found in Simms's fingernail scrapings given the testimony of Dr. Nelson that Simms was instantly felled by the blow from the two-by-four and did not struggle with her killer.  (RT 5628-31, 5659-71.)

(2)     Prejudice

Petitioner argues that counsel's allegedly deficient investigation of the physical evidence was prejudicial because it left counsel unable to effectually defend at the guilt and penalty phases.  (*See, e.g.*, RT 7349.)  However, the California Supreme Court reasonably could have concluded that absent counsel's alleged deficiencies there is not a reasonable probability of a different outcome.

Petitioner fails to show how further investigation and development of the biologic evidence would have been materially exculpating.  As to the tennis shoes, his suggestion the prosecution PGM testing might have been controverted is speculative.  Nothing in the record shows the bloodstains were contaminated in a way that affected the test results, or that multiple tests by Criminalist Andrus according to standard procedures, confirming the findings to which he testified, were unreliable.  Moreover, controverting the prosecution PGM results would have weakened the defense that Pridgon, wearing the tennis shoes, was a responsible third-party in the killing of Simms.  The primary defense at trial was that Pridgon and/or the unknown driver of an unknown white Cadillac killed Simms.  Petitioner fails to demonstrate how further investigation would have developed admissible evidence in support of third-party liability.

As to the two-by-four, nothing in his proffer appears to controvert criminalist Hammand's finding the board tested positive for human blood.  Moreover, the noted evidence that the two-by-four was the murder weapon is substantial.

As to the balance of the physical evidence, it was not clearly inculpating of Petitioner, for the reasons stated.  Petitioner does not show that further testing would have distanced him from clothing linking him to the killing of Simms, or linked Pridgon or other third-party to that

120

killing.  Petitioner's consistent defense at trial was that the bloodstained clothes did not belong to him.  Here again, further serological testing likely would have impaired his third-party liability defense.  The California Supreme Court reasonably could have found the failure to retain a defense forensic expert to rebut non-inculpatory physical evidence conclusions by the prosecution expert was unpersuasive of prejudice.  Especially so given the failure of habeas counsel to include any declaration of counsel addressing Petitioner's ineffectiveness claims.  (Doc. No. 98 at 153.)  Also notable is the absence of any declaration from Petitioner regarding information he provided to counsel.  The California Supreme Court reasonably could have concluded that Petitioner could not rebut with evidentiary fact the *Strickland* presumption.

(3)  **Conclusions**

The California Supreme Court reasonably could have found that Petitioner failed to demonstrate counsel's investigation, development and presentation of the defense relating to the noted physical evidence was other than tactically motivated when "measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523; *see also Hamilton,* 458 F. Supp. 2d at 1134 (defense interviewed the available witnesses, and no better available witness about Petitioner's background and social history other than his mother was uncovered).

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that counsel's performance regarding the physical evidence fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 687-694.

The California Supreme Court also could have found no reasonable probability of a different outcome had the proffered additional information on physical evidence been presented to the jury along with the evidence otherwise in the record.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme

1   Court, or that the state court's ruling was based on an unreasonable determination of the facts

2   in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

3       Claim 25 shall be denied.

4       **e.    Claim 27**

5       Petitioner alleges that counsel was ineffective by failing to advise him meaningfully

6   regarding a pre-trial second degree plea offer and a guilt phase first degree plea offer, violating

7   his rights under International Law and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

8   (Doc. No. 58-1 at 185-87.)

9       *i.      State Court Direct and Collateral Review*

10      Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No.

11  S131322, Doc. No. 50 at 60-63), which was summarily denied on the merits, and denied on

12  procedural grounds (Doc. No. 69-1 at 1).

13      *ii.     Analysis*

14      Petitioner argues that counsel was ineffective by failing to adequately advise him of and

15  as to prosecution plea offers under which he claims he could have plead guilty to murder

16  without special circumstances.  (Doc. No. 58-1 at 185; *see also* Doc. No. 89 at 142-43; RT

17  5393-94, 7528; CT 689-94.)  He argues counsel failed to communicate the pre-trial second

18  degree offer.  He argues counsel failed to effectively advise him on the guilt phase first degree

19  offer without special circumstances, which resulted in Petitioner rejecting the first degree offer.

20  He argues counsel should have strongly recommended that Petitioner accept a plea offer and

21  avoid a death sentence.  (*See* Doc. No. 58-1 at 186.)

22      Petitioner argues these deficiencies arose at least in part from counsel's deficient

23  investigation and development of the trial defense relating to Pridgon, the physical evidence,

24  and mitigation evidence.  He suggests counsel was unprepared for trial and possible plea offers

25  and unable to gauge the likelihood of a successful defense at trial.

26      Petitioner argues these deficiencies were prejudicial given the reasonable probability he

27  would have accepted a non-capital plea offer had counsel recommended he to so.  He argues

28

1    that the California Supreme Court in rejecting this claim errantly relied upon factual findings

2    made without holding an evidentiary hearing.  (Doc. No. 89 at 149.)

3            **(1)    Deficient Performance**

4            **A.      Second Degree Offer**

5            Petitioner argues the prosecution made a second degree offer, prior to trial and upon

6    unspecified term, which counsel failed to pass on to him.  He supports this argument with the

7    trial statements of counsel Pedowitz, who states his recollection that such an offer was made.

8    Also, he offers in support a motion filed by counsel Hart during the penalty phase requesting

9    the alleged second degree plea offer be admitted in mitigation.   (CT 689-94; *see also* RT

10   7528.)

11           The noted requirements under *Strickland* for a showing a deficient performance and

12   prejudice apply with equal force to ineffective assistance claims relating to the plea offer

13   process.  *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *see also Strickland*, 466 U.S. at 687-88, 694.

14           The record reflects that on December 3, 1990, during the penalty phase, counsel

15   informed the trial court of the alleged pre-trial second degree offer when Hart motioned the

16   court to admit evidence of such as part of the mitigation defense.  (CT 689-94.)  Prosecutor

17   Cooper responded that he did not extend any second degree offer, noting he lacked any

18   authority to do so (RT 8406-10), and revisited the rejected first degree murder offer, as

19   follows:

20

21           MR. COOPER: One other thing that I wanted to mention, there's been – I
             received a motion which refers to a second degree dispositional offer that was
22           made in this case. My recollection is that no such offer was ever made. A first
             degree offer was made. The Defendant countered with a determinate term,
23           voluntary disposition totaling 14 years, which I took back to my superiors for
             them to consider and to consider whether there might be a counter to the
24           Defendant's counter. There was not a counter to his counter, and his counter
             was rejected. There was never a second degree murder offer … [T]here may
25           have been discussion about whether the Defendant would be inclined to accept a
             second degree offer, but, I'm sorry, there was never a second degree offer made.

26

27   (RT 7633.)  Mr. Pedowitz disagreed, telling the court that:

28

> I specifically remember talking to [Petitioner] and Ms. Hart in the prisoner
> holding cell behind Department 13 and Muni 12 about a second degree offer.
> And it was not a short conversation, it was a long, drawn out conversation, and
> we discussed the pros and the cons of it. And so I don't want the record settled
> on this based on some statement that Mr. -- Mr. Cooper is making. And it is a
> wide-open issue as far as I'm concerned.

(RT 7638.)

The California Supreme Court reasonably could find that Petitioner failed to support with evidentiary facts the existence of a second degree murder plea offer, the terms thereof, or that the prosecutor was authorized to negotiate a second degree murder offer. Petitioner concedes that there may have been simply an invitation to negotiate and nothing more. (*See* Doc. No. 89 at 147 n.47.)

Counsel Pedowitz also concedes that the defense team placed on the record all plea offers made and rejected. (RT 7637-38.) The record reflects only the first degree murder offer. (*See* RT 8404, 8413.)

Significantly, neither counsel nor Petitioner provided a habeas declaration supporting the alleged second degree murder plea offer. *See Burger v. Kemp,* 483 U.S. 776, 785-86 (1987) (no ineffective assistance where prosecutor refuses to engage in plea bargaining). Prosecutor Cooper, in his 2005 habeas declaration included as an exhibit to Respondent's informal response to Petitioner's second state habeas petition, confirms that he "never extended a second degree murder offer." (Doc. No. 82 at V-EE Ex. B ¶ 6.)

Petitioner's argument that Cooper's declaration was extrinsic to the state petition and should not have been credited by the California Supreme Court without a hearing (*see, e.g.*, Doc. No. 105 at 147), is unpersuasive. Contrary to Petitioner's suggestion, the California Supreme Court has approved the inclusion of factual material demonstrating a habeas claim lacks merit in an informal response to a habeas petition. *See People v. Romero*, 8 Cal. 4th 728, 742 (1994) (citing former Rule 60 of the California Rules of Court).

## B.    First Degree Offer

Petitioner argues counsel was ineffective regarding the guilt phase first degree offer

rejected on the record by Petitioner.

The record reflects that on November 1, 1990, while Pridgon was giving guilt phase testimony, counsel Pedowitz advised the court of a non-capital first degree murder plea offer and Petitioner's rejection of it (*see* CT 549), as follows:

> MR. PEDOWITZ: Thank you, Your Honor. Mr. Cooper made an offer to the Defendant that Ms. Hart and I both conveyed to the Defendant. The offer was that the Prosecution would strike the special circumstance if Mr. -- and the second count if Mr. Lewis would consider pleading guilty to the first degree murder allegation and accept the prior enhancement. [¶] We indicated to Mr. Lewis that offer. We had the opportunity to discuss it with him privately. Mr. Lewis rejected that offer. At that time Ms. Hart and I invited Mr. Lewis to perhaps offer a counteroffer to the District Attorney's office. And after discussing the merits of the case, he indicated that he had no desire to make any counteroffer at all as to this case. [¶] Is that correct, Mr. Lewis?
> THE DEFENDANT: Yes.
> THE COURT: All right.
> MR. PEDOWITZ: And that I would like the record to reflect my comments. Thank you, Your Honor.
> THE COURT: All right. Thank you.

(RT 5393-94.) Prosecutor Cooper, in his 2005 habeas declaration confirmed the guilt phase non-capital first degree murder offer and that it was made because of difficulties Pridgon was having in offering testimony. (RT 5393-94, 8718; *accord* Doc. No. 82 at V-EE Ex. B at 7.)

The California Supreme Court reasonably could find that Petitioner has not articulated with any degree of specificity how and why counsel was deficient as to the first degree offer. Petitioner conceded that counsel "had the opportunity to discuss the offer with him privately" and that in this context they "discuss[ed] the merits of the case." (RT 5394.) Petitioner confirmed on the record his rejection of the first degree plea offer. (*Id.*) Prosecutor Cooper's recollection that Petitioner countered the first degree offer by seeking a determinate term sentence (RT 7633), suggests that Petitioner was advised of the plea process and the facts and circumstances of this case sufficiently to respond in an informed manner.

Petitioner seemingly fails to rebut the "strong presumption" that counsel's performance fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Particularly so as "strict adherence to the *Strickland* standard" is "all the more essential when

125

reviewing the choices an attorney made at the plea bargain stage." *Premo*, 562 U.S. at 124.

"Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks." *Id.*

Petitioner's tangential suggestion that counsel's plea advice was necessarily deficient because counsel's guilt phase investigation and defense were deficient, fails for the reasons stated. (*See* claims 9, 10, 25, *ante*.)

### (2)    Prejudice

Even if counsel was deficient as alleged, the California Supreme Court reasonably could have found Petitioner was not prejudiced thereby.

Assuming arguendo that counsel failed to pass along a second degree plea offer, Petitioner's inability to identify terms and conditions thereof reasonably suggests such an offer was not binding on the prosecution, and that the trial court would not have approved a merely incipient offer. The California Supreme Court reasonably could have concluded any claimed prejudice relating to such a lost opportunity was entirely speculative. *See Pinholster*, 563 U.S. at 181 (the reviewing court is limited to the record that was before the state court that adjudicated the claim on the merits); *Burger*, 483 U.S. at 785-86 (no prejudice from counsel's failure to negotiate a plea deal, allegedly due counsel's conflict of interest, where the prosecutor consistently refused to engage in plea bargaining).

Nor has Petitioner demonstrated that upon appropriate advisement by counsel, he would have accepted the first degree offer. Counsel Pedowitz informed the trial court that Petitioner rejected that first degree plea offer by indicting that "he had no desire to make any counteroffer at all as to this case." (RT 5394.) The failure to counteroffer reasonably suggests Petitioner was not susceptible of any plea deal. Even if Petitioner had countered, given the aggravating facts and circumstances of this case it reasonably appears the prosecution would not have accepted. *See* CT 1005-20; 2/20/91 RT 33-54; 3/6/91 RT 79-88); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (defendant asserting ineffectiveness relating to rejected plea offer must show reasonable probability the outcome of the plea process would have been

different with competent advice).

(3)     **Conclusions**

The California Supreme Court reasonably could find that counsel was not ineffective by failing to communicate and meaningfully advise him relating to plea negotiations and deals as alleged.

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 27 shall be denied.

**f.     Claim 28**

Petitioner alleges that counsel was ineffective by failing to investigate, develop and present a defense based on the magnitude of the victim's drug habit, violating his rights under International Law and the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 188-90.)

*i.     State Court Direct and Collateral Review*

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 64-68), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

*ii.     Analysis*

Petitioner argues that given the extent of Simms's cocaine habit, she likely was without funds at the time she was killed. Specifically, he argues counsel was ineffective by failing to defend the felony murder-robbery charge with evidence that Simms had already spent her

paycheck as a fast-food worker on drugs by the time she was murdered.  (Doc. No. 58-1 at 188; RT 4778-80.)  Such a showing, he argues, would have obviated the motive for robbery and discounted the murder-robbery special circumstance.  (*Id.*)

### (1)    Deficient Performance

Petitioner points to evidence in the record that Simms received her $167.62 Carl's Jr. paycheck the day before she was killed and that as was her practice, she spent the portion not put aside for rent on drugs.  (*See* RT 4432-33, 4778.)  He additionally points to: (i) pathologist Nelson's finding that Simms was a chronic user of cocaine and had a high level of cocaine in her system at the time of her death (RT 5648-51; 2SHCP Ex. 11 at 246), (ii) witness testimony regarding Simms's regular drug use (RT 4778-79, 4827-29, 4870-81, 5273), and (iii) narcotics paraphernalia found on Simms's body (RT 4366).

Petitioner suggests that as a close friend of Simms, he would have been aware of the foregoing and the likelihood that Simms had little if any money to steal at the time she was killed.  (RT 4797, 4818, 6326-28.)  Also, he discounts the prosecution theory that he was motived to rob Simms by pointing out that: (i) Simms likely owed him money at the time of her death (RT 4915, 6341), (ii) Simms still had $20 in her brazier when her body was found (RT 4348), and (iii) Pridgon testified that he did not actually see Petitioner take money from Simms's person after the assault (CT 221; RT 5398-5401).

But the California Supreme Court reasonably could have found that Petitioner was motivated to take money that Simms had on her person that night.  The jury was no doubt aware from Pedowitz's guilt phase closing argument of the defense theory that Petitioner lacked a financial motive for the assault.  Pedowitz posited:

> Was she killed because the motive was robbery? I suggest to you as a skeptic that that should be your first avenue of attack. A couple of good reasons for it. First off, if you decide that robbery was not why she got killed, so much for the special circumstance, so much for the enormity of your decision. It's easier.
>
> And secondly, you resolve the robbery allegation. I'll put it to you that if you believe that there is no motivation for a robbery, that Raymond knew that she already spent all of her money, that's it. That's it.

128

(RT 7323; *see also* RT 7321-22.)

The record reasonably supports an inference that Simms's had money on her person that was taken after she was knocked to the ground.  Simms's cashed her $167.62 paycheck on June 7, 1988 (RT 4287, 4741-48), the day she was killed.  She then told her apartment manager that she was going to meet up with the owner to pay rent (RT 4771-73, 5051), but apparently never did so (RT 4774-75, 4798).  This suggests Simms still had her rent money on her person.

Contributing to the inference Simms had money that evening is her conduct accompanying Petitioner so that she could buy more drugs.  It appears that after Petitioner returned to his room at the boarding house following his initial trip to buy drugs with the $20 Simms had given him earlier that evening, he told Simms that he knew where to score more drugs, $100 worth of crack for $30.  (CT 41-45.)  Simms seemingly was agreeable to that deal because she accompanied Petitioner to the proposed drug buy.  Petitioner remarking as they left together, "Let's go do that . . . Come on, Sandra. Let's go."  (RT 4881-83, 5015, 5058, 5276-77, 6465.)

Pridgon's testimony confirmed that Petitioner took money from Simms after he knocked her to the ground.  Although Pridgon testified at the preliminary hearing that he had not actually seen Petitioner take money from Simms (CT 221), at trial he testified that he both saw and heard money taken from Simms by Petitioner when Simms was on the ground.  Pridgon testified he "heard money rustling when [Petitioner] took it from Simms's bra."  (RT 5323-5326, 5349-50, 5397-5398, 5494, 5496, 5542-5544, 5571; *see also* CT 220-22.)  The inferential evidence suggests at least $10 was taken from Simms when she was killed, i.e., the difference between the $30 needed for the drug buy minus and the $20 that remained on Simms's person when the police found her body.

The prosecution theory that Petitioner was motivated to rob Simms also find support in his knowledge that Simms kept money in her bra.  (RT 6351.)  When police found Simms's body, the upper portion of her blouse was open and hanging down in the left breast area where her bra was exposed.  (RT 4257, 4263-64, 4275-76.)  A $20 bill was found in her bra. (RT

4276, 4284, 4286, 4348.)  Buttons, apparently from the blouse, were found alongside Simms's body.  (RT 4277, 4337-38, 4512-13.)

Additionally, the primary trial defense was that Pridgon had committed the murder and robbery, rather than that there was no robbery.  As a matter of trial tactics, counsel reasonably could have concluded that disproving the object of the robbery would in turn obviate the primary defense of third-party culpability.  (*See* RT 4652); *see also Gentry*, 540 U.S. at 8 (when counsel focuses on some issues to exclusion of others, there is strong presumption it was tactical, rather than negligent).

### (2) Prejudice

Petitioner argues the failure to present a defense negating robbery as a motive was prejudicial because that defense could have resulted in acquittal, or precluded the murder-robbery special circumstance.

However, even if counsel was deficient as alleged, the California Supreme Court could have found no reasonable probability of a different outcome had additional evidence relative to Simms's drug use been presented at trial.

The jury already was aware from the evidence discussed above that Simms was a regular user of cocaine and had cocaine in her system when she was killed (*see also* RT 4778, 4881-83, 4886, 5015, 5058-59, 5276-77, 6465), and that Simms had cashed her paycheck hours before her death and apparently still had a portion of the proceeds from that check on her person when she left with Petitioner for the purported drug buy from which she did not return.

Also, the jury was aware of Petitioner's expressed intent to assault and rob Simms.  Petitioner had stated to Pridgon his intention to hit Simms and take her money.  Petitioner was in a position to do just that as he knew where Simms kept her money, i.e. in her bra.

Additionally, counsel's failure to disprove the robbery motive was not prejudicial of his asserted third-party culpability defense, for the reasons stated.

### (3) Conclusions

The California Supreme Court reasonably could find that Petitioner failed to

130

demonstrate counsel was ineffective by failing to investigate, develop and present a defense based on the magnitude of the Simms's drug habit.

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 28 shall be denied.

3.     Penalty Phase Claims

**a.     Claims 14, 15, 16**

Petitioner alleges that counsel was ineffective by failing to investigate, develop and present mitigation evidence and expert opinion relating to: (i) his life history including evidence of alleged childhood abuse and neglect, mental impairments and positive aspects of his character and potential (i.e. claim 14), (ii) his substance abuse (i.e. claim 15), and (iii) his mental impairments (i.e. claim 16) - violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 79-115.)

*i.     Supplemental Legal Standards*

**(1)     Penalty Phase Application of _Strickland_**

The basic requirements of *Strickland* apply with equal force in the penalty phase. Petitioner must show that counsel's actions fell below an objective standard of reasonableness, and that the alleged errors resulted in prejudice. *Strickland*, 466 U.S. at 687-88.

Here again, *Strickland* dictates a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). AEDPA, acting in tandem with *Strickland* asks whether

the state court's application of *Strickland* was unreasonable. *Richter,* 562 U.S. at 99-100.

Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the

two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at 105 (quoting *Knowles*

*v. Mirzayance*, 556 U.S. 111, 123 (2009)).

In the context of the penalty phase, just as in the guilt phase, the Supreme Court has

"declined to articulate specific guidelines for appropriate attorney conduct and instead [has]

emphasized that '[t]he proper measure of attorney performance remains simply reasonableness

under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S.

at 688).

In cases alleging a failure to investigate and present mitigation, as here, a court must

"reweigh the evidence in aggravation against the totality of available mitigating evidence."

*Wiggins*, 539 U.S. at 534; *see also Porter v. McCollum,* 558 U.S. 30, 41 (2009) (same). The

specific standards applicable to investigation, development and presentation of mitigation

evidence follow.

### (2)     Duty to Investigate

The Eighth Amendment requires that the sentencer not be precluded from considering,

as a mitigating factor, any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than

death. *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604

(1978).

It follows that in the penalty phase, counsel has an "obligation to conduct a thorough

investigation of the defendant's background," *Williams*, 529 U.S. at 396, and a duty to

investigate, develop, and present mitigation evidence during penalty phase proceedings.

*Wiggins*, 539 U.S. at 521-23. Counsel has a duty to make a "diligent investigation into his

client's troubling background and unique personal circumstances." *Williams*, 529 U.S. at 415.

"At the very least, counsel should obtain readily available documentary evidence such as

school, employment, and medical records, and obtain information about the defendant's

character and background." *Robinson v. Schriro*, 595 F.3d 1086, 1108-09 (9th Cir. 2010) (citing *Boyde*, 494 U.S. at 382).

During the sentence selection stage, the Supreme Court has imposed a requirement that the jury make "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972-73 (citing *Stephens*, 462 U.S. at 879, and *Woodson v. North Carolina*, 428 U.S. 280, 303-304 (1976)). This "requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Id.* (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990)) ("[The] requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence").

The Court may not "impede [] the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender" by excluding "relevant mitigating evidence." *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986). Nevertheless, the Court retains "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett,* 438 U.S. at 605 n.12.

As noted, under *Strickland* counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523. As the Supreme Court recently reiterated, "in judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made and by giving a heavy measure of

deference to counsel's judgments." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005).

However, the Supreme Court also has recognized that the duty to investigate does not require counsel "to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 382-83 (citing *Wiggins*, 539 U.S. at 525) (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger*, 483 U.S. at 794 (limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).

"[T]he scope of a counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be." *Soffar v. Dretke*, 368 F.3d, at 473. In determining whether counsel made reasonable tactical decisions about certain evidence, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable. *Wiggins*, 539 U.S. at 523. Limited investigation may be reasonable when it demonstrates that presenting certain evidence "would have been counterproductive, or that further investigation would have been fruitless." *Id.* at 525. Moreover, "where a Petitioner cannot even make an unsubstantiated suggestion as to what the results of further [investigation] would have been, there is no basis on which a reviewing court can find prejudice." *Weaver v. Palmateer*, 455 F.3d 958, 971 (9th Cir. 2006).

A defense attorney is not obligated to track down each and every possible witness or to personally investigate every conceivable lead. An ineffective assistance of counsel claim cannot rest upon counsel's alleged failure to engage in a scavenger hunt for potentially exculpatory information with no detailed instruction on what this information may be or where it might be found. *United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002).

Therefore, to determine the reasonableness of a decision not to investigate, the court must apply "a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at

134

691; *Babbitt v. Calderon*, 151 F.3d 1170, 1173-74 (9th Cir. 1998). The relevant inquiry is not what counsel could have pursued, but whether the choices counsel made were reasonable. *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

"Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Richter*, 131 S. Ct. at 789 (quoting *Strickland*, 466 U.S. at 689); *see also Williams*, 529 U.S. at 415 (counsel conducted a reasonable investigation into the petitioner's troubling background and unique personal circumstances developed a coherent and organized strategy, proffered evidence, and presented a case for mitigation).

### (3) Prejudice

Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94. To assess that probability, the reviewing court must consider the totality of the available mitigation evidence and reweigh it against the evidence in aggravation. *Porter*, 558 U.S. at 41 (citing *Williams*, 529 U.S. at 397-398). The Court must consider whether the likelihood of a different result is "sufficient to undermine confidence in the outcome" actually reached at sentencing. *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694).

Claims of failure to investigate must show what information would be obtained with investigation, and whether, assuming the evidence is admissible, it would have produced a different result. *See*, *e.g.*, *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1989).

#### ii. State Court Direct and Collateral Review

Petitioner presented claim 14 in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. I, Claim 1 at 5-47), which was summarily denied on the merits (Doc. No. 14 at II-P at 1).

Petitioner presented claim 15 in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. I, Claim 2 at 48-56), which was summarily denied on the merits (Doc. No. 14 at II-P at 1).

135

Petitioner presented claim 16 in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. I, Claim 3 at 56-68), which was summarily denied on the merits (Doc. No. 14 at II-P at 1).

### iii.    *Analysis*

Petitioner argues counsel failed to adequately investigate, develop and present his mitigating life, substance abuse, and mental impairment histories.  Penal Code § 190.3(k); (Doc. No. 89 at 105, citing *Eddings,* 455 U.S. at 110 (trial court deficient by refusing to consider mitigating evidence of defendant's violent family history and mental/emotional disturbance)).

Petitioner points to evidence of alleged multi-generational poverty, substance abuse including the alcoholism of his mother (whom he suggests may have consumed alcohol during her pregnancy with Petitioner) and grandparents; violence involving beatings, guns and knives within the family and in the surrounding community; parental neglect to the point of abandonment; unstable and multiple relations between his mother and a number of males; a mother so addicted to alcohol and to outbursts of rage that eventually most of her children fled the home; his serious physical injury as a youth that led to negative changes in his behavior; his substance abuse between 1978-1988 and related disorders; and his psychiatric, neurological and emotional makeup that collapsed under the pressure of these conditions, leaving him paranoid schizophrenic by age 14.  (Doc. No. 58-1 at 79.)

Petitioner's specific allegations are discussed in turn, as follows.

**(1)    Deficient Performance**

## A.    Family and Early Childhood History

Petitioner faults counsel for failing to investigate, develop and present evidence of his struggles at home with deprivation, violence, neglect, and mental impairments, as well as of his successes, positive potential and character attributes - all potential mitigators under Penal Code section 190.3(d, h, k).

Petitioner's Mitigation Proffer

Petitioner's mother, Minnie, was raised in poor circumstances and dropped out of school at the age of thirteen.  (*See* 1SHCP Ex. 2 ¶¶ 1-14.)  Shortly after his birth on September 16, 1961 (1SHCP Ex. 1), Minnie left Petitioner's birth-father and moved Petitioner and his two siblings from Texas to the Laton – Lanare area in central California, an agricultural region where other family members were then living (1SHCP Ex. 2 ¶¶ 1-18).  Minnie's habeas declaration suggests that like her, Petitioner was raised in relatively poor and unstable circumstances, moving to different homes multiple times during his youth as one of seven children in the household.  (1SHCP Ex. 2 ¶¶ 1-18.)

Minnie moved-in with her boyfriend, Ernest McCullar Sr., a truck driver who was often away from home, and his children from a different relationship.  (1SHCP Ex. 2 ¶¶ 15-18, Ex. 3 ¶ 6, Ex. 5 ¶¶ 2-3.)  The family for a time lived and worked in the agricultural fields as a result of which Petitioner suggests he suffered a risk of exposure to farm chemicals and possible brain impairment.  (1SHCP Ex.'s 3, 8, 11.)  Minnie and Ernest would occasionally fight, sometimes violently.  (1SHCP Ex.'s 3, 5, 7, 8.)  Petitioner would sometimes stay with other families, like the Sanchez family where Petitioner stayed for three months at age 10, outside of Lanare to get away from his problematic home life.  (*Id.* ¶ 22; 1SHCP Ex. 18 ¶ 1.)

Minnie suggests there was racial tension in the Laton-Lanare area.  (1SHCP Ex. 2 ¶ 20.)  Betty Lewis, Petitioner's aunt, suggests that race was once an issue at the local elementary school.  (1SHCP Ex. 4 ¶ 13.)

Petitioner's home life significantly deteriorated when Earnest moved out when Petitioner was about age eleven.  (1SHCP Ex.'s 3, 5, 11.)  He suggests Minnie's predisposition to problems with alcohol (1SHCP Ex. 3 ¶ 5, Ex. 4 ¶¶ 5, 7, Ex. 7 ¶ 2) manifested in heavy drinking that left her combative with family members and other adults (1SHCP Ex. 3 ¶¶ 7, 21, Ex. 5 ¶ 5, Ex. 6 ¶¶ 2-3, Ex. 7 ¶¶ 1-4, Ex. 8 ¶ 10, Ex. 11 ¶¶ 4-5, Ex. 12 ¶ 5, Ex. 13 ¶ 2) and often absent from home, leaving the children unsupervised (1SHCP Ex. 3 ¶ 8, Ex. 4 ¶ 8).  When Minnie was around the home, Petitioner would watch her drink and fight (1SHCP Ex. 3 ¶¶ 11-13, Ex. 12 ¶ 4), and would sometimes be forced to defend Minnie and his siblings (1SHCP Ex.

6 ¶ 6, Ex. 7 ¶¶ 3-4, Ex. 11 ¶¶ 6-7, Ex.'s 8, 12).  Given these issues, Minnie eventually found it necessary to abandon Petitioner's new-borne half-sister, Sandra, to a relative.  (1SHCP Ex.'s 4, 13.)

Petitioner was not subject to parental discipline (1SHCP ¶ 10), but rather to parental indifference (1SHCP Ex. 5 ¶ 7, Ex. 6 ¶¶ 3-4, Ex. 7 ¶ 5, Ex. 8 ¶¶ 6-8, Ex. 11 ¶¶ 4-5, 8), that left him unable to appreciate the consequences of his actions (*id.*).

Petitioner struggled in school and was held back in first grade.  (1SHCP Ex.'s 20-23.) His Riverdale Elementary School records show mostly C's, D's, and F's, and withdrawal from school in 1975 following his murder adjudication in the burning death of A. Z. Rogers's and consequent California Youth Authority ("CYA") commitment.  (*Id.*)

The lack of parental supervision and discipline left him susceptible to the bad influence of community trouble-makers such as his longtime crony, Willis Randolph.  (1SHCP Ex. 4 ¶ 10, Ex. 18 ¶¶ 8-9, Ex.'s 11, 13.)  It was in the company of Randolph and Petitioner's other friend Sylvester Green that Petitioner, then age thirteen and suspended from school for fighting, was involved in Rogers's murder.  (1SHCP Ex. 16; RT 7615-8327.)

Mitigation Evidence Presented at Trial

Counsel, shortly before the beginning of the penalty phase, retained psychiatrist Dr. Thomas Callahan and psychologist Dr. Richard Adams to examine and evaluate Petitioner.

Dr. Callahan reviewed Petitioner's family and life history, noting primarily the poverty, indifference, lack of structure and value system, and susceptibility to peer pressure that characterized Petitioner's home life.  (RT 8464.)  Dr. Callahan considered Petitioner's mental health records including as to the violence Petitioner encountered at CYA that became "an organizing principle of his adolescence" (RT 8470-8528; *see also* Doc. No. 89 at 123); the survival and defense skills and unprovoked violent tendencies Petitioner developed at CYA (RT 8473-81, 8515-17); the pattern of aggressive fighting behavior at CYA (RT 8543); and the beneficial tranquilizing medication and intensive group therapy Petitioner received at CYA (RT 8470-84, 8518-19).

138

1    Dr. Callahan personally interviewed Petitioner (RT 8453, 8481-84, 8516, 8525) and

2    considered the evaluations conducted by psychiatrist Dr. Kronenberg and neuropsychiatrist Dr.

3    Papadopoulos that were performed in conjunction with the 1975 juvenile murder proceedings.

4    (RT 8450-51.)  Dr. Callahan also spoke to Dr. Kronenberg about her evaluation and

5    Petitioner's capital murder circumstance.  (RT 8452-53, 8457, 8460, 8469-70, 8500.)  Notably,

6    Drs. Kronenberg and Papadopoulos both found that in 1975 Petitioner demonstrated paranoid

7    schizophrenia with episodes of violence, and borderline intelligence.  (1SHCP Ex.'s 17, 24.)

8         Dr. Callahan noted that Petitioner had engaged in "impulsive violent behavior with

9    peers and siblings" (RT 8467) including "assaulting siblings and schoolmates, some of them

10   requiring stitches in their heads … [o]ne sibling having a fracture of the hand…." (RT 8464-

11   8510; *see also* 1SHCP Ex. 7 at 29-31).

12        Ultimately, Dr. Callahan found no organic brain deficits or psychosis, instead

13   diagnosing Petitioner with antisocial personality disorder (RT 8453-54), impulsiveness and low

14   self-esteem (RT 8455).

15        Dr. Callahan also testified to progress Petitioner made in confronting these issues.  Dr.

16   Callahan made the jury aware that Petitioner had a positive response to and recollection of

17   therapy he received at the CYA.  (RT 8514, 8559.)  Dr. Callahan further opined that

18   Petitioner's violent behavior was controllable in institutional lock-up by the structured setting

19   and medication, and that such violent behavior would attenuate with age.  (RT 8516, 8520-21,

20   8527.)

21        Dr. Adams, a clinical psychologist working independently from Dr. Callahan,

22   personally interviewed and evaluated Petitioner around the time of the penalty phase and he

23   also considered Dr. Kronenberg and Dr. Papadopoulos's reports.  (RT 8533-34, 8542; *see also*

24   1SHCP Ex. 14 at 1-7.)  Dr. Adams concurred in Dr. Callahan's findings and diagnosis of

25   antisocial personality order.  (RT 8530-52.)  Dr. Adams testified that Petitioner told him of his

26   mother's trouble with drinking (RT 8549); and that Petitioner seemed to have grown up in a

27   dysfunctional family (RT 8550).  Dr. Adams made the jury aware of the father-son relationship

28

1   that Ernest McCullar Sr. had with Petitioner during his youth.  (RT 8560-61.)

2        Ultimately, Dr. Adams opined that he found no evidence of any major mental disorder

3   and in particular found no thought, mood, or anxiety disorder.  (RT 8564.)  Dr. Adams testified

4   that Petitioner showed average intelligence and cognition and denied ever hearing voices.  (RT

5   8561-62.)

6        Testimony from Petitioner's family also placed Minnie's drinking before the jury.  For

7   example, Petitioner's sister Sandra McCullar testified that Minnie was "a sweet lady, you

8   know, when she's sober, you know."  (RT 8580.)

9        <u>Counsel was not Deficient</u>

10       Petitioner's proffer appears to add only minimally to the evidence that was otherwise

11  before the jury.

12       The testimony of Drs. Callahan and Adams includes significant information of

13  Petitioner's life history including: (i) early childhood development and experiences with his

14  mother and stable and employed step-father (although the information Petitioner gave was

15  somewhat limited), (ii) his mother's trouble with drinking, (iii) individuals who had a positive

16  effect on his life, (iv) his experiences in CYA, (v) the murder he committed at around age

17  fourteen, (vi) his incarcerations since age fourteen in correctional institutions, (vii) his repeated

18  criminal activities, (viii) his altercations with others, (ix) his apparent inability to establish

19  long-term relationships with people, (x) his enrollment in college for a short time including

20  playing football, and (xi) his claimed auditory hallucinations.  (*See* RT 8535-42, 8544, 8549,

21  8552, 8557-62, 8566-67.)

22       Dr. Adams 1990 report, included with the habeas proffer, covers much the same ground

23  as his trial testimony.  For example, the report notes Petitioner's non-abusive father-son

24  relationship with Ernest Sr. (1SHCP Ex. 14 at 2), and Petitioner's social alienation and limited

25  social skills accompanied by average cognition with no disruptions in thinking or auditory

26  hallucinations (*id. at* 3).  Counsel Hart argued many of these mitigating life history factors to

27  the jury, including poverty, lack of a parental guidance, heredity, lack of treatment for social

28

1  and mental disorders, and substance abuse.  (*See* RT 8862-74.)

2        Petitioner argues that counsel was deficient by failing to present mitigating testimony

3  from his family, friends, teachers, and administrators.  (*See, e.g.,* 1SHCP Ex.'s 2, 3, 4, 5, 6, 7,

4  8, 11, 18, 19; *see also* Doc. No. 58-1 at 103-04; Doc. No. 89 at 108.)  Still, the California

5  Supreme Court reasonably could have concluded counsel was tactically motivated regarding

6  which potential witnesses were contacted, interviewed, and presented at trial.

7        Counsel, during the pre-trial investigation, interviewed Petitioner and reviewed a list of

8  potential trial witnesses he provided.  (Doc. No. 105 at 117; 12/11/89 RT 3; 11/7/89 RT 6-7.)

9  The California Supreme Court reasonably could have presumed counsel was aware of the

10  potential witnesses, areas of testimony, and that certain of the unpresented lay witnesses seem

11  to have had limited contact with Petitioner after his release from the CYA.  For example,

12  Ernest Sr. (1SHCP Ex. 5 ¶ 13), Rosie Wright (1SHCP Ex. 3 ¶ 14), Betty Lewis (1SHCP Ex. 4

13  ¶ 14), Benny Sanchez (1SHCP Ex. 18 ¶¶ 9-100), Emily Sanchez (1SHCP Ex. 19 ¶ 7), Ernest

14  Jr. (1SHCP Ex. 8 ¶ 11-12), and Myra Joe Talley, Bud Brooks, Curtis T. Walker and Albert C.

15  Rist (1SHCP Ex.'s 22-23, 26-27), all appear to have had little if any contact with Petitioner

16  during this timeframe.  Notably, the duty to investigate "does not necessarily require that every

17  conceivable witness be interviewed."  *Hendricks*, 70 F.3d at 1040.

18        That court reasonably could have found counsel was tactically motivated in

19  determining which witnesses to present to the jury.  The noted testimony from defense experts

20  served to place much of Petitioner's mitigating life history before the jury.  Petitioner's habeas

21  proffer of unpresented witness testimony includes evidence that is largely cumulative of

22  testimony given by the defense experts at trial.  Particularly, Petitioner's rather extensive

23  proffer relating to Minnie's alcohol issues (*see, e.g.*, 1SHCP Ex. 3 at 11; 1SHCP Ex. 4 at 17-

24  18; 1SHCP Ex. 11 at 42) covers much the same ground as the defense experts.  (*See* RT 8578-

25  85, 8628-30); *see also Lord v. Wood,* 184 F.3d 1083, 1095 (9th Cir. 1999) (observing that

26  "[F]ew decisions draw so heavily on professional judgment as whether or not to proffer a

27  witness at trial.").

28
                                                    141

1    To the extent Petitioner contends the three family members who did testify in

2    mitigation, i.e. mother Minnie, sister Sandra McCullar, and cousin Cathy Jackson, were

3    insufficiently prepared and omitted mitigating information, his habeas proffer does not suggest

4    the existence of unpresented and non-cumulative material evidence.  (*See* 1SHCP Ex.'s 2,

5    12,13.)  The California Supreme Court characterized the testimony of these witnesses as

6    follows:

7

8    > Minnie Lewis, defendant's mother, testified defendant wrote to her every week
>    and told her if he was not executed he wanted to be a counselor to tell kids to
>    stay off drugs and off the streets. She said she loved her son and would be
9    > extremely distraught if he were executed. Sandra McCullar, defendant's sister,
>    testified that she spoke to defendant every week in jail, and believed that
10   > defendant had changed; that he talked about God and quoted from the Bible,
>    and told McCullar to stay in school and not use drugs, and his younger half
11   > brother to stay in school; and that she would miss defendant very much if he
>    were executed. Cathy Jackson, defendant's cousin, testified defendant offered
12   > advice to young people to stay off drugs and out of trouble. She said she would
>    miss him if he were executed.

13

14   *Lewis,* 26 Cal. 4th, at 351-52.

15       The testimony suggested sympathy for Petitioner's family and the impact upon them

16   should he be executed.  (RT 8578-85, 8628-30.)  Where the record demonstrates an adequate

17   and straightforward examination of a witness and the defendant has not shown that further

18   preparation of the witness would have appreciably affected the result, the defendant fails to

19   show ineffectiveness through inadequate preparation of the witness.  *United States v. Molina*,

20   934 F.2d 1440, 1448 (9th Cir. 1991).

21       Petitioner's proffer does not demonstrate these witnesses could have provided

22   additional non-cumulative mitigating testimony.  As noted, the proffered proposed

23   (unpresented) mitigating testimony of these witnesses appears largely cumulative of testimony

24   given by the defense experts at trial.  Although Minnie's proposed testimony appears non-

25   cumulative to the extent she suggests Petitioner's life as a youth was relatively normal, her

26   testimony is in material respects inconsistent with the life history information presented

27   through the testimony of the defense experts, and thus seemingly unhelpful to the defense.

28

(*See, e.g.*, RT 8444-8567; 1SHCP Ex. 2 ¶ 21.)

Sandra McCullar and Cathy Jackson appeared to know little of Petitioner during his adulthood. (1SHCP Ex.'s 12, 13; *see also* RT 8578-85, 8583-85.) The California Supreme Court reasonably could have rejected Petitioner's suggestion these witnesses could have provided such mitigating testimony.

To the extent Petitioner claims counsel failed to present evidence that Petitioner was protective of his family (*see* Doc. No. 58-1 at 104; 1SHCP Ex. 8 ¶ 2, Ex. 12 ¶ 2), the jury otherwise was aware of his positive character traits through Petitioner's actions while incarcerated where he helped local correctional officer Dana Crittenden handle a problem inmate (RT 8574-76, 8898-999); provided positive life advice to family members to stay off drugs and in school (RT 8578-85); and expressed his desire to be a prison counselor (RT 8558, 8629).

The record also suggests the possibility that some of these unpresented witnesses would have provided potentially aggravating evidence relating to aspects of Petitioner's life and possible future dangerousness. Earnest Sr. states in his habeas declaration that Petitioner developed a reputation as a thief, and was joined in these endeavors by other youths including Randolph. (1SHCP Ex. 5 ¶ 13.) Petitioner's 1975 probation report and recommendation also suggests Petitioner's involvement in a number of violent episodes; his inability to control his anger; and that he had received citations and warnings from law enforcement in the years preceding Rogers's murder. (1SHCP Ex. 16 at 5-6.) Petitioner's mother, Minnie, acknowledged that of her six other children, not one has presented serious difficulties due to involvement with law enforcement. (RT 8631.)

Petitioner's suggestion that he suffered mental impacts from neurotoxic agricultural chemicals is based upon only speculation. Petitioner has not shown more than surmise that living in an agricultural area and working as a youth moving agricultural irrigation lines harmfully exposed him to neurotoxins. (Doc. No. 58-1 at 86; *see also* 1SHCP Ex. 3.) He appears unable to support this contention in the factual record. Drs. Callahan and Adams do

not suggest Petitioner suffered any such brain damage or deficit. (*See, e.g.*, RT 8454, 8498, 8543-44, 8562-64.) Nor has Petitioner demonstrated that family members suffered any such neurotoxic symptoms. *Cf. Caro v. Calderon*, 165 F.3d 1223, 1226-29 (9th Cir. 1999) (counsel deficient for failing to investigate defendant's known extraordinary exposure to neurotoxins and neurological impairments). Notably, neither Petitioner's 1975 EEG or his 1990 EEG showed any brain pathology. (1SHCP Ex. 24 at 2; *id.* Ex. 25; *see also* RT 8476-77.)

As to the proffer that racial issues may have negatively influenced him while growing up, nothing in his proffered evidence suggests Petitioner himself experienced racial tensions or impacts therefrom. The California Supreme Court reasonably could have found that Petitioner failed to demonstrate he suffered any significant racial prejudice during his youth and adolescence. The evidentiary record suggests that apart from an isolated racial epithet directed toward his brother (*see* 1SHCP Ex. 8) racial prejudice appears only to the extent Petitioner acted to create it (1SHCP Ex. 3 ¶ 15). Moreover, Petitioner has not demonstrated race was a motivation in the killing of Simms. The record reflects that Petitioner is Black (CT 1041), and so was Simms (RT 4254).

Finally, Petitioner's allegations relating to potential mitigating value from the burning death of Rogers are unpersuasive for the reasons discussed in claims 17 and 18, *post*.

Accordingly, for the reasons stated, the California Supreme Court was not unreasonable in rejecting these allegations relating to counsel's alleged failure to investigate, develop and present mitigating life history evidence of violence, neglect, and mental impairments, and positive character attributes.

### B.    Bike Accident as a Youth

Petitioner's faults counsel for failing to investigate, develop and present mitigating evidence relating to injuries he suffered as a youth when struck by truck while on the handlebars of a bike piloted by his friend Randolph.

Petitioner's Mitigation Proffer

When Petitioner was about age eleven, he suffered injuries as a result of the above-

mentioned bike accident that left him in a body cast for six months and a leg cast for two additional months.  (1SHCP Ex. 2 ¶ 19, Ex. 3 ¶ 18, Ex. 7 ¶ 6, Ex. 10 ¶ 4.)  He was teased about being immobilized and claims this experience left him a changed person; argumentative, aggressive, and impulsive.  (1SHCP Ex. 3 ¶ 17, Ex. 7 ¶ 7.)  The accident left him with a possible neurological deficit that caused his hands to shake uncontrollably (*see, e.g.*, 1SHCP Ex. 6 ¶ 5; *see also* Doc. No. 58-1 at 92), and even greater struggles in school (1SHCP Ex. 20).

Mitigation Evidence Presented at Trial

Petitioner's mother Minnie testified he suffered the injuries when "he was run over by a truck" (RT 6752), that left him with one leg shorter than the other (*id.*).

Petitioner testified that he suffered an ankle injury when he jumped into a ditch behind his house.  (RT 6448.)

Counsel was not Deficient

The California Supreme Court reasonably could have found counsel was not deficient by not further investigating, developing and presenting evidence relating to the truck-bike accident.

The defense experts who testified at trial, Drs. Callahan and Adams, independently examined Petitioner and found no evidence of organic brain injury or behavioral consequences of an organic brain injury.

Dr. Callahan found no significant organic deficits in terms of brain damage when then examined Petitioner shortly before the penalty phase.  (RT 8454.)  He testified that the 1975 EEG performed by Dr. Papadopoulos, a few years after the accident, found a slow brain wave pattern not affecting Petitioner's behavior and no focal brain pathology.  (RT 8476-77.)  Dr. Callahan also testified that a 1990 EEG performed during the penalty phase was essentially normal.  (*Id.*; *cf.* 1SHCP Ex. 37 ¶ 10.)  Dr. Callahan testified that Petitioner's diagnosed personality disorder did not have an organic origin.  (RT 8498.)

Dr. Adams, who also examined Petitioner just prior to the penalty phase but independently of Dr. Callahan, diagnosed antisocial personality disorder without any indication

145

of organic brain damage.  (RT 8543-44.)  He found Petitioner to show an average range of cognition, showing average abilities and intelligence, with no delusions, obsessions, phobias or hallucinations.  (RT 8561-62.)  Dr. Adams testified that Petitioner denied ever hearing voices.  (RT 8562.)  Dr. Adams found no evidence of any major mental disorder such as a thought, mood, or anxiety disorder.  (RT 8564.)

Petitioner also does not show a reasonable probability of a different outcome had the proffered bike accident evidence been before the jury.  He does not to link the accident to his alleged neurologic and mental state deficits and disorders including the kind of paranoid, violent tendencies noted by Dr. Kronenberg in 1975.  (*See* RT 8460.)  Although the habeas proffer suggests that Petitioner mentioned personality changes during his 1975 interview with Dr. Kronenberg - he attributed the changes not the accident but rather to moving to a different neighborhood.  (1SHCP Ex. 17 at 102.)

In sum, given that Petitioner did not attribute his alleged personality change and right ankle injury to the traffic accident; and the noted substantial expert testimony from Dr. Callahan (*see, e.g.*, RT 8454, 8498) and Dr. Adams (RT 8543-44, 8562, 8564) that trauma did not cause Petitioner psychic or organic injury - the California Supreme Court reasonably could have found  that counsel was tactically motivated in determining not to further investigate the truck-bike accident as evidence in mitigation.  *See Strickland*, 466 U.S. at 691 ("reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

Accordingly, the California Supreme Court was not unreasonable in rejecting these allegations relating to failure to present mitigating evidence of the truck-bike accident.

## C.     Substance Abuse

Petitioner faults counsel for failing to investigate, retain experts, develop and present mitigating evidence of the origins and effect of his alleged substance abuse and connecting negative aspects of Petitioner's life history to substance abuse.

Petitioner's Mitigation Proffer

Petitioner engaged in severe abuse of alcohol and various narcotics during the ten years intervening his 1978 release from CYA custody and the killing of Simms. (1SHCP ¶ 40, Ex. 31.)

Petitioner was re-committed to CYA in 1981 for selling drugs. (1SHCP Ex.'s 29, 30.)

In 1982, Petitioner was sent to state prison for an assault and robbery which he claimed was to support his drug habit. (1SHCP Ex.'s 30, 31.)

In 1986, Petitioner was again sent to state prison, this time for receiving stolen property. (1SHCP Ex. 31.) After his release in April 1988, he continued to test positive for drugs. (1SHCP Ex. 32.)

Mitigation Evidence Presented at Trial

Petitioner testified to his work selling drugs and his ingestion of drugs in the hours prior to Simms's killing. (*See, e.g.*, RT 4914-15, 6359-77, 6625.)

Both Boggs and Pridgon substantiated Petitioner's use of drugs during this time. (RT 5279, 5327-38, respectively.)

Counsel was not Deficient

The California Supreme Court was not unreasonable in rejecting these allegations relating to alleged failure to present mitigating evidence of substance abuse.

Petitioner argues the jury was unaware how his predisposition for substance abuse and his history of substance abuse provided context to and some mitigating explanation for his criminal activities following his 1978 release from CYA custody. (Doc. No. 58-1 at 111 ¶ 381.) He also revisits his life history proffer of multi-generational alcoholism including that of his mother Minnie, and the possibility Petitioner suffered fetal alcohol syndrome. (1SHCP ¶¶ 28-30.)

However, as discussed above, the jury was aware of evidence that Minnie had a drinking problem and that Petitioner smoked crack cocaine. (*See,* e.g., RT 8549-50, 8580.) Dr. Callahan testified that Petitioner had some history of substance abuse beginning at the time he was institutionalized (RT 8482-83), that was the result of a "constellation of characteristics"

in his life history, partly matters beyond his control and partly the result of his own life choices (RT 8455, 8461-64, 8468, 8502-03, 8520-22; *see also* RT 8504-06). Counsel Hart touched on these same concepts in the context of his substance abuse in her penalty closing. (RT 8863-74.)

The jury considered the guilt phase testimony of addiction expert Dr. Raymond Deutsch, M.D., who testified about the effects of substance abuse, particularly cocaine abuse. (RT 6104-52.) Hart argued at the penalty closing that Petitioner's substance abuse, including loss in inhibitions and curbs on violence noted by Dr. Deutsch, was a mitigating factor. (RT 8863-70.) Hart's argument presumably reminded the jury that they could consider Dr. Deutsch's guilt phase testimony at the penalty phase. (*Id.*)

Notably, the testimony of Petitioner's mother appears devoid of any suggestion that she drank alcohol while pregnant with Petitioner (1SHCP Ex. 2 at 2-9), or that Petitioner suffered childhood developmental issues (1SHCP Ex. 16 at 96; *cf. id.* Ex. 7 ¶¶ 1-2) (where Petitioner's older brother Harold appears to speculate that Minnie drank prior to Petitioner's birth).

The California Supreme Court reasonably could have observed a tactical underpinning in counsel's not re-emphasizing Petitioner's substance abuse (and the need to fund his substance abuse) as an explanation for his actions given the counsel Pedowitz's penalty phase argument suggesting lingering doubt as to Petitioner's involvement in Simms's murder. (*See* RT 8890-8901.) This is particularly so, as the extent to which Petitioner abused drugs and alcohol during the years prior to Simms's murder appears uncertain on the evidentiary record. For example, the record includes a 1986 probation report suggesting Petitioner abused neither alcohol nor drugs during the preceding four years. (1SHCP Ex. 31 at 164.)

Petitioner has not shown it was unreasonable for counsel to present his life, family and personal substance abuse history primarily through the testimony of defense experts. *See Gentry*, 540 U.S. at 8 (when counsel focuses on some issues to exclusion of others, there is strong presumption it was tactical, rather than negligent); *see also Pinholster*, 563 U.S. at 201 (noting that evidence of serious substance abuse is "by no means clearly mitigating"). The

habeas court, applying *Strickland*, strongly presumes that counsel exercised reasonable judgment in determining the nature and extent of the investigation.  *Id. at* 194-98.

Accordingly, the California Supreme Court was not unreasonable in rejecting these allegations of failure to present mitigating evidence relating to substance abuse.

### D.      Mental Health Evidence

Petitioner faults counsel for failing to investigate, develop and present mitigating evidence of his mental health history, deficits, and disorders.

Petitioner's Mitigation Proffer

In 1999, defense neuropsychologist Dr. Karen Froming reviewed Petitioner's life history and mental health records including the reports and trial testimony of Drs. Adams and Callahan.  She hypothesizes that Petitioner suffered neuropsychological impairment and possible lowered intellectual abilities.  (1SHCP Ex. 37 at 4.)  Dr. Froming supports her hypothesis by pointing to neuropsychological risk factors including "in utero alcohol exposure, malnutrition, auto accident injuries, pesticide/lead exposure, substance abuse, and neglect." (*Id.* at 3.)  Dr. Froming observes that such deficits often manifest as difficulties with attention, judgment, memory, and self-control.  (*Id.*)

Dr. Froming faults Drs. Adams and Callahan for failing to test for a possible neuropsychological basis for Petitioner's issues in behavioral regulation.  (*Id.* at 4.) Particularly, Dr. Froming points to the failure of these trial experts to perform adult intelligence and neuropsychological evaluations of Petitioner as indicated by his life history. (*Id.* at 4-6.)

Dr. Froming discounts the neurobehavioral examination conducted by Dr. Adams as unsupported by test data and insufficient to assess neuropsychological functioning including memory, behavioral regulation and motor skills.  (*Id.* at 5.)  Petitioner suggest that had Drs. Callahan and Adams been presented with complete information regarding his life and mental health history, they would have delved further into Dr. Froming's hypothesized neuropsychological deficits.

Petitioner's elementary school records document his poor performance.  (1SHCP Ex. 20.)  Although Petitioner had trouble controlling his behavior and was disruptive in grade school (1SHCP Ex.'s 22-23), he showed some progress in dealing with these issues during his CYA incarceration (1SHCP Ex.'s 26-27).

Dr. Adams's 1990 report, included with the habeas proffer similarly suggests that Petitioner was prone to unpredictable, impulsive and hostile actions.  (1SHCP Ex. 14 at 5-6.)

Glenda Johnson, Petitioner's half-sister, discusses Petitioner's difficulties at home including Minnie's alcohol fueled violent outbursts against family members and others, and Ernest McCullar Sr.'s occasional confrontations with Minnie and absences from the home due to his job as a truck driver.  (1SHCP Ex. 11.)

Mitigation Evidence Presented at Trial

Dr. Callahan testified that he considered and rejected the 1975 findings of CYA psychiatrist Kronenberg and neuropsychiatrist Papadopoulos that Petitioner showed paranoid schizophrenia with episodes of violent behavior and borderline intelligence.  (RT 8405-17, 8450-70, 8474-8500.)  Dr. Callahan concluded that the cerebral dysrhythmia suggested in the 1975 findings would not have affected Petitioner's behavior.  (RT 8450-51, 8475-77.)  As discussed above, Dr. Callahan did not find any significant organic brain deficits in terms of brain damage.  (RT 8454-98.)

Dr. Callahan testified to his review of Petitioner's background information including his juvenile and criminal, institutional and disciplinary history showing delinquent behavior such as assaulting siblings and others and snatching purses (RT 8464, 8507-10) for which he received warnings and citations from the police (RT 8508-09); the capital crime and guilt phase trial; penalty phase testimony; and certain other life history information including as to his substance abuse and violent acts (RT 8451-52, 8457, 8470-71, 8482-83, 8487, 8499, 8506, 8515-16, 8525).  Dr. Callahan personally interviewed Petitioner (RT 8453, 8474, 8481-84, 8513-14, 8516, 8525) and consulted with Dr. Adams and the neurologist who performed the 1990 EEG upon Petitioner (RT 8452, 8477, 8534-35).

Dr. Callahan testified to Petitioner's "constellation of characteristics" suggesting anti-social behavior; characteristics that he found to be partially inherited, partially environmental, partially a result of life choices. (RT 8455, 8461-63, 8502-04.) The jury, through Dr. Callahan's testimony became aware of Petitioner's circumstances at home including that Petitioner was one of seven children born to his mother; he grew up in very poor circumstances; there were a series of fathers for those seven children; Petitioner had no consistent fathering from his own father, whom he essentially did not know; Petitioner did not suffer childhood physical or sexual abuse, but rather a degree of parental indifference and lack of supervision; and Petitioner had for some years during his youth a seemingly stable father-figure in Ernest McCullar Sr. (RT 8464-68.)

Dr. Callahan saw nothing to suggest Petitioner's genetic background influenced his behavior choices. (RT 8504-05.) He noted the absence of violent criminal behavior by other family members (RT 8506-07); something Petitioner's mother, Minnie Lewis, corroborated (RT 8630). Dr. Callahan testified that Petitioner's aggressive tendencies could be controlled with medication and simply by the process of aging should he receive an LWOP sentence. (RT 8488-93.)

Based thereon, Dr. Callahan testified at trial to his conclusions that Petitioner had no significant organic deficits in terms of brain damage, and was not psychotic; but rather displayed an "antisocial personality" disorder. (RT 8453-54, 8487, 8494-95, 8497-99, 8516-21.)

Dr. Adams testified that he independently evaluated Petitioner just prior to the penalty phase in order to "assess basically what makes [him] tick, what his personality is like, and [his] level of impulse control." (RT 8532-33; *see also* 1SHCP Ex. 14 at 1.) Dr. Adams interviewed Petitioner several times and administered standard psychological tests for assessing personality issues and organic brain issues. (RT 8498, 8533-52, 8557-62, 8566-67.) Like Dr. Callahan, he also reviewed the 1975 reports of Dr. Kronenberg and Dr. Papadopoulos. (RT 8533-37, 8542.)

Dr. Adams testified to Petitioner's lack of parental guidance and his consequent failure

to develop an adequate sense of himself and internal behavioral and impulse controls. (RT 8539-67.) He testified that Petitioner's character and personality development was impacted by the absence of his birth-father during the critically formative first five years. (*Id.*) He testified to the seemingly stable and positive presence of a father figure, Ernest McCullar Sr., during Petitioner's pre-teen and early-teen years. (*Id.*) He testified that Ernest was non-abusive, had a steady job and took the time to engage in father-son activities. (*Id.*) He testified that the instability of Minnie's and her lifestyle may have left Petitioner insecure, threatened and defensive. (*Id.*)

Based thereon, Dr. Adams opined to the jury that Petitioner did not exhibit organic brain damage, thinking disruptions, anxiety, or major mental disorders (RT 8533-67), but that Petitioner did meet the criteria for antisocial personality disorder (RT 8543-45, 8552, 8560).

<u>Counsel was not Deficient</u>

The California Supreme Court reasonably could find that given the facts and circumstances of this case, counsel was not deficient by failing to investigate, develop and present Petitioner's mitigating mental state defense.

Petitioner suggests that Drs. Callahan and Adams were retained at the 11th hour, lacked an understanding of the proffered evidence of his family and life history, and were unable to examine "independent sources" for their diagnosis of Petitioner's mental state. (Doc. No. 58-1 at 127.) Petitioner argues that as a result these experts simplistically and misleadingly opined that Petitioner suffered antisocial personality disorder. (1SHCP at 67 ¶ 45(b).)

In the Ninth Circuit, a defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client facts that the experts do not request." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999); *see also Caro v. Woodford*, 280 F.3d 1254, 1254-57 (9th Cir. 2002) (counsel was ineffective at penalty phase by failing to investigate the effects of exposure to pesticides notwithstanding defense mental health experts had found no basis for insanity or diminished capacity defense); 1989 ABA Guidelines §11.4.1(C)(D)(2)(c) (counsel is to make

efforts to discover all reasonably available mitigating evidence including medical and mental health evidence). *Caro* held that "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Id.* at 1254.

Even so, counsel only has a duty to investigate a defendant's mental state "if there is evidence to suggest that the defendant is impaired." *Douglas*, 316 F.3d, at 1085. In *Hensley v. Crist*, 67 F.3d 181, 186 (9th Cir. 1995), the Ninth Circuit recognized that petitioner must show counsel was somehow put on notice to investigate a particular matter.

Here, the defense team interviewed Petitioner in 1989 and sought and obtained a pre-trial continuance in order for the defense to contact a voluminous list of witnesses provided by Petitioner. (*See* CT 377, 697; 12/11/89 RT 3; 12/11/89 RT 3; 11/7/89 RT 6-7.) Dr. Callahan spent approximately eighteen hours evaluating Petitioner and reviewing his record. (RT 8453.) Dr. Adams spent approximately six hours interviewing Petitioner on three separate occasions and administering psychological testing. (RT 8533-67.)

Petitioner suggests counsel's inadequate life history investigation led to inappropriate testing by Drs. Adams and Callahan, denying him competent psychiatric assistance and advice. (*See* Doc. No. 89 at 128, citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)) (access to competent psychiatrist is required as to relevant issues at penalty phase); *Wallace,* 184 F.3d at 1118 n.7. For example, he observes that certain neuropsychological testing performed by habeas expert Dr. Froming was absent from Dr. Adams's evaluation of Petitioner; testing which supported Dr. Froming opinion that Petitioner showed signs of "obvious neuropsychological impairments." (1SHCP Ex. 37 ¶¶ 10-12.)

Yet the record reflects that Dr. Adams did administer the Neurobehavioral Cognitive States Examination (NCSE or "CogniStat") test. Although Dr. Froming suggests this test was inadequate, she appears to concede her inability to determine the extent of the testing administered because Dr. Adams did not retain his raw data. (1SHCP Ex. 37 ¶ 12.)

Dr. Froming opined in 1999 that Petitioner's pre-existing psychiatric/medical records

contain obvious signs of neuropsychological impairments (*id.* ¶ 10), but this conclusion would not alone reasonably have compelled the California Supreme Court to discount the opinions of Drs. Adams and Callahan, for the reasons stated. Nor would that court necessarily have discounted the opinions of Drs. Adams and Callahan based upon: (i) signs of abnormality (i.e. the slow brain wave pattern without focal brain pathology) seen in Petitioner's 1975 EEG administered for Dr. Papadopoulos (RT 8451, 74-77; 1SHCP Ex. 24 at 2, Ex. 25) as versus Petitioner's "essentially normal" 1990 EEG taken during the penalty phase (1SHCP Ex. 37 ¶ 10; RT 8476-77) that also showed a slow brain wave pattern but no apparent brain pathology), or (ii) the state habeas court's denial of authorization for neuropsychological assessment (*see* Doc. No. 105 at 129 citing 1 Inf. Rep. at 31).

It reasonably appears that Drs. Callahan and Adams were sufficiently informed of and considered the significant aspects of Petitioner's life history including the negative factors of growing up in poverty (*see, e.g.*, RT 8455, 8464); adolescent exposure to violence (*see, e.g.*, RT 8471-73, 8479, 8503, 8513, 8522-23, 8528), neglect and indifference (*see, e.g.*, RT 8455-59, 8468, 8539-66); marginal academic performance and abilities (*see, e.g.*, RT 8513-14, 8561-64); Minnie apparent alcoholism (*see, e.g.*, RT 8549-51); and Petitioner's lack of a father figure during his early and formative years (*see, e.g.*, RT 8548, 8566-67).

As noted, Dr. Adams performed a battery of mental tests on Petitioner just prior to the penalty phase including a neurobehavioral cognitive status examination. (*See* 1SHCP Ex. 14 at 1.) Drs. Callahan and Adams each independently reviewed, considered, and rejected the 1975 reports of Dr. Kronenberg and Dr. Papadopoulos which concluded that Petitioner was significantly disturbed. Petitioner's suggestion that Drs. Callahan and Adams rejected the 1975 reports due to a lack of Petitioner's life history information reasonably could be rejected, for the reasons discussed above.

Moreover, the separate findings of Drs. Callahan and Adams that Petitioner performed in the low-normal cognitive range (*see, e.g.*, RT 8561-64) finds support in Petitioner's CYA academic records. Petitioner earned his high school diploma during his time at the CYA (RT

8513-14; *see also* 1SHCP Ex. 28), achieving grades that included eight A's, two B+'s, eight B's, one B/C, seven C's, two D's and ten P's) (*id.*).

Based upon the findings of Drs. Callahan and Adams, counsel Hart was able to argue mitigating aspects of Petitioner's noted personality profile including poverty (RT 8862, 8868); lack of authority figures (RT 8862, 8868); heredity of negative factors (RT 8862-63, 8868, 8873-74); alleged lack of treatment when he was manifesting social disorders and showing signs of paranoid schizophrenia (RT 8872); and substance abuse (RT 8863-64, 8868).

Petitioner has not demonstrated the noted disparate expert opinions resulted from counsel's deficient preparation of Drs. Callahan and Adams, rather than a difference of professional opinion. *See Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2004) (counsel's decision not to investigate mental defense further was reasonable in light of conclusions of mental health experts). Particularly so here, given that Dr. Froming frames her findings generated nine years after trial, in merely "hypothetical" terms, and based upon neuropsychological risk factors that appear subject to discount for the reasons stated. *See Boyde v. Brown*, 404 F.3d 1159, 1168-69 (9th Cir. 2005), *amended by* 421 F.3d 1154 (9th Cir. 2005) (holding that if new mental health evidence, obtained after the trial, were sufficient to establish a petitioner's innocence, the petitioner could "always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion.").

Petitioner does not appear to rebut the presumption that counsel's actions were reasonable. Here again, the habeas proffer does not include any declaration from counsel explaining their tactics and actions.

Counsel is entitled to rely on the report of an expert who is consulted. *Babbitt*, 151 F.3d, at 1174 (counsel has no duty to contact other experts when he reasonably thought those consulted were well-qualified and no duty to ensure the trustworthiness of an expert's conclusions). Counsel need not continue looking for an expert merely because an unfavorable opinion has been received. *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998); *see also Murtishaw v. Woodford*, 255 F.3d 926, 947-48 (9th Cir. 2001) (based on information from

experts including that Petitioner's EEG was within normal limits, counsel reasonably could have concluded that further investigation of his possible brain damage was unwarranted).

The California Supreme Court reasonably could have discounted Dr. Froming's estimate that testing Petitioners should have consumed thirty hours as not reflective of testing available in 1990 and as minimally more than the total approximately twenty-four hours of testing actually performed by Drs. Callahan and Adams. *See Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998), *overruled on other grounds by Apelt v. Ryan*, 878 F.3d 800, 827-28 (2017) (alleged lack of preparation for sentencing in capital case failed prejudice prong where Petitioner failed to show what should have been done and how insufficient preparation prejudiced him); *Ake,* 470 U.S. at 83-84 (in capital sentencing proceeding, due process requires access to psychiatric examination on relevant issues, to testimony of psychiatrist, and to assistance in preparation at sentencing phase).

That court could then reasonably find that counsel was entitled to rely on their expert's opinions, and were not obligated, without guidance or a request for information from the expert, to investigate further in these regards. *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995); *see also Coleman v. Calderon*, 150 F.3d 1105, 1114 (9th Cir. 1998), *rev'd on other grounds*, *Calderon v. Coleman*, 525 U.S. 141 (1998) (in the "absence of a specific request, counsel does not have a duty to gather background information which an expert needs"); *cf.*, *Silva*, 279 F.3d, at 842-43 (9th Cir. 2002) (counsel deficient for complete failure to investigate an avenue of mitigation).

For the reasons stated including the opinions of the defense experts at trial, counsel's decision not to further investigate mitigating mental state evidence appears entitled to a presumption of reasonableness. *See Williams*, 384 F.3d, at 611; *Harris v. Vasquez*, 949 F.2d 1497, 1525 (1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts.").

Accordingly, the California Supreme Court was not unreasonable in rejecting these allegations relating to investigation, development and presentation of mitigating mental health

history, deficits, and disorders.

**E.      Attempts to Reform/Good Deeds/Adjustment to LWOP**

Petitioner faults counsel for failing to investigate, develop and present mitigating evidence of his positive attributes.

Petitioner's Mitigation Proffer

Petitioner performed well in structured environments.  He showed positive conduct during the three month period when he was ten years old and living with the family of his friend Bennie Sanchez and performing according to their household rules.  (1SHCP Ex.'s 18-19; *see also* Doc. No. 58-1 at 94-96.)

Petitioner also responded well to the highly structured life at CYA.  Although considered immature by his counselor, Petitioner's conduct at the CYA Wintu Treatment Center was so positive that he was taken off medication.  (1SHCP Ex. 27.)  His grades improved dramatically during his time with the CYA and he earned his GED.  (1SHCP Ex. 28.)

Petitioner maintained at least short-term employment following his release from CYA custody in 1978.  (1SHCP Ex.'s 5, 29-31; *see also* Doc. No. 89 at 116.)  He also briefly attended junior college off and on during this period.  (1SHCP Ex.'s 5, 10.)

Mitigation Evidence Presented at Trial

The jury was aware of testimony from jail and correctional staff that during 1990 Petitioner showed positive and respectful conduct toward staff and even assisted with a problem inmate.  (RT 8573-76, 8621-28.)

The jury heard testimony from family members that Petitioner was supportive and helpful to them (RT 8577-85), had become interested in religion in prison (*id.*), and that he was loved and supported by his mother Minnie Lewis (RT 8628-30).

The jury heard testimony from a former death row inmate Richard Phillips as to the need for LWOP inmates to counsel other inmates (RT 8633-37); suggesting that Petitioner's expressed desire to do so could come to fruition (RT 8639-48).

The jury was aware that Petitioner attended various junior colleges for a time (RT 8566), and wanted to pursue an education within the prison system (RT 8492).

<u>Counsel was not Deficient</u>

The California Supreme Court was not unreasonable in rejecting these allegations relating to alleged failure to present mitigating evidence of Petitioner's positive attributes. That court observed the above noted mitigating character evidence when denying Petitioner's direct appeal. *Lewis*, 26 Cal. 4th, at 351-52.

Petitioner's mitigation proffer appears to be in part cumulative of evidence the jury heard from Drs. Callahan and Adams. For example, the inference that Petitioner performed well in the structured environment at CYA is readily suggested by Dr. Callahan's testimony that Petitioner earned his high school diploma at the CYA achieving largely above average grades. (RT 8513-14.)

As to junior college, Dr. Adams testified that after his release from CYA, Petitioner enrolled in college and played football there. (RT 8566-67.) To the extent evidence of Petitioner's few brief stints at junior college was not further presented, counsel reasonably could have considered the potential aggravating aspects. Dr. Adams conceded on cross-examination that Petitioner got into trouble for fighting and ultimately left junior college entirely without completing it. (*Id.*) In fact, the habeas proffer suggests Petitioner's multiple brief stints at various junior colleges ended due to involvement in fights and with drugs. (*See* 1SHCP Ex. 10.)

Petitioner's employment record similarly suggests the potential aggravating value likely outweighed any minor mitigating value. Petitioner's habeas proffer suggests each period of employment was short-lived, the longest being five months during which he worked in maintenance at a McDonald's. (1SHCP Ex.'s 29-31.) Counsel reasonably could have considered the brief terms of employment, unexplained separations, and evidence suggesting the longest-term employer, McDonald's, denied that Petitioner ever worked there (1SHCP Ex. 29 at 7), as reason not to further pursue this evidence. Particularly so, as such evidence might

have served to highlight Petitioner's circumstance at the time Simms was killed; that he was unemployed (RT 4910-11, 5019) apart from his self-claimed job of selling drugs (RT 4914-15, 6625).

Furthermore, inmate Phillips' penalty phase testimony aided the mitigation defense by suggesting that Petitioner's expressed interest in pursuing his education and counseling inmates while in prison (RT 8492, 8558, 8629) matched a need within prisons for LWOP inmates to serve as counselors to other inmates and troubled youth (RT 8637-46). Petitioner's suggestion that such testimony from Phillips, whose death sentence had been overturned, might have negatively impacted that jury is speculative. Nothing in the record appears to suggest that because Phillips's death sentence had been overturned, the jury failed to follow their instruction to assume the sentence they chose for Petitioner would be carried out. (*See, e.g.,* RT 8634-47, 8858-59, 8940.)

As noted, *Strickland* dictates a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). AEDPA, acting in tandem with *Strickland* asks whether the state court's application of *Strickland* was unreasonable. *Richter,* 562 U.S. at 99-100. Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Accordingly, the California Supreme Court was not unreasonable in rejecting these allegations relating to investigation, development and presentation of mitigating evidence of Petitioner's positive attributes.

### (2) Prejudice

Petitioner argues that had all the above mitigation proffer evidence been presented there is a reasonable probability the jury would have returned a life verdict. He argues that counsel's failure to do so denied him a reliable and individualized sentence. *See Wiggins*, 539 U.S. at 531; *Stephens*, 462 U.S. at 879.

As an example of such prejudice, he points to the habeas declaration of juror Samuel Pack, who states that had the life history proffer regarding lack of parental control, familial alcoholism, and that Petitioner's grandfather was a slave, been available at the penalty phase, he would have voted for LWOP. (2SHCP Ex. 16.)

However, even if arguendo counsel was deficient in investigating, developing, disseminating to experts, and presenting Petitioner's mitigating family and life history information, upon considering the totality of the state habeas proffer along with the evidentiary record, the California Supreme Court reasonably could have discerned no prejudice, for the reasons stated above and summarized below.

Drs. Callahan and Adams appear to have placed before the jury evidence of Petitioner's life and mental state history consistent with and largely cumulative of the habeas proffer. Drs. Callahan and Adams each reviewed information in Petitioner's institutional and mental health history, and personally assessed Petitioner shortly before their respective penalty phase testimony. (*See, e.g.*, RT 8453, 8533.)

Dr. Callahan noted that Petitioner grew up in poor circumstances. (RT 8455, 8464.) From his testimony, the jury also was aware that Petitioner's childhood was seemingly free of abuse, but prone to neglect and essentially unsupervised with little parent figure input. (RT 8455-68.) He found Petitioner to be impulsive, suspicious of other people, and with low self-esteem. (RT 8455.) Dr. Callahan opined that if given LWOP, Petitioner's aggressive impulses could be managed with medication and the passing of time. (RT 8487-94.)

Similarly, Dr. Adams performed the then standard battery of psychological testing and found Petitioner to demonstrate an antisocial personality disorder (RT 8543), seemingly without organic brain damage or deficit. He found Petitioner to be socially alienated and potentially unable to control his anger when threatened, placed at risk, or confronted. (RT 8538-44, 8566.)

The California Supreme Court summarized the testimony of Drs. Callahan and Adams as follows:

As factors in mitigation, defendant presented expert testimony from Dr. Callahan, a psychiatrist, that, given defendant's prior convictions and violent past, he suffered from an antisocial personality disorder. Based on his review of defendant's prior medical records, Dr. Callahan concluded that previous doctors examining defendant in 1975 had diagnosed him with paranoid schizophrenia with episodic violent behavior, impaired judgment, and borderline intelligence. Those doctors concluded that defendant should be placed in a psychiatric facility where he would receive antipsychotic medication and other drugs;
however, this did not occur. Although defendant took the major tranquilizer Mellaril while he was in the California Youth Authority (CYA), he had not taken any medication from January 1, 1990, through the time of the penalty phase. Dr. Callahan concluded that defendant lived in a very unstructured and unsupervised environment, which in part may have accounted for defendant's criminal conduct. Dr. Callahan opined that a structured environment and medication would help prevent defendant from acting out violently. Dr. Callahan noted that antisocial personality disorder tends to diminish in adulthood. Defendant told Dr. Callahan that he wished to pursue an education in prison.

An expert witness, psychologist Dr. Adams, interviewed defendant a week before defendant testified. Dr. Adams concluded that defendant met the criteria for antisocial personality disorder given his criminal history, his incarceration for most of his life since he was 14 years old, and his inability to establish long-term relationships. Dr. Adams opined defendant's lack of a male role model adversely affected his character and personality development.

*Lewis*, 26 Cal. 4th, at 351.  Significantly, neither Dr. Callahan nor Dr. Adams provided a habeas declaration suggesting that the habeas proffer evidence, if then available, would have impacted their conclusions.

Counsel Hart herself emphasized the mitigating value of the mental state factors noted by Drs. Callahan and Adams, suggesting the absence of prejudice.  (*See* RT 8868-70.)  This argument was aided by testimony of both Dr. Callahan (RT 8495) and Dr. Adams (RT 8553-54, 8556-57) that anti-social personality disorder attenuates over time, reasonably suggesting less risk of future dangerousness with the passing of time.

As to juror Pack's habeas declaration, the California Supreme Court reasonably could have discounted it.  As discussed, *ante*, the unpresented life history information Peck notes was before the jury.  Furthermore, the declaration given fifteen years removed from the verdict appears to speculate as to his then deliberative thought process in a fashion inconsistent with Evidence Code section 1150 and inadmissible thereunder, for the same reasons discussed in

claim 12, *ante*.

The habeas proffer suggesting psychiatric symptoms including psychosis during Petitioner's adolescence for which he was given behavioral medication (1SHCP Ex.'s 16, 17, 24, 26) is subject to discount as Drs. Callahan and Adams found no such extreme symptoms. This could have been due to aging and remitted drug use. (*See, e.g.*, RT 8553-57.)

To the extent counsel failed to present proffered life history evidence of violence and its impact upon Petitioner, the California Supreme Court reasonably could find the inference of prejudice weak and subject to discount. The proffer suggests violence was not a strong factor in Petitioner's youth. Petitioner has not established that he himself was the victim of the childhood violence he alleges occurred inside and outside his home. (*See, e.g.*, RT 8630, 8506; 1SHCP Ex.'s 6, 7, 11.) Petitioner's contention that Dr. Callahan was inaccurate in testifying there was no physical abuse associated with his childhood is subject to discount to this extent. (RT 8464.) Moreover, Drs. Callahan and Adams were informed of and considered adolescent exposure to violence.

To the extent counsel failed to present proffered life history evidence of Petitioner's attempts to reform, the jury otherwise was aware that during 1990, a time when Petitioner performed the proffered alleged good deeds and activities, he did so with apparent volition and not because he was taking medication. The jury reasonably could draw the inference that Petitioner was able to control his conduct. Such inference reasonably could provide a basis to discount prejudice to the extent it militates against a mental state defense.

The habeas proffer that Petitioner performed positively in a structured environment is cumulative of Dr. Callahan's testimony that in a structured setting Petitioner might not act violently. (RT 8516-21.) To the extent such a structured situation was unpresented evidence of Petitioner's stays with the Sanchez family, counsel seemingly had ample reason to avoid highlighting it. Petitioner apparently departed the Sanchez household in order to associate with Randolph, whom he casts as a troublemaker who led him astray. (*See* 1SHCP Ex. 2 ¶¶ 24-25, Ex.'s 18-19; *see also* RT 8464-65, 8524.)

For all these reasons, the California Supreme Court reasonably could have found the totality of the mitigating evidence was outweighed by the noted substantial aggravating circumstances including the robbery-killing of Simms, and Petitioner's convictions for selling phencyclidine (PCP) in 1981, robbery in 1982 and receiving stolen property in 1986. (*See* RT 6509-10, 8155, 8165-66, 8326, 8482; CT 1045; *see also* 2/20/91 RT 46-47; CT 1011, 1029); *Pinholster*, 563 U.S. at 189 (habeas proffer not so significant that, even assuming counsel performed deficiently, it was necessarily unreasonable for state court to conclude petitioner had failed to show "substantial" likelihood of different sentence). Also, the jury was aware that Petitioner's siblings, some of whom endured the same family circumstances, were able to avoid any serious problems with the law. (RT 8506, 8630.)

    (3)    **Conclusions**

The California Supreme Court was not unreasonable in rejecting Petitioner's claim that counsel was prejudicially deficient by failing to investigate, develop and present mitigating evidence and expert opinion relating to his life history including substance abuse and mental impairments. For the reasons stated, this does not appear to be a case where counsel failed to present key mitigating evidence, *see Boyde*, 404 F.3d, at 1178, or spent insufficient time preparing the penalty defense, *see Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir. 2001).

A fair-minded jurist could find that Petitioner failed to establish counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

Accordingly, it does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claims 14, 15 and 16 shall be denied.

**b.    Claims 17 and 18**

Petitioner alleges counsel was ineffective by failing to adequately investigate and object

to admission of aggravating evidence of his confession to causing the 1975 burning death of Rogers (i.e. claim 17), and by failing to adequately defend the charge that he caused Rogers' death (i.e. claim 18), violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 58-1 at 116-126.)

### i. *State Court Direct and Collateral Review*

The California Supreme Court reviewed these claims on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Four, Args. 11-13, 19-23, pp. 31-60) and denied them. *Lewis*, 26 Cal. 4th, at 377-87.

Petitioner presented these same claims in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 8 at 83-87, Claim 10 at 93-99, Claim 13 at 103-16, and Claim 14 at 116-22), which were summarily denied on the merits (Doc. No. 14 at II-P at 1).

### ii. *Analysis*

Petitioner faults counsel for the admission of evidence in aggravation that on April 28, 1975, when Petitioner was thirteen years and eight months old, he murdered Rogers by burning him to death.  (*See* RT 7782-83, 7844.)  He argues that because he was under fourteen years of age at the time of the crime and did not appreciate the wrongfulness of his actions, the evidence should not have gone to the jury.  He also argues the jury instructions in these regards were improper.

### (1)  **Deficient Performance**

Rogers, a farm laborer in his mid-forties who had taken Petitioner into his home died from injuries suffered on April 28, 1975, when his car caught fire.  (RT 7616-17, 7861.)  Then thirteen-year-old Petitioner, along with his friends sixteen-year-old Willis Randolph and fifteen-year-old Sylvester Green, all of whom had been suspended or expelled from school (1SHCP Ex. 3 ¶ 18, Ex. 16 at 7) had been riding in the car with Rogers that day.  Rogers was allegedly intoxicated and smoking cigarettes.  The car stopped and the youths got out. Petitioner confessed that soon thereafter he poured gasoline into the passenger compartment of

the car as Rogers slept in it and threw in a lighted match.  (RT 7608-09, 7822-23); *see also Lewis*, 26 Cal. 4th, at 376-77.

Petitioner initially gave conflicting accounts of an accidental death to police detective Thomas Lean during multiple rounds of questioning on the afternoon of May 7, 1975, (RT 7760-99), but ultimately confessed to police investigator Martin that he set Rogers on fire because Rogers had slapped him making him cry.  (RT 7822-23.)

Pathologist John Miller, who autopsied Rogers found had second and third degree burns over about 95 percent of his body.  (RT 7859-62.)  Dr. Miller stated the cause of death as smoke inhalation and shock from the burns.  (RT 7863.)

Petitioner was tried in juvenile court, which found he had committed second degree murder, adjudged him a ward of the court and committed him to the CYA.  (1SHCP Ex. 16 at 1.)

Pursuant to state law, evidence of his juvenile adjudication was not submitted to the jury during the penalty phase, but his actions relating to Rogers's killing were admitted as aggravating violent criminal acts.  Penal Code § 190.3(b); *see also People v. Burton* (1989) 48 Cal. 3d 843, 861-62 (1989).

The California Supreme Court found this appropriate, stating that:

> As a factor in aggravation under section 190.3, factor (b),[8] the prosecution introduced evidence that in 1975, when defendant was about 13 years 9 months old, he murdered A. Z. Rogers. Defendant, along with his two friends, poured gasoline and threw a lighted match into the car in which Rogers was sleeping. After making inconsistent statements, defendant eventually confessed to detectives that he had set Rogers on fire. Because defendant was a minor, he was tried in juvenile court, which found defendant committed the second degree murder of Rogers and adjudged defendant to be a ward of the court. Defendant was subsequently committed to the CYA. Evidence of his juvenile adjudication was not submitted to the jury.

---------------------FOOTNOTE-----------------------

n.8 "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).)

165

Several witnesses testified regarding the circumstances of the 1975 murder. One witness testified she rescued the burning body of Rogers, who died from smoke inhalation and second and third degree burns over 95 percent of his body. A fire captain and a fire marshal who investigated the car fire both confirmed that the fire was not accidental, but that someone deliberately started it by using flammable fluid. Another witness said that she saw three people, including defendant, running away from the fire. Finally, Investigator Martin, who had interrogated defendant, testified that defendant confessed that he had thrown a lighted match into the car.

At trial, defendant moved to exclude evidence of Rogers's murder on the ground that there was no "clear proof" that defendant knew the act's "wrongfulness" at the time he committed the act. Defendant also maintained that when he was interrogated he did not intelligently and knowingly waive his right to counsel, and that his confession was not voluntary. Denying defendant's motion to exclude the evidence, the trial court stated it was up to the jury to determine beyond a reasonable doubt whether defendant knew the wrongfulness of his act. However, the court granted defendant's request that it make a preliminary finding to determine whether defendant's 1975 confession was voluntary and thus admissible. (Evid. Code, § 402, subd. (b) [upon party's request in a criminal action, the "court shall hear and determine" the admissibility of defendant's confession outside the jury's presence].) The trial court determined that defendant's confession was voluntary, and that he had made an intelligent and knowing waiver of his right to counsel. Indeed, when the trial court subsequently denied defendant's automatic motion to reduce the death verdict (Pen. Code, § 190.4, subd. (e)), the court stated it was "satisfied beyond any reasonable doubt" that defendant knew the wrongfulness of Rogers's murder at the time he had committed it.

On appeal, defendant argues that because there was no indication the juvenile court in 1975 found clear proof that defendant knew the wrongfulness of the murder, he lacked the capacity to commit the crime (Pen. Code, § 26); thus, evidence of Rogers's murder should not be considered criminal activity under Penal Code section 190.3, factor (b). As further support of his impaired understanding, defendant points out that at age 14 he was diagnosed a paranoid schizophrenic "with episodic violent behavior and borderline intelligence." Although the jury and trial court determined that defendant understood the wrongfulness of his act at the time of the 1975 murder, defendant maintains that it is inherently unfair and violates due process to make that determination nearly 16 years after the fact. Further, he argues that the trial court should have determined as a preliminary fact whether defendant knew the wrongfulness of his conduct before submitting evidence of Rogers's murder to the jury. (Evid. Code, § 403, subd. (a)(1).) Defendant also objects that the jury instructions were improper. We address each issue in turn.

Although juvenile adjudications do not qualify as prior convictions under section 190.3, factor (c), and may not be admitted during the penalty phase, evidence of juvenile criminal conduct may be considered as an aggravating factor. Prior violent juvenile misconduct, regardless of conviction, may be admitted as evidence of "criminal activity ... which involved the use or attempted use of force or violence or the express or implied threat to use force

or violence." (§ 190.3, factor (b); *see also People v. Burton* (1989) 48 Cal. 3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270].)

Defendant, however, emphasizes the limitation of section 26. Section 26 provides in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] One-Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness ...." (*See In re Gladys R.* (1970) 1 Cal. 3d 855, 864 [83 Cal.Rptr. 671, 464 P.2d 127] ["Section 26 embodies a venerable truth, which is no less true for its extreme age, that a young child cannot be held to the same standard of criminal responsibility as his more experienced elders"].) However, "the presumption of a minor's incapacity [may] be rebutted by clear and convincing evidence" that the minor defendant knew the act's wrongfulness. (*In re Manuel L.* (1994) 7 Cal. 4th 229, 238 [27 Cal.Rptr.2d 2, 865 P.2d 718].)

Although a minor's knowledge of wrongfulness may not be inferred from the commission of the act itself, "the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment" may be considered. (*In re Tony C.* (1978) 21 Cal. 3d 888, 900 [148 Cal.Rptr. 366, 582 P.2d 957].) Moreover, a minor's "age is a basic and important consideration [citation], and, as recognized by the common law, it is only reasonable to expect that generally the older a child gets and the closer [he] approaches the age of 14, the more likely it is that [he] appreciates the wrongfulness of [his] acts." (*In re Cindy E.* (1978) 83 Cal. App. 3d 393, 399 [147 Cal.Rptr. 812].)

Defendant argued both at trial and on appeal that the juvenile file did not disclose the juvenile court's finding that defendant knew the wrongfulness of his conduct pursuant to section 26. Assuming that the juvenile court did not make an express on-the-record inquiry regarding the minor's knowledge of wrongfulness and that it was error not to do so, we find any error to be harmless. There was substantial evidence supporting the finding that defendant knew the wrongfulness of his conduct at the time of the 1975 murder. (*See In re Paul C.* (1990) 221 Cal. App. 3d 43, 52 [270 Cal.Rptr. 369] [reviewing court views evidence in light most favorable to Respondent and presumes the existence of every fact the trier may deduce from the evidence in support of juvenile court order].)

Based on the circumstances that defendant was seen running away from the car, that defendant lied to Detective Lean about the cause of the fires on two occasions, and that defendant admitted to Investigator Martin that he struck a match and threw it in the car, the trial court was "satisfied beyond a reasonable doubt" that defendant appreciated the wrongfulness of his conduct. Defendant's flight from the scene and his conflicting statements to detectives constitute clear proof that defendant knew the wrongfulness of his act. (*In re Gregory S.* (1978) 85 Cal. App. 3d 206, 212 [149 Cal.Rptr. 216].) Moreover, at the time of the murder defendant was nearly 14 years old, which makes it more likely that he understood the wrongfulness of his act. (*In re Cindy E., supra*, 83 Cal. App. 3d at p. 399.) In view of the more stringent reasonable doubt standard the trial court used, we do not find persuasive defendant's unsupported contention that the trial court did not give due consideration to his mental illness and troubled past. (*See In re Paul C., supra*, 221 Cal. App. 3d at p. 52.) To the contrary, the trial court considered both as factors in mitigation. Indeed, we would find it

difficult to conclude that a 13 year old would not know it is wrong to douse a man with gasoline and throw a lighted match.

Noting that it is nearly impossible to "recreate the mental state" of a 13 year old 16 years later, defendant argues it is inherently unfair and violates due process that the jury and trial court here made this determination. We disagree. A trier of fact making a section 26 determination does not attempt to read the mind of the minor, but considers the objective attendant circumstances of the crime-such as its preparation, the method of its commission, and its concealment-to determine whether the minor understood the wrongfulness of his or her conduct. (*In re Tony C.*, *supra*, 21 Cal. 3d at p. 900.) "Reliance on circumstantial evidence is often inevitable when, as here, the issue is a state of mind such as knowledge." (*Ibid.*) Though deliberating nearly 16 years after Rogers's murder, the jury and trial court could ascertain the circumstances of the crime from the testimonial witnesses.

Contrary to defendant's suggestion, the trial court ensured that defendant received a fair hearing on this matter. The trial court submitted the question to the jury and also imposed a reasonable doubt standard, which is more stringent than a clear proof standard under section 26. (*In re Manuel L.*, *supra*, 7 Cal. 4th at p. 234.) The trial court itself also determined it was "satisfied beyond a reasonable doubt" that defendant knew the wrongfulness of his conduct.

We also reject defendant's related argument that the trial court should have determined that defendant's knowledge of wrongfulness was a preliminary fact that the trial court should have decided before submitting evidence of Rogers's murder to the jury. Assuming the trial court was required to do so, any failure by the court to make such finding as a "preliminary fact," as defendant contends, was harmless because the trial court later determined that defendant had known the wrongfulness of the act. Defendant fails to point to any prejudice based on this evidentiary sequence. Indeed, a trial court has discretion to "admit conditionally the proffered evidence ... subject to evidence of the preliminary fact being supplied later in the course of the trial." (Evid. Code, § 403, subd. (b).) We reject defendant's unsupported claim that determining a minor's capacity under Penal Code section 26 should be considered the same as determining the admissibility of a confession as a foundational or preliminary fact. (Evid. Code, § 402, subd. (b) [upon a party's request, a court must first determine the admissibility of a confession or admission outside the presence and hearing of the jury].)

Finally, we reject defendant's claim that the jury instructions were improper because they merely mirrored the language of section 26 and did not specifically instruct the jury to consider the attendant circumstances of the crime, or defendant's age, experience, and understanding. (*See In re Marven C.* (1995) 33 Cal. App. 4th 482, 487 [39 Cal.Rptr.2d 354].) The trial court instructed the jury to consider "such things as flight after the crime, giving conflicting statements to investigating officers, and closeness to the age of 14." These considerations were entirely proper. (*In re Gregory S.*, *supra*, 85 Cal. App. 3d at p. 212; *In re Cindy E.*, *supra*, 83 Cal. App. 3d at p. 399.) Indeed, defendant did not request further amplification or explanation of these instructions. As such, defendant may not complain about these instructions on appeal. (*People v. Lang* (1989) 49 Cal. 3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].)

168

Although defendant failed to object at trial, he also contends the jury instruction was argumentative in the prosecution's favor. (*People v. Hines* (1997) 15 Cal. 4th 997, 1067-1068 [64 Cal.Rptr.2d 594, 938 P.2d 388].) A jury instruction is argumentative when it is "'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]" (*Ibid.*) Although the instruction may have asked the jury to focus on evidence favorable to the prosecution, any error was harmless.

Both the prosecution and defense counsel, during closing arguments at the penalty phase, emphasized factors beyond those enumerated in the instruction. For instance, defense counsel stressed defendant's troubled childhood, his diagnosis of paranoid schizophrenia, and his lack of parental guidance. In light of defense counsel's closing argument, which presented factors that defendant wanted the jury to consider, we do not find it reasonably likely that the jury applied the wrong criteria to determine whether defendant knew the wrongfulness of his conduct. (*See People v. Kelly* (1992) 1 Cal. 4th 495, 525-527 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

*Lewis*, 26 Cal. 4th, 376-81.

## A.      Admission of Petitioner's 1975 Confession

Petitioner argues counsel was deficient by failing to completely investigate and develop objections to admission of his confession to the Rogers's murder. He argues the confession was involuntary and taken in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966). (Doc. No. 58-1 at 124-26.) He points to his young age at the time he confessed; the coercive nature of juvenile interrogation generally and his interrogation specifically; the invalidity of his express *Miranda* waiver; his invocation of rights under *Miranda* and denial thereof by law enforcement; and law enforcement's re-initiation of interrogation without a fresh *Miranda* advisement. (Doc. No. 89 at 188, 214); *see also Lewis*, 26 Cal. 4th, at 383-87.

The record reflects that at the beginning of the penalty phase, the trial court held an Evidence Code section 402-hearing outside the presence of the jury on the admissibility of the 1975 confession. That court found beyond a reasonable doubt that Petitioner voluntarily, knowingly, and intelligently waived his rights under *Miranda*, concluding that:

In considering all the evidence the [c]ourt is satisfied that the Defendant made a voluntary, intelligent, and knowing waiver of his Constitutional rights, and that he voluntarily and intelligently and knowingly beyond a reasonable doubt consented to talk to the officers. That he voluntarily, knowingly, intelligently understood the significance of what he was saying at the time he made the statements.

[The] [c]ourt is satisfied from the testimony of Detective Lean that no
extraordinary procedures were adopted in questioning this particular Defendant
as opposed to any other juvenile of that age at that time. In fact, [the court] was
not impressed by the fact that Mr. Martin at one point questioned the witness.
There is no case law that says that another waiver was needed before Mr. Martin
talked to the witness on the same date. [The] [c]ourt doesn't see anything in
either what the Defendant said or Mr. Lean, that the -- that the Defendant's
statements were not voluntarily, knowingly, and intelligently made. And the
[c]ourt finds so beyond a reasonable doubt. That's with respect to the statement
on May the 7th of '75.

(RT 7608-09); *see also Lewis*, 26 Cal. 4th, at 384-85.

The California Supreme Court considered and rejected the same allegations on direct

appeal, stating that:

At defendant's request, the trial court held a hearing to determine whether
defendant's 1975 confession to Rogers's murder was admissible. After hearing
testimony from defendant and Detective Lean and Investigator Martin, who had
questioned defendant in 1975 regarding Rogers's death, the trial court was
"satisfied that the Defendant made a voluntary, intelligent, and knowing waiver
of his Constitutional rights, and that he voluntarily and intelligently and
knowingly beyond a reasonable doubt consented to talk to the officers."
Defendant contends the trial court erred by failing to consider defendant's lack
of education, lack of experience with the police, and his young age, which
indicated defendant's confession was not a product of his free will and his
intelligent and knowing waiver of his Fifth Amendment rights. Defendant also
argues the failure to readvise him of his rights under *Miranda v. Arizona* (1966)
384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*)
during a subsequent interview rendered his confession inadmissible under the
Fifth Amendment. We will discuss each issue in turn by first beginning with the
facts.

On May 7, 1975, Detectives Lean and Christensen brought defendant and his
friends Sylvester G. and Willis R.-who were not arrested but under suspicion for
Rogers's death-to the sheriff's department for questioning. Detective Lean
testified that he advised defendant, without defendant's mother or an attorney
present, of his rights under *Miranda*. Defendant waived his rights. Defendant
then gave at least two inconsistent versions of what had happened. First,
defendant told Detective Lean he last saw Rogers when Rogers was smoking a
cigarette underneath the hood of his car. Defendant later found out from
Sylvester G. that Rogers's car had caught on fire, presumably from Rogers's
cigarette. During a second interview, after Detective Lean revealed that arson
investigators determined the fire originated from inside the car and not from
under the hood, defendant gave a different version of the facts. Defendant told
Detective Lean that he and Sylvester G. were siphoning gas from Rogers's car
when, while horsing around, defendant threw the gas can at Sylvester G., and it
landed in Rogers's car. The car caught on fire after defendant accidentally
knocked a cigarette out of Sylvester G.'s hand into the car.

To better communicate with defendant, Detective Lean asked Investigator
Martin, who was a Black male, to interview defendant. In the meantime,
Detectives Lean and Christensen stepped out of the room. Detective Lean went

out about 5:00 p.m. to get dinner for defendant and his friends. Investigator Martin did not readvise defendant of his rights because he was advised that the sheriff's office had already done that. After defendant gave another inconsistent version of the facts, Investigator Martin told defendant he did not believe that defendant was being honest. Investigator Martin emphasized that Rogers was a "nice man" and "didn't deserve to die that way," and that "this was something that was horrible and won't go away." Defendant then admitted that he threw gas into the back seat of Rogers's car where Rogers was sleeping, struck a match, and threw it into the car, igniting a fire. Afterwards, defendant went home and "was feeling real bad." Defendant told Investigator Martin he did this because Rogers had slapped him after he had tried to take Rogers's watch.

Detective Lean testified that after he read defendant his *Miranda* rights from a department-issued card, he asked whether defendant understood these rights and "[h]aving these rights in mind, do you wish to talk to us now?" Without any overt hesitation, defendant replied yes, and did not express any confusion over the rights read to him. Detective Lean also testified that before interviewing juveniles, he takes "great care" to ensure that they understand each right read; he tells them that he is open to questions, and that he will stop at any time they do not understand any wording and will explain it to them. Detective Lean took the same care before interviewing defendant. Defendant did not ask any questions, nor did he appear emotionally upset either before or during the interview. Detective Lean did not recall that defendant said he wanted to call his mother during the interview. Moreover, in his interview with defendant, Investigator Martin noted that defendant was mentally alert, relaxed, attentive, and that "[i]t was obvious that he understood what was going on." Investigator Martin was not asked whether defendant had requested to call his mother during his interview with defendant.

Defendant testified on his own behalf. He recalled telling detectives that Sylvester G. tried putting gas in Rogers's carburetor, but they both left after the car would not start. He also admitted he gave three or four different stories regarding what happened on April 28 because he was told Sylvester G. and Willis R. had made statements and he was confused. However, he denied telling detectives that he and Sylvester G. were splashing each other with gas, which landed in the car, or that he was wrestling with Sylvester G. and accidentally flipped a cigarette into the car, causing the fire. He also testified that he was afraid in the interviews; that although he was read his rights under *Miranda*, he did not know what "Constitutional rights," "exercising these rights," "lawyer," and "having a lawyer appointed" meant. Defendant also asserted he did not know he was not required to answer the detectives' questions. Contrary to Detective Lean's testimony, defendant testified that he was denied his request to talk to his mother before and after he gave his statement.

### (i). *Minor's Fifth Amendment Privilege*

A minor has a Fifth Amendment privilege against self-incrimination, which precludes admission of a minor's confession obtained without the minor's voluntary, intelligent, and knowledgeable waiver of his or her constitutional rights. (*In re Gault* (1967) 387 U.S. 1, 55 [87 S.Ct. 1428, 1458, 18 L.Ed.2d 527]; *People v. Burton* (1971) 6 Cal. 3d 375, 383-384 [99 Cal.Rptr. 1, 491 P.2d 793].) To determine whether a minor's confession is voluntary, a court must look at the totality of circumstances, including the minor's age, intelligence, education, experience, and capacity to understand the meaning and consequences of the given statement. (*In re Charles P.* (1982) 134 Cal. App. 3d

768, 771 [184 Cal.Rptr. 707]; *see also In re Eduardo G.* (1980) 108 Cal. App. 3d 745, 756-757 [166 Cal.Rptr. 873].) "The decision to confess cannot be of itself an indicium of involuntariness in the complete absence of coercive circumstances." (*In re Reginald B.* (1977) 71 Cal. App. 3d 398, 405 [139 Cal.Rptr. 465].) A court should look at whether the minor "was exposed to any form of coercion, threats, or promises of any kind, trickery or intimidation, or that he was questioned or prompted by ... anyone else to change his mind." (*In re Frank C.* (1982) 138 Cal. App. 3d 708, 714 [188 Cal.Rptr. 68].)

On appeal, a reviewing court looks at the evidence independently to determine whether a defendant's confession was voluntary, but will uphold the trial court's findings of the circumstances surrounding the confession if supported by substantial evidence. (*People v. Massie* (1998) 19 Cal. 4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29]; *see also In re Anthony J.* (1980) 107 Cal. App. 3d 962, 971 [166 Cal.Rptr. 238] [burden to establish whether accused's statements are voluntary is greater if the accused is a juvenile rather than an adult].) However, if there is conflicting testimony on whether a defendant waived his *Miranda* rights, "we must accept that version of events which is most favorable to the People, to the extent that it is supported by the record." (*People v. Jackson* (1980) 28 Cal. 3d 264, 300 [168 Cal.Rptr. 603, 618 P.2d 149].) We agree that defendant's confession was voluntary and followed a knowing and intelligent waiver of his *Miranda* rights.

Detective Lean's testimony, which the trial court clearly credited, supported the court's finding that defendant intelligently and knowingly waived his rights before voluntarily confessing. Indeed, neither Detective Lean's nor Investigator Martin's testimony was "inherently so improbable as to be unworthy of belief." (*Flowers v. State Personnel Bd.* (1985) 174 Cal. App. 3d 753, 759 [220 Cal.Rptr. 139].) We find the record supports the trial court's finding that defendant intelligently and knowingly waived his *Miranda* rights before voluntarily confessing.

We also reject defendant's contention that his young age and low intelligence precluded him from making a voluntary, knowing, and intelligent waiver. "Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood." (*In re Brian W.* (1981) 125 Cal. App. 3d 590, 603 [178 Cal.Rptr. 159] [15-year-old defendant had an IQ of 81 and the mental age of an 11 or 12 year old].) Although defendant was less than 14 years old (and subsequent to the interviews was diagnosed a paranoid schizophrenic), he participated in his conversations with detectives, and indeed was keen enough to change his story when Detective Lean revealed that the fire originated from inside the car. Both Detective Lean and Investigator Martin testified that defendant expressed no confusion either before or during the interview. Also, defendant's claim that the trial court failed to consider his lack of encounters with the police is undermined by the subsequent witness testimony that defendant received various citations and warnings from the police before 1975.

Thus, apart from defendant's trial testimony, the record does not demonstrate that defendant failed to understand or waive his rights. We do not find persuasive defendant's claim that Investigator Martin, who is Black, was used to employ a Black cop/White cop (i.e., "good guy/bad guy") tactic to elicit an incriminating statement from defendant. It is true that Detective Lean stated it would be helpful that as an older Black man, Investigator Martin might better

172

communicate with the young Black defendant. However, nothing suggests that Investigator Martin unduly influenced defendant. Indeed, the trial court noted it "was not impressed by the fact that Mr. Martin at one point questioned the witness." Thus, we find substantial evidence supports the trial court's finding that no "extraordinary procedures" were used in interviewing defendant.

### (ii). *Defendant's Request to Speak to His Mother*

Defendant argues that he requested to speak to his mother during the interview, thus asserting his Fifth Amendment right. (*People v. Rivera* (1985) 41 Cal. 3d 388, 394 [221 Cal.Rptr. 562, 710 P.2d 362]; *People v. Burton*, *supra*, 6 Cal. 3d at pp. 383-384; *but see People v. Hector* (2000) 83 Cal. App. 4th 228 [99 Cal.Rptr.2d 469].) Defendant testified that he told a detective that he wanted to speak to his mother and that she did not have a phone, to which the detective replied, "Something to [*sic*] it was around dinner time and I would have to wait." Although Detective Lean testified that he did not recall defendant's asking to call his mother, defendant maintains he made his request to Investigator Martin who performed a portion of the interview.

Defendant has waived this claim by raising it for the first time on appeal. (*People v. Raley*, *supra*, 2 Cal. 4th at p. 892.) Notions of fairness and practicality require that the prosecution be given an opportunity to argue this issue during trial. Without such objection, the parties could not develop the issue or further examine witnesses. Indeed, apart from defendant's self-serving testimony at trial, there was no evidence that defendant in fact requested to talk to his mother during the interview. Detective Lean testified that he did not recall that he or Detective Christensen told defendant he would have to wait before he called his mother. He also testified it was his custom and habit when juveniles requested to speak to their parents or any blood relative, that "it was like asking for an attorney and we were to stop our interview at that point." However, he did not recall that being done. To the extent defendant's request was made to Investigator Martin, defendant did not question the investigator at trial whether defendant asked him if he could talk to his mother, nor did defendant testify that he made his request to Investigator Martin. Further, defendant inconsistently testified that he both did and did not continue to talk to the detective after he requested to talk to his mother, which tended to undermine his credibility on this issue. Indeed, as the Attorney General observes, the request that defendant allegedly made to Investigator Martin would have occurred after defendant had given several different versions of the events to detectives, i.e., when Detective Lean went to get dinner for the juveniles around 5:00 p.m. Given that defendant talked to detectives for an extended time without requesting to talk to his mother, "[t]here is no indication ... that appellant's request to see his mother, must be construed to indicate that the minor suspect desire[d] to invoke his Fifth Amendment privilege." (*People v. Maestas* (1987) 194 Cal. App. 3d 1499, 1509 [240 Cal.Rptr. 360], quoting *People v. Burton*, *supra*, 6 Cal. 3d at p. 384.)

In short, because defendant failed to raise his claim at trial that defendant's request to speak to his mother constituted an invocation of his Fifth Amendment right, we are left with an incomplete record. Thus, we cannot speculate to facts that would have given rise to defendant's claim.

### (iii). *Readmonishing Defendant of his Miranda Rights*

Detective Lean read defendant his *Miranda* rights at 12:30 p.m. on May 7, 1975, and Investigator Martin-who was advised the sheriff's office had already

read defendant his rights-did not readmonish defendant approximately five hours later prior to conducting the interview in which defendant confessed. The trial court found that Investigator Martin was not required to readmonish defendant of his rights. Defendant claims a violation of his rights under *Miranda*, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because he was not readvised of his rights prior to Investigator Martin's subsequent interrogation.

If a defendant is subsequently interrogated, "readvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights. [Citations.]" (*People v. Mickle* (1991) 54 Cal. 3d 140, 170 [284 Cal.Rptr. 511, 814 P.2d 290] [readvisement unnecessary where defendant twice received and twice waived *Miranda* rights 36 hours before].)

The approximately five hours that had elapsed did not reduce the effectiveness of defendant's initial waiver, particularly where defendant was mentally alert, spoke freely, and "understood what was going on" in the subsequent interrogation. Defendant also remained in the same room for the ongoing interviews with the detectives and investigator. Moreover, there was some evidence that defendant had prior experience with police based on citations and warnings he received from the police before 1975. Contrary to defendant's suggestion, the fact that defendant was a minor did not in and of itself require the police to readvise the defendant of his *Miranda* rights if the defendant had previously made a knowing and intelligent waiver. (*In re Frank C.*, *supra*, 138 Cal. App. 3d at p. 714 ["on the record before us there is no reason to assume the minor did not understand [his *Miranda* rights] when first given to him or he had already forgotten the admonitions of an hour before or that he had invoked his rights or he did not understand he had already invoked them or he did not understand he was waiving them"].) Moreover, although Detectives Lean and Christensen and Investigator Martin took turns interviewing defendant, this change in the identities of the interrogators does not alter the reasonably contemporaneous nature of the subsequent interrogation, which was part of an ongoing and cooperative process.

Thus, we conclude that under the totality of the circumstances, the detectives were not required to readvise defendant of his *Miranda* rights in a subsequent interrogation, which we find was "reasonably contemporaneous" with defendant's initial knowing and intelligent waiver. (*People v. Mickle*, *supra*, 54 Cal. 3d at p. 170.)

*Lewis*, 26 Cal. 4th, at 381-87.

Petitioner argues that California Supreme Court erred in upholding the trial court's findings following the 402-hearing because the hearing record was insufficient and evidence extrinsic to the hearing record was considered. Specifically, he argues the California Supreme

174

1    Court was limited to the 402-hearing record in its review of the Penal Code section 26

2    allegations.  (*See* Doc. No. 89 at 191-96); *Lewis*, 26 Cal. 4th, at 381-86.

3         However, the trial court's 402 finding was as to the admissibility of Petitioner's

4    confession; the Penal Code section 26 issue remained one for the jury to decide.  (*Id.*; *see also*

5    RT 7608-10.)  It follows that Petitioner has not shown review of the Penal Code section 26

6    findings (regarding Petitioner's awareness of the wrongfulness of his actions) was limited to

7    the record of the 402-hearing (regarding admissibility of Petitioner's confession).

8         Petitioner's remaining arguments that counsel was deficient by failing to completely

9    investigate and develop objections to admission of his confession to the Rogers's murder are

10   considered separately below.

11   ### *Miranda* **Waiver**

12        Petitioner faults counsel for failing to object on grounds that the *Miranda* waiver he

13   gave prior to the initial interview session was invalid.  He argues his youth, emotional state and

14   mental condition kept him from fully understanding his legal rights and the consequences of

15   waiving them.  (*See, e.g.*, RT 7581-82, 7608-09.)

16        He argues that he did not understand the nature of the May 7, 1975 interrogation, the

17   terminology used, and the rights he could have exercised.  Most fundamentally, he suggests

18   that he was unaware he could remain silent and what other rights he possessed.  (*See, e.g.*, RT

19   7581-82.)

20        The record shows that Detective Lean *Mirandized* Petitioner using a department-issued

21   card (RT 7550) and that Petitioner then waived his rights and was questioned in the presence of

22   detective Christensen (RT 7549-98, 7757-68, 7792-95).

23        Petitioner acknowledges that Lean read him the *Miranda* advisement.   (RT 7578-79.)

24   Yet he argues that he was scared (RT 7580-81) and did not understand some of the terms in the

25   *Miranda* advisement (RT 7581-82) and did not know he had the option of simply refusing to

26   answer questions posed by law enforcement (*id.*).

27        It is clearly established that "the prosecution may not use statements, whether

28

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. As to the procedural safeguards to be employed, "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

However, "the defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444, 475); *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981 (same).

A valid waiver of *Miranda* rights depends upon the totality of the circumstances, including whether the "defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Younger*, 398 F.3d 1179, 1185 (9th Cir. 2005). In considering whether *Miranda* rights are knowingly and intelligently waived, the court considers: (i) whether the defendant signed a written waiver; (ii) whether the defendant was advised of his rights in his native tongue; (iii) whether the defendant appeared to understand his rights; (iv) whether a defendant had the assistance of a translator, if necessary; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system. *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998). The burden is on the government to prove voluntariness, and there is a presumption against waiver. *Younger*, 398 F.3d, at 1186. The trial court applied a "beyond a reasonable doubt" standard in finding Petitioner made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. (RT 7608.)

Petitioner is alleging trial counsel was ineffective by failing to defend against admission of his confession. As noted, *Strickland* dictates a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). AEDPA, acting in tandem with

1    *Strickland* asks whether the state court's application of *Strickland* was unreasonable. *Richter,*
2    562 U.S. at 99-100. Since the standards created by *Strickland* and § 2254(d) are both "highly
3    deferential," when the two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at
4    105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

5           Petitioner's argument that he did not understand the *Miranda* advisement and his rights
6    under it reasonably could be rejected and therefore the California Supreme Court reasonably
7    rejected an ineffective assistance of counsel claim premised on the assertion that counsel
8    should have further investigated and developed arguments regarding *Miranda*. The record
9    shows that detective Lean told Petitioner to ask any questions he had regarding *Miranda* or for
10   an explanation of those rights if needed. (RT 7549-98, 7757-68, 7792-95.) Petitioner did not
11   ask any questions or for an explanation. (*Id.*). To the contrary, Petitioner stated that he
12   understood his rights and wanted to speak with the detectives about Rogers's death. (*Id.*) He
13   apparently did so calmly and without any apparent hesitation or reservation, engaging with the
14   interviewers and responding to their input in ways which suggest his statements were knowing
15   and reasoned. (*See, e.g.,* RT 7549-64, 7585-7602, 7757, 7759, 7793, 7795); *see also Lewis*, 26
16   Cal. 4th, at 381-85; *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979) (courts are to determine
17   whether a defendant-minor or adult-has waived the Fifth Amendment privilege by inquiring
18   into the totality of the circumstances surrounding the interrogation); *Moran*, 475 U.S. at 421
19   (courts consider the totality of circumstances in determining whether confession is voluntary);
20   *United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir. 1986) (factors to consider under
21   "totality of the circumstances" test in the case of a minor include parental notification or lack
22   thereof, age, background, experience, and conduct).

23          Petitioner contends counsel failed to present additional life history evidence at the 402-
24   hearing suggesting his education, home life, socialization, experience with authority figures,
25   cognitive capability and mental conditions and impairments precluded any mens rea for
26   Rogers's murder as well as any knowing *Miranda* waiver and voluntary confession. (*See* Doc.
27   No. 58-1 at 118, Doc. No. 89 at 201, 203, 209-13, 221-22; *see also* RT 7604-09.)

28

Particularly, Petitioner complains the 1975 mental health evaluations by Drs. Kronenberg and Papadopoulos, noted above, were not before the court at the admissibility hearing. (Doc. No. 89 at 221, citing RT 7604-09.) He argues this omitted evidence was significant because it showed: (i) his mental deficits, behavioral control issues, and lack of mental competence which prevented his understanding the Penal Code section 26 "wrongfulness" of his participation in Rogers's killing; (ii) his inability to form the mens rea necessary for murder; and (iii) the involuntary nature of his waiver of rights under *Miranda,* and his subsequent confession.

The record shows that Dr. Kronenberg in her July 6, 1975 report diagnosed Petitioner with:

> [P]aranoid schizophrenia with episodic violent behavior. Is [sic] a person with impaired judgment and borderline intelligence. There is evidence of auditory hallucinations, concrete thinking, violent behavior while in Juvenile Hall, and self-revealed history of violent behavior with peers and siblings. According to the neurological examination, there may be some organic basis to this in the evidence of dysrthymia in the brain.

(1SHCP Ex. 17 at 3.) Dr. Kronenberg recommended anti-psychotic drugs along with Ritalin and Dilantin. (*Id.*)

Dr. Papadopoulos, in his June 2, 1975 report concluded that Petitioner suffered from "cerebral dysrythmia associated with chronic brain syndrome secondary to the above mentioned" and that he suffered from a "schizoid personality disorder" significant enough for anti-psychotic medication. (1SHCP Ex. 24.) Petitioner's habeas expert, Dr. Froming, opined twenty-four years later that "[Petitioner] showed signs of obvious neuropsychological impairment" and possible "abnormal brain development." (1SHCP Ex. 38 ¶ 10.)

However, as discussed above, penalty phase defense experts Drs. Callahan and Adams, who testified subsequent to the 402-hearing, each addressed the work of Drs. Kronenberg and Papadopoulos and found it subject to discount. The California Supreme Court reasonably could have found that counsel determined not to present at the 402-hearing the opinions of Drs.

1  Kronenberg and Papadopoulos given the potential for damaging rebuttal.

2        Relatedly, Petitioner appears to concede that Drs. Kronenberg and Papadopoulos lacked

3  sufficient information of Petitioner's life history including alleged physical abuse, alcoholism,

4  potential neurological impairment, abandonment, poverty, racism and violence, such that their

5  reports were incomplete and unreliable.  (*See* 1SHCP at 42.)  It follows that the California

6  Supreme Court reasonably could have discounted Dr. Froming's habeas conclusions regarding

7  Petitioner's prior mental state to the extent she relied upon the reports of Drs. Kronenberg and

8  Papadopoulos.  Especially so, as Dr. Froming framed her conclusions as merely hypothetical.

9  (1SHCP Ex. 38 ¶ 10.)

10        Counsel was also confronted with evidence shedding light on Petitioner's level of

11  functionality.  Significantly, Petitioner performed essentially at his grade level; he was just

12  finishing the eighth grade when he was questioned about and confessed to Rogers's murder.

13  (RT 7582.)  His school record around this time suggests average to sub-average performance.

14  (1SHCP Ex. 28 at 127.)  Although the factual record does not demonstrate Petitioner had

15  previously received a *Miranda* warning or been exposed to legal proceedings, detective Lean

16  testified at the 402-hearing that that Petitioner understood his rights and wanted to speak with

17  the detectives about Rogers's death and did so calmly and without any apparent hesitation or

18  reservation.[14]

19        Furthermore, counsel was afforded the opportunity to argue and did argue that

20  Petitioner did not understand the *Miranda* warning or his constitutional rights, and did not

21  knowingly waive his rights.  (RT 7604-07.)  Counsel also argued that Petitioner, a child under

22  the age of 14 years, lacked the ability to understand the wrongfulness of his actions in the death

23  of Rogers.  (RT 7530-31; *see also* Doc. No. 89 at 209, citing Penal Code § 26.)  Even so, the

24  jury found Petitioner was capable of committing the crime beyond a reasonable doubt.  *See*

25  *Lewis*, 26 Cal. 4th, at 379-80.

26        Fresno  County  District  Attorney  investigator  William  Martin,  who  interviewed

27

28  ---
[14] Respondent argues, but fails to support Petitioner's participation in legal proceedings, i.e. an alleged legal
settlement relating to his bike-truck accident.  (*See* 1SHCP Ex. 2 at 6.)

Petitioner on the afternoon of May 7, 1975, later described him as mentally alert, relaxed, attentive, responsive to questions, and aware of what was going on. (RT 7809-12.) Petitioner also could be seen to display some level of sophistication during his May 7, 1975 interview. As the California Supreme Court noted, during this interview with law enforcement, Petitioner changed his story of Rogers's death when confronted with contrary crime scene evidence and witness statements. (RT 7797, 7819); *see also Lewis* 26 Cal. 4th, at 384. This reasonably suggests a basis upon which to discount Petitioner's noted mental state defense.

For the reasons stated, the California Supreme Court was not unreasonable in denying the allegations that counsel was deficient relating to the *Miranda* waiver.

### **Subsequent Invocation of *Miranda***

Petitioner faults counsel for failing to object on grounds Petitioner's request during the interrogation to speak with his mother, which was refused (RT 7579-80, 7804-05, 7865), should have precluded further questioning. (*See* Doc. No. 89 at 200.) Petitioner counters detective Lean's testimony denying Petitioner made such a request (RT 7571) by arguing that the request may have been made to district attorney investigator Martin (RT 7598). Petitioner argues that a request for a parent is akin to a request for counsel for purposes of *Miranda*. (*See* Doc. No. 58-1 at 117.)

It is clearly established that upon a request for counsel all custodial interrogation must cease until counsel is present unless the suspect himself initiates further communication, exchanges, or conversations with the police. *Miranda*, 384 U.S. at 473-74; *Edwards*, 451 U.S. at 484-85; *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). Whether a juvenile has invoked Fifth Amendment rights under *Miranda* is determined upon consideration of the totality of the circumstances. *See* M*ichael C.*, 442 U.S. at 718 (upon consideration of totality of circumstances, juvenile's request to speak with his probation officer did not invoke Fifth Amendment rights under *Miranda*).

Petitioner is alleging trial counsel was ineffective by failing to defend against admission of his confession. As noted, *Strickland* dictates a "'strong presumption' that

counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). AEDPA, acting in tandem with *Strickland* asks whether the state court's application of *Strickland* was unreasonable. *Richter,* 562 U.S. at 99-100. Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Because the California Supreme Court denied the subsequent *Miranda* invocation allegations both on procedural grounds and alternatively on the merits by summary denial, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. "[A] habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 101-03.

Petitioner testified at the 402-hearing that he asked to speak with his mother and was told that "it was around dinner time and [he] would have to wait" (RT 7579-80), whereupon detectives kept asking him questions (RT 7580). However, the California Supreme Court reasonably could have determined to discount Petitioner's contention that he asked to speak with his mother. Detective Lean could not recall that any such request. Petitioner made numerous noted inconsistent statements during the course of his 1975 interrogation. Upon being made aware that detective Lean could not recall any request to call Petitioner's mother (RT 7559, 7571-72), Petitioner suggested at the 402-hearing that he may have made the request to investigator Martin. However, Petitioner did not develop this theory during his cross-examination of Martin.

Detective Lean testified that if Petitioner had requested to speak with his mother, the interview would have been stopped the same as if counsel had been requested. (7558-59.) Petitioner has not proffered a basis to discredit Lean's testimony.

Even if arguendo Petitioner did request the presence of his mother, the California

Supreme Court observed that he testified inconsistently at the 402-hearing that "[he] both did and did not continue to talk to the detective after he requested to talk to his mother. . . ." *Lewis*, 26 Cal. 4th at 385; (*see also* RT 7580). That court, considering such inconsistent testimony at the 402-hearing along with Petitioner's inconsistent statements to law enforcement during his underlying interrogation, was not unreasonable in discounting Petitioner's credibility and thereupon concluding he continued the dialogue. As noted, "federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Navarro v. Holland*, 698 F. App'x 541, 542 (9th Cir. 2017) (citing *Marshall,* 459 U.S. at 434); *see also Rice*, 546 U.S. at 342 (that reasonable minds might differ is insufficient to supersede trial court's determinations about credibility).

For the reasons stated, the California Supreme Court reasonably rejected the allegations that counsel was deficient by failing to object to the confession on grounds of a subsequent *Miranda* invocation, reasonably discounting both the alleged invocation of *Miranda* and law enforcement re-engagement thereafter.

### *Miranda* Readvisement

Petitioner faults counsel for failing to object on grounds that even if he waived *Miranda* at the outset of the May 7, 1975 interrogations, the subsequent *Miranda* invocation and the subsequent non-contemporaneous interrogation which took place that same day and during which he confessed each required that he be *re-Mirandized*. (*See* Doc. No. 58-1 at 117, citing *Wyrick v. Fields*, 459 U.S. 42, 47 (1982) (*Miranda* waiver for polygraph test does not continue during post-test interrogation where the circumstances have changed so seriously that defendant's answers are no longer voluntary, or where he was no longer making a knowing and intelligent relinquishment or abandonment of his rights); *see also* RT 7603, 7843-45.)

However, the allegation that Petitioner made a subsequent invocation of *Miranda* when he requested his mother was reasonably rejected by the California Supreme Court for the reasons discussed above. That court reasonably could have rejected the allegation that counsel

1  deficiently failed to object to lack of *Miranda* readvisement on such grounds.

2      As to the allegation that a Miranda readvisement requirement was triggered by a
3  subsequent interrogation occurring on May 7, 1975, the California Supreme Court reasonably
4  upheld the trial court's rejection of the allegation.  The trial court stated at the 402-hearing that
5  "there is no case law that says that another waiver was needed before Mr. Martin talked to the
6  witness on the same date."  (RT 7608-09); *see also Lewis*, 26 Cal. 4th, at 384-85.  Based
7  thereon, counsel reasonably could have understood that subsequent objection would have been
8  futile.  Failure to object is not ineffectiveness where an objection would have lacked merit.
9  *Fretwell*, 506 U.S. at 372, 374; *Bosch,* 914 F.2d at 1247.

10     Particularly so here, as the record reasonably could suggest that considering the totality
11 of circumstances, there was no subsequent law enforcement initiated interrogation, but rather
12 serial contemporaneous questioning.  Moreover, after Petitioner confessed to Martin, he asked
13 to speak with detective Christensen for the purpose of repeating the confession.  The California
14 Supreme Court reasonably could have found this request to be Petitioner's initiation of further
15 communication with the detectives and waiver of counsel.

16     The state supreme court was presumably aware no per se rule under Ninth Circuit
17 authority required that a suspect be readvised of his rights after the passage of time or changed
18 circumstances.  *See United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1130 (9th Cir.),
19 *amended*, 416 F.3d 939 (9th Cir. 2005) (holding that where statements made on the second day
20 of questioning, 16 hours after original *Miranda* warnings, they were sufficiently close in time
21 that no readvisement was required); s*ee also United States v. Andaverde*, 64 F.3d 1305, 1312
22 (9th Cir. 1995) (the courts have generally rejected a per se rule as to when a suspect must be
23 readvised of his rights after the passage of time or a change in questioners); *United States v.*
24 *Nordling*, 804 F.2d 1466, 1471 (9th Cir. 1986) (readvisement of *Miranda* rights not required
25 where "no appreciable time had elapsed" between interrogations); *Jarrell v. Balkcom*, 735 F.2d
26 1242, 1254 (9th Cir. 1984) (readvisement of *Miranda* rights not required where interrogation is
27 conducted by other than the officer who advised defendant of his *Miranda* rights).

28

That court reasonably found the approximately four and one-half hours between the *Miranda* warning and Petitioner's confession to investigator Martin and detective Christensen at approximately 5:00 p.m. on that same day not to constitute and "appreciable time" under *Nordling*. 804 F.2d 1471; (*see* RT 7597-99, 7602-04, 7770, 7803-04); *see also Jarrell*, 735 F.2d at 1254 (change in interrogators and three hour interval between warnings did not render statement inadmissible); *People v. Braeseke*, 25 Cal. 3d 691, 701-02 (1979), *vacated and remanded* (1980) 446 U.S. 932 *and subsequently reiterated in its entirety* 28 Cal. 3d 86, 87 (1980) (subject who has been properly admonished does not need to be readmonished at subsequent interrogations so long as each is done "within a reasonably contemporaneous period of time").

Given the totality of circumstances in this case, the California Supreme Court was not unreasonable in concluding readmonishment of *Miranda* rights was not required during the serial and reasonably contemporaneous interviews with authorities on May 7, 1975. That court was not unreasonable in further concluding that Petitioner has not demonstrated that counsel should have objected to admission of his subsequent confession on based upon clearly establish Supreme Court law.

Petitioner's reliance on *Edwards v. Arizona* as authority that Petitioner's serial interrogations on May 7th which included breaks, different interviewers, and room changes were not reasonably contemporaneous and required *re-Mirandizing*, is misplaced. *See* 451 U.S. at 481-87; (*see also* Doc. No. 89 at 182, 194-95, 201; RT 7764-7819). In *Edwards*, police initiated an interrogation of defendant without counsel present after defendant had invoked his Fifth Amendment right to counsel the previous day. 451 U.S. at 481-87. Here, for the reasons stated, the state court reasonably found that Petitioner voluntarily and knowingly waived his *Miranda* rights as to reasonably contemporaneous interrogations on the afternoon of May 7th, such that Petitioner was not subjected to a subsequent police initiated interrogation as was the case in *Edwards*.

Also, Petitioner's reliance upon *Doody v. Ryan* in arguing the confession was

184

1    inadmissible under *Miranda* is unavailing.  649 F.3d 986, 991-92 (9th Cir. 2011).  In that case,

2    the police deviated from the *Miranda* form waiver and misinformed the defendant of his rights

3    thereunder.  Whereas the instant record suggests detective Lean correctly read Petitioner his

4    *Miranda* rights from the departmental form (RT 7549-51, *see also* RT 7757-59), and advised

5    Petitioner to question anything in or about the *Miranda* waiver that he did not understand (RT

6    7562-64; 7757, 7759, 7793, 7795).  The record shows that Petitioner did not ask questions or

7    seek an explanation relative to the *Miranda* waiver.  (RT 7562, 7564, 7567, 7571, 7759, 7793,

8    7795.)

9         Additionally, Petitioner's habeas proffered empirical studies regarding waiver of

10   *Miranda* rights by juveniles (*see* Doc. No. 89 at 200 n.62, citing Grisso, *Juveniles' Capacities*

11   *to Waive Miranda Rights: An Empirical Analysis*, 68 Cal. L. Rev. 1134, 1157, 1160-61 (1980))

12   appears unpersuasive of the issue given the facts and circumstances of this case as discussed,

13   *ante*.  Here, for the reasons stated, the state supreme court reasonably found that Petitioner

14   intelligently and knowingly waived his *Miranda* rights and the police were not required to

15   readmonish.  *See Lewis*, 26 Cal. 4th at 386-87; (*see also* Doc. No. 89 at 189, 194-96; RT 7549-

16   82, 7754, 7764, 7786, 7788-89, 7799-800, 7803-24, 7843-44, 7846, 7865, 8459-60, 8465-67

17   7809-7824); Evid. Code, § 402(b); *Miller-El*, 537 U.S. at 347 ("a state court need not make

18   detailed findings addressing all the evidence before it.").

19        Accordingly, the California Supreme Court reasonably rejected Petitioner's allegations

20   that counsel was deficient by failing to object on grounds law enforcement failed to *re-*

21   *Mirandize* at a subsequent non-contemporaneous interrogation on May 7, 1975.

22   **Police Coercion**

23        Petitioner faults counsel for failing to object on grounds that his confession was

24   coerced.  He points to his youth; lack of experience with law enforcement; the circumstances

25   under which he was detained and not free to go; and the methods used by the police to adduce

26   his confession.

27        The Supreme Court has clearly held that an accused's coerced confession cannot be

28

1  used against him at trial.  *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).

2      Under the Fourteenth Amendment, a statement is involuntary only if the police use

3  coercive means to undermine the suspect's ability to exercise his free will.  *See Connelly,* 479

4  U.S. at 167.  The test for determining whether a statement is involuntary is whether,

5  considering the totality of the circumstances, the statement was obtained by means of physical

6  or psychological coercion or improper inducement such that the suspect's will was overborne.

7  *Burbine,* 475 U.S. at 421; *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961) (holding that the

8  test for voluntariness is whether confession was product of essentially free and unconstrained

9  choice by its maker).

10      Although several factors are considered in determining whether a confession is

11  involuntary, "coercive police activity is a necessary predicate to [a] finding that a confession is

12  '[in]voluntary' within the meaning of the Due Process Clause."  *Connelly,* 479 U.S. at 167;

13  *Withrow v. Williams,* 507 U.S. 680, 693 (1993) (describing police coercion as "crucial

14  element" to determination that confession was involuntary).  In addition to the level of police

15  coercion, other relevant factors include the length of the interrogation, its continuity, and the

16  defendant's maturity, education, physical condition, and mental health.  *Withrow,* 507 U.S. at

17  693-94. "It is not sufficient for a court to consider the circumstances in isolation. Instead, all

18  the circumstances attendant upon the confession must be taken into account."  *Reck v. Pate,*

19  367 U.S. 433, 440 (1961).

20      Here, the three youths suspected in Rogers's death, Petitioner, Randolph, and Green

21  were taken to the sheriff's office for questioning; they were told that they were under

22  suspicion, not under arrest, in Rogers death.  (RT 7554-57, 7755-56, 7783-7802.)  Each of the

23  three agreed to go voluntarily for questioning to the detectives' regular business offices.  (*Id.*)

24  It appears undisputed that Detective Lean did not attempt to contact Petitioner's mother prior

25  to the May 7, 1975 interview.  (RT 7787.)

26      Petitioner testified at the 402-hearing that he was scared during the interview.  (RT

27  7580-81.)  But detective Lean testified that Petitioner was not upset or crying (RT 7571-72)

28

and appeared coherent, not altered by drugs or alcohol, and able to understand the conversation. (RT 7558-59.)

At the sheriff's office the youths were interviewed separately. The record reflects that Petitioner was first interrogated for 30 minutes beginning at 12:30 p.m. on May 7, 1975, during which he provided and explanation suggesting Rogers died accidentally. (*See* RT 7551-96, 7753-7804.) He remained at the sheriff's office after this first interview and was not free to leave. (RT 7764, 7797-99.)

At detective Lean's suggestion D.A. investigator Martin, who like Petitioner is Black, (RT 7801-02, 7846), spoke with Petitioner about Roger's killing. Martin, who did not *re-Mirandize* Petitioner (RT 7843-45), testified that Petitioner was relaxed, attentive, responsive and spoke freely (RT 7812-13). At 4:30 p.m., Petitioner was re-interviewed at his own request and gave a different explanation for Rogers's accidental death. (RT 7597-7603.) At 5:00, while Lean was out of the office getting dinner for the youths, Petitioner made his confession to Martin. (RT 7598, 7823.)

Petitioner argues he confessed because his "will was overborne," noting his age, education, intelligence, experience with the law, and mental history. (Doc. No. 89 at 183 citing *Lynumn v. Illinois,* 372 U.S. 528, 534 (1963).) He points to the presence of uniformed officer White who assisted in separately transporting Petitioner, Green, and Randolph to the sheriff's office for their interviews (RT 7555-56, 7755, 7784-88); the presence during transport of non-interviewing detective Williams (RT 7788); and separate interrogations of the three youths. He argues these considerations suggests police intimidation and coercion.

Petitioner testified at the 402-hearing that in 1975 he was in the eighth grade and did not understand his constitutional rights or how to exercise them. (RT 7581.) He testified that investigator Martin wrongly told him Green's version of the events surrounding Rogers's death was inconsistent with his version. (RT 7811-12, 7819, 7843-45, 7852.) He testified Martin's false statements prompted him to give differing versions of Rogers's death. (RT 7819, 7852.)

However, the California Supreme Court reasonably found that Petitioner's confession

1  was not coerced.  The interview sessions appear to have been relatively short and free flowing.
2  Petitioner, aware the information he provided was not consistent with that in the possession of
3  law enforcement, nonetheless continued to offer-up information.  Detective Martin testified
4  that just prior to the confession, he made a moral appeal that Petitioner tell the truth, (RT 7822,
5  7857-58), and told Petitioner that Green's version of events surrounding Rogers's death was
6  inconsistent with Petitioner's version (RT 7811-12, 7819, 7843-45, 7852).   Petitioner then
7  gave yet another version of Rogers's death (RT 7766-7822, 7849-52), that Rogers death was
8  caused accidentally while Petitioner and Green engaged in horseplay, throwing gas at each
9  other (RT 7819-20; *see* RT 7825, 8253, 8255, 8296).

10      When Martin pointed to further inconsistencies between this newest version of the
11  Rogers's death and crime scene evidence and witness statements, (RT 7822-23, 7847-48,
12  7856), Petitioner offered up his confession.  He told Martin that he had thrown gas into the
13  backseat area and on Rogers and threw in a match because Rogers had earlier slapped him
14  when he had taken Rogers's watch.  (RT 7763, 7813-24, 7848-58.)  Petitioner then repeated his
15  confession to detective Christensen.  (RT 7803-23.)

16      Petitioner has not established that his life and mental state history circa 1975 shows a
17  susceptibility of coercion, for the reasons discuss above.  Nor does he identify facts of physical
18  or psychological inducement.  The trial court found no extraordinary interview procedures that
19  might smack of coercion.  (*See, e.g.,* RT 7609.)  The fact that detective Lean may have been
20  absent from portions of investigator Martin's interview with Petitioner, and Lean's failure to
21  testify to conditions of Petitioner's detention during the separate interviews of Green and
22  Randolph, is not necessarily a basis to discount Lean's testimony at the 402-hearing.  (*See* Doc.
23  No. 89 at 189-90.)  Lean's testimony at the 402-hearing regarding *Miranda* matters appears to
24  be consistent and unimpeached.  (*See* RT 7549-64, 7593-7600.)

25      Accordingly, the California Supreme Court reasonably rejected Petitioner's suggestion
26  the police coerced or induced his confession merely by raising inconsistencies in his statements
27  to them.

28

Petitioner's argument that his confession must have been coerced because his initial explanation for Rogers's death was true appears to be self-serving and merely conclusory. Petitioner's testimony at the 402-hearing in which he alternatively denied giving different explanations for Rogers's death or could not recall doing so, is not evidence otherwise. His testimony is subject to discount given his status as a felon and his repeated changing of his explanation of Rogers's death to accommodate the inconsistencies noted by police during the interview process. (*See, e.g.*, RT 7584-86.)

Additional reason to discount any claimed coercion is apparent from Petitioner's noted calm demeanor during the interview, and his previous involvement with law enforcement for minor conduct prior to and unrelated to Rogers's death, as noted by Dr. Callahan. (RT 8508-10); *see also Lewis*, 26 Cal. 4th, at 384.

Accordingly, the California Supreme Court reasonably rejected Petitioner's allegations that his confession was the product of police coercion and therefore reasonably rejected any deficiency of counsel claim based upon counsel's failure to develop further a theory that the confession was coerced.

### B. Evidence Rogers Death was an Accident

Petitioner argues counsel was deficient by failing to investigate, develop, and present then available evidence that Rogers's death was an accident rather than a homicide.

Petitioner suggests Rogers started the fire himself when he fell asleep while smoking on a gas soaked seat in the car. He points to evidence that Rogers had a habit of carrying gas cans in his car; was a heavy smoker and drinking and often fell asleep in his car with a burning cigarette in his fingers. (1SHCP Ex. 2 ¶ 27, Ex. 3 ¶ 18, Ex. 4 ¶ 11, Ex. 5 ¶ 14, Ex. 6, Ex. 9 ¶ 2; *see also* 1SHCP at 107 ¶ 105(c); RT 8347-49.) He points to his mother's habeas declaration stating that the seats in Rogers's car were soaked with gas on the day he died (1SHCP Ex. 2 ¶ 30; *see also* RT 7732-33, 7845); that she saw Petitioner, Green and Randolph running toward the burning car (1SHCP Ex. 2 ¶ 32; accord *see id.* Ex. 11 ¶ 11); and that Petitioner cried upon learning of Rogers's injuries (*id.*). He points to his 1975 statement to Dr. Papadopoulos that he

did not kill Rogers.  (*See* 1SHCP Ex. 24 at 2.)

Petitioner suggests that he had no motive to kill Rogers as he and Rogers were good friends (*see* 1SHCP Ex.'s 2, 6, 9), and Petitioner was staying with Rogers at the latter's home the time of the fire (1SHCP Ex. 2 ¶ 28, Ex. 6, Ex. 9).  He points to the habeas declaration of defense investigator Oasa that reflects Petitioner's statement he did not set fire to Rogers.  (1SHCP Ex. 10.)  He points to the habeas declaration of Randolph, who was with Petitioner and Green when Rogers was killed, wherein Randolph maintains that none of the three were responsible for Rogers' death.  (2SHCP Ex. 17.)  He points to similar hearsay statements by Green to detective Christensen in 1975, statements he argues are consistent with Petitioner's initial statement to detective Lean that Rogers died accidentally.  (RT 7847; *see also* 1SHCP Ex. 10 ¶ 5.)

The record shows that when called to testify at Petitioner's trial, Green invoked the Fifth Amendment as to all questions relating to the death of Rogers.  (RT 8356-71.)  Although Green's statements were read into the record as unsworn testimony, they were not presented to the jury.  (RT 8372-98; *see also* 1SHCP Ex. 10.)  Petitioner does not identify a basis for admitting Green's hearsay statements.  His suggestion the evidence is admissible as Green's declaration against penal interest (Doc. No. 89 at 220) appears unavailing as Green's unsworn statements are entirely exculpatory as to Green.  (RT 8377, 8391-96.)  Counsel Hart conceded these statements were not admissible.  (*See* RT 8389-98.)

Petitioner faults counsel for not challenging Green's invocation of the Fifth Amendment (Doc. No. 89 at 205-06; *see also* RT 8375-82, 8394-98), but does not to provide any tenable basis for such a challenge.  *See Hoffman v. United States*, 341 U.S. 479, 486 (1951) (the privilege extends to answers which would furnish a link in chain of evidence necessary to prosecute the party claiming the privilege).  Especially so as Petitioner suggested to detective Lean that Green participated in Rogers's death.  Moreover, counsel Pedowitz unsuccessfully objected to Green's invocation of the Fifth Amendment in this context (RT 8369-70A), suggesting further objection to Green's assertion of the right against self-incrimination would

1   have been futile.  Failure to object is not ineffectiveness where an objection would have lacked

2   merit.  *Fretwell,* 506 U.S. at 372, 374*; Bosch,* 914 F.2d at 1247.

3           In any regard, the jury was aware of Petitioner's theories that Rogers accidentally set

4   himself on fire.  (*See, e.g.*, RT 7703, 7711, 7719-20, 7727, 7732, 7748, 7753-66, 7784-97,

5   7802-24.)  Petitioner variously testified that: (i) the car would not start and Rogers was

6   working on the engine (RT 7645-49, 7651, 7761-64), (ii) Petitioner siphoned gas from the

7   tank with a segment of garden hose (RT 7711-12, 7737, 7741-2;  7814-15, 7848-49, 7852; *see*

8   *also* RT 7767, 8878) and Green poured the gas in the carburetor, but the car still would not

9   start so the three youths left the scene (RT 7813-15, 7848-49, 7852), and (iii) Petitioner and his

10  friends were engaging in various versions of horseplay with a gas can that sprayed gas into the

11  car and the fire then somehow ignited (RT 7819-21; 7767-68, 7852-53).

12          The jury was aware from the testimony of Rogers's cousin, Susie Johnson, the school

13  bus driver who pulled Rogers from the burning car on April 28, 1975 (RT 7616-22), that

14  Rogers drank "a lot" and some people referred to him as the "local wino."  (RT 7617; *see also*

15  RT 8349.)  This was re-enforced by the testimony of Rogers's brother Odell Rogers ("Odell"),

16  the common-law husband of Petitioner's mother, Minnie, that Rogers smoked, was a heavy

17  drinker and often carried gas in his car; Rogers would get drunk, pull his car to the side of the

18  road, sleep, awake and strike a match; and that Odell had warned Rogers that he was going to

19  burn himself up some day.  (*See* RT 8347-52; *see also* 1SHCP Ex.'s 2, 3, 4, and 6.)

20          The jury heard testimony from Mid-Valley Fire District fire marshal and arson

21  investigator Sam Garza that prior to concluding the fire was an arson, he had considered the

22  possibility the fire started accidentally.  (RT 7732.)  Garza told the jury that he was unaware

23  Rogers drove around with open containers of gas in the car, and stated he would have

24  considered that information in his evaluation of the origin of the fire.  (RT 7732-33.)

25          Even so, the accidental death scenarios suggested by Petitioner are inconsistent with

26  evidence otherwise in the record.  The suggestion that Rogers accidentally started a fire while

27  working under the hood or by falling asleep in the car holding a lit cigarette is inconsistent with

28

                                          191

the fire scene physical evidence and the testimony of witnesses and experts. The crime scene evidence is not consistent with a fire started by work under the hood. The record suggests that although the engine compartments suffered fire damage (RT 7619, 7643-44, 7868), the hood of the car was closed at the time of the fire (*id.*; *see also* RT 7715-21). Moreover, the air filter and housing were in place on top of the carburetor and mounted too tightly for removal by hand (*see* RT 7668-80) - contrary to Petitioner's suggestion that Green poured gas into the carburetor. The state court reasonably could have found that Rogers did not start the fire under the hood.

Fire investigator Garza opined the fire involved an accelerant on the outside of the driver's door (RT 7677, 7693, 7697, 7704, 7720-27, 7728-33) and originated in the driver's side front seat (RT 7727, 7733, 7747, 7698, 7701). He concluded that based upon the burn patterns and damage to the car (7702-04, 7705-31), the fire was deliberately set in the driver's side front seat area using a flammable liquid (RT 7703-05, 7711, 7719-27, 7732-33, 7748). Garza found a section of garden hose in the car that appeared to have been used in siphoning gas. (RT 7712, 7741-42.) Garza opined the car's gas tank was uninvolved in the fire. (RT 7713, 7743, 7751.)

Mid-Valley Fire captain Wayne Bender, who was a first responder to the fire, confirmed that the car's hood and doors were closed and the air filter above the carburetor was in place and could not be removed by hand. (7667-70.) He noted the fire was mainly in the passenger compartment. (RT 7666-68, 7678-79.) Bender also testified the damage to the car suggested an accelerant was used. (RT 7667-71.) He noted the fuel tank had its cap in place and contained little if any fuel. (RT 7680-81, 7712-13, 7742-43, 7751-52.)

Furthermore, it appears unlikely that Rogers started the fire himself as he was found burning in the rear of the station wagon close to the tailgate (RT 7620, 7867-68), some distance from the point where the accelerant was used.

Given all this, Petitioner's suggestion that fire marshal Garza might have changed his arson opinion had the habeas proffer evidence relating to accidental origin been available is

1   speculative. (*See* RT 7732-33.) Similarly, Petitioner's suggestion that Rogers was in a

2   position to start the fire in the front seat of the car appears unlikely.

3         Petitioner's further argument that counsel should have presented additional testimony

4   from family members confirming Rogers's above noted propensities and practices (*see* Doc.

5   No. 89 at 207-08, 218-19; *see also* 1SHCP Ex. 2) lacks merit. The California Supreme Court

6   reasonably could have found such evidence to be duplicative of evidence before the jury, and

7   no more probative than the crime scene evidence suggesting an accelerant was used and

8   Petitioner's testimony he siphoned gas from the car's tank into one of Rogers's gas cans. (*See*

9   7767, 7814-15, 7848-49, 7852, 8878.)

10        Petitioner confessed that he threw gas into the car and on the sleeping Rogers, struck a

11   match, and threw it into the car igniting the gas, all because Rogers had earlier slapped him and

12   made him cry when Petitioner took Rogers's watch. (RT 7813-24, 7846-53.) Notably,

13   Petitioner's habeas proffer includes a declaration for a CYA counsel, Curtis Walker, who states

14   that Petitioner had an explosive temper and when he started crying, he would tend to lose

15   control and then had to be subdued. (1SHCP Ex. 26 ¶ 7.) Even if not admissible for its truth,

16   Dr. Adams considered Petitioner's statement to him that he murdered Rogers and that Rogers

17   "deserved it." (RT 8558; *see also* 1SHCP Ex. 14 at 1.) The jury also heard from defense

18   witness Deborah Johnson, who lived near the fire and testified that she saw Petitioner and his

19   friends Randolph and Green running away from the fire, not toward it. (RT 7654-56, 7658-59,

20   7661.)

21        Accordingly, the California Supreme Court reasonably rejected Petitioner's allegations

22   that counsel was deficient by failing to investigate, develop, and present evidence that Rogers's

23   death was an accident rather than a homicide.

24       **C.**    **Jury Instructions Regarding Roger's Death**

25        Petitioner argues counsel was deficient by failing to request appropriate jury

26   instructions regarding criminal liability of a minor. Specifically, he argues the jury was not

27   instructed properly on the factors to be considered in deciding whether in 1975, Petitioner was

28

able to understand the wrongfulness of his conduct relating to the death of Rogers.  *See* Penal Code § 26; (Doc. No. 58-1 at 120, 125; Doc. No. 89 at 203-04, 213-16).

The record shows that the jury was instructed the on requirements for finding criminal liability in a child under the age of 14 years.  Counsel acquiesced in and the trial court gave a modified CALJIC 3.17 instruction that:

> A child under the age of 14 years cannot be found to have committed the murder of A. Z. Rogers unless it is established that, at the time of the commission of the act, such child understood the nature and effect of the act constituting the offense; that such act was wrongful and unlawful; and that such child could be punished for participating in the alleged act.
>
> The evidence must also establish that such child voluntarily, willingly and knowingly consented to participate in the alleged act with the intent or purpose of committing, encouraging or facilitating the commission of the crime.
>
> You may not find as an aggravating circumstance any conduct committed by the Defendant when under the age of 14 years unless there is proof beyond a reasonable doubt that, at the time of committing any such act, the Defendant knew its wrongfulness.

(RT 8926-27; *see also* RT 8783, 8788-90, 8843; CT 811-12, 852, 935.)

The trial court also instructed the jury with the prosecution's special instruction #3 that:

> In deciding whether a child understood the wrongfulness of his act, such things as flight after the crime, giving conflicting statements to the investigating officers, and closeness to the age of 14 may be considered.

(RT 8927; CT 812, 936.)

The trial court also instructed the jury on the elements of the predicate offenses of murder and arson.  (RT 8920-27; CT 921-34.)

Petitioner argues these instructions were erroneous, incomplete, and argumentative in the prosecution's favor.  (*See* Doc. No. 89 at 214-15.)  Particularly, he faults the failure of the instructions to account for his alleged profound mental impairments in 1975.

The California Supreme Court rejected these allegations on direct appeal, stating that:

> Finally, we reject defendant's claim that the jury instructions were improper because they merely mirrored the language of section 26 and did not specifically instruct the jury to consider the attendant circumstances of the

194

crime, or defendant's age, experience, and understanding. [Citation.] The trial court instructed the jury to consider "such things as flight after the crime, giving conflicting statements to investigating officers, and closeness to the age of 14." These considerations were entirely proper. (*In re Gregory S., supra*, 85 Cal. App. 3d at p. 212, 149 Cal.Rptr. 216; [Citation.]) Indeed, defendant did not request further amplification or explanation of these instructions. As such, defendant may not complain about these instructions on appeal. [Citation.]

Although defendant failed to object at trial, he also contends the jury instruction was argumentative in the prosecution's favor. [Citation.] A jury instruction is argumentative when it is "'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]" [Citation.] Although the instruction may have asked the jury to focus on evidence favorable to the prosecution, any error was harmless.

Both the prosecution and defense counsel, during closing arguments at the penalty phase, emphasized factors beyond those enumerated in the instruction. For instance, defense counsel stressed defendant's troubled childhood, his diagnosis of paranoid schizophrenia, and his lack of parental guidance. In light of defense counsel's closing argument, which presented factors that defendant wanted the jury to consider, we do not find it reasonably likely that the jury applied the wrong criteria to determine whether defendant knew the wrongfulness of his conduct. [Citation.]

*Lewis*, 26 Cal. 4th, at 380-81.

Petitioner has not demonstrated the California Supreme Court's rejection of these allegations was unreasonable.

The instructions, when viewed in their entirety, did not prevent the jury from considering any and all factors in evidence in determining whether Petitioner understood the wrongfulness of his actions relating to Rogers's death. For example, the jury non-exclusively considered evidence of Petitioner's flight after the crime, giving conflicting statements to the investigating officers, and closeness to the age of 14. (RT 8927.)

Prosecutor Cooper touched upon Petitioner being under the age of 14 the time of Rogers's death and that the jury would then need to decide whether "persons who are below the age of 14 … [have] an appreciation of the act being wrong … [considering things such as] flight after the crime … giving conflicting statements to investigating officers … [and] closeness of the person to the age of 14." (RT 8812.)

Counsel Hart's closing argument touched on Petitioner's "mental illness of paranoid schizophrenia, of having behavior problems at that time . . . that he was born into poverty in a

large family and was left, apparently, virtually unrestrained, to run loose and unsupervised, without a father figure in the household in the early years from birth to age five … [that he] failed to internalize the right and wrong and moral fiber of our society at an early age, at an age when if you don't form those attachments, if you don't incorporate the value system, then you have difficulty for the rest of your life."  (RT 8868-70.)

Hart additionally pointed out to the jury that "[Petitioner was] not culturally sophisticated, somebody who did not have the same value sense incorporated in[to] his psyche. And I think on the basis of the fact we know there was a previous diagnosis of paranoid schizophrenia, that in terms of deciding beyond a reasonable doubt that Mr. Lewis knew the wrongfulness of his action at that time that you cannot conclude that beyond a reasonable doubt that he was guilty of murder."  (RT 8875-77.)  She also argued Dr. Kronenberg's findings that Petitioner experienced auditory hallucinations, bursts of violent behavior, and borderline intelligence.  (*See* RT 8871.)

Moreover, counsel Hart went on to argue to the jury that it was to consider Petitioner's age and mental history and deficits in making its decision whether in 1975 Petitioner understood the wrongfulness of his actions (RT 8875-77), and whether Rogers's death resulted from "juvenile horseplay" (RT 8880).

Particularly, Petitioner has not demonstrated the jury instructions relating to Penal Code section 26, consideration of the confession (CT 778), and the corpus delicti requirement independent of any confession (CT 779), were insufficient, for the reasons stated.  The jury presumably considered the evidence as argued and followed all their instructions.

The jury also was instructed that these questions were to be decided by using the standard of beyond a reasonable doubt.  (RT 8926-27); *see Lewis*, 26 Cal. 4th, at 379. Presumably, the jury considered the evidence using that standard.

Accordingly, the California Supreme Court reasonably rejected Petitioner's allegations that counsel was deficient by failing to request appropriate jury instructions regarding criminal liability of a minor.

### (2) Prejudice

Petitioner argues that absent counsel's deficient investigation and defense of the 1975 burning death of Rogers, he jury could not have found that aggravating criminal activity to be true, raising a reasonable probability of a different outcome under *Strickland*. (Doc. No. 89 at 200.)

However, assuming arguendo that counsel was deficient as alleged, the California Supreme Court still could have found no reasonable probability of a difference sentencing outcome upon balancing the totality of mitigating evidence against the aggravating evidence.

The jury considered testimony that Petitioner fled the fire and did not seek help for Rogers, reasonably suggesting a consciousness of guilt in Rogers's death. Again, even if not admissible for its truth, Dr. Adams in opining on Petitioner's mental history considered Petitioner's statement that he murdered Rogers and that Rogers "deserved it." (RT 8558.)

Additionally, for the reasons discussed *ante* and *post*, the California Supreme Court reasonably could have found true the noted aggravating circumstances of Simms's homicide and the special circumstance (*see, e.g.*, 2/20/91 RT 46-47; CT 1011, 1029), Petitioner's criminal history, and his other violent criminal acts (*see* 2/20/91 RT 47-50, 52; CT 1013-15, 1031, 1033; *Lewis*, 26 Cal. 4th, at 350-51), as not suggestive of a reasonable probability of a different outcome absent the alleged deficiencies.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). That is, only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met *Strickland's* demand that defense errors were "so serious as to deprive [him] of a fair trial." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687).

For the reasons stated, the California Supreme Court reasonably could have found that Petitioner failed to demonstrate a substantial likelihood of a different result absent the allegedly

deficient conduct of counsel.

(3)    **Conclusions**

The California Supreme Court reasonably could find that counsel was not deficient in relation to Petitioner's 1975 confession and defense of the charge he killed Rogers.

Even if counsel was deficient as alleged, that court reasonably could find no prejudice arising therefrom.

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of these claims was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claims 17 and 18 shall be denied.

**c.    Claim 25**

Petitioner alleges that counsel was ineffective by failing to investigate and present a mitigation defense based on the physical evidence, violating his rights under International Law and the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 58-1 at 176-81.)

*i.    State Court Direct and Collateral Review*

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at Claim 2 at 47-55), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

*ii.    Analysis*

Petitioner revisits his guilt phase allegations, discussed *ante*, that counsel failed to investigate and retain experts to test physical evidence relating to the crime and thereupon present potentially exculpating information.  Here, he suggests such potentially exculpatory

1  information would have supported a lingering doubt argument at the penalty phase.  (*See* Doc.

2  No. 58-1 at 181.)

3  However, the California Supreme Court reasonably rejected these penalty phase

4  allegations for the same reasons discussed in the guilt phase analysis of claim 25, *ante*,

5  summarized here.

6  That court reasonably could have found the defense team was tactically motivated in

7  limiting its investigation of the physical evidence.  The primary defense that Pridgon or a third-

8  party killed Simms might have been impaired by such further investigation.  Especially so to

9  the extent that such evidence was not clearly inculpatory of Petitioner and did not clearly link

10  him to Simms's killing.

11  That court also reasonably could have rejected allegations of mitigation value from

12  lingering doubt arising from the meritless guilt phase allegations relating to the physical

13  evidence.  It is unlikely that a further showing in this regard would have raised reasonable

14  doubt as to Petitioner's conviction or the special circumstance(s) found true.  Moreover,

15  counsel did argue lingering doubt in relation to the prosecution's forensic and crime scene

16  evidence.  (*See* RT 8891-92, 8901.)

17  Even if counsel was deficient as alleged, Petitioner has failed to demonstrate prejudice.

18  The California Supreme Court reasonably could have found Petitioner's claimed prejudice

19  lacking in factual support and/or speculative, such that the noted substantial aggravating

20  evidence outweighs the totality of the mitigating evidence.

21  In sum, the California Supreme Court could have found no reasonable probability of a

22  different sentencing outcome had the proffered additional information on physical evidence

23  been presented to the jury along with the evidence otherwise in the record.

24  For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish

25  that counsel's performance fell below an objective standard of reasonableness and that, but for

26  counsel's unprofessional errors, the result of the proceeding would have been different.

27  *Strickland*, 466 U.S. at 687-694.

28

199

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 25 penalty phase allegations shall be denied.

**d.     Claim 27**

Petitioner alleges that counsel was ineffective at the penalty phase by failing to meaningfully advise him regarding prosecution non-capital plea offers, violating his rights under International Law and the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 185-87.)

*i.     State Court Direct and Collateral Review*

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50, claim 4 at 60-63), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

*ii.     Analysis*

Petitioner revisits his guilt phase allegations discussed *ante*, that counsel failed to meaningfully advise him regarding prosecution non-capital plea offers. Here, he suggests counsel was likewise ineffective at the penalty phase which prejudiced him at sentencing.

However, for the reasons stated, *ante*, summarized here, the California Supreme Court reasonably denied these allegations. (Doc. No. 58-1 at 185; *see also* Doc. No. 89 at 142-43.)

Petitioner fails to support the allegedly deficient conduct with evidentiary facts of the existence of a second degree murder plea offer and any term and conditions thereof. The record suggests that prosecutor Cooper was not authorized to negotiate and extend a second degree plea offer and that he did not do so. Furthermore, Petitioner fails to articulate with any degree of specificity how and why counsel was deficient as to the first degree offer of record. Petitioner concedes that he discussed the offer in the context of the merits of the case with counsel and determined to reject the first degree offer without any counter-offer.

Petitioner's additional argument that counsel's plea advice was necessarily deficient because counsel's guilt and penalty phase investigation and defense were deficient fails for the reasons stated *ante* and *post*.

Additionally, Petitioner fails to establish prejudice under *Strickland*. The California Supreme Court reasonably could have concluded that any lost plea opportunity relating to the alleged second degree offer was entirely speculative given Petitioner's inability to identify binding terms and conditions thereof. That court also reasonably could have concluded Petitioner would not have accepted the first degree offer, or effectively countered it, even upon appropriate advisement by counsel.

For the reasons stated, the California Supreme Court reasonably could have found that Petitioner failed to rebut the "strong presumption" counsel's performance fell within the "wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and failed to show that absent the alleged deficiencies there is a reasonable probability of a different sentencing outcome. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 27 penalty phase allegations shall be denied.

**e.      Claim 28**

Petitioner alleges that counsel was ineffective at the penalty phase by failing to investigate, develop and present a mitigation defense based on the magnitude of Simms's drug habit, violating his rights under International Law and the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 188-90; *see also* Doc. No. 89 at 130, 137-42.)

*i.      State Court Direct and Collateral Review*

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at Claim 5 at 64-68), which was summarily denied on the merits, and

denied on procedural grounds (Doc. No. 69-1 at 1).

   *ii.*   *Analysis*

Petitioner revisits the claim 28 guilt phase allegations discussed above, summarized here, arguing that counsel was deficient by failing to present evidence of the magnitude of Simms's drug use.  Here, Petitioner uses the allegations to support a lingering doubt defense to felony murder-robbery.  He again faults counsel for not presenting evidence that on the day she was killed, Simms had already spent her fast-food paycheck on drugs, such that the killer could not have been motivated to rob her.

But the record suggests Simms had funds from her recently cashed paycheck on her person when she was attacked while on her way to buy drugs at Petitioner's behest.  Pridgon's testimony that Petitioner took money from Simms after attacking her finds some corroboration in the record, as discussed above.  It is also apparent from the record that Petitioner knew Simms kept money in her bra.  When police found Simms's body, the upper portion of her blouse was open and hanging down in the left breast area where her bra was exposed.

Even if counsel was deficient by failing to develop and present the proffered evidence of Simms's drug habit, the California Supreme Court reasonably could conclude that Petitioner has not shown prejudice.  The jury heard evidence relating to Simms's habitual use of cocaine and that she did so on the evening she was killed; evidence that appears largely duplicated by the habeas proffer.  The jury also heard defense argument that robbery was not a motive in Simms's killing.  The jury nonetheless returned a guilty verdict and found true the robbery special circumstance.  The California Supreme Court was not unreasonable in finding the robbery murder verdict to be sufficiently supported by the evidentiary record.  (*See* claim 10, *ante*.)

Moreover, the primary defense was that Pridgon had committed the murder and robbery, rather than that it was not a special circumstances robbery case.  Counsel could then have reasonably concluded that obviating the robbery motive would in turn obviate the third-party culpability defense.

202

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 28 penalty phase allegations shall be denied.

**f.      Claim 29**

Petitioner alleges that counsel Hart was ineffective at the penalty phase due to an actual conflict of interest, violating Petitioner's rights under International Law and the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 191-95.)

*i.      Supplemental Legal Standards*

(1)      **Conflict of Interest**

It is clearly established that the right to the assistance of counsel, as guaranteed by the Sixth Amendment of the United States Constitution entitles a defendant to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). The Supreme Court has defined an "actual conflict" by the effect a potential conflict had on counsel's performance. *Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citing *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)). The possibility of conflict is insufficient to impugn a criminal conviction; in order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. *Id.* at 350.

In cases where counsel's actual conflict arises from concurrent representation of

multiple defendants, prejudice may be presumed. *Id.* at 349-50 (defendant is not required to demonstrate specific prejudice but must show actual conflict of interest burdening counsel and conflict's adverse effect on counsel's performance). The Supreme Court has left open the question whether the *Sullivan* presumed prejudice standard should apply to conflict situations besides those involving multiple concurrent representation. *See Mickens,* 535 U.S. at 176.

A lawyer's violation of ethical norms does not make the lawyer per se ineffective. *Burt v. Titlow*, 571 U.S. 12, 18 (2013).

> *ii.    State Court Direct and Collateral Review*

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 69-76), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

> *iii.    Analysis*

Petitioner argues that Hart was conflicted at the penalty phase because she concurrently represented Randolph, a prosecution penalty phase witness and long-time friend of Petitioner, in a separate and unrelated criminal appeal. (Doc. No. 58-1 at 191; RT 7498, 7536; CT 696.) Petitioner argues that "as a result of that representation and its ensuing duty of loyalty counsel pulled their punches in ascribing blame to Randolph" (Doc. No. 89 at 149) by: (i) failing to present available evidence that Randolph was principally responsible for the death of Rogers (*id.* citing RT 7542, 7646, 7754-55, 8327); (ii) failing to implicate Randolph in the Logan/Ohler robberies even though he was a potentially culpable third-party (RT 7786); and (iii) downplaying the extent of Randolph's negative lifelong influence upon Petitioner (RT 7782-83; 1SHCP Ex.'s 13, 18, 31; *see also* Doc. No. 58-1 at 193).

However, the California Supreme Court was not unreasonable in finding that Hart did not actively represent conflicting interests and that her representation of Petitioner as co-counsel with Pedowitz was not adversely affected by an actual conflict of interest. *See Sullivan*, 446 U.S. at 349-50 (no ineffective assistance where counsel did not actively represent conflicting interests).

The record reflects that Hart disclosed a merely potential conflict on the record early in the penalty phase. (RT 7497-99.) During discussion of this issue, counsel stated their intention to have Petitioner waive any potential conflict and that a conflict would arise only if Randolph testified against Petitioner. (RT 7535-39; *see also* CT 719.)

The prosecution called Randolph to testify as to statements he allegedly made to sheriff deputy Johansen (RT 8186) that: (i) Petitioner had assaulted Logan intending to steal money and cut his throat and that Logan was afraid to identify Petitioner as the assailant, and (ii) Petitioner had assaulted Steven Ohler. (RT 8297-8302.) However, during his testimony Randolph refused to implicate Petitioner in prior robberies and attacks upon Ohler and Logan, and denied that he made such statements to Johansen. (RT 8187-8201.)

Because Randolph's testimony on its face does not appear to inculpate Petitioner or Randolph in the Logan and Ohler incidents, the California Supreme Court reasonably could find that his testimony did not give rise to an actual conflict of interest as between Petitioner and Randolph and did not impact Hart's representation of Petitioner. Nothing in the record suggests Hart's representation of Randolph related to the Logan and Ohler incidents; or that Hart by virtue of her representation of Randolph possessed privilege information relating to those incidents; or that Hart had but did not present information impeaching Randolph because she then represented him in the other matter. *See, e.g., Lewis*, 391 F.3d, at 997-98 (attorney had actual conflict where he previously represented and failed to impeach with resulting conviction the key witness against the attorney's client in a subsequent litigation). Notably, Petitioner's argument that counsel could and should have developed evidence that Randolph was a participant in the prior criminal activity, but did not due to the alleged conflict, lacks factual support and in any event suggests little if any exculpatory and mitigating value for Petitioner.

Moreover, Pedowitz not Hart handled the cross-examination of Randolph. (RT 8187-8201.) Petitioner has not suggested on the evidentiary record that Pedowitz's cross-examination was affected by or motivated by any conflict Hart might have had.

1    Petitioner also argues that testimony from prosecution rebuttal witnesses impeached

2    Randolph's testimony so as to indirectly impugn Petitioner's credibility, creating a conflict in

3    Hart given her concurrent representation of Randolph and Petitioner. (*See* Doc. No. 58-1 at 192

4    citing 2SHCP Ex. 13 at 328-29, 331, 334-35.)  Specifically, the prosecution presented

5    testimony from victim Steven Ohler who testified that Randolph phoned him after the assault

6    and told him Petitioner was the perpetrator.  (RT 8234-36, 8296-99, 8301-06.)  The

7    prosecution also presented testimony from sheriff's detective Johansen who testified that

8    Randolph contacted him, identified Petitioner as the assailant in the Logan and Ohler assaults,

9    and requested assistance with a charge pending against Randolph in exchange for that

10   information.  (RT 8295-8309.)

11        But here again, the California Supreme Court reasonably could have found any

12   impeachment of Randolph in this proceeding did not place Hart in a conflict of interest.  The

13   record does not show that impeachment by rebuttal witness testimony caused counsel to

14   modify their representation of Petitioner in a way that adversely affected counsel's

15   performance and prejudiced Petitioner.  *See Houston,* 533 F.3d, at 1082.  Moreover,

16   Randolph's testimony neither was adverse to Petitioner nor self-inculpating.  The mere fact

17   that Randolph's testimony may have been impeached alone does not suggest that his interests

18   were at odds with counsel's penalty defense or that counsel's loyalties were divided.  (RT

19   7498-7499, 7536-7539, 8187-8201, 8234-36, 8296-99, 8301-06, 8295-8309.)

20        For the reasons stated, the California Supreme Court was not unreasonable in finding

21   the rebuttal testimony, even if impeaching of Randolph's credibility, did not give rise to

22   concurrent conflicting interests and representation as between Randolph and Petitioner.  *See*

23   *Sullivan,* 446 U.S. at 348.  Notably, neither Hart nor Pedowitz provided a declaration

24   discussing and enlightening as to any such alleged conflict of interest.

25        Absent a showing that Hart actively represented conflicting interests, Petitioner has not

26   established the constitutional predicate for his claim of ineffective assistance.  *Garcia v.*

27   *Bunnell,* 33 F.3d 1193, 1198 (9th Cir. 1994) (no actual conflict where record discloses no

28

active representation of competing interest); *see also Mickens*, 535 U.S. at 171 ("[A]n actual

conflict of interest [means] precisely a conflict that affected counsel's performance - as

opposed to a mere theoretical division of loyalties.").

There must be more than mere speculation that a conflict of interest affected the

outcome of the trial. *Rich v. Calderon*, 187 F.3d 1064, 1069 (9th Cir. 1999) (instead of mere

speculation, there must be an adverse impact that "significantly worsens" the client's

representation); *United States v. Perry*, 857 F.2d 1346, 1350-51 (9th Cir. 1988) ("mere

possibility of an actual conflict of interest created by service of a grand jury subpoena upon a

target's counsel is insufficient to disturb a conviction" absent proof of actual prejudice).

Additionally, Petitioner has not demonstrated entitlement to *Sullivan's* presumption of

prejudice. The Ninth Circuit has confirmed the clearly established Supreme Court precedent

that application of *Sullivan's* presumption of prejudice outside the joint representation context

to be an open question. *See Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005); *but see*

*Lewis v. Mayle*, 391 F.3d 989, 997-99 (9th Cir. 2004) (court applies *Sullivan* prejudice standard

to conflict based on successive representation; no discussion of, or citation to, *Mickens*).

Petitioner and Randolph were not jointly represented by Hart in the same proceeding.

To the extent *Sullivan* does not apply, Petitioner must meet the *Strickland* prejudice

standard by establishing a reasonable probability that, but for the conflict, the result of the

proceedings would have been different. *See Strickland,* 466 U.S. at 694; *see also Chaidez v.*

*Knowles*, 258 F. Supp. 2d 1069, 1082-83 (N.D. Cal. 2003), *aff'd*, 111 F. App'x 899 (9th Cir.

2004) (*Strickland* applicable where no constructive denial of assistance of counsel).

Here, the California Supreme Court reasonably could have found no *Strickland*

prejudice. As noted, Petitioner has not shown the alleged conflict of interest caused counsel to

modify their representation of Petitioner in a way that adversely affected their performance and

prejudiced Petitioner. Significantly, Petitioner has not shown that Hart had inculpatory

information about Randolph or exculpatory information about Petitioner that was not presented

to the jury due to alleged conflict of interest.

1    The jury heard testimony from district attorney investigator Debra Bennett that Juanita

2    Heard, Green's cousin, made the noted out of court statement that she saw Randolph throw a

3    lighted match into Roger's car, a statement Heard later denied on the stand.  (RT 8293-95,

4    8327-28.)

5        The jury heard testimony from Deborah Johnson potentially implicating Randolph in

6    Rogers's killing.  She testified that she saw Petitioner, Green and Randolph running away from

7    the smoke (of the burning car) and through a field.  (RT 7654-59.)  The jury was aware that

8    Randolph's credibility was in issue given his conviction for first degree murder.  (RT 8199-

9    8200.)

10       The defense also argued mitigation value from evidence of Petitioner's relationship

11   with Randolph because Randolph had a negative influence over Petitioner.  (*See, e.g.*, RT

12   8464-68, 8877; claims 14, 18, *ante*.)  For example, the jury heard evidence that Petitioner

13   performed well in the stable environment of the Sanchez family, but was then coaxed away by

14   Randolph.  (*See* 1SHCP Ex. 2 ¶¶ 24-25, Ex.'s 11, 13, 18-19; *see also* RT 8464-65, 8524.)  Hart

15   herself acknowledged that Petitioner "ran around with" Randolph and together with him

16   engaged in "antisocial acts."  (RT 8877.)  Defense expert Dr. Callahan testified that Petitioner

17   was subject to peer influences and was particularly susceptible to the values of his peers.  (RT

18   8464-65, 8524.)

19       Additionally, the trial court devalued Randolph's testimony.  That court, in denying

20   Petitioner's automatic motion [for new trial] and modification of the verdict in February 1991,

21   discounted Randolph's credibility, and did not consider the residential burglaries and attacks

22   upon Logan and Ohler as factors in aggravation.  (2/20/91 RT 51; CT 1015.)

23       For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish

24   that counsel's performance fell below an objective standard of reasonableness and that, but for

25   counsel's unprofessional errors, the result of the proceeding would have been different.

26   *Strickland*, 466 U.S. at 687-694.

27       It does not appear that the state court rejection of the claim was contrary to, or an

28

1  unreasonable application of, clearly established federal law, as determined by the Supreme

2  Court, or that the state court's ruling was based on an unreasonable determination of the facts

3  in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

4      Claim 29 shall be denied.

5      4.    Post-Conviction Counsel

6      **a.    Claim 30**

7      Petitioner revisits allegations discussed in section VII, C, 4, *ante*, that the trial court

8  erred by admitting certain legally insufficient penalty phase evidence of prior unadjudicated

9  violent acts, contending here that appellate counsel was ineffective by failing to present such

10  claim, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc.

11  No. 58-1 at 198; *see also* Doc. No. 89 at 226.)

12      *i.    Supplemental Legal Standards*

13      **(1)    Application of Strickland to Post-Conviction Counsel**

14      The *Strickland* standard applies to appellate counsel.  *Smith v. Robbins*, 528 U.S. 259,

15  285 (2002); *Evitts v. Lucey*, 469 U.S. 387, 397 (1985).

16      *ii.    State Court Direct and Collateral Review*

17      Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No.

18  S131322, Doc. No. 50 at 77-81), which was summarily denied on the merits, and denied on

19  procedural grounds (Doc. No. 69-1 at 1).

20      *iii.    Analysis*

21      Petitioner argues that "to the extent the state court may conclude that this claim for

22  relief could or should have been presented in [Petitioner's] automatic appeal or prior petition

23  for writ of habeas corpus, prior counsel's failure to do so constitutes [a] separate and

24  independent violation of his Sixth Amendment right to effective assistance of appellate

25  counsel."  (Doc. No. 58-1 at 198.)

26      However, for the reasons stated in section VII C 4 above the claim 30 allegations that

27  aggravating evidence of unadjudicated prior violent acts was legally insufficient fail on the

28

merits.

Moreover, appellate counsel has no constitutional obligation to raise every non-frivolous issue, even if requested by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that an attorney need not advance every colorable argument on appeal). The Supreme Court has acknowledged that "since time beyond memory" experienced advocates "have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible or at most on a few key issues." *Id.* at 751-52; *see also Gustave v. United States*, 627 F.2d 901, 906 (1980) (counsel need not appeal every possible question of law at the risk of being found ineffective); *cf. Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" -- an issue obvious from the record that would have resulted in reversal -- is ineffective).

It follows that the appropriate inquiry is not whether raising a particular issue on appeal would have been frivolous, but whether raising it would have led to a reasonable probability of reversal. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Where a Petitioner had only a remote chance of obtaining reversal based upon an issue, neither of the *Strickland* prongs is satisfied. *Id.* at 1435.

Here, the state supreme court reasonably could have found that given the record, appellate counsel was not deficient in choosing on appeal those issues believed to have the greatest chance of success, or in failing to raise meritless constitutional violations relating to aggravating evidence. *Barnes*, 463 U.S. at 751; *see also* 28 U.S.C. § 2254(a); *Medellin v. Dretke*, 544 U.S. 660, 664 (2005); *Hill v. U.S.* 368 U.S. 424, 428 (1962); *Rodriguez Benitez v. Garcia*, 495 F.3d 640, 643 (2007). The choice of arguments to be made on appeal (and on habeas for that matter) is, to a large extent, a tactical matter. *See Miller*, 882 F.2d at 1434.

Notably, in this case appellate counsel filed a 376-page opening brief raising seventeen issues of law with numerous sub-issues. *See Waldrop v. Thigpen*, 857 F. Supp. 872, 921 (N.D. Ala. 1994), *aff'd*, 77 F.3d 1308 (11th Cir. 1996) (finding no ineffective assistance on appeal in capital case where counsel filed an 11-page brief with no citations to authority raising three

substantive issues). Appellate counsel also filed a 223-page reply brief, a 12-page rehearing petition, and a 12-page petition for certiorari. *See United States v. Birtle*, 792 F.2d 846, 849 (9th Cir. 1986) (finding no ineffective assistance on appeal where counsel filed 54-page opening brief raising twelve issues and no reply brief).

The briefs filed by appellate counsel in this case were exhaustive and showed detailed familiarity with the record. The lengthy reasoned opinion by the California Supreme Court denying the appeal suggests the arguments of appellate counsel were closely reviewed by that court. *See Lewis*, 26 Cal. 4th, at 334.

Additionally, even if appellate counsel was deficient as alleged, the California Supreme Court reasonably could have found no resulting prejudice. These allegations of constitutional violations relating to evidence of aggravating prior violent acts were raised later by Petitioner on habeas corpus and reasonably denied on the merits by the California Supreme Court. (*See* VII, C, 4, *ante*.) It follows that Petitioner has not shown a reasonable probability of reversal absent appellate counsel's allegedly deficient conduct. *Miller*, 882 F.2d at 1434.

Accordingly, the California Supreme Court reasonably could have found that Petitioner failed to make a prima facie showing that appellate counsel's performance was deficient, let alone prejudicial. *Strickland*, 466 U.S. at 687-88, 694; *see also Robbins*, 528 U.S. at 285; *Evitts*, 469 U.S. at 397. Especially so here, as the trial court found death to be the appropriate sentence even without crediting the aggravating effect of the noted evidence of unadjudicated prior violent acts. (*See* 2/20/91 RT 51; CT 1014-16.)

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that appellate counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts

1    in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

2          The claim 30 allegations of ineffectiveness of appellate counsel shall be denied.

3          **b.      Claim 32**

4          Petitioner alleges that appellate counsel was ineffective by failing to raise violations of

5    state and federal law as constituting violations of International Law, violating his rights under

6    the Sixth, Eighth, and Fourteenth Amendments, and International Law. (Doc. No. 58-1 at 212-

7    30.)

8          *i.      State Court Direct and Collateral Review*

9          Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No.

10   S131322, Doc. No. 50 at 104-37), which was summarily denied on the merits, and denied on

11   procedural grounds (Doc. No. 69-1 at 1).

12         *ii.     Analysis*

13         Petitioner argues that reasonably competent appellate counsel would have raised

14   International Law bases for relief in the 1998 appellate opening brief and 1999 first state

15   habeas petition. (Doc. No. 58-1 at 229; *see also* section VII, G, 5, *post*.)

16         However, as noted Petitioner is no longer pursuing claim 32. Even if he were, the

17   substantive allegations of claim 32 fail for the reasons stated below in section VII, G, 5.

18   Appellate counsel has no constitutional obligation to raise even non-frivolous issues that have

19   "only a remote chance of obtaining reversal." *Barnes*, 463 U.S. at 751.

20         Here again, the California Supreme Court reasonably could find appellate counsel was

21   not deficient in choosing on appeal those issues believed to have the greatest chance of

22   success, or in failing to raise meritless constitutional violations as alleged violations of

23   International Law. *Id.*; *see also* 28 U.S.C. § 2254(a); *Medellin*, 544 U.S. at 664; *Hill*, 368 U.S.

24   at 428; *Rodriguez Benitez*, 495 F.3d, at 643. The choice of arguments to be made on appeal

25   and habeas, to a large extent, is a tactical matter. *See Miller*, 882 F.2d at 1434.

26         As noted, appellate counsel exhaustively briefed the issues and the California Supreme

27   Court issued a lengthy reasoned opinion. *Lewis,* 26 Cal. 4th, at 334.

28

Furthermore, even if appellate counsel was deficient as alleged, the California Supreme Court reasonably could have found no resulting prejudice. These allegations relating to violations of International Law were raised later by Petitioner on habeas corpus and reasonably denied on the merits by the California Supreme Court. For the reasons stated in section VII, G, 5, *post*, the California Supreme Court was not unreasonable in rejecting these allegations.

Accordingly, the California Supreme Court reasonably could have found that Petitioner failed to make a prima facie showing that appellate counsel's performance was deficient, let alone prejudicial. *Strickland*, 466 U.S. at 687-88, 694; *see also Robbins*, 528 U.S. at 285; *Evitts*, 469 U.S. at 397.

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish that appellate counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 32 allegations of ineffectiveness of appellate counsel shall be denied.

**E.     Claims Relating to Trial Court and Instructional Error**

1.     Legal Standards

**a.     Trial Court Error**

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. at 294, 303.

**b.     Instructional Error**

Any error in the state court's determination of whether state law supported an instruction in the case cannot form the basis for federal habeas relief. *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

review of the wisdom of state evidentiary rules").  "Failure to give [a jury] instruction which might be proper as a matter of state law, by itself, does not merit federal habeas relief." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005), (quoting *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985)).

Claims of instructional error will constitute a violation of due process under the Fourteenth Amendment only where the alleged error by itself infects the entire trial to such an extent that it was unfair, violating due process. *Dunckhurst*, 859 F.2d at 114; *Naughten*, 414 U.S. at 147; *see also DeChristoforo*, 416 U.S. at 643.  Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy."  *Kibbe*, 431 U.S. at 155; *see also Clark*, 450 F.3d, at 904.

Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given.  *Clark*, 450 F.3d, at 916.

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge.  *Spivey v. Rocha*, 194 F.3d 971, 976 (1999).  "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner.  *Boyde,* 494 U.S. at 380.  Additionally, a reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial."  *Johnson v. Texas*, 509 U.S. 350, 368 (1993).  Lastly, federal courts presume that juries follow instructions, including cautionary instructions.  *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan v. Runnels*, 413 F.3d 1101, 1115 (2005).

2.　　Guilt Phase Claims

### a.   Claims 5 And 6

Petitioner faults the trial court for failing to instruct the jury that Pridgon's testimony should have been treated as testimony by an accomplice (i.e., claim 5), and for excluding certain evidence that Pridgon was an accomplice in Simms's killing (i.e., claim 6).  He claims these errors violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 57-62; *see also* Doc. No. 89 at 153-60; 165-68.)[15]

#### i.     *State Court Direct and Collateral Review*

Claim 5 was presented on direct appeal, (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. V at 39-66), and denied on the merits, *Lewis*, 26 Cal. 4th, at 368-71.

Claim 6 was presented on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. VI at 66-75), and denied on the merits, *Lewis*, 26 Cal. 4th, at 372-74.

#### ii.    *Analysis*

Petitioner revisits accomplice allegations and evidence discussed in the context of claimed insufficiency of evidence in claim 2, *ante*, arguing here that: (i) Pridgon was linked to the crime by the physical evidence, (ii) Pridgon had motive for, knowledge of, and involvement in the crime, and (iii) Pridgon had a propensity toward violence and showed paranoia, psychosis, alleged hostility toward women, and alleged homicidal ideations.  (*See* section VII, C, 2, b, ii, (3), *ante*.)

Petitioner argues here that the trial court's instructions errantly prevented the jury's consideration of Pridgon's testimony as that of an accomplice, denying Petitioner a fair trial and a reliable verdict.  (*See* Doc. No. 89 at 154 citing RT 4211, 4498-4499; 5813-24, 5836-39, 5950, 6448-49, 6749, 6770-71, 7098-7100, 7343; *see also* Doc. No. 105 at 155-56.)  He argues this error was prejudicial because the prosecution's case turned on Pridgon's testimony.  He argues this prejudice was compounded by the trial court's errant exclusion of accomplice liability evidence allegedly showing that years prior to Simms's killing, Pridgon acted violently against four women and a police detective.

---

[15] The Court previously dismissed the Fourth Amendment ground for claim 5.  (*See* Doc. No. 54 at 5, 19.)

**(1)    Accomplice Liability and Instructions**

Petitioner argues that Pridgon must have been an accomplice in Simms's killing because:

> [Pridgon] knew where the lethal weapon was; he wanted money for drugs; he was with the victim at the time of her murder; he did not report his "eyewitness" account until being taken to the police department by others; he had an intimate knowledge of the crime scene; he was known to carry sticks and assault people with them; he abused drugs and alcohol; he had borderline personality disorder, low intellectual functioning and paranoid schizophrenia which manifested itself in hallucinations and irrational assaults on persons by whom he felt slighted.

(Doc. No. 89 at 159; *see also* section VII, C, 2, b, ii, (3), *ante*.)

The trial court disagreed and refused to give instructions requiring that Pridgon's testimony be corroborated by other evidence and viewed with distrust.  (*See* RT 7205, 7215-21.)

In denying the sufficiency of Petitioner's accomplice allegations, that court noted: (i) blood consistent with the victim's blood was on shoes worn by Petitioner and apparently identified to detective Sanchez as his own, (ii) Petitioner had two felony convictions, so his claim that detective Sanchez had lied about the shoes was not believable when compared to detective Sanchez's otherwise unrebutted testimony; (iii) there is no evidence that Petitioner was confused when pointing out the tennis shoes as his own; (iv) there is no evidence that Pridgon changed out Petitioner's shoes for his own in order to lay blame on Petitioner; (v) there is no evidence that Pridgon was acquainted with Simms prior to the night she was killed or that Pridgon had any motive to kill her - notably Pridgon has a steady fixed income, reasonably suggesting Pridgon had no motive to rob Simms; and (vi) the state apparently did not view Pridgon as  "prosecutable at the time … or in and about the time of [Petitioner's] arrest."  (RT 7216-20.)

The California Supreme Court also was unconvinced that accomplice instructions should have been given, stating that:

216

Defendant claims the trial court prejudicially erred by refusing to instruct the jury on accomplice liability and testimony regarding prosecution witness Pridgon. (§ 1111;[5] CALJIC Nos. 3.10, 3.11, 3.12, 3.14, 3.16.) Because the testimony implicating defendant in the crimes was from an accomplice, the trial court should have instructed the jury that the testimony must be independently corroborated by evidence connecting defendant to the crimes. Based on the trial court's failure to do so, defendant maintains his conviction rests on uncorroborated accomplice testimony proscribed by section 1111.

----------------------FOOTNOTE-----------------------

n.5  Section 1111 provides, in pertinent part, that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense ...."

--------------------END FOOTNOTE--------------------

Under section 1111, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." To be chargeable with an identical offense, a witness must be considered a principal under section 31.[6] (*People v. Horton* (1995) 11 Cal. 4th 1068, 1113-1114 [47 Cal.Rptr.2d 516, 906 P.2d 478]; *but see id., at* p. 1114 [a mere accessory is not an accomplice].) An accomplice must have "guilty knowledge and intent with regard to the commission of the crime." (*People v. Hoover* (1974) 12 Cal. 3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].)

----------------------FOOTNOTE-----------------------

n.6  Section 31 defines principals as "[a]ll persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission ...."

--------------------END FOOTNOTE--------------------

"If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. [Citation.] But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. [Citation.]" (*People v. Horton*, *supra*, 11 Cal. 4th at p. 1114; accord, *People v. Hoover*, *supra*, 12 Cal. 3d at p. 880 ["Whether the facts with respect to the participation of a witness in the crime for which the accused is on trial are clear and not disputed, it is for the court to determine whether he is an accomplice"].)

Defendant proffered evidence that Pridgon was at the crime scene, he had intimate knowledge of the crimes beyond that of a mere bystander, he had a habit of carrying sticks or boards, and he had a reputation for dishonesty. Defendant also points to testimony from a shoe store owner that the bloody shoes fit Pridgon better than they fit defendant, evidence of Pridgon's history of

mental illness and auditory hallucinations, which may have caused him to kill Simms, and Pridgon's inconsistent and "evasive" testimony. He also postulates that based on the fact that Simms was struck on the left side of her face, Simms must have been struck by a left-handed person like Pridgon, and not defendant, who is right-handed. Defendant argues the foregoing evidence constituted disputed facts on the issue of accomplice liability, a question of fact which the trial court should have submitted to the jury.

We find no error. Defendant's evidence supporting the request for accomplice instructions was not substantial but speculative. Substantial evidence is "evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'" (*People v. Williams* (1992) 4 Cal. 4th 354, 361 [14 Cal.Rptr.2d 441, 841 P.2d 961].) Although Pridgon was at the scene of the crime and had intimate knowledge of the robbery and murder, this fact without more merely means that he was an eyewitness and not necessarily an accomplice to the crimes. (*See People v. Stankewitz* (1990) 51 Cal. 3d 72, 90 [270 Cal.Rptr. 817, 793 P.2d 23].) There was no admissible evidence-apart from evidence that Pridgon may have kicked and bit a police officer who called him derogatory names-of his violent, assaultive behavior. Defendant also presented no evidence that Pridgon used the sticks or boards he carried as weapons to assault people. In short, the evidence relating to Pridgon's motive to commit the crimes was speculative. Although defendant is correct that motive is not an element of the crimes and thus is not indispensably necessary for conviction, "[m]otive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (*People v. Scheer* (1998) 68 Cal. App. 4th 1009, 1017-1018 [80 Cal.Rptr.2d 676].)

Moreover, the evidence relating to the bloody tennis shoes did not support giving accomplice instructions. Although at trial defendant asserted that Pridgon, who was in defendant's room the night of the murder, may have planted the shoes or that defendant was confused when he pointed to the shoes, defendant failed to show any evidence supporting these assertions. Moreover, even the shoe store owner's testimony was ambiguous. Although the owner said that the tennis shoes fit Pridgon better than they fit defendant, he did not state the shoes actually fit either defendant or Pridgon, and defendant was still able to wear the shoes. In addition, defendant's argument that Pridgon was left-handed and, as such, was more likely the one to have hit Simms on the left side of her head, was speculative and not dictated by the evidence. In short, there was no evidence other than speculation that Pridgon planned, encouraged or instigated the murder and robbery to give rise to accomplice liability. (*People v. Horton*, *supra*, 11 Cal. 4th at p. 1115; *see also* § 31.) Contrary to defendant's suggestion, evidence tending to negate his own guilt, including his denial that he owned the tennis shoes and his alleged lack of motive to commit the crimes, would not necessarily lead to the conclusion that Pridgon was an accomplice.

Even assuming the trial court erred by failing to give accomplice instructions, we find the error to be harmless. A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. (*People v. Hayes*, *supra*, 21 Cal. 4th at p. 1271.) "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" (*Ibid.*) The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice

is telling the truth." (*People v. Fauber* (1992) 2 Cal. 4th 792, 834 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

Pridgon's testimony was sufficiently corroborated. As discussed, Detective Sanchez testified that defendant pointed to the bloody tennis shoes as his, and tests later confirmed that a bloodstain on one shoe was consistent with Simms's PGM type. Based on her refreshed recollection, Boggs testified that the shoes the police took when they arrested defendant were defendant's, and that he had no other shoes besides those. Also, Pridgon's description of how Simms's murder took place was corroborated by the pathologist.

To the extent defendant argues the jury should have been instructed to view Pridgon's testimony with distrust (CALJIC No. 3.18), we find the other instructions given-including "[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others" (CALJIC No. 2.21.2), along with instructions on a witness's credibility (CALJIC No. 2.20) and the character of a witness for honesty or truthfulness or their opposites (CALJIC No. 2.24) were sufficient to inform the jury to view Pridgon's testimony with care and caution, in line with CALJIC No. 3.18. Indeed, the prosecution informed the jury during closing argument of Pridgon's prior convictions and told the jury to consider whether his testimony was truthful in view of the physical evidence and other witnesses' testimony. Emphasizing Pridgon's possible involvement in the murder, the defense argued that Pridgon was at the scene of the crime and "either did it himself or watched someone else do it or may have somehow assisted in the particular murder. The problem is that with Paul's record of falsity and Paul's record of mental problems we can't know exactly what his contribution was." Thus, we conclude there was no reasonable probability that defendant would have received a more favorable result if the trial court instructed the jury to view Pridgon's testimony with distrust. (*People v. Watson* (1956) 46 Cal. 2d 818, 837 [299 P.2d 243].) Indeed, defendant did not contend that Pridgon helped him commit the crimes, nor was there evidence they were working together. Thus, the instructions requested would have informed the jury to view Pridgon's testimony with distrust if the jury determined that Pridgon-and not defendant-committed the crimes. Any reasonable juror would reach this conclusion without instruction.

Notwithstanding defendant's citation of federal and state Court of Appeal cases, we have observed that "[n]o cases have held failure to instruct on the law of accomplices to be reversible error per se." (*People v. Gordon* (1973) 10 Cal. 3d 460, 470 [110 Cal.Rptr. 906, 516 P.2d 298].) Because we find no error and otherwise find any error to be harmless, we accordingly reject defendant's federal constitutional claims that the court's failure to instruct on accomplice liability violated his right to a trial by jury, to due process, and to present a defense protected by the Sixth and Fourteenth Amendments, and his right to a reliable conviction for a capital offense under the Eighth and Fourteenth Amendments, and deprived him of a reliable, individualized capital sentencing determination guaranteed by the Eighth Amendment.

*Lewis*, 26 Cal. 4th, at 368-71.

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Trombetta,* 467 U.S. at 485. Exclusion of probative and

admissible evidence that another person may have committed the crime violates that constitutional right. *Chambers,* 410 U.S. at 302-03. "[A] state may limit the defendant's evidence only when that limitation has [a] non-arbitrary purpose(s) that is (are) proportionate to the corresponding infringement upon the defendant." *Moses,* 555 F.3d, at 766.

Under California law an accomplice is one liable for the identical offense charged against the defendant. Penal Code § 1111; *see People v. Tewksbury*, 15 Cal. 3d 953, 960 (1976). That person must have knowingly and with shared criminal intent aided, promoted, encouraged, or instigated by act and/or advice, commission of the offense. *Id.; see also People v. Matta*, 57 Cal. App. 3d 472, 486 (1976). It is not enough that the person knew of the crime, was present at the scene, or failed to prevent the crime. *People v. Stankewitz*, 51 Cal. 3d 72, 90 (1990).

The defendant bears the burden of establishing by a preponderance of evidence that a witness is an accomplice. *Tewksbury*, 15 Cal. 3d, at 968. That determination presents a question of fact for the jury unless there is no dispute as to the facts or the inferences to be drawn whereupon it presents a question of law. *People v. Rodriguez*, 42 Cal. 3d 730, 759 (1986); *Tewksbury*, 15 Cal. 3d, at 960.

Here, the California Supreme Court reasonably rejected the accomplice allegations, for the reasons stated by that court and those discussed in claim 2, *ante.*

The record suggests that Pridgon was not motivated to commit the crimes upon Simms and did not conspire in the crimes or intend they be committed. Pridgon refused to participate in Petitioner's non-descript plan to hit Simms and take her money; he was previously unacquainted with Simms; he had no apparent need for funds. Pridgon's testimony suggesting he tried to warn Simms of an assault by Petitioner does not alone suggest otherwise; nor does Pridgon's then apparent mental state.

Petitioner's inferential argument that Pridgon aided and abetted or participated in the attack on Simms finds scant supported in the factual record. *See Matta*, 57 Cal. App. 3d at 486. Petitioner does not point to facts suggesting Pridgon participated in the killing of Simms.

1   Pridgon's disposal of the butter knife given to him by Petitioner after the killing does not

2   suggest otherwise; Pridgon apparently was unaware Petitioner had the knife that appears not to

3   have been used in the crimes against Simms. Petitioner is unable to point to facts linking

4   Pridgon to the physical crime scene evidence presented by the prosecution.

5        Petitioner's theorizing the clothing and tennis shoes belonged to Pridgon appears

6   unsubstantiated, for the reasons stated. In any event, Pridgon testified he was at the crime

7   scene when Simms was killed and witnessed her death. Similarly, no facts show Simms was

8   killed by left-handed assailant, or that Pridgon was physically capable of wielding and did

9   wield the blows that killed her.

10       It remains that Petitioner is unable to point to facts in the record showing that: (i)

11  Pridgon had or used a stick or knife on Simms or anyone else (*see* RT 5562-63, 5813-14, 5818,

12  5824; 7099-100, 7102-05), (ii) the white tennis shoes admitted into evidence fit Pridgon rather

13  than Petitioner (*see* RT 4301, 4499, 4507, 4989-90, 5456, 5691-92, 5727-28, 5839-43, 6446-

14  50, 6461-65, 6572-73, 6744-46), (iii) Pridgon had homicidal thoughts or an intention to kill

15  Simms (*see* RT 7342-45), (iv) Simms was struck with the two-by-four by a left-handed person

16  (*see* RT 5616, 5655-59, RT 7317-19), (v) Pridgon was close enough to Simms to have gotten

17  blood splatter from the attack on his person (RT 4339-40, 5036-37, 5403, 5405, 5490; CT

18  237), and (vi) Pridgon testified to Simms's strangling only because he heard the testimony of

19  pathologist Dr. Nelson that Simms died after being strangled (*see* RT 5323-25, 5494-5504,

20  5526-32, 5543-46, 5555, 5570-71, 5704-05, 5713-22, 5760, 5766, 5769-72; CT 217-18, 315-

21  317).

22       Petitioner's re-argument that Pridgon's mental illness left him predisposed to kill

23  Simms is unavailing for the reasons stated in sections VII, B, C, *ante*, and those discussed in

24  section VII E, 2, a, ii, (2), *post*. (*See also* RT 4211, 4498-4499, 5813, 5819-24, 5836, 5839,

25  5950, 6448-49, 6749, 6770-71, 7098-7100, 7343.) For these same reasons and those stated by

26  the California Supreme Court, Petitioner has not demonstrated the excluded evidence related to

27  Pridgon's mental state at the time of Simms's killing in a way that is more probative than

28

prejudicial.  (*See, e.g.*, RT 4618, 4645, 4651-52.)

Furthermore, at trial Pridgon denied attacking Simms.  (RT 5590.)  The record suggests that Pridgon would not have had a motive in killing Simms.  He met her for the first time on the evening she was killed (RT 7220); he did not appear to dislike her, did not show anger toward her and in fact testified that he tried to warn her of an attack by Petitioner (RT 5360-61); Simms seemed to have nothing that Pridgon wanted or needed, notably Pridgon had a steady state disability income (RT 5241-46), and in any event seemed to have been unaware Simms had cash on her and where she kept it (*see, e.g.*, RT 4646-47).  Moreover, given Dr. Nelson's testimony regarding the amount of force behind the blows to Simms (RT 5667-69), the jury reasonably could find it unlikely the 6'1" and 129 lb. Pridgon (RT 5685) delivered those blows.

Petitioner's argument that the physical evidence suggests accomplice liability reasonably could be rejected for the same reasons stated in section VII, D, 2, d and VII, D, 3, c, *ante*, summarized here.  The record reasonably suggested that the bloodstained clothing and bloody white tennis shoe belonged to and were worn by Petitioner; Petitioner's denial thereof could not be believed because of his felony convictions and controverting testimony by officer Sanchez; and Pridgon was not "prosecutable" based thereon at the time of Lewis's arrest.  (RT 7217-20.)

Accordingly, the California Supreme Court reasonably could find the trial court did not err in finding that there was not a preponderance of the evidence that Pridgon knowingly and with criminal intent aided, promoted, encouraged, or instigated by act and/or advice the commission of Simms's killing, s*ee Matta,* 57 Cal. App. 3d at 486, and that the trial court could make this determination as a question of law and refuse the requested accomplice instructions.  That court reasonably could find the noted substantial evidence that Petitioner killed Simms was adequate corroboration of Pridgon's testimony.  (*See* claim 2, *ante*); *see also Lewis*, 26 Cal. 4th, at 357-59, 365-68, 370-71; *Odle v. Calderon*, 884 F. Supp. 1404, 1418 (N.D. Cal. 1995) (petitioner's claim that his murder conviction relies solely on uncorroborated

testimony does not establish basis for federal habeas relief).

Additionally, Petitioner has not demonstrated that corroboration of accomplice testimony is a federal constitution requirement. *See United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) (uncorroborated testimony of accomplice is sufficient to sustain conviction unless testimony is incredible or insubstantial on its face); *see also Odle*, 884 F. Supp. at 1418.

It follows that the California Supreme Court's rejection of accomplice instructions was not unreasonable as that theory was unsupported by sufficient evidence. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) (explaining that a defendant is only entitled to an instruction on a defense theory supported by the evidence). That court reasonably could find the failure to instruct on an unsubstantiated defense theory did not render Petitioner's trial unfair. *See Dunckhurst*, 859 F.2d at 114; *Naughten,* 414 U.S. at 147; *see also DeChristoforo*, 416 U.S. at 643. Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy." *Kibbe*, 431 U.S. at 155; *see also Clark*, 450 F.3d, at 904.

Furthermore, as noted by that court, the jury appears to have been adequately instructed on witness impeachment and credibility. *Lewis*, 26 Cal. 4th, at 371; *(see also* CT 613-21, 631-32). Federal courts presume that juries follow instructions, including cautionary instructions. *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d, at 1115.

(2)    Accomplice Evidence Excluded by the Trial Court

Petitioner alleges the trial court erred by excluding evidence that Pridgon acted violently in three separate incidents which took place several and more years prior to Simms's killing, denying him a complete defense, an individualized sentence determination, and a reliable verdict. *See Stephens*, 462 U.S. at 879; *Beck,* 447 U.S. at 637-38; *Crane*, 476 U.S. at 690-91; *Chambers*, 410 U.S. at 302.

The record shows that during the guilt phase, the defense sought to introduce evidence that: (i) in 1983, Pridgon threatened and struck three younger girls, Love Williamson and two others, after Williamson confronted Pridgon about stealing her radio (RT 4618, 4651, 4844,

4858-4861); (ii) in 1984, upon being told to sit down and be quiet while on a school bus, Pridgon took sunglasses from the face of Kim Vierra and broke them (RT 4651); and (iii) in 1985 while being questioned by law enforcement investigators Clark and Kuczynski about an arson, Pridgon responded to pejorative remarks by striking and threatening to kill one of them and continuing the struggle even after being placed into custody (RT 4620-21, 4629-30, 4645-51, 5922, 6852, 6862-63; CT 69-70).

The trial court ruled this evidence was "inadmissible [to show Pridgon's culpability as a third-party or to attack his credibility]." (RT 4652-53.) That court found pursuant to Evidence Code section 352 that presentation of such evidence of prior violent acts would consume an undue portion of the court's time, create substantial danger of undue prejudice, confuse the issues, and mislead the jury. (RT 4652; *see also* RT 4611-12.) That court found speculative the defense suggestion that Pridgon "probably" attacked Simms because Pridgon was motivated by his propensity for violence against people he did not like (RT 4646-50) and he knew crime scene details (RT 4651-52).

The California Supreme Court reviewed and rejected Petitioner's claim this evidence was improperly excluded, stating that:

> In support of a third party culpability defense that Pridgon, and not defendant, committed the crimes, defendant proffered evidence that Pridgon struck five people in three incidents between 1983 and 1985. The incidents included Pridgon's punching and slapping one girl, and slapping two other girls, who accused him of stealing one of the girl's headset; pulling sunglasses off a girl's face and breaking them after being told to sit down and be quiet on a school bus; and striking a detective when he interviewed Pridgon about his involvement and alibi in a reported arson.
>
> Defendant argued this evidence raised the inference that Pridgon had a motive and predisposition to rob and kill Simms. These incidents showed that when Pridgon is "frustrated" or is confronted with "[a]nything he doesn't like, he attacks people physically, and that he has a propensity for violence." Thus, in conjunction with circumstantial evidence linking Pridgon to the crimes, defendant claimed Pridgon was "more likely" the one who committed the crimes. The trial court excluded the evidence. Determining that the prejudicial effect of evidence of Pridgon's prior physical attacks substantially outweighed its probative value, the trial court ruled this evidence of third party culpability was inadmissible under *People v. Hall* (1986) 41 Cal. 3d 826 [226 Cal.Rptr. 112, 718 P.2d 99]. Defendant claims that by finding the proffered evidence "just

raises speculative issues," the trial court erred by making a determination that is within "the province of the jury." (*People v. Hall*, *supra*, 41 Cal. 3d at p. 834.)

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability .... [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall*, *supra*, 41 Cal. 3d at p. 833.) We emphasized that "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)."[7] (*People v. Hall*, *supra*, 41 Cal. 3d at p. 834.) A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal. 4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

-----------------------FOOTNOTE------------------------

n.7 Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

--------------------END FOOTNOTE--------------------

We find no abuse of discretion. Although defendant asserted the prior acts of violence showed Pridgon attacked "[a]nything he didn't like" or attacked when he was frustrated, there was no evidence or suggestion that Pridgon was frustrated or that he did not like Simms, whom he met for the first time the night she was killed. Moreover, Pridgon's prior acts were remote not only in time, but also in pattern, to the present crimes. (*See People v. Hall*, *supra*, 41 Cal. 3d at p. 833.) They did not involve victims or methods of attack similar to the present crimes. The trial court reasonably found the evidence was too speculative to be relevant. In view of the prejudicial impact, undue consumption of time, and possible confusion of issues, the trial court properly determined that evidence of Pridgon's prior acts of violence was inadmissible under Evidence Code section 352. Contrary to defendant's contention, the trial court's determination that the evidence presented only speculative issues did not invade the jury's province. (*People v. Hall*, *supra*, 41 Cal. 3d at p. 834.) The trial court simply made a threshold evidentiary ruling to exclude speculative evidence, the probative value of which did not outweigh its prejudicial effect. (*Ibid.*; *see also People v. Babbitt* (1988) 45 Cal. 3d 660, 682 [248 Cal.Rptr. 69, 755 P.2d 253] [evidence is irrelevant if it produces only speculative inferences].)

Indeed, defendant's assertion that these prior acts would show that Pridgon "had a propensity for violence," undercuts his position that the evidence should have been admitted. (*See* Evid. Code, § 1101, subd. (a) [character evidence is inadmissible to prove a person's conduct on a specified occasion].) "The inference of a criminal disposition may not be used to establish any link in the

chain of logic connecting the uncharged offense with a material fact. If no theory of relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible." (*People v. Thompson* (1980) 27 Cal. 3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883].) As discussed, defendant fails to establish how, apart from suggesting Pridgon's "criminal disposition," Pridgon's prior acts of violence connected him to the present crimes. (*Ibid.*) Thus, this evidence was inadmissible.

Accordingly, we reject defendant's claims under the federal Constitution that the trial court's exclusion of the third party culpability defense violated his Sixth and Fourteenth Amendment rights to present a complete defense, his Eighth and Fourteenth Amendment rights to a reliable conviction for a capital offense, and his Eighth Amendment right to a reliable, individualized capital sentencing determination.

*Lewis*, 26 Cal. 4th, at 372–74.

That court reasonably could find the trial court did not abuse its discretion in refusing to admit this evidence of alleged prior violent acts on grounds the evidence was speculative, irrelevant, and more prejudicial than probative. *See Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992) (trial judges have broad discretion both to determine relevance and to determine whether prejudicial effect or other concerns outweigh the probative value of the evidence).

"[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (defendant's right to present evidence is not absolute for defendant must comply with established rules of evidence and procedure). In California, the trial court enjoys "wide discretion" in determining the relevancy of evidence. *People v. Green*, 27 Cal. 3d 1, 19 (1980), *abrogated on other grounds by People v. Martinez*, 20 Cal. 4th 225 (1999).

Here, it appears that Petitioner's proffered evidence suggesting Pridgon's propensity for violence was reasonably precluded on at least two grounds. As noted, state law precludes evidence of propensity for violence to show conduct on a specific occasion. Evid. Code § 1101(a). Additionally, the rejected propensity to violence evidence relates only to incidents where Pridgon was confronted or provoked. (RT 4620-21, 4629-30, 4645-51, 5922, 6852, 6862-63; CT 69-70.) Relatedly, prosecution expert Dr. Terrell opined that Pridgon would not

act violently absent confrontation or provocation. (RT 6865-66.) Nothing in the facts and circumstances surrounding Simms's killing suggests Pridgon was confronted or provoked by Simms.

Federal habeas corpus does not ordinarily lie to review questions about admissibility of evidence or for errors of state law absent a due process violation. *McGuire*, 502 U.S. at 67-68; *Johnson v. Sublett*, 63 F.3d 926, 931 (9th Cir. 1995). California law holds that evidence tending to show that another person committed the offense is admissible if relevant; like all evidence, however, it is subject to exclusion at the court's discretion under California Evidence Code section 352 if its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion. *People v. Hall*, 41 Cal. 3d 826, 834-35 (1986), *reaffirmed in People v. Yeoman*, 31 Cal. 4th 93, 141-42 (2003).

Inferential evidence that is merely speculative, as here, is irrelevant evidence in California. *People v. De La Plane*, 88 Cal. App. 3d 223, 241-42 (1979). There is no federal constitutional right to submit irrelevant evidence. *Wood*, 957 F.2d at 1549-50.

### (3) Prejudice

Even assuming arguendo that the trial court erred as alleged, the California Supreme Court reasonably could have found that Petitioner had not shown a resulting substantial and injurious effect or influence in the jury's determination of his verdict. *Brecht*, 507 U.S. at 62; *see also Coleman*, 525 U.S. at 146-47 (*Brecht* harmless error standard applies to instructional error).

The jury was aware of the defense theory that Pridgon participated in the killing of Simms. The jury heard Petitioner's argument and evidence meant to link Pridgon to the killing, as discussed above. (*See, e.g.*, RT 4211, 4498-99, 5813, 5819-24, 5836, 5839, 5950, 6448-49, 6749, 6770-71, 7098-7100, 7343.) The excluded evidence of Pridgon's prior violent acts appears to lack relevance to Simms's killing. Its minor probative and persuasive value is evident when the excluded evidence is weighed against the noted admitted evidence. Furthermore, the jury was aware that Pridgon allegedly carried around sticks and boards (RT

227

4969); witness Williamson had difficulty remembering the incident with Pridgon; and Pridgon struck only Williamson and not the two other girls who were in her company.  (*See* RT 4618, 4651, 4858-61.)  The California Supreme Court reasonably determined that the excluded evidence was speculative would not have measurably added to the totality of evidence before the jury and supporting Petitioner's accomplice theory.

That court reasonably reached a similar conclusion regarding the omitted accomplice instructions.  Applying *Brecht,* a "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given.  *Clark*, 450 F.3d, at 916.

Here, the jury presumably was aware that Pridgon's credibility was in issue and that his testimony should be considered with caution.  *See, e.g., Lewis*, 26 Cal. 4th, at 371.  For example, the prosecution conceded Pridgon's criminal convictions (RT 7280-81), and counsel reminded the jurors of Pridgon's mental problems and dishonest statements to law enforcement (RT 7316, 7346-61).  It appears the jury considered and weighed the totality of evidence going toward Pridgon's credibility, including impeaching and corroborating evidence, in the context of all the instructions given.

The jury was otherwise instructed as to witness credibility, honesty and truthfulness.  For example, the trial court instructed the jury with CALJIC No. 2.20 relating to the credibility of a witness), as follows:

> Every person who testifies under oath is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness. [¶] In determining the believability of a witness, you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to … [t]he extent of the opportunity or the ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified; … [t]he existence or nonexistence of a bias, interest, or other motive; … [t]he character of the witness for honesty or truthfulness or their opposite; … [and] [t]he witness' prior conviction of a felony.

(RT 7399-400; CT 614-15.)  Also, the jury was also instructed with: CALJIC No. 2.13 (relating to prior consistent or inconsistent statements), CALJIC No. 2.21.1 (relating to

228

discrepancies in testimony), CALJIC No. 2.21.2 (relating to willfully false testimony by a witness), CALJIC No. 2.22 (relating to weighing conflicting testimony), CALJIC No. 2.23 (relating to believability of a witness who has been convicted of a felony), CALJIC No. 2.24 (relating to believability of a witness relating to evidence of character for honesty or truthfulness), and CALJIC No. 2.92 (relating to factors to consider in proving identity by eyewitness testimony).  (*See* RT 7398-7402; CT 613, 616-20, 631-32.)  Furthermore, the jury was instructed to consider the instructions in their entirety.  (CALJIC 1.01, *see* CT 603.)

A trial court may properly reject a defendant's proposed jury instruction if other instructions adequately cover the issues about which the defense is concerned.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

Given the facts and circumstances of this case, the California Supreme Court reasonably found that the jury instructions in their entirety were adequate to guide the jury's deliberations.  *See Lewis*, 26 Cal. 4th, at 371; *see also United States v. Marin-Cuevas*, 147 F.3d 889, 893 (9th Cir. 1998) (stating the test for error is whether the jury instructions "taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations.").

(4)    Conclusions

The California Supreme Court reasonably found that the trial court did not prejudicially err by rejecting Petitioner's request for accomplice instructions and excluding his proffered accomplice evidence of Pridgon's noted prior violent acts.

For the reasons stated, it does not appear that the state court rejection of these claims was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claims 5 and 6 shall be denied.

**b.    Claim 7**

Petitioner alleges the trial court erred by excluding evidence impeaching prosecution witness Pridgon regarding mental illness, and evidence impeaching prosecution witnesses Allen, Thomas, and Woods regarding financial bias in favor of Pridgon, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 58-1 at 63-65; *see also* Doc. No. 105 at 154.)

    *i.*      *Supplemental Legal Standards*

    **(1)**    **Right of Confrontation**

The right to confront witnesses, guaranteed by the Sixth and Fourteenth Amendments, includes the right to cross-examine witnesses to attack their general credibility or show their possible bias or self-interest in testifying.  *Davis*, 415 U.S. at 316; *Franklin v. Henry*, 122 F.3d 1270, 1273 (9th Cir. 1997), *reversed in part on other grounds*; *Payton v. Woodford*, 346 F.3d 1204, 1218 (9th Cir. 2003) (exclusion of impeachment evidence, unrelated false accusations by the only percipient witness, was reversible error when the jury could only convict if they believed her); (*see also* section VII B, 1, a, *ante*.)

    *ii.*     *State Court Direct and Collateral Review*

Petitioner raised certain of these allegations on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. VII at 75-86), which were denied on the merits, *Lewis*, 26 Cal. 4th, at 374-76.

The full claim was raised in Petitioner's third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 18-23), which was summarily denied on the merits, (Doc. No. 69-2 at 1), and denied on procedural grounds (*id.*).

    *iii.*   *Analysis*

Petitioner faults the trial court for refusing to allow a psychiatrist in the courtroom to observe Pridgon's testimony for symptoms of mental illness (*see also* claim 4, *ante*), and for excluding evidence of the extent of mental illness and violent tendencies apparent from Pridgon's 1987 evaluation by Fresno County psychiatric technician Mancebo and psychologist Dr. Kinsey.

Petitioner also faults the trial court for excluding evidence that prosecution witnesses Allen, Thomas, and Woods, whom Pridgon had taken into his home, were financially biased in favor of Pridgon and to corroborate his testimony.

Petitioner argues these errors denied him the right to confront these witnesses and to a complete defense and a reliable and individualized conviction and sentence. *See Crane,* 476 U.S. at 690-91; *Chambers*, 410 U.S. at 302; *Beck,* 447 U.S. at 637-638; and *Stephens,* 462 U.S. at 879.

The California Supreme Court rejected the allegations on direct appeal, stating that:

To establish bias, defendant proffered evidence that three witnesses (Lorene Allen, Betty Thomas, and Jimmy Woods) lived with Pridgon and lived off Pridgon's $700 Supplemental Security Income (SSI) check each month. Defendant maintains that this evidence would show that these individuals had a monetary interest in protecting Pridgon because if Pridgon were incarcerated, he would no longer receive SSI checks, and they, too, would receive no money. The trial court sustained the objections to this impeachment evidence, ruling the prejudicial effect of this evidence outweighed any probative value.

Defendant also sought unsuccessfully to introduce evidence and to cross-examine Pridgon on certain issues to undermine his credibility. The trial court sustained the objection to the question to Pridgon whether Dr. Kinsey, who had prescribed Mellaril to him, called his mother asking Pridgon to return to see him. The trial court excluded the testimony and notes of a psychiatric technician who had interviewed Pridgon on June 24, 1987. Defendant also requested to have a psychiatrist or psychologist in the courtroom while Pridgon testified to determine whether Pridgon had the capacity to perceive and recollect. However, before the court could rule, trial counsel withdrew his request stating, "I just mooted [the issue]." The trial court also sustained objections to questions whether Pridgon ever hit anyone with a stick, and whether he ever carried a knife at night for protection. And the trial court prevented the defense from asking Pridgon whether he threatened to strangle defense counsel. Defendant contends the trial court committed error based on these rulings.

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal. 4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. (*People v. Alvarez*, *supra*, 14 Cal. 4th at p. 201.) "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues. [Citation.]" (*People v. Ayala* (2000) 23 Cal. 4th 225, 301 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Regarding constitutional limitations, we have held that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation.

Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citation.]" (*Ibid.*)

Applying the foregoing standard, we find no abuse of discretion. The probative value of the evidence that Allen, Thomas, and Woods received money from Pridgon was minimal because Pridgon testified at the preliminary hearing that he told Allen to help pay for rent when she got a job and told Woods either to help pay rent or to clean up. Thus, their financial dependence was not without limits. Further, any evidence of their bias in protecting Pridgon was already introduced because the record showed that the apartment where these individuals lived belonged to Pridgon, and that there was a preexisting, somewhat familial relationship between them, i.e., Pridgon sometimes called Allen "Mom," and Thomas had known Pridgon for eight years. The trial court also reasonably excluded evidence that Pridgon had said he wanted to strangle defense counsel. The prejudicial effect of this evidence outweighed any probative effect this evidence may have had on Pridgon's credibility or bias toward defendant.

The trial court also properly limited questions to Pridgon about whether he ever hit anyone with a stick or whether he ever carried a knife for protection. These questions were unlimited in time and of marginal relevance. However, defendant was permitted to question Pridgon as to whether he hit Simms with a stick and whether he cut Simms with a knife, to which questions Pridgon replied in the negative.

Moreover, defendant's question to Pridgon whether Dr. Kinsey phoned his mother to have Pridgon see him, and testimony from the psychiatric technician were properly excluded because the testimony would have been repetitive. Dr. Kinsey later testified regarding Pridgon's visits and missed appointments. Also, the technician's proposed testimony and her notes regarding Pridgon's mental state in 1987 had already been introduced through other expert witnesses. Contrary to defendant's contention, the trial court did not err by limiting the questioning and excluding the evidence.

Finally, defense counsel withdrew his request for a psychiatrist or psychologist to be present during Pridgon's testimony, thus precluding any cognizable appellate claim that the trial court abused its discretion on this evidentiary issue. "[T]he absence of an adverse ruling precludes any appellate challenge." (*People v. McPeters* (1992) 2 Cal. 4th 1148, 1179 [9 Cal.Rptr.2d 834, 832 P.2d 146].) Moreover, the jury heard ample expert evidence regarding Pridgon, and observed Pridgon firsthand as he testified. Thus, even without additional expert testimony, the jury was sufficiently equipped to make its ultimate decision on Pridgon's capacity to perceive and recollect. (*See People v. Anderson*, *supra*, 25 Cal. 4th at p. 576 [observing that psychiatric testimony would be less useful on issues relating to a witness's competency or credibility where the trier of fact on its own could evaluate the witness's demeanor and responses in view of evidence presented].)

*Lewis*, 26 Cal. 4th, at 374-76.

The Court finds the California Supreme Court was reasonable in denying these allegations, as follows.

232

**(1)    Evidence of Pridgon's Mental Illness**

2    Petitioner argues the trial court erroneously excluded certain evidence that: (i) County

3    intake psychiatric technician Delia Mancebo noted in 1987 that Pridgon exhibited mental

4    illness, paranoia and psychosis manifested in psychotic symptoms and violent impulses and

5    acts at least one year prior to Simms's murder (RT 5899-5900, 6079-83), (ii) Pridgon had

6    failed to make return visits to Dr. Kinsey and failed to follow Dr. Kinsey's [1987] mental

7    health treatment plan including use of the anti-psychotic drug Mellaril (RT 5906-5907, 5596-

8    97), (iii) Pridgon at times carried on his person a stick or a knife, (RT 5562-64) and may have

9    struck an individual with a stick, and (iv) during petitioner's trial, Pridgon expressed a desire to

10    strangle counsel Pedowitz (RT 5515-16, 5519-21).

11    The record reflects the trial court sustained prosecution objections to development of

12    this evidence.

13    **A.    Expert Testimony**

14    Petitioner contends the trial court erred by excluding (i) on grounds of undue

15    consumption of time, the testimony of Fresno County psychiatric technician Ms. Mancebo

16    regarding her intake notes when Pridgon presented at the County mental health department in

17    June of 1987, and (ii) on hearsay grounds, testimony by Pridgon relating to Dr. Kinsey's phone

18    call to Pridgon's mother regarding Pridgon's return visits for further treatment.

19    However, the California Supreme Court reasonably denied the allegations.  As that

20    court noted, the jury heard a series of trial experts testify at length to Pridgon's mental state.

21    *See* claim 1, *ante*.  Dr. Kinsey testified extensively to his 1987 examination of Pridgon, his

22    conclusion Pridgon demonstrated "schizophreniform disorder", and his treatment of Pridgon.

23    (RT 5898, 5900-01, 5904-06, 5910-12.)  Petitioner has not demonstrated that counsel's attempt

24    to cross-examine Pridgon regarding Dr. Kinsey's call to Pridgon's mother about a return visit

25    and missed visits (*see* RT 5596-5600) was other than objectionable hearsay (*see* Evid. Code §

26    1200) and duplicative of Dr. Kinsey's testimony discussed above, (*see* claim 1, *ante*); *see also*

27    *Lewis*, 26 Cal. 4th, at 375.

28

Dr. Moulder, who examined Pridgon in 1987, also testified to Pridgon's state of mind and treatment. (RT 6175-83, 6191-95, 6204-06, 6210, 6213-14.) Dr. Moulder testified that as to treatment: (i) Pridgon prematurely left his first appointment, (ii) he had Pridgon return a second time with his mother, and (iii) he met with Pridgon once more, but Pridgon missed three subsequent appointments. (RT 6176-77, 6182-83, 6188-89, 6199, 6201.) The jury heard Dr. Moulder testify that he concurred in Dr. Kinsey's diagnosis. (RT 6177-87.)

Dr. Terrell, a prosecution trial expert who examined Pridgon in 1987, testified to psychiatric technician Mancebo's observations that: (i) Pridgon was in special education classes for being a slow learner, (ii) Pridgon is paranoid, complaining people call him inappropriate names and stupid, (iii) in June of 1985, Pridgon was arrested and served seventeen days in jail for fighting with police officers who allegedly jumped on him, (iv) Pridgon had feelings of wanting to hurt others and himself, (v) Pridgon felt like killing the police officer who made a racial slur towards him, (vi) Pridgon would kill himself because he did not want to go to prison, (vii) Pridgon hears voices talking to him, (viii) Pridgon has no visual hallucinations, (ix) Pridgon's mind races at times and he cannot rest and walks the streets until 3:00 a.m., (x) Pridgon would like to work but nobody will hire him, (xi) Pridgon is on social security, (xii) Pridgon has below normal intelligence, and (xiii) Pridgon has very poor impulse control. (RT 6851-53, 6862-69; *see also* CT 69-70.)

Petitioner does not demonstrate a basis for admitting Mancebo's hearsay testimony of Pridgon's 1987 statements relating to his mental condition. (*See* RT 6079-98.) In any event, Dr. Terrell considered and testified to Mancebo's notes in forming his opinion of Pridgon's mental state. (*See* RT 6851-52, 6862, 6869.) The California Supreme Court reasonably could have concluded that Mancebo's further testimony would have been cumulative of the more probative direct evidence provided by the expert and thus reasonably subject to objection under section 352. (RT 6079-98); *see Lewis*, 26 Cal. 4th, at 375.

Dr. Terrell informed the jury that in his opinion a diagnosis of "atypical psychosis" was more appropriate than the schizophreniform disorder diagnosed by Drs. Kinsey and Moulder.

1  (RT 6760-70; *see also* RT 5947-48, 5954-56, 6022, 6065-66, 6068, 6071-72.)  Dr. Terrell
2  found Pridgon's condition to be suggestive of: (i) borderline intellectual functioning at the
3  level of a 7-year-old (RT 6763-70), (ii) mild mental retardation (RT 6768), (iii) substance
4  abuse (RT 6807), and (iv) personality disorder with anti-social traits (RT 6762).

5  Defense trial expert Dr. Pickering testified that he reviewed the reports of Drs. Kinsey,
6  Moulder, and Terrell.  (RT 5928, 6065, 6069.)  Dr. Pickering disagreed with the diagnosis of
7  Drs. Kinsey and Moulder that Pridgon presented with "schizophreniform disorder."  Instead,
8  Dr. Pickering agreed with prosecution expert Dr. Terrell's diagnosis of "atypical psychosis",
9  concluding Pridgon did not meet the criteria to be considered schizophrenic.  (RT 5947-48,
10  5954-56, 6022, 6065-66, 6068, 6071-72.)

11  For the reasons stated, the California Supreme Court reasonably could have found the
12  trial court did not err by excluding: testimony of psychiatric technician Mancebo that was
13  covered during expert testimony, and testimony by Pridgon relating to Dr. Kinsey's phone call
14  to Pridgon's mother regarding return visits for further treatment.

15  **B.    Sticks and Knives**

16  Petitioner contends the trial court erred by excluding on grounds of relevance,
17  vagueness as to time, and as more prejudicial than probative, certain testimony by Pridgon
18  relating to whether he carried a stick or knife.  (*See* Doc. No. 58-1 at 63-65, citing RT 5561-
19  69.)  He argues this evidence should have come in because it relates to testimony by other
20  witnesses and whether Pridgon's mental state manifest in violent acts and threats consistent
21  with Petitioner's accomplice theory.

22  The record reflects that during cross-examination, counsel sought to develop witness
23  testimony that Pridgon carried sticks and knives when walking about his former neighborhood.
24  Although some of counsel's questions relating to whether Pridgon felt his former
25  neighborhood was dangerous and whether he ever carried a knife or had hit anyone with a stick
26  were disallowed, (RT 5561-69), counsel was able to ask Pridgon whether he carried sticks and
27  removed sticks from fences for use as protection (*see* RT 5563).  Pridgon denied carrying

28

sticks and removing sticks from fences.  (*Id.*)

The California Supreme Court was not unreasonable upholding the trial court's exclusion of evidence on the noted grounds.  Petitioner fails to demonstrate how Pridgon's alleged conduct at unspecified times in his former neighborhood relates to matters in issue in this proceeding.  Nothing in the evidentiary record links Pridgon to the two-by-four used to kill Simms, or to participation in the attack upon Simms.

Similarly, counsel's questions relating to a knife appear untethered from the facts and circumstances of Simms's killing.  Dr. Nelson, the pathologist who performed the autopsy on Simms was unable to determine that two superficial cuts on Simms's neck were caused by a knife.  (RT 5620, 5659-61.)  The butter knife Pridgon disposed of for Petitioner after Simms was killed had no blood on it.  (RT 5572, 4331.)

For the same reasons, Petitioner has not demonstrated that exclusion of such evidence resulted in a fundamentally unfair and unconstitutional trial.  To the contrary, admission of such evidence would have been prejudicial because it suggested an inference of Pridgon's involvement in Simms's killing that was unsupported by the facts and circumstances surrounding the killing of Simms.  Additionally, the California Supreme Court reasonably and specifically rejected Petitioner's third-party culpability claims for the reasons discussed above.  (*See* claims 5-6, *ante*.)

### C.      Desire to "Strangle" Counsel

Petitioner contends the trial court erred by excluding evidence of Pridgon's alleged remark in a courthouse hallway that he wanted to strangle defense counsel.  (Doc. No. 58-1 at 64, citing RT 5515-19.)  He argues this evidence related to Pridgon's mental illness and propensity for violent acts and threats consistent with the accomplice defense; and alleged bias against defense counsel impacting Pridgon's credibility as a witness.

The record shows that out of the presence of the jury, the trial court sustained prosecution objection to this evidence on ground it was irrelevant and more prejudicial than probative under Evidence Code section 352.  (RT 5515-21.)  The trial court noted the evidence

was not probative of anything in the case; unrelated to Pridgon's credibility as a witness; and potentially confusing for the jury. (RT 5519.)

The California Supreme Court was not unreasonable upholding the trial court's exclusion of the evidence. Petitioner fails to demonstrate how Pridgon's passing remark regarding opposing counsel, overheard in a courthouse hallway outside the presence of the jury was probative of Pridgon's credibility or third-party liability so as to exceed the potential for prejudice and confusion. Notably, the trial court had been unreceptive to character evidence suggesting a propensity for violence. Especially so here, as no facts suggest the comment was meant literally or voiced anything other than passing displeasure with opposing counsel. The comment is not inferential evidence that Pridgon was liable in Simms's strangling; nothing in the factual record links Pridgon to Simms's killing.

Petitioner's further argument that the comment implied bias against the defense impeaching Pridgon's credibility is unsupported by the record and speculative, for the reasons stated.

To the extent Petitioner revisits his allegations the trial court improperly denied a defense motion to exclude all Pridgon's testimony on competency and credibility grounds, (*see* RT 5507), the allegations fail for the reasons discussed in claims 1 and 2, *ante*.

For the same reasons, Petitioner has not demonstrated that exclusion of such evidence resulted in a fundamentally unfair and unconstitutional trial.

**(2)    Defense Request for Psychiatrist in the Courtroom**

Petitioner argues that trial court erroneously denied a defense request that psychologist Dr. Pickering be present in the courtroom during Pridgon's testimony so that Pickering could consider whether Pridgon was competent to testify. (RT 4412-26.) Petitioner argues that given Pridgon's alleged difficulties determining reality from fantasy, Dr. Pickering could have testified whether Pridgon was "confabulating" while testifying, i.e. filling memory gaps with fantasy. (Doc. No. 58-1 at 63 ¶ 209, 65 ¶ 217; Doc. No. 89 at 161, citing RT 4423-25.)

However, as discussed more fully in claim 4, *ante*, counsel withdrew the request to

have Dr. Pickering evaluate Pridgon in court while the trial court had the request under consideration, seemingly acknowledging an apparent dearth of supporting authority. (RT 4484.)

The California Supreme Court considered and rejected the allegation on direct appeal, noting that:

> [D]efense counsel withdrew his request for a psychiatrist or psychologist to be present during Pridgon's testimony, thus precluding any cognizable appellate claim that the trial court abused its discretion on this evidentiary issue. "[T]he absence of an adverse ruling precludes any appellate challenge." (*People v. McPeters* (1992) 2 Cal. 4th 1148, 1179 [9 Cal.Rptr.2d 834, 832 P.2d 146].) Moreover, the jury heard ample expert evidence regarding Pridgon, and observed Pridgon firsthand as he testified. Thus, even without additional expert testimony, the jury was sufficiently equipped to make its ultimate decision on Pridgon's capacity to perceive and recollect. (*See People v. Anderson*, *supra*, 25 Cal. 4th at p. 576 [observing that psychiatric testimony would be less useful on issues relating to a witness's competency or credibility where the trier of fact on its own could evaluate the witness's demeanor and responses in view of evidence presented].)

*Lewis*, 26 Cal. 4th, at 375-76.

The California Supreme Court was reasonable in rejecting the allegation. Petitioner fails to provide authority that Dr. Pickering's proposed in-court observations would have been admissible as expert opinion, and more than duplicative of the seemingly replete expert and other testimony relating to Pridgon's mental state otherwise before the jury, including the testimony of Dr. Pickering. *See Richter*, 562 U.S. at 98 (petitioner bears of burden of showing "there was no reasonable basis for the state court to deny relief."). Moreover, Dr. Pickering examined Pridgon outside the courtroom and reviewed his mental health history and testimony in this proceeding and opined thereon, reasonably suggesting withdrawal of the request for in-court observation was tactically motivated.

(3)     **Evidence Impeaching Prosecution Witnesses Allen, Thomas and Woods**

Petitioner argues these witnesses were financially reliant upon Pridgon and may have shaded their testimony accordingly.

Petitioner sought to introduce evidence that prosecution witnesses Allen, Thomas, and

238

Woods, who testified that Pridgon told them Petitioner murdered Simms (Doc. No. 58-1 at 63-64; Doc. No. 89 at 160-61; *see also* RT 5226, 5336-37, 5579-80), were biased in favor of Pridgon because they lived in his apartment and benefitted from his SSI disability income (RT 5188-89, 5238-39, 5241-46).

Petitioner argues the excluded evidence would have "suggested … these witnesses … may well have coached Pridgon before he reported the murder to police … [and] had both motive and opportunity to instruct Pridgon to falsify his testimony in order to deflect suspicion from himself." (Doc. No. 58-1 at 63-64; *see also* Doc. No. 89 at 160.) Counsel Pedowitz argued to the jury: "I believe that [Allen] and her family [Thomas and Woods] think that as long as -- as long as [Pridgon] is a successful eyewitness in this case, they will continue to get their SSI check." (RT 5243-44.) Pedowitz argued that Allen took care of Pridgon and that his SSI check was the sole source of income for the family (RT 5241-42), such that the family was financially motivated to ensure Pridgon stayed out of trouble and avoided suspicion in Simms's killing and continued to receive his SSI check (RT 5226, 5242-44, 5336-37, 5579-5580).

The trial court refused to admit such evidence of financial bias, stating that:

> The probative value in my opinion of that impeach[ment] is outweighed by its prejudicial effect. To me it confuses the issue, it draws attention from the main issue. I don't see the connection between the witness's testimony that she's given so far and the fact that the family -- that Mr. Pridgon gets a check that he shares with the family, whether it's 100 percent of it, 99 percent, 95 percent. So the objection is sustained.

(RT 5246.)

The California Supreme Court agreed the evidence was properly excluded, stating that:

> The probative value of the evidence that Allen, Thomas, and Woods received money from Pridgon was minimal because Pridgon testified at the preliminary hearing that he told Allen to help pay for rent when she got a job and told Woods either to help pay rent or to clean up. Thus, their financial dependence was not without limits. Further, any evidence of their bias in protecting Pridgon was already introduced because the record showed that the apartment where these individuals lived belonged to Pridgon, and that there was a preexisting, somewhat familial relationship between them, i.e., Pridgon sometimes called Allen "Mom," and Thomas had known Pridgon for eight years.

*Lewis*, 26 Cal. 4th, at 375.

As noted, California trial courts have "wide discretion" in determining the relevancy of evidence. *Green*, 27 Cal. 3d, at 19. Even relevant evidence may be excluded where its probative value is exceeded by undue prejudice, confusion of the issues, or misleading of the jury. Evid. Code § 352. California courts retain similar latitude insofar as the confrontation clause is concerned and may limit cross-examination to avoid prejudice, confusion of the issues, or pursuit of marginally relevant evidence. *Van Arsdall*, 475 U.S. at 679.

Here, the probative value of impeaching financial bias evidence reasonably could be seen as minimal given that the jury was aware of the living arrangements between Pridgon, Allen, Thomas and Woods. The evidence before the jury, including that noted by the California Supreme Court in denying the claim, is sufficient to support the inference of financial bias argued by counsel. For example, the jury was aware of the relationship the family of three had with Pridgon and the apparently temporary circumstances that brought them to Pridgon's apartment. (RT 5188-89, 5228, 5238-39, 5289, 6237-38, 6257-59.) The jury knew that Allen's family and Pridgon's family had known each other for more than nine (9) years; Pridgon's mother suggested the Allen family move-in with Pridgon to their mutual benefit while the former got back on their feet upon relocating from Sacramento to Fresno (RT 5188-89, 5228, 5238-39, 5265-66, 5289, 6237-44, 6257-59); and Pridgon sometimes called Allen "Mom" (RT 5228, 5265-66, 6237, 6244); *see also Lewis*, 26 Cal. 4th, at 374-75.

The jury was aware of Pridgon's testimony that wanted to tell the police what he had just witnessed, but Allen told him, "Don't do that, because you will get yourself in big trouble you can't get out of." (RT 5337) - suggesting that Allen was trying to protect Pridgon and suggesting an inference of bias on her part.

It reasonably appears that the additional evidence of financial bias proffered by Petitioner was of marginal relevance and potentially time consuming and confusing to the point of undue prejudice.

(4) **Prejudice**

240

Petitioner argues these errors were prejudicial because Pridgon was the only eyewitness to Simms's killing and corroborating his testimony was key for the prosecution. (*See, e.g.*, RT 5317-19.)

However, even assuming arguendo the trial court erred as alleged, the California Supreme Court reasonably could have found no substantial and injurious effect or influence upon the jury's determination of its verdict. *Brecht*, 507 U.S. at 637. The excluded financial bias evidence is largely duplicative of the noted direct and circumstantial evidence otherwise before the jury including evidence developed by counsel upon examination of these witnesses. *See Van Arsdall*, 475 U.S. at 684 (confrontation clause violations are subject to a harmless error analysis which considers the importance of witness's testimony, whether statements are cumulative, presence or absence of corroboration, extent of cross-exam allowed, and overall strength of case); *Whelchel v. Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000) (*Brecht* test applies on federal habeas, but *Van Arsdall* factors are still relevant in assessing harmlessness of confrontation clause violation).

As discussed above, the jury was aware of evidence that Pridgon was previously acquainted with the Allen family and allowed them to temporarily move-in with him shortly before Simms's killing. Allen had only been living with him for about a month before Simms was killed (RT 6238-39); Woods had moved in four days earlier (RT 6238); and Thomas had just moved in (RT 5228). The jury was aware that Allen family members contributed in-kind to the combined household. For example, Allen testified that she shopped, cooked and cleaned for Pridgon during this time. (RT 5188-89, 5228, 5238-39, 5265-66, 5289, 6237-44, 6257-59; *see also* RT 6238-47, 5228.) The trial testimony is consistent with Pridgon's preliminary hearing testimony that he told Allen she could pay him rent when she got a job and that he told Woods to help pay rent or clean up. (CT 173-74.)

Similarly, the jury had seemingly abundant expert and other evidence before it relating to Pridgon's mental state and credibility. (*See, e.g.*, sections VII, B, 1, C, 2, *ante*.) Counsel was otherwise able to develop evidence relating to Pridgon's alleged habit of carrying sticks

and his allegedly violent tendencies. (*See, e.g.,* RT 4969, 5813-20, 6852, 6862.) Defense expert Dr. Pickering testified at length to his observations, examinations, and findings regarding Pridgon's mental state. (*See, e.g.*, RT 5846-97, 5927-64, 5975-6075.) The excluded evidence reasonably could be seen as largely duplicative and insubstantial given the totality of related evidence in the record. Particularly, Pridgon's hallway comment regarding his desire to "strangle" counsel lacked relevance to matters in issue and reasonably suggested prejudice and juror confusion outweighing any probative value. (*See* claims 1-2, 5-8.) The California Supreme Court reasonably could find exclusion of the noted evidence had no injurious impact on the outcome.

Additionally, even if the trial court erred by excluding Dr. Pickering from the courtroom as alleged, the California Supreme Court reasonably could have found Petitioner not to show prejudice. The jury otherwise had the benefit of Dr. Pickering's expert testimony and was able to consider and weigh Pridgon's testimony and credibility for itself.

### (5)   Conclusions

The California Supreme Court reasonably could find that the trial court did not prejudicially err by excluding evidence impeaching prosecution witness Pridgon as to his mental state, and evidence impeaching prosecution witnesses Allen, Thomas and Woods as to financial bias in favor of Pridgon.

For the reasons stated, it does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 7 shall be denied.

**c.   Claim 8**

Petitioner alleges the trial court erred by admitting hearsay testimony from district attorney investigator Bennett suggesting Petitioner had a motive to rob Simms, violating his

rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 58-1 at 66-67; *see also* Doc. No. 89 at 168-71.)

### i. *State Court Direct and Collateral Review*

Petitioner raised the claim on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. VII at 75-76, 84-85), which was denied on the merits, *Lewis*, 26 Cal. 4th, at 376.

The claim also was raised in Petitioner's third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 24-26), and summarily denied on the merits, (Doc. No. 69-2 at 1), and denied on procedural grounds *(id.)*.

### ii. *Analysis*

Petitioner argues the trial court erroneously overruled defense objection and allowed district attorney investigator Debra Bennett to testify to a hearsay statement made on October 15, 1990 by Petitioner's girlfriend, Michelle Boggs, that Petitioner had no money on the night Simms was murdered.  (RT 5270, 5279.)  He argues this error allowed the prosecution to establish motive for robbery and murder, including Petitioner's desire "to obviate the necessity of . . . returning money to [Simms] which had been given to [Petitioner] for the purpose of purchasing drugs."  (Doc. No. 58-1 at 67; *see also* Doc. No. 89 at 171.)

Petitioner argues this error denied him the right to confront Boggs's hearsay statement, resulting in an unreliable conviction and sentence.  (Doc. No. 89 at 168, citing *Ohio v. Roberts,* 448 U.S. 56, 66 (1980) (the confrontation right does not bar admission of statements of an unavailable witness if the statements "bea[r] adequate indicia of reliability", i.e., the evidence falls within a firmly rooted hearsay exception, or failing that, the evidence bears "particularized guarantees of trustworthiness"), *abrogated by Crawford v. Washington*, 541 U.S. 36, 59 (2004) (out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court); *see also Whorton v. Bockting*, 549 U.S. 406, 407 (2007) (*Crawford* does not apply retroactively on

habeas review).

(1)     **Admissibility of Boggs's Hearsay Statement**

Investigator Bennett, over Pedowitz's objection, testified that during a pretrial interview on October 15, 1990 Boggs told her that she was surprised Petitioner had a lot of crack when he returned with Pridgon and Thomas on the night Simms was killed because at that time Petitioner did not have any money.  (RT 5279; *see also* RT 4893-94, 5060-61, and 5271.)

Petitioner argues that error was prejudicial because Boggs' testimony at trial, though at times equivocal, was that she was unaware whether Petitioner had any money around the time of Simms's killing (RT 4891-94), and that she did not tell law enforcement that Petitioner wanted Simms's money because he was broke (RT 4827, 4893-95).

The record reflects testimony of detective Sanchez that shortly after the killing, Boggs similarly told him that on the day of Simms's killing Petitioner wanted money from Simms because he was broke (RT 4500-01, 4506, 5053-61), and that Boggs did not know where Petitioner could have gotten the cocaine they all smoked after Simms's disappearance (RT 5060*)*.

In rejecting Petitioner's claim of error, the California Supreme Court noted that:

> Over defendant's hearsay objection, Investigator Bennett testified that Boggs told her that she was surprised defendant had crack cocaine since he did not have any money, which statement tended to show defendant had a motive to rob and kill Simms. Defendant argues this statement prejudiced him because it directly contradicted the defense's case on this issue.

> We find no error. Although hearsay, this statement was admissible under the hearsay exception for inconsistent statements under Evidence Code section 1235. Boggs previously testified that defendant never told her he had no money, and that she did not recall whether she told the police that she told Simms that defendant wanted the $10 Simms owed him because he had no money.

> Because we find no error, we accordingly reject defendant's contentions that the foregoing exclusion and admission of evidence violated his various constitutional rights.

*Lewis*, 26 Cal. 4th, at 376.

244

The California Supreme Court presumably observed that Boggs was available for cross-examination at trial and was cross-examined by counsel Pedowitz such that Petitioner was not deprived of the opportunity to confront her testimony. (*See, e.g.*, RT 5012-18; *see also California v. Green*, 399 U.S. 149, 158 (1970) ("Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination").

Given the inconsistent statements noted by the California Supreme Court, (*see* RT 4893-94, 5279), that court was not unreasonable in finding the evidence admissible under the noted state law hearsay exception for prior inconsistent statements. (Evid. Code §§ 1235, 770.) Petitioner's argument that Boggs's statements to Bennett were consistent with her testimony (*see* Doc. No. 89 at 170) reasonably could be rejected. The record reflects that Boggs's testimony was that she did not know whether Petitioner had money; whereas Boggs's statements to law enforcement were that Petitioner had no money. (*See* RT 4893-94, 5060-61, 5271-79.)

Even assuming arguendo that the trial court erred in admitting investigator Bennett's challenged testimony, the California Supreme Court reasonably could find no federal constitutional violation. Petitioner was not denied the opportunity to confront and cross-examine Boggs regarding the hearsay statement. Admission of the hearsay statement did not result in a fundamentally unfair proceeding given the noted other evidence of Petitioner's motive and mens rea for the crimes against Simms.

(2)     Prejudice

Petitioner argues prejudice from the errant admission of Boggs's hearsay statement, singly and cumulatively with the alleged wrongly excluded evidence impeaching Pridgon and supporting third-party culpability (Doc. No. 89 at 171), because it tended to show motive to rob and kill Simms (*see* Doc. No. 58-1 at 66-67). Particularly so, Petitioner argues as Boggs was entitled to "special credibility" as Petitioner's girlfriend. (*Id.*)

However, the California Supreme Court reasonably could find that even if Boggs's

statement was errantly admitted, it did not have substantial and injurious effect in determining the jury's verdict. *Brecht*, 507 U.S. at 637.

Boggs had already testified that she had told someone she did not know where the money for the cocaine had come from and that Petitioner did not have any money earlier in the day. (RT 4893-94.) Boggs also testified that Petitioner was unemployed and looking for a job; he had not earned money for at least the past three weeks (RT 4910-11, 5019); and he was not known by her to have money (RT 6936). Petitioner himself testified that he was broke and possessed no other money when he went to purchase cocaine for Simms earlier that evening aside from what she had given to him. (RT 6341, 6594, 6609, 6625.) The jury heard similar testimony from detective Sanchez. Thus, Petitioner's lack of funds was otherwise in evidence.

Furthermore, the defense argued to the jury its theory that Petitioner had his own funds on the day of Simms's murder and thus was not motivated to kill Simms over money. The jury heard testimony suggesting that Petitioner had a bank account and a job selling drugs. (*See, e.g.*, RT 4914-15, 6359-77, 6625.)

To the extent Petitioner alleges cumulative error (*see* Doc. No. 89 at 171), the allegation fails for reasons discussed in claims 23 and 33, *post*.

### (3) Conclusions

The California Supreme Court reasonably could find that the trial court did not prejudicially err by admitting hearsay testimony from district attorney investigator Bennett suggesting Petitioner had a motive to rob Simms.

It does not appear that the state court rejection of these allegations was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 8 shall be denied.

### 3. Penalty Phase Claims

#### a. Claim 13

Petitioner alleges the trial court erred by refusing to instruct the jury on its right to exercise mercy, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1, at 77-78; *see also* Doc. No. 89 at 265-75.)

### i.   *State Court Direct and Collateral Review*

Petitioner raised the claim on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Three, Arg. XVI at 21-26), which was denied on the merits, *Lewis*, 26 Cal. 4th, at 393.

The claim also was raised in Petitioner's third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 39-41), which was summarily denied on the merits, (Doc. No. 69-2 at 1), and denied on procedural grounds (*id.*).

### ii.   *Analysis*

Petitioner argues that his right to a fair and reliable penalty determination was violated when the trial court refused a defense request to instruct the jury that it could exercise mercy. *See Caldwell*, 472 U.S. at 328-337; *Boyde*, 494 U.S. at 380-81; *Stephens,* 462 U.S. at 879.

Petitioner requested a special instruction that:

> In determining whether to sentence the defendant to life imprisonment without possibility of parole, or to death, you may decide to exercise mercy on behalf of the defendant.

(CT 863-64.)

The trial court rejected the proposed instruction (RT 8755-56) finding it cumulative of CALJIC 8.85, which was given by that court and instructed the jury that:

> In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors if applicable [¶] … (k)] Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspects -- aspect of the Defendant's character or record that the Defendant offers as a basis for sentence less than death, whether or not related to the offense for which he is on trial.

(RT 8937-39; *see also* CT 833-34, 842, 863-64, 875-77.)

1    The trial court also instructed the jury with CALJIC 8.88 that:

2

3         You are free to assign whatever moral or sympathetic value you deem
          appropriate to each and all of the various factors you are permitted to consider.

4    (RT 8942; *see also* CT 840-41, 872.)

5         The California Supreme Court considered and rejected the claimed error on direct

6    appeal, stating that:

7

8         Defendant requested the trial court to instruct the jury that "[i]n determining
          whether to sentence the defendant to life imprisonment without possibility of
9         parole, or to death, you may decide to exercise mercy on behalf of the
          defendant." He argues that the trial court's refusal to give the instruction
10        deprived him of his Eighth Amendment right to an individualized capital
          sentencing determination. Not so. We have cautioned that "the jury must ignore
11        emotional responses that are not rooted in the aggravating and mitigating
          evidence introduced during the penalty phase. [Citation.] The jury may not act
12        on whim or unbridled discretion." (People v. Clark (1992) 3 Cal. 4th 41, 164
          [10 Cal.Rptr.2d 554, 833 P.2d 561].) "The unadorned use of the word 'mercy'
13        implies an arbitrary or capricious exercise of power rather than reasoned
          discretion based on particular facts and circumstances. Defendant was not
14        entitled to a pure 'mercy' instruction." ( People v. McPeters, supra, 2 Cal. 4th
          1148, 1195.) Accordingly, the trial court did not err by refusing the instruction.

15        Moreover, the instruction was cumulative. The trial court instructed the jury
          with CALJIC No. 8.85, which allows the jury to consider "any sympathetic ...
16        aspect of the defendant's character, or record" in connection with the relevant
          statutory factors.  (People v. Nicolaus (1991) 54 Cal. 3d 551, 588-589 [286
17        Cal.Rptr. 628, 817 P.2d 893].) In closing argument, both defense counsel urged
          the jury to show sympathy and mercy to defendant. Thus, the trial court
18        adequately instructed the jury.

19   *Lewis*, 26 Cal. 4th, at 393.

20        Petitioner has not demonstrated that the California Supreme Court unreasonably

21   rejected the claim.  He does not point to any clearly established Supreme Court law as a basis

22   for relief.  *See Blystone*, 494 U.S. at 305 (it is sufficient that "jury be allowed to consider and

23   give effect to all relevant mitigating evidence"); *id.* at 308 (no general Eighth Amendment

24   requirement for a mercy instruction); *Brown*, 479 U.S. at 543 (instructing the jury that they

25   cannot consider mere sympathy for the defendant at penalty determination does not violate the

26   United States Constitution).  Similarly, as the California Supreme Court noted, under state law

27   Petitioner is not entitled to a "pure mercy instruction."  *Lewis*, 26 Cal. 4th, at 393.

28

Here, as Petitioner acknowledges, the jury was provided with an alternative "mercy verdict" form (*see* Doc. No. 58-1 at 77; CT 663, 963) that provided "the circumstances in aggravation substantially outweighed the circumstances in mitigation and, despite that fact, the jury selected the sentence of life without the possibility of parole." (CT 963.) Petitioner's suggestion that the jurors did not understand the noted instructions and the "mercy verdict" form, (*see* Doc. No. 89 at 266), reasonably could be seen as lacking support in the factual record and merely speculative. Notably, counsel failed to object to the "mercy verdict" form.

Even if the trial court erred as alleged, the California Supreme Court reasonably could find such error had no substantial and injurious effect on the jury's penalty selection. *Brecht*, 507 U.S. at 620. The requested instruction readily appears cumulative of the noted instructions given by the trial court. *See Lewis*, 26 Cal. 4th, at 393. The jurors were instructed to consider all the instructions together. (CT 756.) A federal court can presume that jurors follow all the instructions given them. *Weeks*, 528 U.S. at 234. Petitioner has not demonstrated on the evidentiary record any reasonable likelihood the jury applied the court's instructions so as to preclude consideration of constitutionally relevant evidence.

Furthermore, counsel for both sides touched on the issue of sympathy during penalty phase argument. Prosecutor Cooper told that jury (pursuant to CALJIC 8.85 citing Penal Code section 190.3(k)) that "Petitioner may present to you anything about himself in order to see if there might be a sympathetic response from you . . . [and that] if there's anything in the evidence that you feel is a -- is a mitigation, somehow arouses a sympathetic response in you, you can consider that, too." (RT 8845-46.) Prosecutor Cooper suggested to the jurors that in considering sympathetic evidence they reflect upon the evidence presented. (RT 8849-51.)

Counsel argued for mercy even if the jurors should find aggravating factors substantially outweigh mitigating factors. (RT 8879, 8889-94.) Counsel argued that jurors should show Petitioner "the sympathy that every human being deserves, whether they're a killer or not." (RT 8901.)

In sum, the California Supreme Court reasonably found the trial court did not

249

prejudicially err by refusing to instruct the jury on its right to exercise mercy.

The state court rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 13 shall be denied.

**F.      Claims Relating to Prosecutorial Misconduct**

1.      Legal Standards

**a.      Prosecutorial Misconduct**

A Petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643.

To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [state's action] is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Phillips*, 455 U.S. at 221 (quoting *Cupp,* 414 U.S. at 146). Ordinary trial errors by a prosecutor do not suffice in this regard. *Phillips*, 455 U.S. at 221.

The clearly established standard of review for claims of prosecutorial misconduct is a "narrow one of due process"; the federal habeas court must determine whether the alleged instances of misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *DeChristoforo*, 416 U.S. at 643).

In a habeas case, the Petitioner must establish the prosecutor's misconduct by a preponderance of the evidence. *United States v. Juan*, 704 F.3d 1137, 1142 (9th Cir. 2013).

Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. *Greer*, 483 U.S. at 765-66. The Court must keep in mind that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Phillips*, 455 U.S. at 219. "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting *Jeffries*, 5 F.3d, at 1191).

If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in *Brecht*. *See Thompson*, 74 F.3d, at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless."). A Petitioner is entitled to relief in this context only where the constitutional violations exerted a "substantial and injurious" effect on the judgment. *Brecht*, 507 U.S. at 620; *Fields*, 309 F.3d, at 1109 (stating the Ninth Circuit applies *Brecht* if misconduct of constitutional dimension is established), *amended* 315 F.3d 1062 (9th Cir. 2002).

### 2. Claim 24

Petitioner alleges the prosecution intentionally withheld significant exculpatory evidence in its possession and intentionally used misleading evidence relating to benefits prosecution witness Pridgon received in exchange for his testimony in this case, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and International Law. (Doc. No. 58-1 at 165-75; Doc. No. 89 at 60, 88-98.)

### a. Supplemental Legal Standards

#### i. *Brady Evidence*

If the state fails to disclose exculpatory evidence as required by *Brady v. Maryland*, the conviction cannot stand if there is a reasonable probability that the evidence, considered cumulatively, would have produced a different result at trial. 373 U.S. 83 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 441 (1995).

There are three components of a *Brady* violation: (i) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (ii) the evidence must have been suppressed by the state either willfully or inadvertently; and (iii) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]here is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281.

The Supreme Court has held that a federal court can grant habeas relief on a constitutional trial error claim only if the error had a "substantial or injurious effect" on the verdict. *Brecht*, 507 U.S. at 637. A new trial is warranted only if prosecutorial misconduct resulted in a fundamental denial of due process. *Darden*, 477 U.S. at 181. Where the issue is evenly balanced and the judge has doubts about whether the error had a "substantial and injurious effect" on the jury's verdict, then the judge must treat the error as if it were not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995); *see also California v. Roy,* 519 U.S. 2, 5 (1996) (ordinary test for harmless (non-structural) error in federal habeas corpus proceeding is whether the error had a substantial and injurious effect or influence in determining the jury's verdict). Once a habeas Petitioner establishes the "reasonable probability" of a different result, the error cannot subsequently be found harmless under *Brecht. Kyle*s, 514 U.S. at 436.

ii. *Napue Evidence*

Under *Napue v. Illinois*, the knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. 360 U.S. 264 (1959). The knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. *Id.* at 269. The Court explained that the principle a state may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty." *Id.*

A conviction obtained by the knowing use of perjured testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678. Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony. *See United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995). "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies." *Id.*

To warrant habeas relief, a petitioner must establish that: (i) the testimony was actually false; (ii) the prosecution knew or should have known that the testimony was actually false; and (iii) the false testimony or evidence was material. *Soto v. Ryan*, 760 F.3d 947, 957-58 (2014). False testimony is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 958 (citing *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005)).

> **b.    State Court Direct and Collateral Review**

Petitioner presented the claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 30-46), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

> **c.    Analysis**

Petitioner argues that the prosecution concealed and allowed its witness Pridgon to testify falsely as to substantial benefits Pridgon received in exchange for his cooperation and testimony in Petitioner's case. He argues that after Pridgon began cooperating with the state in 1988, Pridgon benefitted from the state's determination not to seek probation violations, custodial holds and/or enhancements despite his lengthy criminal record, in the following crimes: (i) a December 1988 theft of a lawnmower, charged in January 1989 as receipt of stolen property (Penal Code § 496(1), M89026486-1) where Pridgon benefitted from a 3 year suspended sentence that was never imposed; (ii) an August 1989 commercial arson (Penal Code § 452(d), M89033836-8) where Pridgon benefitted from a conditional guilty plea

resulting in dismissal of the charge after Petitioner's trial ended; (iii) a November 1989 conviction of felony burglary (Penal Code § 459, F429498-9) where Pridgon benefitted by being placed on probation that was not violated upon subsequent offenses; (iv) an August 1990 conviction for being under the influence of cocaine (Health and Safety Code § 11550, M90040555-5) where Pridgon benefitted from a 3 year suspended sentence that was never imposed; and (v) an October 1990 commercial burglary in Fresno (Penal Code § 459, F90040048-8) where Pridgon benefitted by delaying his guilty plea until after Petitioner's trial ended whereupon he received the statutory low term, essentially for time served. (Doc. No. 58-1 at 165; *see also* Doc. No. 89 at 88; 2SHCP Ex.'s 6, 8, 9, 10; RT 6413-23.)

Petitioner argues these non-disclosed benefits were material and the prosecutorial misconduct was prejudicial because Pridgon's testimony, unimpeached by this evidence, was essential to the prosecution's case. (Doc. No. 58-1 at 165; *see also* Doc. No. 89 at 88.) He notes that Pridgon was the star witness to Simms's killing. (*See, e.g.*, RT 5317-19; 5322-25; 5542-43); *see also Kyles*, 514 U.S. at 444 (finding undisclosed evidence tending to undermine the reliability of key witness testimony was material); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (finding undisclosed deal with key prosecution witness was material non-disclosure).

Still, the California Supreme Court reasonably denied these allegations, as follows.

### i.    *No Benefit Conferred*

Petitioner testified at trial to his belief that Pridgon received preferential treatment in exchange for his testimony. (RT 7025-29.) He argues that the prosecution acknowledged as much during post-conviction discovery. (2SHCP Ex. 7.)

Prosecutor Cooper countered at trial that the defense team had been provided discovery which did not show any such benefit. (*See* RT 7025-39.) Counsel Pedowitz retorted outside the presence of the jury that "the prosecutor had covered his tracks beautifully so [the defense] can't get the information." (RT 7034.)

Specifically, Petitioner proffers evidence that: (i) a three year sentence imposed on the

254

receipt of stolen property charge was suspended and never imposed notwithstanding Pridgon's noted subsequent criminal violations (2SHCP Ex. 9), (ii) the arson charge was dismissed on favorable terms following a no-bail release notwithstanding issuance of bench warrants for failure to appear (*see* 2SHCP Ex. 8); and failure to comply with a condition to dismissal (that he not be arrested within six months on any similar matters) due to his arrest on the commercial burglary charge (*see* 2SHCP Ex.'s 6, 9, 10), (iii) a three year sentence imposed on the cocaine charge was suspended and never imposed (*see* 2SHCP Ex.'s 6, 9 & 10), and (iv) a sixteen month sentence imposed on the commercial burglary charge was the low-end term and was imposed only after Petitioner's proceeding was concluded (*see* 2SHCP Ex.'s 6, 9, 10).

Petitioner also proffers Pridgon's 2006 habeas declaration in which he states that:

> Around the time I testified in [Petitioner's] murder case, I was arrested for burglary and arson. I [also] had other cases against me around the time of [Petitioner's] murder case. [¶] Before I testified in [Petitioner's] murder case, the District Attorney had agreed to help me in my cases. [¶] The District Attorney helped me get a lighter sentence in my cases I had around the time of [Petitioner's] murder case. [¶] The District attorney helped me because I was a witness and testified in [Petitioner's] murder case. The District Attorney kept his word and helped me in my cases.

(Doc. No. 82 at V-GG Ex. 1.)

Petitioner argues these benefits were not disclosed to the defense team. He points to counsel Hart's habeas declaration stating that prior to or during trial, the defense was never informed of or provided with information that Pridgon was receiving benefits of any sort in relation to his trial testimony. (2SHCP Ex. 14.)

Even so, the California Supreme Court reasonably rejected the *Brady* allegations. Pridgon testified at trial that no one had told him he would be helped in these regards or as to his pending matters if he testified for the prosecution in Petitioner's case. (RT 5462-66.) He acknowledged his noted criminal background and pending proceedings and at that time denied any prosecution benefit. (*Id.*) More specifically, he admitted at trial that he had a felony burglary conviction and that he was then on three years' probation for that offense and for a separate charge of being under the influence of cocaine. (RT 5437, 5463, 5585.)

The parties stipulated to the jury that Pridgon had been convicted of felony burglary in November 1989 and of being under the influence of cocaine in August of 1990 and that he was placed on probation for both charges. (RT 6908.) Pridgon admitted that he was then in custody on a commercial burglary charge. (RT 5462.) He acknowledged that a probation violation could result in a long sentence. Pridgon's criminal records included in his habeas proffer show that he was held in custody in lieu of bail during November 1989 and July-August 1990. (2SHCP Ex. 8 at 172-74.)

Counsel Pedowitz acknowledged on the record that in September 1990, he questioned Pridgon about any deals he might have with the prosecution in response to which Pridgon stated he had called prosecutor's Cooper's office regularly, but that Cooper had never spoken to him. (RT 5379.)

Additionally, Pridgon's statement in his habeas declaration that the district attorney helped him get "a lighter sentence" does not alone show or imply a benefit conferred. Nothing suggests the "sentence" or sentencing range applicable to Pridgon's offenses absent the alleged prosecutorial intervention, or Pridgon's understanding of such. Moreover, the California Supreme Court reasonably could have discounted Pridgon's seemingly uncorroborated habeas declaration to the extent inconsistent with his trial testimony, on grounds the trial testimony was proximal to the events in issue, and on credibility grounds given Pridgon's status as a felon.

The California Supreme Court reasonably could have viewed Pridgon's noted criminal dispositions (i.e., the release from detention on "own recognizance," conditional guilty plea and ultimate dismissal of the arson prosecution, and unimposed suspended sentences) as reflective of the relative strength/weakness of the prosecution's cases related to those charges, consistent with standard practice and procedure prevailing in the Fresno County District Attorney, courts, and jail at that time, rather than benefits in consideration of his testimony against Petitioner. (*See, e.g.*, 2SHCP Ex. 8.)

Regarding the arson charge, Petitioner only speculates that Pridgon's "no bail" release

256

1  was preferential.  (Doc. No. 89 at 88.)  Particularly so, as it appears Pridgon was placed in

2  custody in lieu of bail upon arrest for his failures to appear.  (*See* 2SHCP Ex. 8 at 172-74.)

3  Moreover, Petitioner has not identified new offenses by Pridgon, similar to arson, that

4  necessarily violated his conditional guilty plea.  (*See* Doc. No. 89 at 88-89); *People v.*

5  *Martinsen*, 193 Cal. App. 3d 843, 849 (1987) (state court has discretion regarding revocation

6  of probation and re-imposition of a suspended sentence).

7        Petitioner's argument that the prosecution favored Pridgon by not violating his

8  probation appears refuted by the record.  For example, Fresno County probation officer Gerald

9  Wade testified that Pridgon was on probation in September 1990 as a result of a felony

10  burglary conviction and that he was violated on the basis of a subsequent offense (i.e.,

11  Pridgon's admitted Health & Safety Code section 11550 violation of being under the influence

12  of a controlled substance).  (RT 7144-46, 7173-93.)  The jury was aware Pridgon was on

13  probation and in jail at the time of Petitioner's trial.  (*Id.*; *see also* RT 7281-82.)  Although the

14  trial court appears to have cut-off Wade's further testimony finding it irrelevant (RT 7193), the

15  prosecutor then sought a stipulation regarding probation and the consequences of it (RT 7235-

16  41), which resulted in the jury being advised that "being placed on probation may include a

17  requirement that one spend time in a county jail … as opposed to a state penitentiary, and may

18  include other sanctions."  (RT 7246.)  It appears that counsel Pedowitz acknowledged

19  Pridgon's receipt of a concurrent sentence for the above probation violation.  (RT 7189.)

20        Regarding Pridgon's 1990 burglary plea disposition and sentence, Petitioner appears

21  merely to speculate that this was a favorable disposition because it was delayed until the

22  conclusion of Petitioner's proceeding.  (*See* Doc. No. 50 Ex. I-6 at 112.)  The California

23  Supreme Court reasonably could have found that no benefit was conferred in Pridgon's

24  burglary case.

25        Regarding Petitioner's suggestion that Pridgon benefitted from unlevied criminal

26  enhancements, Petitioner fails to demonstrate on the factual record what enhancements, if any,

27  would have been available.  Here again, his suggestion Pridgon was benefited appears

28

speculative.

Furthermore, Prosecutor Cooper's 2005 habeas declaration disclaims the suggestion that Pridgon received any benefit in exchange for his testimony in Petitioner's proceeding. Cooper stated therein that:

> Paul Pridgon was a prosecution witness in that case. Due to the passage of time, I do not specifically recall one way or the other whether Mr. Pridgon received any benefits in exchange for his testimony. However, if he had received any benefits, I would have readily disclosed that information to the defense and would have put it on the record.
>
> I am informed that no information concerning any benefits in exchange for Mr. Pridgon's testimony was disclosed to the defense and that no information concerning any such benefits appears on the record and thus, I must deduce that no such benefits ever existed.

(Doc. No. 82 at V-EE Ex. B.)

Additionally, the jury was able to consider all evidence going to Pridgon's credibility. For example, the jury was instructed that "you must base your decision on the facts …" (RT 7392); "you must determine the facts from the evidence *received* in this trial and not from any other source" (*id.*); and "do not consider for any purpose any offer of evidence that was rejected or any evidence that was stricken by the Court. Treat it as though you had never heard of it." (RT 7394.)

The prosecution acknowledged Petitioner's noted *Brady* allegations, telling the jury that "you'll decide whether there's been anything that hasn't been occurring that should be occurring." (RT 7281-82.) The jury is presumed to have followed the court's instructions. *Weeks*, 528 U.S. at 234.

The Supreme Court has characterized the relative importance of instructions and argument as follows:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence … and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are

subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

*Boyde*, 494 U.S. at 384-85.

For the reasons stated, the California Supreme Court reasonably found Petitioner had not demonstrated these noted dispositions were benefits Pridgon received in exchange for his testimony in Petitioner's proceeding. Moreover, that court reasonably could have observed that Pridgon might have been motivated to testify against Petitioner given the latter's defense theory that Pridgon participated as an accomplice in Simms's killing. (*See, e.g.,* RT 4211, 4498-4499, 5813-24, 5836-39, 5950, 6448-49, 6749, 6770-71, 7098-7100, 7343.)

  *ii. No Presentation of False Evidence*

Petitioner argues the prosecution knowingly allowed Pridgon to testify falsely as to the alleged material benefits discussed above. However, the California Supreme Court reasonably found otherwise, for the reasons stated and those discussed below.

Petitioner has not shown that Pridgon's testimony at trial was incomplete or false regarding his noted criminal matters. For example, the jury heard testimony regarding Pridgon's felony probation (RT 5437, 5463, 5585; *see* RT 6908); in-custody status for commercial burglary (RT 5462); and lack of expectation that the prosecution would assist him (RT 5462-64). Counsel Pedowitz acknowledged the absence of any deal, stating that:

> Excuse me. I have to intercede. In [Prosecutor] Cooper's behalf, I'll alert the [c]ourt to the fact that I questioned Mr. Pridgon in September regarding any deals he might have with the District Attorney's office. And at that time he told me and my investigator that he did call Mr. Cooper's office regularly, but that Mr. Cooper had never spoken to him; and that he kept talking to Mr. Cooper's secretary, leaving messages for him.

(RT 5379.) Later, Pedowitz appears to concede that he was speculating as to alleged favoritism toward Pridgon. (*See* RT 7240.)

It also appears the prosecution was forthcoming as to Pridgon's criminal matter that

259

arose during Petitioner's trial. The record shows that October 31, 1990, the day after Pridgon's arrest on a burglary charge, prosecutor Cooper provided a counsel with the relevant police report (RT 5184) and agreed to provide other relevant reports (*id.*), while noting equal availability of such information in the public record (RT 5185; *see also* Doc. No. 89 at 88-89).

### iii. *Prejudice*

Petitioner argues that he would have been acquitted, or a lingering doubt defense in mitigation would have been successful absent the alleged prosecutorial misconduct. (*See* Doc. No. 58-1 at 174-75.) He argues the habeas proffer demonstrates his actual innocence and unlawful conviction. (*Id.,* citing *Schlup v. Delo*, 513 U.S. 298, 331 (1995).)

However, for the reasons stated, the California Supreme Court reasonably rejected Petitioner's proffer that Pridgon received undisclosed benefits and falsely denied them at trial. For the same reasons, that court could have found no reasonable probability or likelihood of a different verdict had the proffered evidence been presented to the jury. *See Strickler,* 527 U.S. at 281; *Soto*, 760 F.3d, at 958. The jury was well acquainted with the issue of Pridgon's credibility and the evidence before it in that regard.

### iv. *Conclusions*

The California Supreme Court reasonably rejected Petitioner's claim the prosecution intentionally withheld significant exculpatory evidence in its possession and intentionally used misleading evidence relating to benefits prosecution witness Pridgon received in exchange for his testimony in this case.

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 24 shall be denied.

3.      Claim 26

Petitioner alleges that after trial, the prosecution and/or law enforcement intentionally

260

1  and in bad faith failed to preserve material evidence, violating his rights under the Fifth, Sixth,

2  Eighth, and Fourteenth Amendments, and International Law.  (Doc. No. 58-1 at 182-84; *see*

3  *also* Doc. No. 89 at 299-303.)

4          **a.**       **Supplemental Legal Standards**

5          *i.*       *State's Failure to Preserve Evidence*

6          Where the government fails to preserve evidence that is only potentially exculpatory,

7  the right to due process is violated only if [the evidence] possesses "an exculpatory value that

8  was apparent before the evidence was destroyed, and [is] of such a nature that the defendant

9  would be unable to obtain comparable evidence by other reasonably available means."

10 *Trombetta*, 467 U.S. at 489.

11         According to the court in *Arizona v. Youngblood*, the failure of a state to preserve

12 evidence "of which no more can be said than it could have been subjected to tests, the results

13 of which might have exonerated the defendant," is not a denial of due process of the law

14 "unless a criminal defendant can show bad faith on the part of the police."  488 U.S. 51, 57

15 (1988).

16         The Ninth Circuit used the *Youngblood* standard for a claim of bad faith destruction of

17 evidence in *U.S. v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir. 1997), stating "the mere failure

18 to preserve evidence which could have been subjected to tests which might have exonerated

19 the defendant does not constitute a due process violation.*"*

20         **b.**       **State Court Direct and Collateral Review**

21         Petitioner presented the claim in his second state habeas petition (Cal. Sup. Ct. No.

22 S131322, Doc. No. 50 at 56-59), which was summarily denied on the merits, and denied on

23 procedural grounds (Doc. No. 69-1 at 1).

24         **c.**       **Analysis**

25         Petitioner's argues that Fresno Police Department files provided to habeas counsel in

26 2004 suggest potentially exonerating evidence was destroyed in 2001.  (2SHCP Ex. 11 at 302-

27 05, Ex. 12; CT 458-67.)  He points to the following evidence, untested forensically, that was

28

destroyed: (i) the blue top and pants allegedly taken by detective Sanchez from Pridgon's apartment, items Petitioner contends he [Petitioner] was wearing the night Simms was killed (RT 5062, 5176, 5183, 5720, 6339-40; 2SHCP Ex. 11 at 239-40); (ii) the brown slippers Petitioner alleges were taken by police from his boarding house; (iii) paint residue taken from a fence in the alley where Simms was killed that the defense theorized was from a white Cadillac allegedly involved in Simms's killing (RT 4896, 6532-36); and (iv) Simms's fingernail scraping. (*See* 2SHCP Ex. 15.)

However, the California Supreme Court reasonably rejected the claim, as follows.

i.      *Exculpatory Value*

Petitioner cites to the habeas declaration of forensic science expert Dr. Keith Inman and argues the evidence destroyed should have been reviewed by a qualified forensic scientist in order to expose limitations in the prosecution testing and presentation including that the PGM blood typing used by the prosecution is less discriminating that other methods. (2SHCP Ex. 15 ¶¶ 3-5.) He argues that such review and testing "is of the type which, upon appropriate examination, could have served to exonerate [Petitioner]." (Doc. No. 58-1 at 183; *see also* 2SHCP Ex. 15 ¶¶ 3-6.) He complains particularly that the noted blue top and pants were not tested for biological materials; the brown slippers were not tested for exonerating foot impression evidence; the paint residue from the fence board was not tested to determine whether it came from an unspecified white Cadillac; and the fingernail scrapings from Simms were not tested for a match to an alternative suspect such as Pridgon.

But the California Supreme Court reasonably could have determined that Petitioner's proffer had at most only minimal exculpatory value. The record suggests the blue top and pants were collected by police detective Sanchez on June 10, 1988 from Pridgon's apartment and that these items belonged to Pridgon. (RT 5062, 5176, 5183, 5720; *see also* 2SHCP Ex. 11.) Petitioner has not pointed to facts in the record suggesting that either he or Pridgon wore these clothes on the night of Simms's murder, or that these items are otherwise linked to Simms's killing. The habeas declaration of criminalist John Hamman confirms these items

were not tested because they were not linked to Petitioner.  (Doc. No. 82 at V-EE Ex. C at 8.)

It appears the brown slippers also were collected by police from Pridgon's apartment and belonged to him.  (RT 4498-99, 4507-08, 6928-29, 6931-33, 6944.)  Petitioner has not demonstrated that Pridgon was wearing the slippers when Simms was killed, or that the slippers are otherwise linked to Simms's killing.  He does not appear to argue or show that an interior foot impression was sought and would have been other than cumulative of the testimony and demonstrative evidence in the record regarding the fit of the tennis shoes relative to Petitioner and Pridgon.  Nowhere does he point to an unidentified relevant crime scene footprint.  In contrast, the bloody white tennis shoes admitted into evidence were the subject of testimony by a defense footwear salesperson and were subject to examination by the jurors themselves.  (RT 5835-40, 5843-44, 6446-47, 6744-47.)

The record reasonably suggests the paint mark on the fence was not left by a white Cadillac on the night Simms was killed because vegetation between alleyway pavement and the fence appeared undisturbed with no indication that a car had passed close to the fence.  (RT 6524-38, 6543, 6550-54, 6557.)  The fencing throughout the forty-foot-long alley showed possible vehicular damage.  (*See* RT 6569.)  Damage from automobile traffic running the length of the fence reasonably suggests sources other than the alleged white Cadillac and that the paint mark on the fence board admitted in evidence was unrelated to Simms's killing.  Moreover, at trial Pridgon denied seeing a car in the alley that night.  (RT 5590.)  In any event, Petitioner has not demonstrated the fence board containing the paint mark introduced at trial (CT 466, Defendant's Ex. EE; RT 6547; 2SHCP Ex. 11 at 324) is unavailable from the Fresno Superior Court.  The record suggests only that the board is in storage with that court and has not been located.  (*See* Doc. No. 82 at V-EE Ex. F at 55-56; 2SHCP Ex. 11 at 305); *see Youngblood*, 488 U.S. at 57.

As to the fingernail scrapings, Petitioner's suggestion this evidence could have potential exculpating value is supported only by speculation.  Pathologist Dr. Nelson who performed the autopsy on Simms testified that she likely did not struggle with her assailant.

(RT 5628-31, 5655-71.) Petitioner has not suggested how, given Dr. Nelson's testimony, Simms could have collected any exculpatory forensic evidence under her fingernails. Petitioner's proffered habeas declaration from Dr. Keith Inman, who states that further forensic review and examination of the pertinent evidence would have been advisable, is not evidence otherwise given the noted facts and circumstances of this case. (*See* 2SHCP Ex. 15.)

Accordingly, the California Supreme Court reasonably could have found that the noted evidence, here destroyed, is of the type "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. Such evidence falls short of the threshold suggesting a constitutional violation. *Id.*

### ii.       *Bad Faith Attributable to Authorities*

Petitioner argues inferential evidence that the noted items were destroyed in bad faith. He points to the habeas declaration of Ronald Weber, a police procedures consultant and former Fresno Police Department officer. (*See* 2SHCP Ex. 18.) Weber opines that all the evidence should have been properly preserved to avoid unduly dissipating evidentiary value because all potential legal proceedings, including trial, appellate, collateral and administrative, had not yet been concluded, especially so as this is a capital case. (*Id.*) Based on Weber's opinion, Petitioner argues the authorities in this case were at least reckless in their destruction of the items, to suggest bad faith failure to preserve exculpatory evidence. (*See* Doc. No. 58-1 at 184 citing *Trombetta*, 467 U.S. at 488-89; *Youngblood*, 488 U.S. at 81, 85.)

However, the California Supreme Court reasonably could have determined the evidence was inadvertently destroyed, without authorization from prosecutor Cooper, by the Fresno police department in order to make room in their evidence storage facility and based on latter's apparent belief that no appeals were pending. (*See* Doc. No. 82 at V-EE Ex.'s B, D, E, H); *see also Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997) (destruction of evidence containing untested bloodstain was at most was negligent such that failure to preserve the evidence did not constitute denial of due process). Petitioner has not made any other or further showing on the

record.

iii. *Conclusions*

The California Supreme Court reasonably rejected Petitioner's claim the prosecution and/or law enforcement intentionally and in bad faith failed to preserve material evidence. Petitioner has not shown bad faith on the part of the police or the prosecution. In this case, any failure to preserve mere potentially exculpatory evidence appears not to constitute a denial of due process. *Youngblood*, 488 U.S. at 57-58; *Grisby*, 130 F.3d, at 371; *Mitchell v. Goldsmith*, 878 F.2d 319, 322-23 (9th Cir. 1989) (same for when police lost two photo lineups that had been shown to victim where defendant's photo was not included and victim failed to identify anyone).

It does not appear that the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 26 shall be denied.

**G.     Claims Relating to Constitutionality of California's Death Penalty Statute**

Petitioner alleges in multiple claims that California's death penalty statute is unconstitutional, asserting grounds previously rejected by the California Supreme Court. *Lewis*, 26 Cal. 4th, at 393-95.

The state court's findings as to purely state law points raised by Petitioner is final and its interpretation is binding on this Court. State law error, if any there be, is not alone a basis for federal habeas relief. *See Pulley*, 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

As discussed below, the California Supreme Court reasonably denied Petitioner's allegations of federal constitutional error.

1.     Claim 20

Petitioner alleges that the use of lethal injection as provided by Penal Code section

265

3604 constitutes cruel and unusual punishment, violating his rights under the Eighth Amendment.  (Doc. No. 58-1 at 131-36; Doc. No. 89 at 297-98.)

### a. Legal Standards

#### i. *Cruel and Unusual Punishment*

The Eighth Amendment prohibits punishments that are "incompatible with the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102 (1976).

Executions that "involve the unnecessary and wanton infliction of pain," *Gregg,* 428 U.S. at 173, or that "involve torture or a lingering death," *In re Kemmler,* 136 U.S. 436, 447 (1890), are not permitted.

### b. State Court Direct and Collateral Review

Petitioner raised this claim in his first state habeas petition.  (Cal. Supreme Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 18 at 130-40.)  The state court summarily denied the claim on the merits.  (*Id.* at II-P at 1.)

### c. Analysis

Petitioner argues that lethal injection, the only available means for carrying out his death sentence constitutes cruel and unusual punishment because it presents a great risk of malfunction and, consequently, of imposing unnecessary pain and that the chance for human error compounds the probability of unnecessary pain.  (Doc. No. 58-1 at 132.)  He argues his death sentence must be vacated because California lacks a constitutional method of execution.  (*Id.* at 136.)

Petitioner points to a number of executions by lethal injection outside California that he suggests show a risk of inflicting torture or a lingering death or the unnecessary and wanton infliction of pain.  (*See* Doc. No. 58-1 at 132-35.)

However, Petitioner's federal habeas claim relating to lethal injection is premature and shall be dismissed without prejudice, for the reasons that follow.

#### i. *Standing to Challenge Lethal Injection*

266

Petitioner argues that his execution must be carried out by lethal injection because: he has not selected the statutorily available alternative method of execution by lethal gas (*see* Doc. No. 58-1 at 131 citing Penal Code § 3604), and execution by lethal gas is unconstitutional (*id.* at 136).

California allows inmates to choose execution by either lethal injection or lethal gas not later than 10 days following service upon the inmate of an execution warrant. Penal Code § 3604(b).

Here, Petitioner retains the option of choosing either statutory method of execution because no execution warrant has issued. *See Fierro v. Terhune*, 147 F.3d 1158, 1160 (9th Cir. 1998) (inmate lacked standing to challenge constitutionality of California's method of execution by lethal gas where inmate did not choose and was not subject to execution by lethal gas). Petitioner's reliance upon *Dear Wing Jung v. United States*, 312 F.2d 73, 75-76 (9th Cir. 1962), an immigration case, as authority otherwise is misplaced. The court in *Dear Wing Jung* found unconstitutional a sentencing condition that provided a "choice" between imprisonment in the U.S. or deportation and separation from spouse and family – that court found the latter option to be either cruel or unusual punishment or a denial of due process. *Id. Dear Wing Jung* has nothing to do with the constitutionality of execution of sentence under Penal Code section 3604.

Additionally, Petitioner has not pointed to either federal or state authority that execution by lethal gas constitutes cruel and unusual punishment under the Eighth Amendment. *See Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1984), *aff'd*, 77 F.3d 301 (9th Cir. 1996), *cert. granted, judgment vacated*, 519 U.S. 918 (1996), *and vacated sub nom. Fierro v. Terhune*, 147 F.3d 1158 (9th Cir. 1998) (execution by lethal gas is unconstitutional cruel and unusual punishment under the Eighth Amendment).

*ii.* *Habeas Challenge to California's Lethal Injection Protocol is Premature*

Petitioner alleges that the lethal injection protocol in effect at the time he filed his amended petition, San Quentin Institutional Procedure 770 which included the use of sodium

thiopental, poses an unacceptable likelihood of a painful death.  (Doc. No. 58-1 at 136, citing *Morales v. Hickman*, 438 F.3d 926, 929 (9th Cir. 2006) (noting in a § 1983 action that "sodium thiopental will not have its desired [anesthetic] effect.").)

To the extent Petitioner challenges the use of lethal injection generally, his claim is precluded by the Supreme Court's decision in *Baze v. Rees,* 553 U.S. 35 (2008).  Therein the Supreme Court*,* reviewing an Eighth Amendment challenge to Kentucky's lethal injection protocol, upheld the use of lethal injection as a method of carrying out the death penalty.  *Id.* at 48, 62-63.  The Court observed that the Eighth Amendment prohibits "wanton exposure to objectively intolerable risk, not simply the possibility of pain."  *Id.* at 61-62.

To the extent Petitioner challenges California's lethal injection protocol, his claim is premature on the grounds discussed below.

### (1)     Petitioner's Execution is not Imminent

Petitioner has not shown an execution date has been set in his case.  His execution is not imminent.  *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998) (claim concerning competency to be executed previously dismissed as premature because execution was not imminent); *Poland v. Stewart*, 117 F.3d 1094, 1104-05, (9th Cir. 1997) (claim relating to lethal gas as method of execution not ripe for judicial decision); *Cook v. Brewer*, 649 F.3d 915, 918 (9th Cir. 2011) (Eighth Amendment violation requires showing of risk that is sure or very likely to cause needless suffering and sufficiently imminent dangers).

### (2)     Petitioner does not Challenge California's Current Protocol

The execution protocol in place when Petitioner filed his 2008 amended petition twice has been revised.  A 2010 lethal injection protocol was held invalid by the state court on procedural grounds.  *See* Cal. Code Regs. tit. 15, § 3349 *et seq.*; *see also Payton v. Cullen,* 658 F.3d 890, 893 n.1 (9th Cir. 2011) ("[T]he California Office of Administrative Law approved a revised protocol on July 30, 2010, with an effective date of August 29, 2010"); *Sims v. Dep't of Corrections and Rehabilitation,* 216 Cal. App. 4th 1059, 1084 (2013) (revised protocol held invalid and enjoined for non-compliance with California's Administrative Procedures Act).

Petitioner acknowledged as much in subsequent briefing of his motion for evidentiary hearing, requesting therein that proceedings on this claim be suspended until "conclusion of the *Morales v. Cal. Dep't of Corr. & Rehab*, 168 Cal. App. 4th 729 (2008), litigation [enjoining lethal injection pending compliance with the state Administrative Procedures Act] and its regulatory aftermath." (*See* Doc. No. 109 at 32.)

A 2018 lethal injection protocol was promulgated following California's adoption of Proposition 66, The Death Penalty Reform and Savings Act of 2016 approved by the voters on November 8, 2016. The state now has a one-drug (barbiturate) lethal injection execution protocol in place. *See* Cal. Code Regs. tit. 15 § 3349.1(i) (2018); *see also Briggs v. Brown*, 3 Cal. 5th 808, 831 (2017) (the exemption from the Administration Procedure Act removes procedural impediments to execution protocols that are evident in published cases). However, the constitutionality of the 2018 protocol is the subject of ongoing litigation in the Northern District of California and a stay upon execution of defendants therein is in effect pending conclusion of the litigation. *See Morales v. Kernan*, No. 06-CV-0219 RS, 2017 WL 8785130, at *3 (N.D. Cal. Dec. 4, 2017) (granting motions to intervene and staying execution pending conclusion of litigation challenges to the constitutionality of California's lethal injection protocol).

For the reasons stated, claim 20 fails to allege the unconstitutionality of California's current lethal injection protocol, which is subject to challenge and stay in the noted separate proceeding.

Additionally, to the extent Petitioner requests that his death sentence be vacated, he fails to provide authority that the alleged unconstitutionality of California's proposed method of execution of sentence impacts the validity of his death sentence. *See, e.g.*, *People v. Welch*, 20 Cal. 4th 701, 800 (1999) (constitutionality of the method of execution bears solely on the legality of the execution of sentence and not on the validity of the sentence itself).

iii.    *§1983 Challenge to California's Lethal Injection Protocol*

To the extent Petitioner asserts a challenge under 42 U.S.C. § 1983 to application of a

269

state lethal injection protocol on grounds of unnecessary suffering, without challenging his underlying conviction or sentence (*see* Doc. No. 58-1 at 136; Doc. No. 89 at 297-98), the California Supreme Court reasonably could have concluded habeas relief is unavailable for such a claim. *See Hill v. McDonough*, 547 U.S. 573, 582 (2006); *Brown v. Ornoski*, 503 F.3d 1006, 1017 n.5 (9th Cir. 2007). Petitioner appears to concede as much. (*See* Doc. No. 89 at 297-98.)

       *iv.*    *Conclusions*

Petitioner lacks standing to challenge and does not challenge California's current lethal injection protocol. Any habeas challenge to the current protocol is premature. Additionally, habeas relief is unavailable with respect to Petitioner's challenge to California's lethal injection protocol under 42 U.S.C. § 1983.

Claim 20 shall be denied, without prejudice, as premature.

    2.    Claim 21

Petitioner alleges in the following ten subclaims A through J that California's death penalty statute is unconstitutional. (Doc. No. 58-1 at 137-52; *see also* Doc. No. 89 at 275-94.) The California Supreme Court reasonably rejected the subclaims, as follows.

    **a.**    **Subclaims A and B**

Petitioner alleges in subclaims A and B that Penal Code sections 190.2 and 189 (respectively) are unconstitutionally overbroad because (i) nearly all (section 189) first degree murders can be charged under the (section 190.2) special circumstances, and (ii) felony murder is death eligible without any homicidal mens rea - violating rights under the Fifth, Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 137-41; *see also* Doc. No. 89 at 275-83.)

       *i.*    *Legal Standards*

    **(1)**    **Arbitrary and Capricious Sentence**

A state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the

circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). If the "state system satisfies these requirements," then the "state enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Id.* (citing *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988), *Stephens*, 462 U.S. at 875-876, n.13).

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder. *Sawyer v. Whitley*, 505 U.S. 333, 342 (1992). A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors." *Id.*; *see also Gregg*, 428 U.S. at 196-97.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict," the test announced in *Brecht*. *Coleman*, 525 U.S. at 145-46.

ii.      *State Court Direct and Collateral Review*

Petitioner raised subclaim A on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 26-31), which was denied on the merits, *Lewis*, 26 Cal. 4th, at 393-94. He raised the same claim in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 16 at 124-28), which was summarily denied on the merits, (Doc. No. 14 at II-P at 1). He again raised the claim in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 55-63), which also was summarily denied on the merits, (Doc. No. 69-2 at 1).

Petitioner raised subclaim B in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 17 at 128-30), which was summarily denied on the merits, (Doc. No. 14 at II-P at 1). Petitioner again presented it to the state court in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 62-63), which also was summarily denied on the merits, (Doc. No. 69-2 at 1).

iii.      *Analysis*

Petitioner argues California's death penalty scheme, which includes death eligible

1  felony-murder offenses, is unconstitutional because it is arbitrary and unpredictable and fails to

2  genuinely narrow the class of murders eligible for the death penalty, violating his Eighth and

3  Fourteenth Amendment rights.

4     Petitioner argues that under Penal Code sections 189 (first degree murder) and 190.2

5  (death eligible special circumstances) "nearly all murders in California can be charged as

6  capital offenses." (Doc. No. 58-1 at 137; *see also id.* at 138 n.18, citing Steven F. Shatz &

7  Nina Rivkind, *The California Death Penalty Scheme: Requiem for Furman?* 72 N.Y.U. L. Rev.

8  1283 (1997).) He argues that most of those who could be convicted of first degree murder are

9  statutorily eligible for the death penalty, yet only a small portion of murderers who are

10  statutorily eligible for the death penalty are actually sentenced to death.

11    Petitioner cites to *People v. Anderson*, 43 Cal. 3d 1104 (1987), *superseded by statute as*

12  *stated in People v. Mil*, 53 Cal. 4th 400, 408-09 (2012), and argues that California's death

13  penalty scheme is unconstitutional because it allows death eligibility without any intent

14  element for the actual killer. This, he contends, does not comport with Supreme Court

15  authority that the death penalty must be reserved for those killings which society views as the

16  most "grievous . . . affronts to humanity," *Stephens,* 462 U.S. at 877 n.15 (citing *Gregg,* 428

17  U.S. at 184); and that the accused's mental state is critical to a determination of suitability for

18  the death penalty. (*See* Doc. No. 58-1 at 141 citing *Enmund v. Florida*, 458 U.S. 782, 798

19  (1982) (Eighth Amendment violated where death penalty imposed upon accomplice who

20  neither killed not intended killing take place).)

21    In rejecting this claim on direct appeal, the California Supreme Court stated that:

22

23  > Contrary to defendant's contention, section 190.2 is not impermissibly broad.
   > (*People v. Jenkins*, *supra*, 22 Cal. 4th at p. 1050; *People v. Bradford* (1997) 14
   > Cal. 4th 1005, 1058 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Ray* (1996)
24  > 13 Cal. 4th 313, 356-357 [52 Cal. Rptr. 2d 296, 914 P.2d 846].) We have noted
   > that the categories of special circumstances have not been construed in an
25  > unduly expansive manner. (*People v. Arias* (1996) 13 Cal. 4th 92, 187 [51 Cal.
   > Rptr. 2d 770, 913 P.2d 980].) Contrary to defendant's suggestion, we see no
26  > basis to revisit the issue. We conclude that "[h]aving been found guilty of
   > intentional murder in the course of robbery, defendant falls within the 'subclass'
27  > of murderers who are eligible for the death penalty." (*Ibid.*)

28

*Lewis*, 26 Cal. 4th, at 393-94. The California Supreme Court has further held that:

> California's scheme for death eligibility satisfies the constitutional requirement that it "not apply to every defendant convicted of a murder [but only] to a subclass of defendants convicted of murder. [(*Tuilaepa v. California* (1994) 512 U.S. 967 (1994).]" Even after 1990 additions by virtue of Propositions 114 and 115, the special circumstances set forth in the statute are not over inclusive by their number or terms. [(*e.g., People v. Stanley* (1995) 10 Cal. 4th 764, 842-843 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Crittenden*, supra, 9 Cal. 4th 83, 154-156 [noting 1990 amendments]; *People v. Wader* (1993) 5 Cal. 4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80])] [N]or have the statutory categories been construed in an unduly expansive manner. [(*Crittenden*, *supra*, at p. 155).] Having been found guilty of an intentional murder in the course of a robbery, defendant falls within the "subclass" of murderers who are eligible for the death penalty. [(*Pulley v. Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871] [upholding 1977 death penalty law]; *see also People v. Bacigalupo* (1993) 6 Cal. 4th 457, 467 [24 Cal.Rptr.2d 808, 862 P.2d 808] [noting essential identity of 1978 scheme].)]

*People v. Arias*, 13 Cal. 4th 92, 186-87 (1996) (citing *Pulley*, 465 U.S. at 53) (upholding the 1977 death penalty law).

The Ninth Circuit has noted the constitutionality of felony murder statutes, stating that:

> The United States Supreme Court has upheld the constitutionality of the death sentence for felony murder where the defendant killed, attempted to kill or intended that lethal force be used. [Footnote] *See, e.g., Cabana v. Bullock*, 106 S. Ct. at 696-97, 700 (permitting imposition of death sentence if state court first made required findings of culpability in robbery felony murder case); *Jurek v. Texas*, 428 U.S. at 268, 270, 96 S. Ct. at 2955 (kidnaping-rape felony murder); *Gregg v. Georgia*, 428 U.S. at 160-61, 96 S. Ct. at 2919 (aggravating circumstances found were that murders were committed in course of robbery and for the purpose of furthering robbery).

*McKenzie v. Riley*, 842 F.2d 1525, 1540-41 (9th Cir. 1988).

Under California's death penalty statute, a defendant may be sentenced to death for first-degree murder if the trier of fact finds the defendant guilty and finds true one or more of special circumstances listed in Penal Code section 190.2. As relevant here, one of the circumstances is a robbery-murder special circumstance, which when applied to the actual killer does not require any homicidal mens rea. (*See* CT 49, CALJIC 8.80, CT 650, CALJIC 8.81.17 citing Penal Code 190.2(a)(17)); *see also McKenzie*, 842 F.2d at 1540-41 (noting that the Supreme Court has upheld the constitutionality of the death sentence for felony murder

where the defendant killed, attempted to kill or intended that lethal force be used).

The California Supreme Court was not unreasonable in finding this sentencing scheme satisfies clearly established constitutional requirements. *See Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (2002) (California's sentencing scheme adequately narrows the class of persons eligible for death). First, the subclass of defendants eligible for the death penalty is rationally narrowed to those who have the predicate felony of robbery. *Tuilaepa*, 512 U.S. at 969-73. The robbery special circumstance sufficiently guides the sentencer and is not unconstitutionally vague. *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (the sentencer's discretion must be guided by "clear and objective standards."). For the reasons stated, the Court is unpersuaded by Petitioner's suggestion that *Tuilaepa* is inapplicable to analysis of narrowing at the death eligibility stage. (*See* Doc. No. 89 at 282 citing *Tuilaepa*, 512 U.S. at 975.)

In *California v. Ramos*, the United States Supreme Court stated that "once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious. 463 U.S. at 1008-09. At the selection stage, an individualized determination includes consideration of the character and record of the defendant, the circumstances of the crime, and an assessment of the defendant's culpability. *Tuilaepa*, 512 U.S. at 972-73. However, the jury "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979.

The California Supreme Court reasonably determined that California's death penalty scheme in effect in 1990 did not fail to genuinely narrow the class of murderers eligible for the death penalty. California's scheme, which narrows the class of death eligible offenders to less than the definition of first degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court, *Tuilaepa*, 512 U.S. at 972-79; *Pulley*, 465 U.S. at 38, and this Court, *see Ben-Sholom v. Woodford*, Case No. 1:93-CV-F-93-5531 AWI (E.D. Cal. October 5, 2001).

274

Accordingly, the state court rejection of these subclaims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaims A and B shall be denied.

**b.    Subclaim C**

Petitioner alleges that prosecutors have unbounded discretion whether to seek the death penalty, violating his rights under the Eighth Amendment. (Doc. No. 58-1 at 143; *see also* Doc. No. 89 at 283-84.)

*i.    Legal Standards*

**(1)    Prosecutorial Discretion**

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict," the test announced in *Brecht*. *Coleman*, 525 U.S. at 145-46.

*ii.    State Court Direct and Collateral Review*

Petitioner raised subclaim C in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 64-65), which was summarily denied on the merits (Doc. No. 69-2 at 1).

*iii.    Analysis*

Petitioner alleges that unbridled prosecutorial discretion whether to seek the death penalty combined with California's overbroad death penalty statute permits reliance upon constitutionally irrelevant and impermissible considerations, such as race and socio-economic status, resulting in arbitrary implementation of the punishment. (*See* Doc. No. 89 at 284.) He

argues such discretion "leaves the prosecutor free to seek the death penalty in almost every murder case," (*see* Doc. No. 58-1 at 143, citing *People v. Morales,* 48 Cal. 3d 527 (1989), disapproved by *People v. Williams*, 49 Cal. 4th 405, 459 (2010)), denying him equal protection. (Doc. No. 105 at 198 citing *Bush v. Gore*, 531 U.S. 98 (2000).)

Petitioner argues that such arbitrariness is apparent in his case because the single special circumstance found true, robbery-murder, is duplicative of the separately charged offense of robbery. (Doc. No. 89 at 284.)

However, the California Supreme Court's rejection of the subclaim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

The Supreme Court has held that the mere existence of prosecutorial discretion over charging decisions does not deny equal protection or render a capital punishment scheme unconstitutional absent some showing that a particular decision was based on a discriminatory standard. In rejecting a petitioner's argument that the Georgia capital punishment system operated in a discriminatory manner, the Supreme Court held, "absent a showing that Georgia's capital punishment system operates in an arbitrary and capricious manner, [the petitioner] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987).

Further, the Court has held that prosecutorial charging decisions are "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Prosecutorial discretion "is essential to the criminal justice process", *McCleskey*, 481 U.S. at 297, and does not violate the federal Constitution. The Constitution forbids only "purposeful discrimination" in the exercise of that prosecutorial discretion, *id.* at 292-93, and

in order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297. It follows that the fact California's statutory scheme gives the prosecutor discretion does not violate the United States Constitution. *See* 28 U.S.C. § 2254(a); *Gregg*, 428 U.S. at 225.

Here, Petitioner appears not to allege that the prosecutor exercised discretion in a discriminatory manner in his case. (*See* Doc. No. 58-1 at 143; *see also* Doc. No. 89 at 283-84.) His apparent reliance upon a dissenting opinion by Justice Mosk in *Morales* relating to overbreadth of the lying-in-wait special circumstance (*see* 48 Cal. 3d, at 575), is not authority supporting his challenge to prosecutorial discretion.

Moreover, Petitioner's "failure to narrow" allegations fail for the reasons stated, *ante*.

Accordingly, the state court rejection of the subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaim C shall be denied.

**c.    Subclaim D**

Petitioner alleges that California's death penalty scheme fails to require "proof beyond a reasonable doubt" as to aggravating factors, aggravation outweighing mitigation, and death being the appropriate penalty, violating his rights under the Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 143-44; *see also* Doc. No. 89 at 284-86.)

*i.    Legal Standards*

**(1)    Standard of Proof at Sentencing Phase**

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict,"

under *Brecht.  Coleman*, 525 U.S. at 145-46.

ii.     *State Court Direct and Collateral Review*

Petitioner raised subclaim D in his direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 39-41), which was denied on the merits, *Lewis,* 26 Cal. 4th, at 394.

Petitioner presented the same allegation in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 65-66), which was summarily denied on the merits (Doc. No. 69-2 at 1).

iii.     *Analysis*

Petitioner argues the failure of the state to prove these sentencing determination factors under the beyond a reasonable doubt standard, or by any articulated standard for that matter, in order to ensure that "capital punishment [is] imposed fairly, and with reasonable consistency, or not at all," denied him due process and equal protection.  (Doc. No. 58-1 at 144, citing *Eddings,* 455 U.S. at 112; *see also* Doc. No. 89 at 285.)

In rejecting this claim, the California Supreme Court stated that:

> Contrary to defendant's contentions, juries are not required to (1) make written findings regarding aggravating circumstances, (2) achieve unanimity as to aggravating circumstances, (3) find beyond a reasonable doubt that either aggravating circumstances are proved (other than other criminal conduct) and the aggravating circumstances outweigh those in mitigation, or that death is the appropriate penalty. (*People v. Jenkins*, *supra*, 22 Cal. 4th at p. 1053, citing *People v. Arias*, *supra*, 13 Cal. 4th at p. 190; *People v. Marshall* (1990) 50 Cal. 3d 907, 935-936 [269 Cal. Rptr. 269, 790 P.2d 676]; *People v. Rodriguez* (1986) 42 Cal. 3d 730, 777 [230 Cal. Rptr. 667, 726 P.2d 113].) Also, a trial court need not instruct as to any burden of proof when determining the sentence to be imposed. (*People v. Jenkins*, *supra*, 22 Cal. 4th at pp. 1053-1054.)

*Lewis*, 26 Cal. 4th, at 394.

State and federal courts have rejected this allegation.  *See, e.g. Williams v. Calderon*, 52 F.3d 1465, 1484-85 (9th Cir. 1995); *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992); *People v. Webb*, 6 Cal. 4th 494, 536 (1993).  Under California law "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the

278

1  determination of the appropriate penalty remains a question for each individual juror." *People*

2  *v. Samayoa*, 15 Cal. 4th 795, 853 (1997).

3       Petitioner's argument that the Constitution requires the jury to determine beyond a

4  reasonable doubt that death is the appropriate penalty runs contrary to the conclusion of a

5  plurality of the Supreme Court that a defendant may constitutionally be required to establish

6  the existence of mitigating circumstances by only a preponderance of the evidence standard.

7  *Carriger*, 971 F.2d at 334, (citing *Walton v. Arizona*, 497 U.S. 639, 649-651 (1990), *rev'd on*

8  *other grounds, Ring v. Arizona*, 536 U.S. 584, 589 (2002)).

9       In California, for a defendant to be eligible for the death penalty, the jury must, beyond

10  a reasonable doubt, find him guilty of murder in the first degree, and must find true one of the

11  special circumstances set forth in Penal Code section 190.2. *Tuilaepa*, 512 U.S. at 975. But

12  once a defendant is convicted, "the prosecution has no burden of proof that death is the

13  appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a

14  judgment of death." *People v. Anderson*, 25 Cal. 4th 543, 589 (2001). Instead, the clearly

15  established law at the time Petitioner's conviction became final vested the jury with "unbridled

16  discretion in determining whether the death penalty should be imposed after it has found that

17  the defendant is a member of the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at

18  979-80.

19       Further, "the United States Supreme Court has never stated that a beyond a reasonable

20  doubt standard is required when determining whether a death penalty should be imposed."

21  *Harris v. Pulley*, 692 F.2d 1189, 1195 (1982), *rev'd on other grounds by Pulley v. Harris,* 465

22  U.S. 37, 41 (1984). Nor is there any Supreme Court authority requiring a burden of proof or

23  persuasion be assigned to any of the jury's penalty phase determinations. On the contrary, the

24  Supreme Court has held that no "specific method for balancing mitigating and aggravating

25  factors in a capital sentencing proceeding is constitutionally required." *Marsh*, 548 U.S. at

26  175. California's death penalty sentencing scheme has been consistently upheld as

27  constitutional by the Supreme Court. *Tuilaepa*, 512 U.S. at 975-80; *Pulley*, 465 U.S. at 53.

28

1    In these regards, the California Supreme Court has held that:

2

3         We also reject defendant's contention that the California death penalty law
      violates the Eighth and Fourteenth Amendments because the jury is not
4     instructed as to *any* burden of proof in selecting the penalty to be imposed. As
      we have explained, '[u]nlike the guilt determination, "the sentencing function is
5     inherently moral and normative, not factual" … and, hence, not susceptible to a
      burden-of-proof quantification.' … The instructions as a whole adequately
6     guide the jury in carrying out their 'moral and normative' function." (*People v.
      Jenkins, supra,* 22 Cal. 4th at pp. 1053–1054, 95 Cal. Rptr. 2d 377, 997 P.2d
7     1044.) The death penalty statute is not unconstitutional because it fails "to
      impose a burden of proof on either party, even if only proof by a preponderance
8     of the evidence, or, alternatively, in failing to instruct the jury on the absence of
      a burden of proof. [Citations]." (*People v. Vines* (2011) 51 Cal. 4th 830, 891,
9     124 Cal. Rptr. 3d 830, 251 P.3d 943.)

10   *People v. Tully*, 54 Cal. 4th 952, 1068 (2012).

11        Here, the jury was instructed that aggravating criminal conduct must be proved beyond

12   a reasonable doubt.  (RT 8940-41.)  They were instructed to consider the applicable factors of

13   aggravating and mitigating circumstances and that in order to find for death each juror must be

14   persuaded that the aggravating evidence and/or circumstances is so substantial in comparison

15   with the mitigating circumstances that it warrants death instead of life without parole.  (RT

16   8942-43; *see also* CT 840-41 (CALJIC 8.88).)  Due process requires no more.  *Harris*, 692

17   F.2d at 1194.

18        California is not required to adopt specific standards for instructing the jury on

19   consideration of aggravating and mitigating circumstances.  *Stephens*, 462 U.S. at 890; s*ee also*

20   *Ortiz*, 149 F.3d at 944 (citing *Stephens*, 462 U.S. at 880) (the Constitution requires only that a

21   state provide procedures to guide the sentencer's discretion generally).  The Ninth Circuit has

22   rejected argument otherwise.  *See Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).  As to

23   Petitioner's claim that the jury must determine that death is the appropriate penalty beyond a

24   reasonable doubt, this too has been rejected.  *Harris*, 692 F.2d at 1195.

25        For the reasons stated, the state court then reasonably found the requirement under

26   California's death penalty statute, that the jury weigh aggravating and mitigating factors before

27   imposing the death penalty, adequately guarantees the jury's discretion will be guided and its

28

considerations deliberate.

Accordingly, the state court rejection of this subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaim D shall be denied.

### d. Subclaim E

Petitioner alleges that California's death penalty scheme fails to require inter-case and intra-case proportionality, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 144-45; *see also* Doc. No. 89 at 286-87.)

#### i. *Legal Standards*

##### (1) **Sentencing Proportionality**

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. A death penalty law must narrow the class of death-eligible defendants, and provide for individualized penalty determination. *McCleskey*, 481 U.S. at 308.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "[a] substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

#### ii. *State Court Direct and Collateral Review*

Petitioner presented certain of these allegations on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 43-46), which were denied on the merits, *Lewis*, 26 Cal. 4th, at 394-95.

Petitioner fully presented the subclaim in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 66-68), which was summarily denied on the merits (Doc. No. 69-2 at 1).

*iii.*    *Analysis*

Petitioner argues that the lack of proportionality review exposed him to the possibility that the jury failed to consider all mitigating evidence and sentenced him arbitrarily, and denied him meaningful appellate review.  He argues his death sentence is unreliable because of these errors.  He argues that *Pulley v. Harris* should not be seen as authority otherwise because that decision considered California's prior (1977) death penalty statute which contained significantly fewer special circumstances.  (*See* Doc. No. 105 at 204.)

Petitioner points to other states, Florida, Louisiana and Ohio, that he suggests review capital sentences for proportionality.  (*See* Doc. No. 58-1 at 144-45, citing *Woods v. State*, 733 So. 2d 980 (Fla. 1999); *State v. Snyder*, 750 So. 2d 832 (La. 1999); *State v. Ashworth*, 706 N.E. 2d 1231 (Ohio 1999).)

Petitioner also argues that California's death penalty scheme unconstitutionally denies him the very inter-case and intra-case proportionality review that is afforded non-capital inmates.  (*See* Doc. No. 89 at 286, citing Penal Code section 1170.)

The California Supreme Court considered and rejected these allegations on the merits, stating that:

> We also reject defendant's claim that because it does not require inter-case proportional review, the California death penalty statute ensures arbitrary, discriminatory, or disproportionate impositions of death sentences. "[U]nless a defendant demonstrates that the state's capital punishment law operates in an arbitrary and capricious manner, the circumstance that he or she has been sentenced to death, while others who may be similarly situated have received a lesser sentence, does not establish disproportionality violative of the Eighth Amendment." (*People v. Crittenden* (1994) 9 Cal. 4th 83, 157 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Moreover, we disagree that defendant is denied equal protection and substantive due process because noncapital defendants receive some comparative review under the determinate sentencing law. (*People v. Jenkins*, *supra*, 22 Cal. 4th at p. 1053.)

*Lewis*, 26 Cal. 4th, at 394-95.

The California Supreme Court reasonably could have found Petitioner's intra-case and inter-case proportionality subclaim to be foreclosed by the Supreme Court's decision in *Pulley*

*v. Harris.* Therein, the Supreme Court reviewed California's death penalty procedure and considered the fact that California did not require any sort of comparative proportionality review. The Supreme Court found that the Eighth Amendment did not require a "state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." *Pulley*, 465 U.S. at 43-44.

The Supreme Court also held that "on its face, [California's] system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman v. Georgia*, [408 U.S. 238 (1972)] and our subsequent cases." *Pulley*, 465 U.S. at 53. The Supreme Court considered and upheld California's 1977 scheme where "a person convicted of first degree murder is sentenced to life imprisonment unless one or more special circumstances are found, in which case the punishment is either death or life imprisonment without parole", *Pulley*, 465 U.S. at 51; "the judge is required to state on the record the reasons for his findings [denying a] motion for modification [of the verdict]", *id.* at 53; and "there is an automatic appeal [from denial of a motion for modification]", *id.* at 53.

The California Supreme Court reasonably could find that Petitioner has not provided authority supporting his argument that California's 1978 death penalty scheme is infirm based upon an increase in the number of special circumstances. Nor has he demonstrated on that basis that California's 1978 statute is overbroad, for the reasons stated in subclaims A and B, discussed *ante*.

Notably, the California Supreme Court has rejected the intra-case and inter-case proportionality claim in numerous cases. *Lewis*, 26 Cal. 4th, at 394-95; *see also People v. Sanchez*, 12 Cal. 4th 1, 83-85 (1995), *disapproved on other grounds by People v. Doolin*, 45 Cal. 4th 390, 421 n.22 (2009); *People v. Cox*, 53 Cal. 3d 618, 692 (1991), *disapproved on other grounds by People v. Doolin*, 45 Cal. 4th 390, 417 (2009).

As discussed above, in order to satisfy constitutional requirements a death penalty law must narrow the class of death-eligible defendants and provide for an individualized penalty

determination. *McCleskey,* 481 U.S. at 308. California's 1978 death penalty meets these requirements, *Rodriguez,* 42 Cal. 3d 730, 777-779 (1986), and has been upheld as constitutional by the Supreme Court. The federal court has rejected proportionality review. *Pulley*, 465 U.S. at 53, as has the California Supreme Court. Any error of state law alone generally is not cognizable on federal habeas. *McGuire*, 502 U.S. at 67.

For the reasons stated, the state court rejection of the subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaim E shall be denied.

### e. Subclaim F

Petitioner alleges that Penal Code section 190.3(a) "circumstances of the crime" sentencing factor is impermissibly vague, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 58-1 at 145-47; *see also* Doc. No. 89 at 287-89.)

#### i. *Legal Standards*

##### (1) Ambiguity and Vagueness

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

The Supreme Court has affirmed that the proper inquiry when an instruction is challenged as ambiguous is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Brown v. Payton*, 544 U.S. 133, 143 (2005) (quoting *Boyde*, 494 U.S. at 380). The Supreme Court further emphasized:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process,

with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Payton*, 544 U.S. at 143 (quoting *Boyde*, 494 U.S. at 380-81).

If the reviewing court finds constitutional error, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

### *ii.    State Court Direct and Collateral Review*

Petitioner raised the subclaim on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 31-38), which was denied on the merits, *Lewis*, 26 Cal. 4th, at 394.

Petitioner again raised the subclaim in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 68-71), which was summarily denied on the merits (Doc. No. 69-2 at 1).

### *iii.    Analysis*

Petitioner argues that the "circumstances of the crime" capital sentencing factor has been applied "in such a wanton and freakish manner that all features of any murder, even features exactly at odds with those of other murders, have been found to be aggravating within the statute's meaning." (Doc. No. 58-1 at 145; *see* Doc. No. 89 at 287.) He argues this factor is so broad as to allow aggravating weight to be placed upon circumstances present in every homicide without any limitation. This he claims results in indiscriminate imposition of the death penalty. (*See* Doc. No. 89 at 289.)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

Defendant also argues that section 190.3, factor (a) which allows the jury to consider the "circumstances of the crime" as an aggravating factor-is impermissibly vague. Pointing to cases in which the aggravating circumstances were arguably inconsistent (e.g., the defendant killed with a motive to rob or the defendant killed for no reason at all; the victim had children or the victim had no chance to have children), he asserts that section 190.3, factor (a) "has been used in ways so arbitrary and contradictory as to violate the federal guarantee of

due process of law."

Both the United States Supreme Court and this court have rejected this claim. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750]; *People v. Jenkins*, *supra*, 22 Cal. 4th at pp. 1050-1053.) Finding that section 190.3, factor (a) provides adequate guidance to a jury in sentencing, we have concluded that the jury in determining penalty "should" consider circumstances of the crime, but that this is "an individualized, not a comparative function." (*People v. Jenkins*, *supra*, 22 Cal. 4th at p. 1052.) As such, "[t]he ability of prosecutors in a broad range of cases to rely upon apparently contrary circumstances of crimes in various cases does not establish that a jury in a particular case acted arbitrarily and capriciously." (*Id.*, at p. 1053.) Accordingly, defendant's claim must similarly fail.

*Lewis*, 26 Cal. 4th, at 394.

The California Supreme Court's denial of these allegations was not unreasonable. Petitioner concedes the Supreme Court has upheld this factor against a facial Eighth Amendment challenge. *See Tuilaepa,* 512 U.S. at 975-76, 978, 980 (factor (a) circumstances of the crime neither vague nor otherwise improper under Eighth Amendment jurisprudence [and] not violat[ive of] the Constitution).

Still, Petitioner argues this factor is unconstitutionally vague as applied. (*See* Doc. No. 105 at 205.) He argues as examples other cases where prosecutors argued this factor in conflicting circumstances and in circumstances present in every capital case. (*See* Doc. No. 105 at 207-08, cases cited therein.)

However, the California Supreme Court reasonably rejected this allegation given the highly aggravating facts and circumstances surrounding the killing of Simms as discussed in claims 2 and 10, *ante*, and the constitutionally sufficient narrowing function under California's death penalty statute discussed in subclaims A and B, *ante*.

Additionally, Petitioner fails to demonstrate unconstitutional vagueness on the evidentiary record. The California Supreme Court reasonably could find that the jury's consideration of constitutionally sufficient evidence was not limited by instruction with the Penal Code section 190.3(a) sentencing factor.

Accordingly, the state court rejection of the subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme

Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaim F shall be denied.

**f.     Subclaim G**

Petitioner alleges the failure to require written findings on the aggravating factors relied upon by the jury in sentence selection violates his rights under the Eighth and Fourteenth Amendments. (Doc. No. 58-1 at 147; *see also* Doc. No. 89 at 289-90.)

*i.     Legal Standards*

**(1)     Written Findings**

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

*ii.     State Court Direct and Collateral Review*

Petitioner raised the claim on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 42-43), which was denied on the merits, *Lewis*, 26 Cal. 4th, at 394.

Petitioner again presented the claim in his third state habeas petition (*In re Lewis*, Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 71-72), which was summarily denied on the merits, (Doc. No. 69-2 at 1).

*iii.     Analysis*

Petitioner argues the failure to require written findings by the jury on aggravating factors relied upon at sentence selection denied him a fair and reliable sentence and meaningful appellate review.

In denying the allegation on direct appeal, the California Supreme Court stated that:

> Contrary to defendant's contentions, juries are not required to (1) make written findings regarding aggravating circumstances.... (*People v. Jenkins, supra,* 22 Cal. 4th at p. 1053, citing *People v. Arias, supra,* 13 Cal. 4th at p. 190; *People v. Marshall* (1990) 50 Cal. 3d 907, 935-936 [269 Cal. Rptr. 269, 790 P.2d 676]; *People v. Rodriguez* (1986) 42 Cal. 3d 730, 777 [230 Cal. Rptr. 667, 726 P.2d 113].)

*Lewis,* 26 Cal. 4th, at 394.

Petitioner relies upon *Brown,* 479 U.S. at 543, and *Gregg,* 428 U.S. at 195, and surmises that absent written findings the jury could have rested its decision to impose death on improper considerations. (*See* Doc. No. 58-1 at 147; Doc. No. 89 at 289-90). But neither of those cases appears to hold that a jury is required to make written findings regarding aggravating circumstances.

Moreover, the California Supreme Court "has repeatedly held that [written findings on aggravating factors] are not required." *Sanchez,* 12 Cal. 4th, at 82; accord *Harris,* 692 F.2d at 1195-96.

The California procedure provides a sufficient record for appellate review by requiring the judge to provide a written statement upholding or overturning the jury's verdict without requiring written findings by the jury on the aggravating circumstances. As noted, the California procedure was approved by the Supreme Court in *Pulley v. Harris,* where it was stated:

> If the jury finds the defendant guilty of first degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. § 190.3. "After having heard all the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole." *Ibid.* If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. § 190.4(e). The trial judge then reviews the evidence and, in light of the statutory factors, makes an "independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." *Ibid.* The judge is required to state on the record the reasons for his findings. *Ibid.* If the trial judge denies the motion for modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute does not require comparative proportionality review or otherwise describe the nature of the appeal. [Footnote omitted.] It does state that the trial judge's refusal to modify the sentence "shall be reviewed." § 190.4(e). This would seem

to include review of the evidence relied on by the judge. As the California Supreme Court has said, "the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case." *People v. Frierson*, 25 Cal. 3d 142, 179, 158 Cal. Rptr. 281, 302, 599 P.2d 587, 609 (1979)….

The jury's "discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S.Ct., at 2932. Its decision is reviewed by the trial judge and the California Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman* and our subsequent cases.

465 U.S. at 51-53.

Written findings by the jury regarding the death penalty are not required by the United States Constitution. *Walton*, 497 U.S. at 647-48, *overruled on other grounds in Ring*, 536 U.S. 584; *see also Williams*, 52 F.3d, at 1484-85. Especially so as "the United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." *Harris*, 692 F.2d at 1195.

Rather, all that is federally required is an "adequate basis for appellate review." *Id.* In California, the trial court's express reasons for its findings in ruling on the automatic motion for modification provide the "adequate basis" for appellate review. *Id.*; *see People v. Diaz*, 3 Cal. 4th 495, 571-573 (1992). Nothing further is constitutionally required, and Petitioner cannot point to any clearly established Supreme Court precedent stating otherwise. *Williams*, 52 F.3d, at 1484 (California's statute "ensures meaningful appellate review") (citing *Brown*, 479 U.S. at 543); *Bonin v. Vasquez*, 794 F. Supp. 957, 987-88 (C.D. Cal. 1992), *aff'd sub nom. Bonin v. Calderon,* 59 F.3d 815 (9th Cir. 1995).

Accordingly, the state court rejection of the subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaim G shall be denied.

**g.    Subclaim H**

Petitioner alleges that the jury's consideration of and reliance upon Penal Code section 190.3(b) "unadjudicated criminal activity" at sentence selection, here allegedly insufficient evidence relating to robberies, assaults, battery, arson, and murder, violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 58-1 at 147; *see also* Doc. No. 89 at 290.)

     *i.    Legal Standards*

     **(1)    Ambiguity and Vagueness**

See section VII, G, 2, e, i, *ante*.

     **(2)    Trial Court Error**

See section VII, C, 1, a, *ante*.

     *ii.    State Court Direct and Collateral Review*

Petitioner raised certain of these allegations on direct appeal (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 46-47), which were denied on the merits, *Lewis*, 26 Cal. 4th, at 395.

The subclaim was fully presented in Petitioner's third state habeas petition (*In re Lewis*, Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 72), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-2 at 1).

     *iii.    Analysis*

Petitioner argues that during the penalty phase, the jury was given numerous complex instructions relating to insufficient evidence of unadjudicated criminal activity, i.e., the noted robberies, assault, battery, arson, and murder by vehicular arson.  (*See, e.g.*, CT 913, 930-49; Doc. No. 89 at 290; claim 30, *ante*.)  He argues these instructions caused the jury to apply the unadjudicated criminal activity factor in an unconstitutionally vague and overbroad manner, rendering his death sentence unreliable.  (*See* Doc. No. 105 at 211.)

In denying the partially presented subclaim on direct appeal, the California Supreme Court stated:

> Defendant also asserts that the jury improperly considered defendant's unadjudicated criminal activity (purse snatchings, assaults, arson) introduced by the prosecution. He maintains the jury's use of this evidence during the penalty phase violates his right to due process and the Fifth, Sixth, Eighth, and Fourteenth Amendments, thus rendering his death sentence unreliable. He is wrong. (*People v. Jenkins, supra*, 22 Cal. 4th at p. 1054.)

*Lewis*, 26 Cal. 4th, at 395.

The California Supreme Court reasonably denied these allegations. Petitioner has not demonstrated that Supreme Court precedent bars the admission of unadjudicated criminal conduct in the sentence determination phase of a capital case. That California allows this aggravating evidence is then neither "contrary to" nor an "unreasonable application of" Supreme Court law. *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007).

The Supreme Court stated in *Gregg* that:

> The Petitioner objects, finally, to the wide scope of evidence and argument allowed at [penalty] hearings. We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the [penalty] hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

*Gregg*, 428 U.S. at 203-204.

The Supreme Court has upheld the constitutionality of California's death penalty law, including § 190.3(b), which permits evidence of prior criminal activity involving violence or threats of violence. *Ramos*, 463 U.S. at 1013; *Brown*, 479 U.S. at 543; *Tuilaepa*, 512 U.S. at 975-80. Furthermore, for the reasons discussed in claim 30, *ante*, the California Supreme Court reasonably denied substantive allegations relating to unadjudicated prior violent acts.

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable

1  determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

2  Subclaim H shall be denied.

3  **h.  Subclaim I**

4  Petitioner alleges that Penal Code section 190.3 contains certain adjectives that prevent

5  full consideration of mitigating evidence, violating his rights under the Fifth, Sixth, Eighth, and

6  Fourteenth Amendments. (Doc. No. 58-1 at 148; *see also* Doc. No. 89 at 290-91.)

7  *i.  Legal Standards*

8  **(1)  Sentencing Discretion**

9  The Constitution requires that the jury must "not be precluded from considering, as a

10  mitigating factor, any aspect of a defendant's character or record and any of the circumstances

11  of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*,

12  438 U.S. at 604.

13  The test is "whether there is a reasonable likelihood that the jury has applied the

14  challenged instruction in a way that prevents the consideration of constitutionally relevant

15  evidence." *Boyde*, 494 U.S. at 380. Further, a single instruction "may not be judged in

16  artificial isolation," but must be considered in light of the instructions as a whole and the entire

17  trial record. *McGuire*, 502 U.S. at 72.

18  If the reviewing court finds constitutional error under this test, it must additionally

19  decide whether the error had "had substantial and injurious effect or influence in determining

20  [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

21  *ii.  State Court Direct and Collateral Review*

22  Petitioner raised certain of these allegations on direct appeal (Cal. Sup. Ct. No.

23  S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 47), which were denied on the merits,

24  *Lewis*, 26 Cal. 4th, at 395.

25  The subclaim was fully presented in Petitioner's third state habeas petition (Cal. Sup.

26  Ct. No. S154015, Doc. No. 75-1 at 72-73), and was summarily denied on the merits, and

27  denied on procedural grounds (Doc. No. 69-2 at 1).

28

*iii.  Analysis*

2    Petitioner argues that the Penal Code section 190.3 list of potentially mitigating

3   sentencing factors includes such adjectives as "extreme" (*see* CALJIC No. 8.85 subpart (d)),

4   and "substantial" (*see id.* subpart (g)), which limit the jury's consideration of less than

5   "extreme" and "substantial" mitigating information.[16] (*See* Doc. No. 58-1 at 148, citing

6   *Lockett,* 438 U.S. 586; *see also* CT 875-77; Doc. No. 105 at 212.)[17] He argues the sentencing

7   factors are unconstitutionally vague and/or incapable of principled application (Doc. No. 58-1

8   citing *Maynard v. Cartwright,* 486 U.S. 356, 363 (1988)), causing his death sentence to be

9   unreliable.

10    In denying the partially presented subclaim on direct appeal, the California Supreme

11   Court stated that:

12

13    Contrary to defendant's assertions, the [u]se of the words "extreme" and
     "substantial" in section 190.3, factors (d) and (g), does not impermissibly limit
14    consideration of mitigating factors in violation of the federal Constitution.
     (*People v. Jenkins,* 22 Cal. 4th 900, 1054-1055.) The trial court is not required
15    to identify which sentencing factors are aggravating and which are mitigating.
     (*People v. Davenport* (1995) 11 Cal. 4th 1171, 1229 [47 Cal. Rptr. 2d 800, 906
16    P.2d 1068].) Moreover, the trial court here instructed that the "absence of a
     mitigating factor should not count as a factor in aggravation."

17

18   *Lewis*, 26 Cal. 4th, at 395.

19    The record suggests that the jury received multiple pertinent instructions. The jurors

20   were instructed: (i) to consider "whether or not the offense was committed while the defendant

21   was under the influence of extreme mental or emotional disturbance" (CALJIC 8.85(d); CT

22   833, 876; RT 8938); *see also* Penal Code § 190.3(d); (ii) to consider "whether or not the

23   defendant acted under extreme duress or under the substantial domination of another person"

24   (CALJIC 8.85(g); CT 833, 876; RT 8938); *see also* Penal Code § 190.3(g)); (iii) that "in

25   ───────────────
     [16] Penal Code section 190.3 provides in pertinent part that: "In determining which penalty is to be imposed on
26   defendant, you shall consider … take into account and be guided by the following factors, if applicable … (d)
     whether or not the offense was committed while the defendant was under the influence of *extreme* mental or
27   emotional disturbance … (g) whether or not the defendant acted under *extreme* duress or under the *substantial*
     domination of another person…." (Emphasis added).
     [17] The allegation based upon CALJIC 8.85(g) is not included in the amended petition; but was included in
28   Petitioner's automatic appeal. *See Lewis*, 26 Cal. 4th, at 395.

determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case . . ." (CALJIC 8.85; CT 833, 875; RT 8937); (iv) that "a mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty" (CALJIC 8.88; CT 840, 872; RT 8942); (v) they may consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial" (CALJIC 8.85(k); CT 833-34, 876-77; RT 8937-39); *see also* Penal Code § 190.3(k); and (vi) to consider the penalty phase instructions as a whole (CT 756).

Also, the jury was instructed with defense special instructions that: it may consider any mitigating facts shown by the evidence (CT 835), and the absence of a mitigating factor is not aggravating (CT 836).

The Supreme Court has reviewed these instructions on several occasions and consistently rejected claims they restrict the jury's consideration of mitigating evidence. *See, e.g., Ayers v. Belmontes*, 549 U.S. 7, 24 (2006); *Brown*, 544 U.S. at 133; *Boyde*, 494 U.S. at 370. Particularly, the Supreme Court has stated that factor (k) directed the jury to consider "any other circumstance that might excuse the crime. . . ." *Boyde*, 494 U.S. at 382.

The Ninth Circuit has rejected this allegation where, as here, the jury was advised it could consider any other mitigating matter. *See Hendricks*, 974 F.2d at 1109. Moreover, the 190.3 factors are not read in isolation. For example, factor (k) on its face allows the jury to consider non-extreme mental or emotional conditions when read in conjunction with instructions on factor (d). *See Sanchez*, 12 Cal. 4th, at 80.

The Court observes that "the factor (k) instruction is consistent with the constitutional right to present mitigating evidence in capital sentencing proceedings." *Belmontes*, 549 U.S. at 24. That instruction made it clear to the jurors that they should consider any evidence of

294

mental or emotional disturbance of any degree, if they believed there was such evidence presented.  *See id.* at 19-20 (same instructional language permitted consideration of *Belmontes*'s mitigating evidence).  Petitioner's suggestion that factor (k) allows consideration only of mitigation different in "kind" not "amount" from the other listed mitigation factors (*see* Doc. No. 105 at 213) is unpersuasive for the reasons stated and is unsupported by authority.

Petitioner has not shown that the instructions in issue here precluded the jury from considering his mitigating evidence.  *See Blystone,* 494 U.S. at 307; *Boyde,* 494 U.S. at 377; *see also McGuire*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).  His speculation that given unspecified circumstances of this case, factor (k) did not ameliorate the noted limiting language of factors (d) and (g), and his attempts to distinguish *Boyde*, *Brown*, and *Belmontes* in this regard (*see* Doc. No. 105 at 215) reasonably were rejected by the California Supreme Court, for the reasons stated.

The Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation.  The Supreme Court has stated that "a capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  *Tuilaepa*, 512 U.S. at 979.  Similarly, in *Marsh*, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and obligate sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. at 175 (quoting *Franklin*, 487 U.S. at 179) (citing *Stephens,* 462 U.S. at 875–876, n.13).

In any event, assuming arguendo the alleged deficiencies, Petitioner has not shown prejudice.  He argues the jurors would have understood the instructions as whole to exclude mitigating evidence of non-severe mental or emotional distress.  (*See* Doc. No. 89 at 291.)

However, Petitioner does not point to evidence that at the time Simms was killed, he suffered "significant mental or emotional disturbance. . . ." (*Id.*)  Nor does the evidence suggest he was under duress or domination of another during the crime.  The California Supreme Court reasonably could have rejected claimed prejudice as speculative.

For the reasons stated, the California Supreme Court reasonably found that the instructions were adequate to permit jurors to consider all the relevant mitigating evidence, *Boyde*, 494 U.S. at 381-82 (1990), and that on the facts and circumstances of this case Penal Code section 190.3(d)(g) did not limit the jurors' discretion in this regard.  *See Richter*, 562 U.S. at 101 (state court finding that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision).

If the jury found the evidence showed that Petitioner's actions were the result of mental or emotional disturbance of any degree, then CALJIC Nos. 8.85 and 8.88, and particularly factor (k) of CALJIC No. 8.85, allowed the jury to consider it.  Petitioner has not demonstrated that the Constitution requires more.  *See Buchanan v. Angelone,* 522 U.S. 269, 276 (1998) (as long as state does not preclude jury from considering any constitutionally relevant mitigating evidence, it need not "affirmatively structure in a particular way the manner in which juries consider mitigating evidence.").

Accordingly, the state court rejection of the subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Id.*

Subclaim I shall be denied.

**i.      Subclaim J**

Petitioner alleges the failure to identify which Penal Code section 190.3 sentencing factors are relevant as potential mitigators violated his rights under the Eighth and Fourteenth Amendments.  (Doc. No. 58-1 at 148-52; *see also* Doc. No. 89 at 292-94.)

*i.      Legal Standards*

**(1)**     **Sentencing Discretion**

See section VII, G, 2, h, i, *ante*.

*ii.        State Court Direct and Collateral Review*

Petitioner raised certain of these allegations on direct appeal (Cal. Sup. Ct. No.

S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 47-49), which were denied on the merits,

*Lewis*, 26 Cal. 4th, at 395.

The subclaim was fully presented in Petitioner's third state habeas petition (Cal. Sup.

Ct. No. S154015, Doc. No. 75-1 at 73-80), and was summarily denied on the merits, and

denied on procedural grounds (Doc. No. 69-2 at 1).

*iii.       Analysis*

Petitioner argues the trial court did not identify to the jury those Penal Code section

190.3 sentencing factors relevant only as potential mitigators. This, he argues allowed the jury

to aggravate based upon traits or conduct that should have mitigated. (*See* Doc. No. 58-1 at

149, citing *Stephens,* 462 U.S. at 885.) He argues the California Supreme Court has

recognized this ambiguity, but refused to require corrective instruction. (Doc. No. 58-1 at 150,

citing *People v. Davenport,* 41 Cal. 3d 247, 289 (1985); *People v. Raley*, 2 Cal. 4th 870, 919

(1992).)

Specifically, Petitioner argues that the following Penal Code section 190.3 sentencing

factors included in the trial court's penalty instruction on aggravating and mitigating

circumstances (CALJIC No. 8.85) can only be mitigating and should have been identified as

such to the jury:

(d) Whether or not the offense was committed while the defendant was under
the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal
        conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the
defendant reasonably believed to be a moral justification or extenuation for his
        conduct.

(g) Whether or not the defendant acted under extreme duress or under
substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any other instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.

(*See* Doc. No. 58-1 at 149, citing CT 875-77; *see also* RT 8937; Doc. No. 105 at 215-16.)

Particularly, Petitioner argues the "whether or not" language included in some of these instructions improperly suggests they might have aggravating value if mitigating value is unsupported. He suggests such state law ambiguity tends to artificially inflate the number of aggravating factors and lends itself to unconstitutionally arbitrary and unreliable sentences biased toward death. (*See* Doc. No. 58-1 at 151, citing *Tuilaepa,* 512 U.S. at 973 (quoting *Gregg,* 428 U.S. at 189).)

However, the Supreme Court has indicated that states need not structure their jury instructions in any particular manner as long as juries are given the opportunity to consider relevant mitigating evidence. *Tuilaepa,* 512 U.S. at 979-80 ("[S]entencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."); *Buchanan,* 522 U.S. at 276 (as long as state does not preclude jury "from giving effect to any relevant mitigating evidence," it need not "affirmatively structure in a particular way the manner in which juries consider mitigating evidence.").

"The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. 586 at 604; *Eddings*, 455 U.S. at 113-114 (adopting rule in *Lockett*). "The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* was set forth in *Boyde*. . . ." *Johnson*, 509 U.S. at 367-68. In *Boyde*, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." *Boyde*, 494 U.S. at 377 (quoting *Franklin*, 487 U.S. at 181).

In evaluating instructions to determine whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence, *Johnson*, 509 U.S. at 367 (quoting *Boyde*, 494 U.S. at 380), the reviewing court approaches the instructions with "a commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.* at 368 (quoting *Boyde*, 494 U.S. at 381). Further, a single instruction "may not be judged in artificial isolation," but must be considered in light of the instructions as a whole and the entire trial record." *McGuire*, 502 U.S. at 72.

The Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan,* 522 U.S. at 275-77. "[I]t must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." *Tuilaepa*, 512 U.S. at 974.

The Supreme Court has examined the language in California's jury instruction on mitigation multiple times and upheld it against constitutional challenges every time. *See Belmontes*, 549 U.S. at 24; *Payton*, 544 U.S. at 141, 142; *Boyde*, 494 U.S. at 382. Petitioner fails to show clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner.

The California Supreme Court considered and rejected the partially presented subclaim on direct appeal, stating that:

299

1

2          The trial court is not required to identify which sentencing factors are
           aggravating and which are mitigating. (*People v. Davenport* 11 Cal. 4th 1171,
3          1229 (1995) [47 Cal. Rptr. 2d 800, 906 P.2d 1068].) Moreover, the trial court
           here instructed that the "absence of a mitigating factor should not count as a
4          factor in aggravation."

5    *Lewis*, 26 Cal. 4th., at 395.  That court has consistently rejected this allegation.  *See, e.g.,*

6    *People v. Osband*, 13 Cal. 4th 622, 705 (1996) (noting it has "regularly rejected the contention

7    that the court must specify which factors of section 190.3 apply in mitigation and which in

8    aggravation").

9          For the reasons stated, the California Supreme Court reasonably found it clearly

10   established that a sentencing court need not identify which factors are aggravating and which

11   are mitigating.  *Pulley,* 465 U.S. at 51 and 53 n.14; *Tuilaepa*, 512 U.S. at 975-80.  It follows

12   that the failure to identify whether factors are aggravating or mitigating is not contrary to or an

13   unreasonable application of Supreme Court authority.  *Id.; see also Musladin*, 549 U.S. at 77;

14   *Sims*, 414 F.3d, at 1153.

15         The Ninth Circuit so concluded in *Williams v. Calderon, i.e.* that "the death penalty

16   statute's failure to label aggravating and mitigating factors is constitutional."  52 F.3d, at 1484-

17   1485.  The Ninth Circuit has found California's death penalty statute does not violate due

18   process by failure to label factors as aggravating or mitigating.  *Id.*

19         Furthermore, in this case the prosecutor in his closing argument told the jury that the

20   Penal Code section 190.3 factors (d) through (k), if applicable, were all mitigators.  (RT 8844-

21   45.)  Relatedly, the trial court instructed the jurors that they were permitted to consider in

22   addition to the statutory mitigation factors any other mitigating facts supported by the evidence

23   and that the absence of a mitigating factor should not count as a factor in aggravation.  (RT

24   8939.)

25         To the extent Petitioner raises only an issue of state law, his claim is not a basis for

26   habeas relief.  *McGuire*, 502 U.S. at 67.

27         Even if the alleged constitutional error did occur, Petitioner is not entitled to relief

28

                                          300

because he has not demonstrated on the record that any such error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. The jury was not precluded from considering relevant evidence pursuant to all the instructions given them. The record reasonably suggests the noted aggravating evidence substantially outweighs the total mitigating evidence. (*See, e.g.*, 2/20/91 RT 52; *see also id.*, at 34-50; CT 1011-16, 1028-29, 1033; RT 5321-26; Doc. No. 98 at 408.) The prosecution presented substantial aggravating evidence of the circumstances of Simms's killing and special circumstance found true; Petitioner's knowing involvement in the burning death of Rogers; the 1989 jailhouse assault on correctional officers and disturbance by starting a fire; Petitioner's participation in the Cardoza robbery; and Petitioner's prior felony convictions for sale of a controlled substance, receiving stolen property, and robbery. *See Lewis*, 26 Cal. 4th, at 350-51.

Accordingly, the state court rejection of the subclaim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Subclaim J shall be denied.

3.    Claim 22

Petitioner alleges that given the extraordinary delay between sentencing and execution of sentence, the death penalty as it is administered in California serves no legitimate penological purpose and causes extensive inmate suffering, violating his rights under societal norms, the Eighth and Fourteenth Amendments, and International Law. (Doc. No. 58-1 at 153-63; *see also* Doc. No. 89 at 294-97.)

Particularly so here, he argues, as the delay has been caused by "the [s]tate's action and its failure to set up reasonable review procedures that permit timely adjudication of critical constitutional claims." (Doc. No. 89 at 296.)

a.    **Legal Standards**

i.    *Cruel and Unusual Punishment*

"[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments. The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings. A punishment is 'cruel and unusual,' therefore, if it does not comport with human dignity." *Furman*, 408 U.S. at 270.

The mental suffering, demoralization, uncertainty and consequent psychological hurt inherent in the punishment must be considered in interpreting Eighth Amendment. *Id. at* 271, 272.

An execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg,* 428 U.S. at 183.

The assessment should be whether punishment is cruel and unusual in consideration of the standards of decency that mark the progress of a maturing society, or standards of decency that are more or less universally accepted. *Id.*

**b.      State Court Direct and Collateral Review**

Petitioner presented the claim in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 81-100), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-2 at 1).

**c.      Analysis**

Petitioner relies upon Justice Stephens's memorandum respecting denial of certiorari in *Lackey v. Texas* in arguing the extraordinary delay in carrying out his death sentence originally imposed on March 20, 1991 amounts to cruel and unusual punishment. 514 U.S. 1045 (1995) (suggesting that the issue whether delay in a defendant's individual case between judgment and execution constitutes an Eighth Amendment violation warrants review); *see also Jones v. Chappell*, 31 F. Supp. 3d, at 1050 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015) (finding systemic delay in the administration of California's death penalty renders any ensuing executions arbitrary and violative of the Eighth Amendment).

Petitioner argues such delay undermines social purposes underlying the death penalty, i.e., retribution and deterrence. (Doc. No. 58-1 at 161, citing *Lackey*, 514 U.S. at 1045.)

Petitioner points to human rights standards established by International Law (*see* claim 32, *post*; *Pratt & Morgan v. Attorney General for Jamaica,* 3 SLR 995, 2 AC 1, 4 All ER 769 (Privy Council 1993)) as guidance for interpreting federal and state constitutional provisions, including the Eighth Amendment. (*See* Doc. No. 58-1 at 154, citing *Thompson v. Oklahoma,* 487 U.S. 815, 830-31, 851-52. (1988).) Particularly, he argues the prohibition upon "torture or inhuman or degrading treatment or punishment" embodied in human rights jurisprudence under the European Convention on Human Rights includes a prohibition upon lengthy incarceration awaiting execution regardless of cause. (Doc. No. 58-1 at 158, citing *Soering v. United Kingdom,* 161 Eur. Ct. H.R. (ser. A), at 34 [reprinted in 11 Eur. Hum. Rts. Rep. 439].)

Petitioner notes that the European Court in *Soering*, facing a decision whether to extradite an EU national to Virginia to face capital murder charges, held that the protracted delays in carrying out death sentences in Virginia, which it averaged at six to eight years, constituted inhuman and degrading punishment in violation of Article 3 of The European Human Rights Convention Charter, a provision that "enshrines one of the fundamental values of the democratic societies making up the Council of Europe." *Soering,* 161 Eur. Ct. H.R. (ser. A) at 26.

However, the California Supreme Court's rejection of this claim was not unreasonable. Petitioner's does not cite any clearly established Supreme Court authority for the proposition that a prolonged detention is cruel and unusual punishment. *See Allen v. Ornoski*, 435 F.3d 946, 958-59 (9th Cir. 2006) ("The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment . . . Allen cannot credibly claim that there is any clearly established law, as determined by the Supreme Court, which would support this . . . claim"*); see also McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir. 1995) (casting doubt that delays caused by satisfying the Eighth Amendment can violate it); *Smith v. Mahoney*, 611 F.3d 978, 997-98 (9th Cir. 2010) (citing *McKenzie* and finding *Lackey* claim barred by *Teague v. Lane*, 489 U.S. 299, 316 (1989)); *People v. Taylor* 26 Cal. 4th 1155, 1176-77 (2001) (rejecting claim that relatively lengthy period of incarceration constitutes cruel and unusual punishment

303

on grounds such delay is necessary to permit careful appellate review).

Justice Stevens, in his memorandum respecting denial of certiorari in *Lackey*, noted that this issue needed further study. *Lackey* indicates that the issue has never been squarely addressed by the Supreme Court, nor have lower courts in the United States given the issue ample consideration. 514 U.S. at 1045. Four years later, Justice Thomas stated in concurring on a denial of certiorari that:

> I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.

*Knight v. Florida*, 528 U.S. 990 (1999); *see also Allen*, 435 F.3d, at 958-59.

Since the Supreme Court has not decided the issue, the state court's decision could not be contrary to or an unreasonable application of Supreme Court precedent. *Musladin*, 549 U.S. at 77; *Sims*, 414 F.3d, at 1153. Petitioner appears to concede as much. (*See* Doc. No. 89 at 297.)

At least one other circuit has held that the time consumed by a petitioner's direct and collateral review proceedings "is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." *Johns v. Bowersox*, 203 F.3d 538, 547 (8th Cir. 2000) (quoting *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998)).

Here, as noted *ante* and discussed in claim 32 *post*, Petitioner no longer pursues his claim to relief under International Law. In any event, the Court observes that the European Convention does not appear to prohibit the death penalty. *See Soering,* 161 Eur. Ct. H.R. (ser. A) at 40. The California Supreme Court has rejected International Law as a basis for finding unconstitutional capital punishment and the lengthy delays it can entail. *See People v. Bolden* 29 Cal. 4th 515, 567 (2002) ("[W]e are not persuaded that international law prohibits a sentence of death rendered in accordance with state and federal constitutional and statutory

requirements.").

Accordingly, the state court rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 22 shall be denied.

4.     Claim 31

Petitioner alleges the failure to require that sentencing determinations be "unanimous" and "beyond a reasonable doubt" violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, and Cal. Const., art. I, §16. (Doc. No. 58-1 at 199-211; *see also* Doc. No. 89 at 260-65.)

**a.     Legal Standards**

*i.     Sentencing Discretion and Standard of Proof*

Claims of instructional error will constitute a violation of due process under the Fourteenth Amendment only where the alleged error by itself infects the entire trial to such an extent that the resulting conviction violates due process. *Naughten,* 414 U.S. at 147; *see also DeChristoforo*, 416 U.S. at 643. Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy." *Kibbe*, 431 U.S. at 155. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.*" Winship*, 397 U.S. at 364. If the reviewing court finds constitutional error under this test, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht. Coleman*, 525 U.S. at 145-46.

**b.     State Court Direct and Collateral Review**

Petitioner raised the claim on direct appeal, (Cal. Sup. Ct. No. S020032, Doc. No. 14 at I-E Vol. Five, Arg. XVII at 39-43), which was denied on the merits, *Lewis*, 26 Cal. 4th, at 394.

Petitioner again presented the claim in his second state habeas petition (Cal. Sup. Ct.

1   No. S131322, Doc. No. 50 at 82-103), which was summarily denied on the merits, and denied

2   on procedural grounds (Doc. No. 69-1 at 1).

3       **c.    Analysis**

4       Petitioner argues that in light of the holdings of *Ring v. Arizona* and *Apprendi v. New*

5   *Jersey*, the instructions should have required the jury to unanimously and beyond a reasonable

6   doubt make the prerequisite findings that at least one aggravating factor exists and that such

7   aggravating factor(s) outweigh any and all mitigating factors and that death is the appropriate

8   punishment.[18]

9           *i.       Failure to Instruct on Burden of Proof*

10      Petitioner argues the jury should have been instructed that the prosecution must prove

11  the relative substantiality of the aggravating circumstances beyond a reasonable doubt.  He

12  argues the presence of at least one aggravating factor "is the functional equivalent of an

13  element of capital murder in California" subject to the protections of *Ring*.  (Doc. No. 89 at

14  264.)

15      He argues that such error is reversible per se because the jury was permitted to sentence

16  him to death without making the findings required by law.  (Doc. No. 89 at 205.)

17  Alternatively, he argues the error was more than harmless.  (*Id.*)

18      The record shows the jury was instructed that to impose a death sentence it must find:

19  "the aggravating circumstances are so substantial in comparison with the mitigating

20  circumstances that it warrants death instead of life without parole." (CT 872-73.)  Also, the

21  jury was also instructed that aggravating prior criminal conduct (under Penal Code section

22  190.3(b)(c)) must be proven beyond a reasonable doubt.  (*See* CT 839.)  Still, Petitioner

23  suggests the jury should have been instructed to apply the beyond a reasonable doubt standard

24  with regard to the other statutory sentencing factors in section 190.3.  (*See* Doc. No. 58-1 at

25  199.)

26

27  [18] As discussed in claim 30, *ante*, the jury was instructed that aggravating factors of prior criminal conduct must
    be proven beyond a reasonable doubt.  (*See* CT 783-84, 838-39, 875-77, 960; RT 8941.)

28

                                                306

Specifically, Petitioner argues that penalty phase findings of at least one aggravating factor and that aggravation outweighs mitigation are conditions precedent to a death sentence and must be found by the jury beyond a reasonable doubt.  He finds support for this argument in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that a state may not impose a sentence greater than that authorized by the jury's verdict unless the facts supporting an increased sentence are submitted to the jury and proved beyond a reasonable doubt), and *Ring,* 536 U.S. at 602, 609 (holding that the jury in a capital case must determine, unanimously and beyond a reasonable doubt any fact that may increase the maximum punishment).

Petitioner suggests that penalty phase findings of the presence of at least one aggravating factor and that evidence in aggravation outweighs evidence in mitigation are factual determinations necessary for imposition of the death penalty and thus serve to increase the maximum punishment.  (*See* Doc. No. 58-1 at 206, 211, citing to high court decisions out of Arizona, Colorado, Nevada, and Missouri.)

However, the California Supreme Court reasonably rejected these allegations. *Apprendi* is not implicated by California's death penalty scheme because once a California jury convicts of first degree murder with a special circumstance "the defendant stands convicted of an offense whose maximum penalty is death."  *People v. Ochoa*, 26 Cal. 4th 398, 454 (2001), *abrogated on other grounds by People v. Harris*, 43 Cal. 4th 1269, 1306, 1310 (2008); *see also People v. Prieto*, 30 Cal. 4th 226, 263 & n.14 (2003) (same).  *Ring* is inapposite for the same reasons *Apprendi* is inapplicable.

Notably, state and federal courts have rejected this allegation.  *See, e.g. Williams*, 52 F.3d, at 1485; *Carriger*, 971 F.2d at 334; *Webb*, 6 Cal. 4th, at 536; *People v. Cudjo,* 6 Cal. 4th 585, 634 (1993).

Under California law "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror."  *Samayoa*, 15 Cal. 4th, at 853.  In *Walton v. Arizona*, a plurality of the United States Supreme Court concluded that a

defendant may constitutionally be required to establish by a preponderance of the evidence the existence of mitigating circumstances. 497 U.S. at 649-651, *rev'd on other grounds by Ring*, 536 U.S. at 589. This conclusion appears to militate against a beyond a reasonable doubt standard. *See, e.g.*, *Carriger*, 971 F.2d at 334 (citing *Walton* in rejecting allegation that beyond a reasonable doubt standard applies in determining appropriateness of death sentence and absence of mitigating circumstances).

The California Supreme Court has consistently rejected Petitioner's argument because as noted above the maximum penalty for one convicted of first degree murder with a special circumstance is death, *see* Penal Code section 190.2(a); *see also Anderson*, 25 Cal. 4th, at 589, and the penalty phase findings regarding aggravating and mitigating circumstances do not increase that maximum statutory penalty. *See Prieto*, 30 Cal. 4th, at 263; *People v. Navarette* 30 Cal. 4th 458, 520-21 (2003) (noting California Supreme Court repeatedly has rejected this claim notwithstanding *Ring*).

The penalty phase findings in California are in the nature of moral and normative determinations. The Supreme Court in upholding the constitutionality of California's death penalty scheme noted that at the penalty phase, the jury merely weighs the aggravating and mitigating factors to determine whether a defendant eligible for the death penalty should be sentenced to death. *See Tuilaepa*, 512 U.S. at 972. The jury "may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."). *Id.,* at 979-80. The noted Supreme Court and Ninth Circuit case law does not support Petitioner's argument.

Here, it is again the case that "a capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa,* 512 U.S. at 979. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* (quoting *Ramos,* 463 U.S. at 1008).

Moreover, to the extent Petitioner raises only state law errors, he fails to state a basis

for federal habeas relief.  28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 67-68.  "In the absence of a federal constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law."  *Mitchell*, 878 F.2d at 324.  Petitioner was not denied a fair trial by any failure to instruct on a burden of proof at the penalty phase. *Dunckhurst*, 859 F.2d at 114.

For the reasons stated, the California Supreme Court reasonably rejected Petitioner's allegations relating to the failure to instruct on a burden of proof at the penalty phase.

### ii.        *Failure to Require Unanimity on Aggravating Factors*

Petitioner argues the jury should have been instructed that they must unanimously find particular aggravating factors as a predicate in their sentencing determination.  He argues the failure to do so created a reasonable probability the jury concluded findings of aggravating factors need not be made unanimously.  He argues that such error is reversible per se because the jury was permitted to sentence him to death without making the findings required by law. (Doc. No. 58-1 at 205.)  Alternatively, he argues the error was more than harmless.  (*Id.)*

Petitioner acknowledges the jury was instructed that unanimity was required with respect to the sentence imposed.  (*Id.*; *see also* CT 872-73.)  Still he revisits his argument that findings in aggravation serve to increase the penalty beyond the statutory maximum and therefore must be confirmed by unanimous vote of all jurors.  (*See* Doc. No. 58-1 at 205.)

However, the California Supreme Court reasonably rejected the argument.  That court has repeated rejected the contention that unanimity is required as to aggravating circumstances. *See, e.g.*, *Prieto,* 30 Cal. 4th, at 265 (*Ring* does not require jury to unanimously make such finding beyond reasonable doubt because *Ring* does not affect California's death penalty scheme); *People v. Brown*, 33 Cal. 4th 382, 402 (2004) (jury unanimity as to aggravating circumstances, including unadjudicated criminal activity involving force or violence, is not constitutionally required, *Ring* and *Apprendi* have not altered the California Supreme Court's conclusions regarding burden of proof or jury unanimity).

Petitioner fails to identify clearly established Supreme Court precedent holding that a

309

jury must unanimously find aggravating prior unadjudicated criminal activity to be true in order to consider it as a factor in aggravation during the penalty phase of a capital case. *Cf. Sharp*, 488 U.S. at 872 (Marshall J, dissenting) ("I would grant the petition to resolve the question whether the Eighth and Fourteenth Amendments preclude the introduction of evidence of unadjudicated criminal conduct at the sentencing phase of a capital case.").

As discussed above, Petitioner was not being tried for the conduct adduced at the penalty phase. Thus, the unanimity safeguard was unnecessary. Aggravating circumstances are not separate penalties, but are standards to guide the making of the moral and normative choice between death and life imprisonment. *See Raley*, 2 Cal. 4th, at 910. A factor set forth in Penal Code section 190.3 does not require a yes or no answer to a specific question, but points the sentencer to the subject matter guiding the choice between the two punishments. *Tuilaepa,* 512 U.S. at 975. Again, a jury may exercise unbridled discretion at the sentencing phase. *Ramos*, 463 U.S. at 1008 n.22 (quoting *Stephens*, 462 U.S. at 875).

*iii*    *Conclusions*

For the reasons stated, Petitioner has not demonstrated federal constitutional error arising from the jury's failure to make sentencing determinations unanimously and beyond a reasonable doubt.

Accordingly, the state court rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 31 shall be denied.

5.    Claim 32

Petitioner alleges that the violations of state and federal law asserted on direct review, in his first state habeas petition, and in this proceeding, constitute violations of international law as informed by customary international law, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the American Declaration of the

310

Rights and Duties of Man (collectively "International Law").  (Doc. No. 58-1 at 212-30.)

### a.  Legal Standards

*i.  Federal Habeas Jurisdiction*

Federal habeas relief lies for violations of the Constitution, laws, and treaties of the United States.  28 U.S.C. § 2254(a).

Federal courts may grant habeas relief to persons who are in state custody as a result of judgment rendered in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2241(c)(3).

### b.  State Court Direct and Collateral Review

Petitioner presented this claim in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 104-37), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-1 at 1).

### c.  Analysis

Petitioner argues that the claims raised on state direct and collateral review and in this proceeding amount to a denial of his right to a fair trial and due process in violation of International Law.  (Doc. No. 58-1 at 217.)  He supports this argument by pointing to provisions of International Law purportedly protecting individual rights to life, liberty and security of person, equality, and due process.  (Doc. No. 58-1 at 212-30.)

The Court observes that Petitioner, in his reply brief states his intention not to pursue claim 32.  (*See* Doc. No. 105 at 74, 107, 144 at n.52, 146, 148, 219-20.)  However, he has not notified the court the claim has been withdrawn.  Upon review, the Court finds that the California Supreme Court reasonably rejected the claim.

Petitioner fails to point to clearly established Supreme Court precedent at the time Petitioner's conviction became final on April 22, 2002 that capital punishment is illegal in this country based on International Law.  To the contrary, it appears that such challenges to imposition of the death penalty have been repeatedly rejected.  For example:

In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), the Sixth Circuit

explained that "the claim that international law completely bars this nation's use of the death penalty is unsupportable since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law." *Id., at* 443 n.12. In *Carter v. Chappell*, 2013 WL 781910, (C.D. Cal. Mar. 1, 2013), the district court noted that "[c]learly established federal law does not hold the death penalty to violate international law or the federal Constitution." Similarly, in *Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012), the district court rejected an essentially identical claim, stating that "Petitioner cannot demonstrate that any claim of a violation of international law is even cognizable on federal habeas review, given that such review is designed to address claims that a Petitioner is in custody in violation of the Constitution or laws or treaties of the United States." "International law is not United States law, and Petitioner does not demonstrate that the International Covenant of Civil and Political Rights creates a form of relief enforceable in United States courts." *Id.*

*Ervin v. Davis*, No. 00-CV-01228-LHK, 2016 WL 3253942, at *12 (N.D. Cal. June 14, 2016); *see also Buell v. Mitchell*, 274 F.3d 337, 370-76 (6th Cir. 2001) (rejecting challenge to death sentence based international laws such as the noted American Declaration, International Covenant, and customary international law norms); *Am. Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756, 770 (N.D. Cal. 1989) (treaties that are not self-executing do not provide a basis for private lawsuit absent appropriate implementing legislation); *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas Petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.").

Petitioner's claim is not cognizable to the extent it relies on the Universal Declaration of Human Rights and the American Declaration as freestanding authority, that is, to the extent these documents are used for anything other than determining a body of customary International Law which falls short of abolishing the death penalty. *See* 28 U.S.C. § 2254(a) (limiting the scope of these proceedings to alleged violations of the Constitution, laws, and treaties of the United States). The California Supreme Court reasonably could have found that the Universal Declaration of Human Rights is not a law or treaty within the meaning of 28 U.S.C. § 2254(a); it "does not of its own force impose obligations as a matter of international law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (2004); *see also Siderman de Blake v.*

1  *Argentina*, 965 F.2d 699, 719 (9th Cir. 1992) (same).

2        Similarly, the American Declaration is not a treaty.  *See, e.g., Jamison v. Collins,* 100

3  F. Supp. 2d 647, 767 (S.D. Ohio 2000).   Petitioner concedes as much (Doc. No. 58-1 at 216),

4  and that the ICCPR as ratified by the U.S. Senate expressly is not self-executing (*id.* at 217).

5  Petitioner also acknowledges that federal courts enforce treaties only if they are self-executing

6  or (if executory in nature) implemented by legislation.  (Doc. No. 58-1 at 217-220.)  Thus, to

7  the extent Petitioner relies on these documents for anything other than help defining customary

8  International Law, the California Supreme Court reasonably could view his argument as non-

9  cognizable.

10        Furthermore, as Respondent argues, Petitioner lacks standing to invoke the jurisdiction

11  of International Law.  (*See* Doc. No. 98 at 504.)  The principles of International Law apply to

12  disputes between sovereign governments and not between individuals.  *Hanoch Tel-Oren v.*

13  *Libyan Arab Republic*, 517 F. Supp. 542, 545-47 (D.D.C. 1981).  It is only when a treaty is

14  self-executing, that is, when it prescribes rules by which private rights may be determined, that

15  it may be relied on for the enforcement of such rights.  *Dreyfus v. Von Finck*, 534 F.2d 24, 30

16  (2d Cir. 1976) (*disavowed on other grounds by Filaratiga v. Pena-Irala*, 630 F.2d 876, 884-85

17  (2d Cir. 1980)).

18        In determining whether a treaty is self-executing, courts look to the following factors:

19  (i) the language and purpose of the agreement as a whole, (ii) the circumstances surrounding its

20  execution, (iii) the nature of the obligations imposed by the agreement, (iv) the availability and

21  feasibility of alternative enforcement mechanisms, (v) the implications of permitting a private

22  right of action, and (vi) the capability of the judiciary to resolve the dispute.  *Frolova v. Union*

23  *of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985); *see also People of Saipan v.*

24  *United States Dept. of Interior*, 502 F.2d 90, 97 (9th Cir. 1974) ("The extent to which an

25  international agreement establishes affirmative and judicially enforceable obligations without

26  implementing legislation must be determined in each case by reference to many contextual

27  factors: the purposes of the treaty and the objectives of its creators, the existence of domestic

28

1  procedures and institutions appropriate for direct implementation, the availability and

2  feasibility of alternative enforcement methods, and the immediate and long-range social

3  consequences of self- or non-self-execution.").

4      For the reasons stated, the California Supreme Court reasonably could have found

5  unpersuasive Petitioner's inferential argument in support of his assertion that the treaties upon

6  which he relies are self-executing.  (*See* Doc. No. 58-1 at 213-30); 28 U.S.C. § 2254(a);

7  *Medellin*, 544 U.S. at 664; *Hill*, 368 U.S. at 428; *Rodriguez Benitez*, 495 F.3d at 643; *see also*

8  *Sosa*, 542 U.S. at 734-35; *Jamison*, 100 F. Supp. 2d at 766 (International Covenant on Civil

9  and Political Rights is not self-executing); *People v. Ghent*, 43 Cal. 3d 739, 778-79 (1987)

10  (United Nations charter does not supersede domestic legislation); *Brown*, 33 Cal. 4th, at 404

11  ("International law does not prohibit a sentence of death rendered in accordance with state and

12  federal constitutional and statutory requirements. [Citations.]").

13      Furthermore, even if the ICCPR were viewed as self-executing, Petitioner

14  acknowledges its provisions do not prohibit the death penalty, but rather merely limit its

15  application (Doc. No. 58-1 at 224) including as to arbitrary deprivation of life (*id.* at 226) and

16  execution of the severely mentally ill (*id.* at 227).

17      Finally, to the extent Petitioner supports alleged International Law violations with the

18  claims stated in this proceeding, those claims all fail for the reasons stated *ante* and *post*.

19      Accordingly, the state court rejection of the claim was not contrary to, or an

20  unreasonable application of, clearly established federal law, as determined by the Supreme

21  Court.  28 U.S.C. § 2254(d).  Nor was the state court's ruling based on an unreasonable

22  determination of the facts in light of the evidence presented in the state court proceeding.  *Id.*

23      Claim 32 shall be denied.

24      **H.      Claims Relating to Cumulative Error**

25      1.      Claim 19

26      Petitioner alleges that counsel was ineffective based upon the cumulative effect of

27  penalty phase errors, violating his rights under the Fifth, Sixth, Eighth and Fourteenth

28

Amendments.  (Doc. No. 58-1 at 127-130.)

**a.      Legal Standards**

*i.        Ineffective Assistance of Counsel*

See section VII D 1, *ante*.

*ii.       Cumulative Error*

The Ninth Circuit has stated "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *DeChristoforo*, 416 U.S. at 643).  In the Ninth Circuit, the cumulative effect of trial errors can be a basis for habeas relief in certain circumstances.

Although individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal. *Necoechea*, 986 F.2d at 1282.  However, the fact that errors have been committed during a trial does not mean that reversal is required.  "While a defendant is entitled to a fair trial, [she] is not entitled to a perfect trial, for there are no perfect trials." *United States v. Payne*, 944 F.2d 1458, 1477 (9th Cir. 1991); *see also Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003) ("[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

Errors of state law, such as whether instructions were correct under state law, are not cognizable in federal habeas, *McGuire*, 502 U.S. at 71-72, and therefore should play no part in cumulative error analysis.  *See Parle,* 387 F.3d, at 1045 (citing *Jeffers*, 497 U.S. at 780) (no habeas relief for state law errors whose combined effect does not violate the federal constitution).

**b.      State Court Direct and Collateral Review**

Petitioner presented this claim in his first state habeas petition (Cal. Sup. Ct. No. S083842, Doc. No. 14 at II-K Vol. II, Claim 14 at 116-22), which was summarily denied on

the merits (Doc. No. 14 at II-P at 1).

      **c.**    **Analysis**

Petitioner revisits allegations discussed in claims 14-18, *ante*, that counsel failed to investigate, develop and present penalty phase evidence of: (i) the Rogers murder adjudication and confession, (ii) Petitioner's family and personal history, and (iii) Petitioner's substance abuse and mental state and impairments. He argues that had the jury considered the totality of the mitigating evidence there is a reasonable probability the outcome would have been different. *Strickland*, 466 U.S. at 695. He argues that counsel's errors may be considered cumulatively in determining whether to grant habeas relief. *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (habeas relief granted based upon errors including by counsel considered cumulatively).

Apart from arguing *Strickland* error, Petitioner has not demonstrated and does not appear to argue clearly established Supreme Court precedent that cumulative error is a basis upon which habeas relief may be granted. (*See* Doc. No. 105 at 139.)

Moreover, the California Supreme Court was not unreasonable in rejecting the claim for the reasons stated in claims 14-18, *ante*. A fair-minded jurist could find that Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-694.

There is no need to reach and employ cumulative error analysis because review has detected no error. *See United States v. Karterman*, 60 F.3d 576, 580 (9th Cir. 1995) ("Because each error is, at best, marginal, we cannot conclude that their cumulative effect was 'so prejudicial' to [defendant] that reversal is warranted.").

Accordingly, the state court rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim 19 shall be denied.

2        Claims 23 And 33

Petitioner alleges the cumulative impact of errors during the guilt phase, penalty phase, and post-conviction proceedings violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and International Law.  (Doc. No. 58-1 at 164, 231; *see also* Doc. No. 89 at 298-99.)

a.        **Legal Standards**

i.        *Cumulative Error*

 See section VII, H, 1, a, ii, *ante*.

b.        **State Court Direct and Collateral Review**

Petitioner presented claim 23 in his third state habeas petition (Cal. Sup. Ct. No. S154015, Doc. No. 75-1 at 101-102), which was summarily denied on the merits, and denied on procedural grounds (Doc. No. 69-2 at 1).

Petitioner presented claim 33 in his second state habeas petition (Cal. Sup. Ct. No. S131322, Doc. No. 50 at 138), which was summarily denied on the merits (Doc. No. 69-1 at 1).

c.        **Analysis**

Petitioner alleges the cumulative effect of errors during the guilt and penalty phases and post-conviction proceedings caused an unfair trial, conviction and sentence, denying him due process.   Especially so, he argues, given the heightened reliability required in capital proceedings.  (*See* Doc. No. 58-1 at 164, citing *Kyles*, 514 U.S. at 422, quoting *Burger,* 483 U.S. at 785) ("[O]ur duty to search for constitutional error with painstaking care is never more exacting then it is in a capital case.")

However, the California Supreme Court reasonably found that Petitioner fails to show the cumulative effect of alleged errors deprived him of due process.   There were no constitutional errors for all the reasons discussed above. (*See, e.g.*, *Parle*, 505 F.3d, at 927-28 (cumulative error warrants habeas relief only where the errors have "so infected the trial with

unfairness as to make the resulting conviction a denial of due process.") There is nothing to accumulate to a level of reversible error. Petitioner was "entitled to a fair trial but not a perfect one, "for there are no perfect trials." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (quoting *Brown v. United States*, 411 U.S. 223, 231-232 (1973)).

Even if errors could be discerned, to whatever extent Petitioner has demonstrated any, he has failed to demonstrate their combined effect was prejudicial by rendering his defense "far less persuasive" so as to exert a "substantial and injurious effect or influence" on the verdict. *Parle*, 505 F.3d, at 928 (citing *Chambers*, 410 U.S. at 294, and *Brecht*, 507 U.S. at 637).

For the same reasons, the California Supreme Court reasonably found that Petitioner's appellate counsel was not ineffective by failing to raise these claims on appeal.

Accordingly, the state court rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claims 23 and 33 shall be denied.

## VIII. MOTION FOR EVIDENTIARY HEARING

On February 12, 2013, Petitioner filed a motion seeking an evidentiary hearing on claims 1, 3, 12, 14, 15, 16, 17, 18, 19, 24, 26, 27, and 29. (Doc. No. 109.)[19]

Petitioner argues the California Supreme Court denied him factual development and hearing to resolve disputed facts notwithstanding his alleged diligence and presentation of colorable claims. (*See, e.g.*, Doc. No. 105 at 89-90, citing *Williams,* 529 U.S. at 437.)

Respondent filed his opposition on June 12, 2013, arguing that an evidentiary hearing is not warranted because the claims lack merit; there is no sufficient offer of proof; and the new evidence presented by Petitioner does not cast doubt on the California Supreme Court's finding that Petitioner failed to set forth facts which constitute a constitutionally cognizable claim.

---

[19] Petitioner equivocally requests an evidentiary hearing on claims 2, 6, 7, 8, 10, 11, 13, 20, 21, 25, 28, 30 and 31, but absent any argument in support, the Court does not consider the request which in any event lacks merits for the reasons stated in this section VIII. (*See* Doc. No. 109 at 7.)

(*See* Doc. No. 129.)  Respondent also asserts procedural and *Teague* bars to certain claims, and argues that claim 20 is not ripe.  (*Id.* citing *Teague,* 489 U.S. at 310.)

Petitioner filed a reply on September 24, 2013, revisiting controlling law, his § 2254(e) diligence, and essentially re-arguing his position on the motion and discounting procedural and *Teague* defenses.  (Doc. No. 137.)

## A.    Legal Standards

Section 2254(d), as amended by AEDPA, provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A federal court reviewing a habeas claim that was adjudicated on the merits in state court must conclude that the state court decision was contrary to clearly established federal law, an unreasonable application of clearly established federal law, or based upon an unreasonable determination of the facts before relief can be granted.  28 U.S.C. § 2254(d); *accord Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).  The federal court is limited to the evidence presented in state court when it assesses whether 28 U.S.C. § 2254(d) bars a claim. *Pinholster*, 563 U.S. at 185.

Accordingly, as to the merits of a claim, an evidentiary hearing is unnecessary if § 2254(d) is a bar to relief.  However, if § 2254(d) is not a bar, the federal court must review the substantive issues and assess evidence challenging the constitutionality of the conviction and sentence.  *Panetti*, 551 U.S. at 953-954 (inadequate state court fact-finding where § 2254(d) satisfied); *Godoy v. Spearman*, 861 F.3d 956, 966 (9th Cir. 2017) (same); *see also Frantz*, 533 F.3d, at 737 (same).  This review contemplates factual development and an evidentiary hearing

to the extent necessary to resolve the constitutional claim.

Also, a petitioner requesting an evidentiary hearing must "show that he has not failed to develop the factual basis of the claim in the state courts [pursuant to 28 U.S.C. § 2254(e)(2)] . . . [and] meet one of the *Townsend* factors and make colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief." *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005); *see also Pinholster*, 563 U.S. at 185-186 (noting that § 2254(e)(2) still applies even after § 2254(d) is satisfied). That is, once the statutory provisions of 28 U.S.C. § 2254(d) and § 2254(e) have been satisfied, the entitlement for an evidentiary hearing in a habeas case turns on two things: first, whether there was an opportunity to develop the facts in state court, and, second, whether the petitioner has pled a colorable claim entitling him to relief. *Lambright v. Stewart*, 241 F.3d 1201, 1206 (9th Cir. 2001).

A petitioner's allegations need not be completely persuasive, but must state a colorable claim. *Insyxiengmay*, 403 F.3d, at 671; *see also Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004) (petitioner entitled to evidentiary hearing upon raising colorable claim of ineffective assistance).

In determining whether to hold an evidentiary hearing, "the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under [habeas] Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8 of the Rules Governing Section 2254 Cases ("Rule 8").

**B.      Analysis**

Petitioner's request for an evidentiary hearing on the noted claims shall be denied.

As stated, the Supreme Court in *Pinholster* held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Pinholster*, 563 U.S. at 181. Although the central holding of *Pinholster* pertained to § 2254(d)(1), the Supreme Court observed that § 2254(d)(2) includes the language "in light of the evidence presented in the State court proceeding," providing "additional clarity" that

review under § 2254(d)(2) is also limited to the record before the state court. *Id.* at 185 n.7. Therefore, for claims that were adjudicated on the merits in state court, Petitioner can rely only on the record that was before the state court to satisfy the requirements of § 2254(d). *See Landrigan,* 550 U.S. at 474.

All thirteen of the claims for which evidentiary hearing is requested were adjudicated on the merits in the state court. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Petitioner's reliance upon *Winston v. Pearson*, 683 F.3d 489 (4th Cir. 2012), for the proposition that summarily denied claims must be reviewed de novo (*see* Doc. No. 105 at 80) is misplaced. The Fourth Circuit in *Winston* considered de novo the issue of § 2254(e)(1) deference to state court factual determinations and found such deference inappropriate where the state court failed to adjudicate an ineffective assistance claim by refusing discovery and evidentiary hearing of new material evidence. *Winston*, 683 F.3d, at 506.

Here, Petitioner's claims were adjudicated on the merits in state court. He has not passed through the § 2254(d) gateway. He is not entitled to de novo review. Moreover, he has not shown that he was denied state court discovery of new material evidence as was the case in *Winston*. He supports his request for evidentiary hearing by citing only to his first and second state habeas petitions and proffer thereunder, and the California Supreme Court's failure to issue an order to show cause in either case. (Doc. No. 109 at 13 n.5.)

For the reasons stated, Petitioner fails to demonstrate that any of these thirteen claims overcomes the limitation of § 2254(d). Thus, *Pinholster* effectively bars a habeas court from any further factual development of these claims at evidentiary hearing. 563 U.S. at 203 n.20.

To the extent Petitioner further claims that he is entitled to a hearing under 28 U.S.C. § 2254(e)(2), *Pinholster* suggests this is not so. "Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief." *Id.* at 185. Analysis of the claims

under § 2254(d) must precede the granting of an evidentiary hearing under § 2254(e)(2). *Id.* at 184. Thus, only if Petitioner overcomes § 2254(d) can the Court consider a hearing under § 2254(e)(2). As Justice Breyer stated: "If the federal habeas court finds that the state-court decision fails [§ 2254](d)'s test (or if [§ 2254](d) does not apply), then an [§ 2254](e) hearing may be needed." *Id.* at 205 (Breyer, J., concurring in part and dissenting in part).

As discussed above, § 2254(d) applies to all thirteen claims adjudicated on the merits. For the reasons stated, Petitioner fails to overcome § 2254(d) with respect to any of these claims.

Petitioner's motion for evidentiary hearing shall be denied.

## IX. MOTION TO EXPAND THE RECORD

On February 12, 2013, Petitioner filed a motion to expand the record (Doc. No. 115) to include Exhibits 1 through 26 attached to the motion for evidentiary hearing (*see* Doc. Nos. 109-114), and Exhibits 100 through 117 attached to the motion to expand the record (*see* Doc. Nos. 115-120).[20] He argues that these materials not contained in the record are relevant to a merits determination and that he diligently sought but was denied evidentiary development and hearing in state court. (*See* Doc. No. 115 at 2.)

Petitioner argues that Exhibits 1-26, consisting of testimony, declarations, records, documents, legal standards and commentary, news articles, and other evidence generally support his claims and allegations. (*See* Doc. No. 115 at 3.) He argues that Exhibits 100-117, consisting of testimony, documents, declarations, statistical surveys, and other evidence presented in the separate case of *Ashmus v. Ayers*, No. 3:93-cv-0594-TEH (N.D. Cal.), particularly support his instant claim 21 (alleging California's death penalty scheme is unconstitutional). (*See id.* at 3-5.)

Respondent filed his opposition to record expansion on June 12, 2013. (Doc. No. 130.) He argues that expansion of the record should be denied because these exhibits were not

---

[20] The Court observes the motion for evidentiary hearing also requests expansion of the record to include evidence presented in *Ashmus v. Ayers*, No. 3:93-cv-0594-TEH (N.D. Cal.), included with the motion to expand the record. (*See* Doc. No. 109 at 31.)

presented to the state court and Petitioner has not shown an exception under § 2254(d). He argues that there is no sufficient offer of proof, i.e., that the newly proffered evidence presented by Petitioner in this proceeding does not cast doubt on the California Supreme Court's finding that Petitioner failed to set forth facts which constitute a constitutionally cognizable claim. (*See* Doc. No. 130 at 9-10); *see also Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (conditions of § 2254(e)(2) generally apply to Petitioners seeking relief based on new evidence).

Respondent also argues that Petitioner was not diligent in presenting this information to the state court. 28 U.S.C. § 2254(e)(2); *see Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241-42 (9th Cir. 2005) (*overruled on other grounds by Daire v. Lattimore*, 812 F.3d 766, 768 (9th Cir. 2016)) (district court properly declined to expand record where prisoner knew of existence of information in affidavit at time of state court proceedings but did not diligently present it, nor argue that new retroactive rule of constitutional law applied; thus, he failed to make required showing under § 2254(e)(2)).

Petitioner filed a reply on September 24, 2013, revisiting controlling law, his § 2254(e)(2) diligence, and essentially re-arguing his position on the motion. (Doc. No. 138.)

## A. Legal Standards

A petitioner who seeks to expand the record without a hearing must meet the same requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. § 2254(e)(2). *See* section VIII A, *ante*; *see also Jackson,* 542 U.S. at 653 (finding that the restrictions of § 2254(e)(2) "apply *a fortiori* when a prisoner seeks relief based on new evidence without an evidentiary hearing"); *Landrigan,* 550 U.S. at 474 (district court not required to hold evidentiary hearing where state record refutes Petitioner's allegations); *Colegrove v. Hoshino*, No. 13-CV-00096-BLF, 2014 WL 4421393, at *2 (N.D. Cal. Sept. 5, 2014) (petitioner who seeks to expand the record without a hearing must meet the same requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. § 2254(e)(2)).

1    "The judge may direct the parties to expand the record by submitting additional

2    materials relating to the petition . . . The materials that may be required include letters

3    predating the filing of the petition, documents, exhibits, and answers under oath to written

4    interrogatories propounded by the judge . . . The judge must give the party against whom the

5    additional materials are offered an opportunity to admit or deny their correctness." Rule 7 of

6    the Rules Governing Section 2254 Cases ("Rule 7").

7            **B.    Analysis**

8            Petitioner's motion for expansion of the record to include the noted Exhibits 1 through

9    26 and 100 through 117 shall be denied.

10           As was the case with Petitioner's request for evidentiary hearing, the limitations upon §

11   2254(d) review set out in *Pinholster* require that as to claims adjudicated on the merits, he can

12   only rely upon the record that was before the state court.  563 U.S. at 181, 185.

13           Accordingly, where a state court denies the claim on the merits, an expanded record

14   cannot be considered in determining whether the state court's decision was objectively

15   unreasonable.  *See Rogovich v. Ryan*, 694 F.3d 1094, 1096-97 (9th Cir. 2012) (citing

16   *Pinholster,* 563 U.S. at 180).

17           Petitioner's motion for expansion of the record shall be denied.

18                            **X. MOTION FOR DISCOVERY**

19           On February 12, 2013, Petitioner filed a motion for discovery (Doc. No. 121) seeking

20   evidence from state and local law enforcement and the Fresno County Superior Court relating

21   to claims 1, 3, 12, 14, 15, 16, 17, 18, 24, 25, 26, 27, 28, and 29 (regarding Petitioner's role in

22   the murder of Simms including: (i) forensic evidence, (ii) alleged jury misconduct, (iii)

23   whether witness Pridgon was competent and unbiased, (iv) whether counsel was conflicted,

24   and (v) whether counsel was ineffective regarding the prior homicide of Rogers and alleged

25   plea offers in Petitioner's capital proceeding).  (*See* Doc. No. 121 at 10-25.)

26           Petitioner seeks the discovery from multiple sources.  He seeks to depose with issuance

27   of a subpoena duces tecum: (i) prosecuting deputy district attorney Dennis Cooper, (ii) former

28

                                         324

deputy district attorney James Oppliger who was contemporaneously prosecuting witness Randolph in a separate proceeding, and (iii) former Fresno County Sheriff's investigator Pete Chavez. (*See id.* at 16-19.)

Petitioner seeks to depose: (i) witness Paul Pridgon, (ii) jury foreperson Paul W., and (iii) juror Sally B. (*See id.* at 19-20.)

Petitioner seeks production of the following materials to the extent not previously produced: (i) district attorney files relating to Petitioner and Rogers and Pridgon, (ii) state agency files relating to misconduct allegations against prosecuting deputy district attorney Cooper, (iii) state and county files relating to Rogers, (iv) state bar records of counsel Noxon, (v) state prison and Fresno County jail records of Petitioner and Randolph, (vi) personnel records of Fresno County Juvenile Division investigator Thomas Lean relating to Petitioner, (vii) personnel records of Fresno County Sheriff's homicide detective Arthur Christensen relating to Petitioner, (viii) personnel records of Fresno County District Attorney investigator William Martin relating to Petitioner, and (ix) prosecution physical evidence for inspection and testing, or memorialization thereof if the evidence no longer available. (*See id.* at 20-25.)

Petitioner argues good cause for the discovery based upon colorable claims satisfying § 2254(d) and the state court's failure to allow for factual development, and its failure to make factual determinations likely to support the claims. (*See id.* at 6-25.)

Respondent filed his opposition on June 12, 2013, arguing that Petitioner fails to show good cause for discovery. (Doc. No. 131.) He argues discovery is not warranted because the proffer in support was not presented to the state court and Petitioner has not shown an exception under § 2254(d). (*See* Doc. No. 131 at 9, 11; *see also Pinholster*, 563 U.S. at 181; *Ryan v. Gonzales*, 568 U.S. 57, 68-69 (2013); *Wood v. Ryan*, 693 F.3d 1104, 1122 (9th Cir. 2012). He argues a portion of the supporting proffer cannot be considered because Petitioner failed to develop such new evidence in state court. (*See* Doc. No. 131 at 15-17; *see also* § 2254(e).) He argues Petitioner improperly seeks production from non-parties. (*See id.* at 9-10, 29-30, citing Fed. R. Civ. P. 34.)

Petitioner filed a reply on September 24, 2013, revisiting controlling law, his § 2254(e) diligence, and essentially re-arguing his position on the motion.  (Doc. No. 139; *see id. at* 5-19.)  He agrees to seek any necessary (Fed. R. Civ. P. 45) subpoena regarding discovery from non-parties.  (*Id.*)

### A.    Legal Standards

A petitioner who seeks "review under [§] 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181; *accord Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011).

Availability of discovery during habeas is vested in the sound discretion of the district court.  *Campbell v. Blodgett*, 982 F.2d 1356, 1358, (9th Cir. 1993).  A judge may authorize or limit discovery upon a showing of the reasons for the request and good cause pursuant to Rule 6 of the Rules Governing Section 2254 Cases ("Rule 6"), which in pertinent part provides:

> A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery....
>
> A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents....

### B.    Analysis

Petitioner's motion for discovery shall be denied.  As noted, a federal court is limited to the evidence presented in state court when it assesses whether 28 U.S.C. § 2254(d) bars a claim.  *Pinholster*, 563 U.S. at 185.  The parties seem to agree that *Pinholster* does not expressly refer to habeas discovery.  (*See* Doc. No. 121 at 9; Doc. No. 131 at 12.)

However, the Ninth Circuit has acknowledged that *Pinholter* impacts discovery, albeit that court did so with little analysis.  *See Runningeagle v. Ryan*, 686 F.3d 758, 773-74 (9th Cir. 2012) (petitioner not entitled to an evidentiary hearing or additional discovery in federal court because his claim is governed by 28 U.S.C. § 2254(d)(1)).

Notably, the good cause standard set forth by Rule 6 is similar to the standard that governs whether or not a habeas Petitioner is entitled to an evidentiary hearing: "[I]n deciding

whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474.

Here, for the reasons stated *ante*, Petitioner has not demonstrated entitlement to an evidentiary hearing. *Cf. Jones*, 114 F.3d, at 1008-09 (where petitioner in pre-AEDPA case satisfied the standard for obtaining an evidentiary hearing on certain claims, district court abused its discretion by denying a discovery request pertaining to such claims).

This Court has relied upon *Pinholster* to limit discovery in connection with petitions for habeas relief. *See, e.g., Coddington v. Cullen,* No. CIV S-01-1290 KJM 2011 WL 2118855, at **1-3 (E.D. Cal. May 27, 2011) (*Pinholster* limits discovery in federal habeas cases because no good cause to allow discovery whose fruits cannot be considered on § 2254(d) review); *Sok v. Substance Abuse Treatment Facility,* No. 1:11-CV-00284-JLT HC, 2011 WL 1930408, at *2 (E.D. Cal. May 19, 2011) (finding no basis to permit discovery because, "pursuant to *Pinholster*," the court was "limited to reviewing only the record that was before the state courts"); *cf. Ervin v. Cullen,* No. C 00–01228 CW, 2011 WL 4005389, at *4 (N.D. Cal. Sept. 8, 2011) (finding the heightened need for discovery in capital cases justified discovery despite *Pinholster*).

The Court finds the instant discovery motion relates to factual development of claims that were adjudicated on the merits in the state court. These claims do not survive § 2254(d) analysis for reasons stated, *ante*. Petitioner fails to show good cause for the discovery sought because he has not demonstrated that factual development would allow him to demonstrate entitlement to relief upon § 2254(d) review. *Cf.*, *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997) ("[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.").

For the reasons stated, Petitioner's motion for discovery shall be denied.

# XI. CERTIFICATE OF APPEALABILITY

Because this is a final order adverse to the Petitioner, Rule 11 of the Rules Governing Section 2254 Cases ("Rule 11") requires this Court to issue or deny a Certificate of Appealability ("COA"). Accordingly, the Court has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *Miller-El*, 537 U.S. at 335–36 (2003). The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Court may issue a COA only "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence

of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that, with respect to the following claims, reasonable jurists could disagree with the Court's resolution or conclude that the issues presented are adequate to deserve encouragement to proceed further:

1)      Claims 14, 15, 16, 17, and 18.

Therefore, a COA is granted as to these five claims.

As to the remaining claims and motions, the Court concludes that reasonable jurists would not find the Court's determination that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed further.

Accordingly, the Court hereby declines to issue a COA as to the remaining claims and motions for evidentiary hearing, expansion of the record, and discovery.

## XII. ORDER

Accordingly, for the reasons stated:

1.      The first amended petition for writ of habeas corpus (Doc. No. 58-1) is DENIED, claims 1-19, 21-33 are denied on the merits, claim 20 is denied without prejudice as premature,

2.      Petitioner's motions for evidentiary hearing (Doc. No. 109), record expansion (Doc. No. 115), and discovery (Doc. No. 121), are DENIED,

3.      A Certificate of Appealability is ISSUED as to the Court's resolution of claims 14, 15, 16, 17, and 18, and DECLINED as to the remaining claims and requests for evidentiary hearing, expansion of the record, and discovery,

4.      Any and all scheduled dates are VACATED, and

///

///

///

///

///

1    5.    The Clerk of the Court is directed to substitute RON DAVIS, Warden of San

2         Quentin State Prison, as the Respondent warden in this action, and to enter

3         judgment accordingly.

4

5    IT IS SO ORDERED.

6    Dated:  __August 20, 2018__                    _____/s/ Lawrence J. O'Neill_____
                                                    UNITED STATES CHIEF DISTRICT JUDGE
7